UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

              Plaintiff,

     - against -

HERIBERTO MARTINEZ,

              Defendant.

------------------------------------------------------------X

**MEMORANDUM OF
<u>DECISION AND ORDER</u>**

<u>CRIM-10-074</u> (JFB)

**A P P E A R A N C E S:**

**LORETTA E. LYNCH,**
United States Attorney
Eastern District of New York
610 Federal Plaza
Central Islip, NY 11722
By:    John J. Durham, Assistant U.S. Attorney
          Raymond Tierney, Assistant U.S. Attorney

**ELIZABETH E. MACEDONIO, ESQ.**
Attorney for the Defendant
42-40 Bell Boulevard
Bayside, NY 11361

**SPATT, District Judge.**

       This is a suppression hearing.  The attorney for the defendant Heriberto Martinez

(the "defendant" or "Martinez") moved to suppress the statements made by the defendant

to law enforcement officers in four separate jurisdictions.  The statements were made in

separate interrogations by (1) the New York City Police Department – two sets of

statements; (2) the Nassau County Police Department; (3) the Suffolk County Police

1

Department; and (4) the Federal Bureau of Investigation.

For the reasons set forth below, the motions to suppress the statements made by Heriberto Martinez to the four law enforcement agencies are all denied.  However, the Government has agreed to restrict its use with regard to a portion of the statement obtained by the Federal Bureau of Investigation.

## I.  THE HEARING

### A.  The First New York City Police Department Statement

Detective Benjamin Cintron of the New York City Police Department is with Brooklyn North Night Watch and responds to major cases in late hours.  He has spoken  Spanish since his youth.  His parents are Spanish and he was raised reading, writing and speaking Spanish.  As a police officer he has conducted interviews and taken statements in Spanish "close to maybe a hundred" times.  (Tr. at 9)[*].

On March 17, 2010, at approximately 7:20 am, Detective Cintron came in contact with the defendant.  In Spanish, he introduced himself to the defendant and advised him of his rights.  The defendant acknowledged that he understood his rights by initialing the rights form.  A copy of the Miranda warning and rights card with regard to the rights given to the defendant by Detective Cintron in Spanish is in evidence as Government Exhibit 4.  The Miranda warning card contains the date, the detective's name and is signed by both the detective and the defendant.

Detective Cintron read each right "out loud" to the defendant.  Next to each right is the word "si" and the defendant's initials.  These rights read to the defendant in Spanish

---

[*]Tr. Refers to the Hearing Transcript.

and signed off by him included, "the right to remain silent and not answer any questions." The second right read to the defendant was question two, namely, "Anything you say can be used against you in a court of law." Again, the defendant wrote in "si". Then the Detective read right number three, namely, "You have the right to remain silent before speaking to the police and have an attorney present during any investigation now or in the future. Do you understand?" Again, the defendant wrote "si" and placed his initials next to the question. The fourth right was then read to the defendant, namely, "If you do not have money to pay for an attorney, one will be given to you free of charge. Do you understand?" And again the defendant indicated he did understand, and wrote "si" and his initials next to the fourth advice right.

Then Detective Cintron read the defendant the final advice of rights in Spanish, namely, "Now that I have advised you of your rights, do you want to answer any questions, yes or no." The defendant responded, "okay", wrote "si" and his initials next to that final right recitation. Then the defendant signed the bottom of the Advice of Rights card with his full signature. The Detective also signed the bottom of the Advice of Rights card and dated the card.

After Detective Cintron advised the defendant of all of his rights in Spanish, and the defendant initialed and signed the "Advice of Rights" card, the detective conducted an interview of the defendant in a room in the 101 Precinct. Detective Cintron asked the defendant about what he knew about a homicide at the beach in the 101 Precinct. Detective Cintron asked the defendant if he would provide a Witness Statement with regard to that homicide and the defendant agreed to do so. Detective Cintron then obtained a legal notepad and a pen and gave it to the defendant and asked him to write

out his statement as to the homicide.  The defendant then wrote a statement in Spanish, and signed and dated the statement, which was admitted in evidence as Government Exhibit 5.  This statement was in the defendant's own handwriting.  The statement is dated March 17, 2010 at 9:30 am.  Detective Cintron translated the Martinez statement into English, in evidence as Government Exhibit 5A.

Detective Cintron also testified that during his conversation with the defendant he was not handcuffed; he did not appear overly drowsy; he did not appear impaired by alcohol or drugs; and he did not appear to have any difficulty understanding the detective. Also, Detective Cintron testified that he did not threaten or physically assault the defendant.  Also, of importance, Detective Cintron testified that at no time while he was with the defendant did he ask to speak to an attorney.

On cross-examination, it was brought out that the detective's parents also spoke English at home, even though he speaks Spanish regularly, both at home and at work. Also, Detective Cintron is not a registered Spanish interpreter.  Detective Cintron arrived at the 101 Precinct at 4:20 am; first saw the defendant at 7:20 am; and finished the interview at 9:30 am.  He was told that there was a homicide, someone had been cut and that there was a vehicle involved.  Detective Vilani signed the defendant's statement as a witness.  However, in the interview, he was alone with the defendant.  In his statement the defendant said that he got off work at 9:00 pm and was drinking beer that night.

## B.  The Second New York City Police Department Statement

Oscar Ferrufino is a corporate security officer for the Consolidated Edison Company.  He formerly was a Detective/Sergeant in the New York City Police Department,

Queens County Homicide Squad. Ferrufino speaks English and Spanish. He was born in Bolivia, South America, and his primary language is Spanish. He took classes in high school and college in Spanish. In his career in the New York City Police Department he interviewed victims, witnesses and defendants in Spanish and he advised defendants of their <u>Miranda</u> rights in Spanish.

On March 17, 2010, he was involved in investigating the murder of Mario Quijada. On that date, he was working a 0800 to 1600 tour. After he reported to his office in the Queens Homicide Office, he was instructed to respond to a murder crime scene in Far Rockaway, Queens. He was told that three individuals were taken into custody. He walked around the crime scene and was shown a hand gun, discovered on the beach, right off the boardwalk. After several hours at the crime scene, he went to the 101 Precinct, arriving at about 12 noon. At the 101 Precinct, he spoke to several other detectives including the murder case officer – Detective Timothy Villani. The three individuals who were taken into custody were being held separately at the precinct. They were Daniel Marroquin, Roger Alvarado and the defendant Heriberto Martinez.

The defendant, who was identified in Court by Ferrufino, was being held in the juvenile room, separated from the two other persons being held. Ferrufino then interviewed Marroquin orally and then got a written statement from him. At approximately 5:00 pm he then went into the juvenile room to speak to the defendant. Having spoken to Detective Benjamin Cintron he knew that he had been advised of his <u>Miranda</u> rights. Also, Detective Cintron showed the defendant a copy of the <u>Miranda</u> warnings given him. He saw the <u>Miranda</u> warnings written in Spanish and signed by the defendant. (Government Exhibit 4 in evidence). Ferrufino went in to interview the defendant accompanied by Dave

Moser, another detective from the Queens Homicide Office.  Asked to describe the defendant's demeanor, he testified that he was "very calm, relaxed, normal, unemotional . . .." (Tr. at 216).  The defendant did not appear to be tired or sleepy.  Ferrufino did not smell alcohol or marijuana on his breath; nor did he have bloodshot eyes.  The defendant did not seem to be intoxicated.

Of importance, when asked to explain how he began his interview with the defendant, there was the following testimony:

> Q.  Could you explain to the Court, you entered the room and how you began the interview with the defendant?
>
> A.  I introduced myself, as I always do.  I advised him that his warnings were still in effect and told him what we were there to talk about.
>
> Q.  You said you advised him that his warnings were still in effect.
>
>      Could you explain to the Court exactly what you said to the defendant?
>
> A.  I basically reminded him that - - I basically - - I asked him, do you remember signing these papers?  It's still in effect.  We're here to talk to you just like the other detectives spoke to you about the incident that occurred the night before.
>
> Q.  And when you say signing these papers, were you referring to Government's Exhibit 4, the Miranda waiver form?
>
> A.  Correct.

(Tr. at 217).

Ferrufino then asked the defendant about the Quijada murder and went through an oral interview.  He questioned the defendant in Spanish regarding the murder.  The defendant made certain admissions.  Then Ferrufino requested that the defendant himself write exactly what he had just told him, "in a written form in his own writing."  The defendant

would then write a paragraph and Ferrufino would stop him and orally read the paragraph to make sure it wasn't changed in any way. Then Ferrufino wrote out some questions in Spanish and the defendant wrote the answers in his own writing. The defendant signed each page at the bottom of the written statement. Then Ferrufino and Detective Moser also signed that statement, so that there were three signatures on each page. The written statement is Government Exhibit 6 in evidence. Ferrufino translated the statement into English and prepared an English translation of the Spanish statement, which is in evidence as Government Exhibit 6A.

The interview with the defendant commenced at approximately 5:00 pm and ended at approximately 9:00 pm. When the interview commenced, the defendant was offered something to eat or drink. He accepted a soda. During the interview the defendant never complained that he did not understand and the tone of the conversation was calm, "a normal tone, normal conversation, normal talk." (Tr. at 225). The defendant never asked to speak to a lawyer.

On cross-examination, Ferrufino testified that while he was at the 101 Precinct, Detective Cintron told him about his interview with the defendant; that his Miranda rights were read and initialed. He read the statement made by the defendant. Ferrufino interviewed the defendant in a juvenile room; a small room with a desk and a few chairs. The defendant was not handcuffed during this interview. His prior interview with Marroquin took three to four hours. Marroquin had given different versions so that he wanted to interview the defendant even though Detective Cintron had also done so. He did not interview Alvarado. Although he was a Spanish speaking detective, he was never asked to take a test or be certified.

7

Ferrufino was told by Detective Cintron that the defendant had been advised of his Miranda warnings and that he waived his rights under Miranda.  He was also aware that when he interviewed him, the defendant had been up for a long period of time.  In a key part of his testimony, however, Ferrufino did not himself give the defendant his Miranda warnings, as stated on cross-examination:

> Q.    How many times did you give Miranda warnings over the course of your career in the 24 years at the NYPD?
>
> A.    Numerous times.
>
> Q.    And how long does it take?
>
> A.    10 minutes.
>
> Q.    You didn't seek to give Mr. Martinez his Miranda warnings to make sure he understood that he was waiving his rights yet again when he was speaking to you?
>
> A.    Detective Cintron had given them to him.  I didn't think I had to give it to him again.
>
>       I made him aware of it.  I reminded him that he signed the form.
>
> Q.    You showed him the form, right?
>
> A.    No, I didn't show him the form.
>
> Q.    You didn't show him the form?
>
> A.    I orally reminded him that he had signed the warnings.
>
> Q.    You, yourself, didn't see fit to take that extra 10 minutes before you interviewed an individual, 23 year old man who had been up all night, you didn't see fit to take that extra 10 minutes and have him sign a Miranda form; is that fair to say?
>
> A.    I didn't see that it was necessary.
>
> Q.    You didn't think it was necessary so you didn't do it, right?

A.    I didn't do it, no.

(Tr. at 242, 243).

Detective Moser also was there during the interview of the defendant.  However, he speaks no Spanish and was there to assist Ferrufino as to the questions being asked.

The defendant wrote out a statement which is in evidence as Government Exhibit 6.  The defendant wrote the first two pages in his handwriting.  On page three, Ferrufino wrote some questions and the answers were in the defendant's handwriting.  At the bottom of the statement is the time of 2100 which is 9:00 pm.  The interview of the defendant took approximately four hours.  During that time the defendant had nothing to eat.

Ferrufino wanted to re-interview the defendant because there were inconsistencies in the "two stories" told by Marroquin and the defendant.  He told the defendant that Marroquin gave them a different account of the night's incident and they felt that he wasn't being truthful with what he told them.  He told the defendant that he has to tell the truth.

When Ferrufino finished his interview, the defendant had been in the precinct for about eighteen hours.  During that time there was no discussion about bringing the three individuals to court or seeing a judge.  None of the police officers present had any concern about bringing the defendants to court to be arraigned.  Nor did the defendant ask if he could call his family so that they would know he was alright; he never asked Ferrufino to make a phone call.  Ferrufino did not know if the defendant made a phone call prior to his interview but during the four hours he was with the defendant he did not ask to make a phone call, nor did he ask to use the restroom.  Also, the defendant, who was making a second statement that evening about a homicide, "never said what am I going to get out of this."  "Can I go home" or "how does this cooperation thing work."  (Tr. at 250).  When

9

Ferrufino told the defendant about his co-defendant giving a different account, he might have told the defendant "something like it's in your best interest to be truthful." (Tr. at 251). However, Ferrufino testified that he was not in a position to give him a quid pro quo or promise him anything.

On redirect examination, Ferrufino testified that the defendant did not exhibit any symptoms of being under the influence of beer or marijuana. Also, Ferrufino explained that he was not the case officer. He was a supervisor and had nothing to do with the transportation to court. Here, Detective Timothy Villani was the case detective and he was in contact with the District Attorney's Office throughout the night and during the day. Any decision as to when to bring the defendant to court would be made by the District Attorney's Office.

The Court then asked several questions about the defendant's <u>Miranda</u> rights with regard to statement taken by Ferrufino, as follows:

| | |
|---|---|
| THE COURT: | I wold like to clarify something. When you first went in to speak to the defendant, and when you were in there, did you give him his <u>Miranda</u> rights separate and apart from what had been done before?" |
| THE WITNESS: | No, I didn't. |
| THE COURT: | So you used the previous <u>Miranda</u> rights? |
| THE WITNESS: | Correct. |
| THE COURT: | What did you do with it? What did you say? |
| THE WITNESS: | I basically told him, I orally advised him that those - - that he had signed that <u>Miranda</u> warning and they were still in effect. |

(Tr. at 253-54).

## C.  **The Nassau County Police Department Statement**

Roberto De Pietro is a former Nassau County Police detective.  He retired after twenty-seven years in March 2012.  De Pietro was in homicide for the last ten years of his career with the Nassau County Police Department.  He speaks Portugese and Spanish.  He was born in Brazil, moved to the United States and learned English and then Spanish.  He had friends that spoke Spanish and he initially worked in a place where his employer spoke Spanish.  During his twenty-seven year career with the Nassau County Police Department, he conducted interviews in Spanish approximately three hundred times.  Also, during his career he advised defendants of their <u>Miranda</u> rights in Spanish many times.

In March of 2010, De Pietro was involved in the investigation of the murder of Nestor Moreno, which took place at the El Rancho Bar in Hempstead on March 6, 2010.  On March 17, 2010, De Pietro was working a day tour of from 7:00 am to 4:00 pm.  He received information from a detective in the 101 Precinct in New York City, that they had a subject in custody for a crime that occurred the night before in Far Rockaway.  The subject's name in the gang was Boxer.  His true name was Heriberto Martinez and he was the subject in the El Rancho Bar murder.  He and Detective Garry then responded to the 101 Precinct in Far Rockaway.  They spoke to the detectives involved in the Far Rockaway case and then went to the scene on the beach right off Cedar Boulevard in Far Rockaway and then returned to the 101 Precinct.

At the 101 Precinct, they waited to interview the defendant.  On March 17, 2010, at approximately 9:00 pm, Detective De Pietro began the interview of the defendant conducted in Spanish.  He advised the defendant of his <u>Miranda</u> rights in Spanish.  He

read the rights from the PDCN Form 233, Spanish side. The defendant signed the card in two places and he and Detective Garry also signed the card which is in evidence as Government Exhibit 7A. At that point in his testimony, Detective De Pietro made an in court identification of the defendant. The detectives introduced themselves and advised the defendant that they were investigating a murder at the El Rancho Bar in Hempstead, which occurred a few months before. Detective De Pietro described the defendant as calm and cooperative. He did not appear to be tired and did not appear to be high on alcohol or drugs. In advising the defendant of his <u>Miranda</u> rights in Spanish, Detective De Pietro advised him that he had a right to remain silent and that any statement by him can be used against him; that he had the right to have an attorney and that they will assign one for him and pay for the attorney. The defendant heard all these rights in Spanish, agreed to speak to the detectives and signed "si" and his signature in two places on the Form.

Detective De Pietro then proceeded to interview the defendant who made admissions about the murder at the El Rancho Bar. During the interview, Detective De Pietro took notes, which are in evidence as Government Exhibit 7C. He also showed the defendant three photographs of three men. The defendant identified the three men in the photographs and signed their names on the photographs as Michicki, Carletos and Henry. The photographs are in evidence as Government Exhibits 12, 13 and 14. The defendant identified these three men as persons involved in the murder at the El Rancho Bar.

Detective De Pietro speaks Spanish but does not write Spanish. So that after the verbal interview with the defendant and the defendant identified and signed the photographs of the three men, Detective De Pietro contacted Detective Milton Aponte and asked him to come to the 101 Precinct and take a written statement from the defendant.

After two or three hours, Detective Aponte came to the 101 Precinct.  He reviewed the notes of Detective De Pietro and took a written statement from the defendant.  It was a six page statement, containing signatures of the defendant, De Pietro and Aponte on each page.  The written statement is in evidence as Government Exhibit 7B, with a translation by Detective Aponte, as Government Exhibit 7.  These two interview sessions with the defendant lasted about four and a half hours, during which time, Detective De Pietro provided the defendant, himself and Detective Garry with sodas.

In sum, Detective De Pietro testified that he never told the defendant that he would be released if he answered his questions; he had no trouble communicating with the defendant; the defendant was very cooperative and forthcoming; the defendant did not appear to be scared; he was not crying and did not fall asleep.  At no time during the interview did the defendant ask to speak to a lawyer.

On cross-examination, Detective De Pietro testified that the initial interview with the defendant occurred on March 17th at 9:00 pm.  He completed his initial interview at approximately 11:00 pm.  As to his ability to speak Spanish, Detective De Pietro stated that he learned it from friends, in school and when he worked in a gas station where the boss' relative spoke no English.  He studied Spanish in high school and took a course in the Nassau County Police Department in the late 1980's, "of how to interview people, give people their rights in Spanish . . ."  (Tr. at 80).  However, he cannot write in Spanish, which is why he called in Detective Aponte.  He speaks Spanish only at work, where there were "Spanish cases," almost every day.

When he interrogated the defendant, Detective De Pietro told him he wanted to speak to him about a murder that occurred in Hempstead two or three weeks before.  He

advised the defendant of his rights and told him that they had witnesses and knew he was involved and to tell them the truth as to what happened and the defendant proceeded to do so.  The defendant tried to minimize his role and emphasized that he was not the shooter; he was not the person who shot the security guard at the El Rancho Bar.  Detective De Pietro did not believe that the defendant was hand cuffed when he interviewed him.  Detective De Pietro also testified that he felt comfortable speaking Spanish with the defendant during the interview, and had no problems communicating with him.

Detective Milton Aponte is assigned to the Nassau County Homicide Squad.  For the last two years, after the incidents involved in this case, he has been temporarily assigned to the FBI, Melville office, as part of the Long Island Gang Task Force.  Detective Aponte speaks English and Spanish.  He is of Puerto Rican descent.  Both of his parents were born in Puerto Rico.  The primary language in his house was Spanish.  He spoke Spanish his entire life.  He is a certified Spanish interpreter for the Nassau County Police Department.  He graded an A in the Nassau County Spanish certification course.  Detective Aponte conducted interviews in Spanish thousands of times.

In March 2010, Detective Aponte was involved in the investigation of the murder of Nestor Moreno at the El Rancho Bar in Hempstead.  He has conducted numerous interviews with Detective De Pietro with witnesses and defendants in Spanish.  Detective Aponte was asked to respond to the 101 Precinct in Queens to interview the defendant.  He arrived at the 101 Precinct on March 18, 2010 about 1:30 am.  He was briefed by Detective De Pietro and he reviewed his written notes.  Detective De Pietro escorted him into the room where the defendant was held and introduced him.  He shook hands with the

14

defendant, who he identified in court. He asked the defendant if he needed something to eat or drink or to go to the rest room. The defendant indicated that he did not need those things.

Detective Aponte described the defendant as being calm, relaxed, responsive and interactive. The defendant did not appear to be tired or intoxicated or high on marijuana. He responded to every question he was asked. Detective Aponte went through the notes of Detective De Pietro. (Gov't Exhibit 7C). He asked the defendant questions from the notes and the defendant's answers to his questions were consistent with the notes. He told the defendant that he was going to discuss the facts in this matter in detail, chronologically. Detective Aponte proceeded to review the <u>Miranda</u> rights with the defendant from the card in evidence. (Government Exhibit 7A). Then, Detective Aponte wrote a statement which he described as follows:

Q.    And then you wrote out the written statement for him?

A.    Yes.

Q.    That is in your handwriting?

A.    Yes.

Q.    What is the procedure?

A.    The process is after I incorporate his constitutional rights in the body of the statement, I take it -- I tell him, let's start from the beginning. How did it all start?

He went about, again, in chronological order, describing the events to me of March 6th. He doesn't specify it as March 6th, but he specifies it at the bar, the location, how it took place.

And I went about going point for point, again, chronologically. Attempted to try -- so that the statement made sense to the reader. I continued in that manner to its completion.

I read the statement back to the defendant. I asked him if that is correct, if everything on the statement is correct.

He said that it was.

I said, I'd like you to read it. I said, I want to make sure that you can read my handwriting. Please read the first page out loud and read the rest to yourself.

I also gave him a pen. As you go through the statement, you'll see there are a number of cross-outs. When you encounter them, typically there will be a spelling mistake. Indicate that you saw that cross-out and that you are okay with the manner in which it was handled.

If anything in the body of the statement is inaccurate or incorrect, please let me know, and we'll make any corrections necessary.

At that point I then -- after having read the statement to him and giving him those instructions, he read the first page out loud, and then he read the remainder of the statement himself.

I saw he put his initials on all the cross-outs.

At the completion of putting his initials after the cross-outs and reading it to himself, I asked him: Is that okay? Is that what happened?

He indicated, yes, that is what it was. That is what happened.

I said, if that is the case, please sign each of the six pages.

He went about signing that. He surrendered the statement to me. I signed each of the six pages and gave the statement to Detective DePietro, who was present throughout, and he also signed each of the six pages.

Q.    And the statement, what language is it written in?

A.    In Spanish.

Q.    You read the statement to him out loud. What language did you use?

A.    In Spanish, as it was written.

Q.   And he was able to read the statement out loud to you?

A.   He read the first page out loud to me and read the remainder to himself.

(Tr. at 107-09).  (Government Exhibit 7B).

After the statement was signed by the defendant, Detective Aponte thanked the defendant and walked out of the room. On March 18, 2010, he prepared a typewritten English translation of the handwritten Spanish statement.  (Government Exhibit 7).  Again, Detective Aponte testified that the defendant was responsive, relaxed, and "appeared to be resigned  . . . he was fine."  (Tr. at 112).

## D.  **The Suffolk County Police Department Statement**

Detective Ralph Rivera was in the Suffolk County Police Department Homicide Squad.  Detective Rivera speaks Spanish.  He grew up speaking Spanish in his home.  He was taught by his parents who were both natives of Puerto Rico.  He has been speaking Spanish on the job for twenty-five years.   On the job, he has taken statements from Spanish speaking witnesses and suspects hundreds of times.

On March 17, 2010 at 10:00 am, he was called to work on a murder case that had occurred on February 5, 2010, involving the killing of a worker and her daughter.  Detective Rivera was told that the New York City Police Department had a person of interest who speaks Spanish.  He and Detective Chase, the murder scene detective, went to the 101 Precinct in Queens and arrived on March 17, 2010 at 12:40 pm.  At the 101 Precinct he spoke to the detectives involved, and, on March 18, 2010 at 12:01 in the morning, they spoke to the defendant, identified in court.  The defendant was taken to a large office and uncuffed.  They introduced themselves and read him his Miranda rights.  He read the

defendant his <u>Miranda</u> rights in Spanish by the use of a rights card. (Government Exhibit 8). Asked what he told the defendant in Spanish with regard to his rights, Detective responded, line by line through all of his rights, as follows: the right to remain silent (initialed by the defendant); "whatever you say can be used and will be used against you in a court of law"; "you have the right to speak to a lawyer now, have him present with you while you are being questioned"; "if you don't have the funds to obtain a lawyer and you want one, the Court will designate a lawyer before any questioning"; "If you decide to answer the questions without having a lawyer present, you will have the right at whatever moment to stop the questioning until you consult with a lawyer." The defendant answered "si" in Spanish to each question and initialed each question. The defendant also signed the Advice of Rights portion on the bottom of the card and placed the date and time near his signature.

After reviewing his rights on the Spanish <u>Miranda</u> card, they showed the defendant a six person photo array. (Government Ex. 9A). The defendant recognized photo two as a person that he knew as Crucito, who is Juan Garcia. The defendant placed a circle around number two and wrote his initials next to it. The defendant told Detective Rivera that he had a conversation with Crucito in which Crucito said that he shot Vanessa twice, but he did not shoot the kid. Then a person identified as Zorro, who is Rene Mejia, shot the kid twice. The defendant said Vanessa was associated with the 18th Street Gang and tried to set up Crucito to be killed.

The detective showed the defendant two other photo arrays, (Government Exhibit 9C), of two other men, including Zorro, also known as Rene Mejia. The defendant also identified other photographs and initialed them. Interestingly, Detective Rivera and

18

Detective Chase were speaking with the defendant mostly in English. The defendant appeared to understand English. The defendant also told them that he got his nickname because he wore boxer shorts. Detective Chase then asked the defendant if he would give them a written statement and he said he would. Then Detective Chase took a statement from the defendant, which is Government Exhibit 9 in evidence. They read the defendant's Spanish statement, (Government Exhibit 8), and again read the defendant his rights in Spanish. Again, the defendant responded "si" and initialed and signed the statement. In fact, the detectives read to the defendant his statement in English and Spanish. The defendant was given an opportunity to make corrections or additions to the statements. And, in fact, the defendant made an addition to the Spanish statement on page 2, three quarters of the way down. He wrote in Spanish: "This is the pistol that I had – this is the pistol that I had this morning," and he initialed his addition. The detectives testified that the defendant was not cuffed at any time; did not appear to be sleepy; did not appear to be impaired by either drugs or alcohol; and never asked for an attorney.

On cross-examination, it was brought out again by counsel for the defendant that Detective Rivera asked the defendant to sign a statement in a language he did not understand – namely, a statement in English. So here we have a man who gave them information about the murder of a two year old, did not have a "real" Spanish interpreter and was told to sign a statement in English that he did not understand.

Also, there was no discussion about bringing the defendant to court the next morning. Nor did the defendant ask what benefit he could receive by signing these statements. Although Detective Rivera believed that the defendant studied English in the United States, because he heard this from other detectives, he was not sure of this

assertion.

**E.** **The Federal Bureau of Investigation Statement**

Edward J. Heslin is an FBI Special Agent assigned to the Long Island Gang Task Force. His duties were primarily the investigation of MS-13 gang matters. He speaks Spanish, having studied the language for five years from grades seven through twelve, including one year of college Spanish. Also, most of his life he worked in a Spanish speaking environment in Brooklyn, Queens and the Bronx. In government service, he has spent most of his professional life in a Spanish speaking environment. As an FBI Special Agent, he was assigned to a Latin King Task Force in Brooklyn, to monitor Spanish language wires. In 2004, based on his Spanish language score on an examination, Agent Heslin was sent to Puerto Rico, where he spent two and a half years, until 2007. During the course of his career with the FBI, he has taken statements from Spanish speaking witnesses and defendants many times.

On April 23, 2010, he went to Riker's Island to pickup the defendant and transfer him back to Suffolk County for processing. He identified the defendant in court. In the transporting van, Deputy Davis was driving and Agent Heslin was sitting in the passenger compartment, next to the defendant. They were initially taking the defendant to the FBI Melville office to be processed as a new federal arrest. He explained to the defendant that they were going to the FBI Melville office and the following night he would be going to court. He advised the defendant that he had been indicted on a federal crime. The defendant told Agent Heslin that he was already cooperating with the police and that he told them everything that he knew about a murder that occurred in Queens.

At the FBI Melville office, the defendant was processed as a new arrest. They took his fingerprints; photographs of his face; and photographs of all his gang tattoos. Then they executed an FD395 Advice of Rights form, Spanish language version. Agent Heslin read the defendant his rights. The defendant read each right and initialed each right and signed the Advice of Rights statement and a witness also signed. (Government Exhibit 10). Agent Heslin read each of these rights to him, as follows:

Q.    Now I believe you indicated that you read each of these rights to him, and you asked him to read it out loud in Spanish.

A.    That's right.

Q.    The first right at the top, what does that mean in English?

A.    If I may read the form.

It starts off as notification of rights, place, date, hour. Then it says your rights, place, date, hour. Then it says your rights. Then proceeding, it says: Before formulating any question, you must know your rights.

You have the right to maintain silence. Whatever you say may be used against you in a tribunal.

You have the right to consult with an attorney in order that he may counsel you before we formulate any questions. And also, you have the right to have a lawyer present with you during your interrogation.

If you are not able to pay the cost of an attorney, one will be assigned to you before questioning begins, if you desire.

If you decide to answer questions now, without an attorney being present, you still have the right to stop answering questions at any time. You also have the right to stop answering questions at any time, at any moment, for any reason.

At the bottom it reads: I have read this declaration of rights, and I understand them. I am disposed to make a statement

and to answer the questions without the presence of an attorney.

Q.      And then underneath that it says, fierma, F-I-E-R-M-A, which is Spanish for signature?

A.      Sign, yes.

Q.      Next to that, is that the defendant's signature?

A.      Yes.

Q.      Above that where you read, there are initials after each of those advice of rights. Who placed those initials there?

A.      Mr. Martinez.

Q.      Okay. And below that there is a time. What is that time?

A.      11:12.

Q.      Is that the time that the defendant executed this document?

A.      That is correct.

(Tr. at 179, 180, 181).

The defendant told Agent Heslin that he wanted to cooperate and tell about the murders. They discussed four murders, namely, Baby Blue in Queens, a bouncer in a bar in Hempstead and a woman and her child in Suffolk County. During this period, the defendant's demeanor was very pleasant and Agent Heslin was "certain" that he would be a cooperator. The defendant then explained some details at length with regard to the four murders mentioned above.

The interview ended when the defendant had to go to federal court. During this interview, Agent Heslin concluded that the defendant understood some English but most of their discussions were in Spanish. A document memorializing the interview was

received in evidence as Government Exhibit 11.

On cross-examination, Agent Heslin described the defendant's statements with regard to the Queens murder, namely, "I couldn't shut him up about it." (Tr. at 190). Also, the defendant never asked the Agent, "What am I going to get out of cooperation."

## II. <u>DISCUSSION</u>

### A. <u>The Standards</u>

"[T]he coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements." <u>Dickerson v. United States</u>, 530 U.S. 428, 435, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). To prevent such coercion and to safeguard a suspect's privilege against self incrimination, law enforcement officers must provide a suspect with <u>Miranda</u> warnings prior to conducting a custodial interrogation. "The purpose of the <u>Miranda</u> warnings is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent and voluntary." <u>United States v. Carter</u>, 489 F.3d 528, 534 (2d Cir. 2007). The rule with respect to a motion to suppress statements was clearly set forth in <u>United States v. Ramirez</u>, 79 F.3d 298, 304 (2d Cir. 1996), as follows:

> <u>Miranda</u> Warnings are intended principally to safeguard the suspect's privilege against self-incrimination. <u>See</u> e.g., <u>Weaver v. Brenner</u>, 40 F.3d 527, 534 (2d Cir. 1994). To that end, law enforcement agents conducting a custodial interrogation are required to advise a suspect, <u>inter-alia</u>, that he has the right to remain silent and the right to consult with counsel. If the government wishes to introduce into evidence at trial a statement made during such an interrogation, it has the burden of establishing by a preponderance of the evidence that the suspect waived his <u>Miranda</u> rights and that his statement was "truly the product of free choice." <u>United States v. Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991).

23

Once a defendant establishes a basis for a motion to suppress, the Government must prove that the admissibility of any disputed evidence is proper by a preponderance of the evidence. See, Brown v. Illinois, 422 U.S. 590, 602, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (stating that "the burden of showing admissibility [of seized items or statements by a defendant] rests, of course, on the prosecution"); United States v. Matlock, 415 U.S. 164, 177 n.14, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974) (stating that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"); see also United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir. 1983) (noting that the government bears the burden of proof by a preponderance of the evidence at a suppression hearing).

Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), mandates that the police may not interrogate a suspect who has been taken into custody without first warning the person "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id. at 479; accord Dickerson v. United States, 530 U.S. 428, 443-44, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (revisiting and reaffirming Miranda). A suspect may waive his Fifth Amendment rights "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. The inquiry of whether a waiver is coerced "has two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned

and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

<u>Moran v. Burbine</u>, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) (quoting <u>Fare v. Michael C.</u>, 422 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)).

As set forth recently in <u>United States v. Williams</u>, 681 F.3d 2012 (2d Cir. 2012), in a determination of the validity of statements made by a defendant, the Court should review the totality of the evidence surrounding the interrogation.

**B. As to the Statements Taken By Detective Clinton, Detective De Pietro, Detective Rivera and Special Agent Heslin**

In this case, the Court finds that the Government has established, by a preponderance of the evidence, that each of these four law enforcement officers who conducted interrogations, did clearly advise the defendant Heriberto Martinez of all his constitutional rights. The Court finds that the defendant was advised of his right to remain silent, and his right to consult with counsel prior to making any statement. The record is replete with the rights given to the defendant by Detective Benjamin Cintron of the New York City Police Department; Detective Roberto De Pietro formerly of the Nassau County Police Department; Detective Milton Aponte of the Nassau County Police Department; Detective Ralph Rivera of the Suffolk County Police Department; and Special Agent Edward Heslin of the Federal Bureau of Investigation.

Further, the Court finds that the Government established, by a preponderance of the evidence, that the defendant Heriberto Martinez was advised of his <u>Miranda</u> rights and all his other rights in Spanish; that he understood the rights offered to him in Spanish; that he indicated his understanding by signing the rights cards and initialing each and every

right given to him by all of the respective above named police officers; and that he signed and initialed the advice of rights cards and the statements in evidence.

The Court further finds that the Government proved, by a preponderance of the evidence, that when the defendant waived his <u>Miranda</u> and constitutional rights he was fully aware of his surroundings and what was going on.  He was not under the influence of drugs or alcohol, but was alert, calm, and cooperative.  The Court finds that the Government established that each of these statements were made after the defendant made a knowing, intelligent and voluntary waiver of such rights.

Therefore, the Court finds that the Government has established, by a preponderance of the evidence, that, as to each of the four law enforcement officers, Detective Benjamin Cintron in the New York City Police Department, Detective Roberto De Pietro in the Nassau County Police Department, Detective Ralph Rivera in the Suffolk County Police Department and Special Agent Edward J. Heslin in the Federal Bureau of Investigation, that each of the statements made by the defendant, Heriberto Martinez, obtained by these law enforcement officers were voluntarily made after being fully advised of his <u>Miranda</u> rights in Spanish.  Therefore the defendant's motions to suppress all of these four statements, is denied.

**C.  <u>As to the Statement Taken By Former Detective/Sergeant Oscar Ferrufino</u>**

The defendant was interviewed an additional time on March 17, 2010 at the 101 Precinct by former New York City Police Department Detective/Sergeant Oscar Ferrufino. At that time, the defendant made additional inculpatory statements and signed a second handwritten statement, also in Spanish.  Copies of that statement and an English

translation are in evidence as Government Exhibits 6 and 6A, respectively. In this second statement to the New York City Police Department, Martinez made incriminating admissions regarding the murder of Quijada. However, the Ferrufino statement was taken on March 17, 2010, between 5:00 pm and 9:00 pm, after the initial statements taken by Detective Benjamin Cintron, without new or additional <u>Miranda</u> warnings. The relevant testimony with regard to the <u>Miranda</u> rights afforded to the defendant in the Ferrufino interview is as follows:

DIRECT EXAMINATION

Q.    Before going in to speak to Martinez, were you aware of whether or not he had been advised of his <u>Miranda</u> rights?

A.    Yes.

Q.    What was your understanding?

A.    From speaking to Benny Cintron, Detective Cintron, he had told me that he had read him his rights and showed me a copy of the <u>Miranda</u> warnings.

Q.    Did you physically see the written <u>Miranda</u> waiver?

A.    Yes.

Q.    I ask you to look in front of you. There are several documents. If you could look at a document marked as Government's Exhibit 4 which is already in evidence.

A.    Yes.

Q.    Do you recognize that document?

A.    Yes, I do.

Q.    What do you recognize it to be?

A.    The <u>Miranda</u> warnings written in Spanish.

Q.      How do you recognize it?

A.      From the signatures and date and I remember the signatures.

Q.      So you had seen that prior to interviewing the defendant?

A.      Correct.

                    *    *    *    *    *

Q.      Could you explain to the Court, you entered the room and how
        you began the interview with the defendant?

A.      I introduced myself, as I always do.  I advised him that his
        warnings were still in effect and told him what we were there to
        talk about.

Q.      You said you advised him that his warnings were still in effect.

        Could you explain to the Court exactly what you said to the
        defendant?

A.      I basically reminded him that - - I basically - - I asked him, do
        you remember signing these papers?  It's still in effect.  We're
        here to talk to you just like the other detectives spoke to you
        about the incident that occurred the night before.

Q.      And when you say signing these papers, were you referring to
        Government's Exhibit 4, the Miranda waiver form?

A.      Correct.

                    *    *    *    *    *

Q.      And after interviewing him, did you ask the defendant to
        prepare a written statement?

A.      After orally speaking to him for a short time, I requested he
        write exactly what he had just told me in a written form in his
        own writing, and he said that he could do that and he did.

Q.      Just explain to the Court step-by-step what that process was.

A.     He would write a paragraph and I would stop him.  I would read the paragraph, make sure it was appropriate or adequate to what he told me orally during the interview and that it wasn't being changed in any way.

He then went through that, through the two pages of the interview, and at the end myself and Detective Moser had a half dozen questions that we felt weren't answered.  I wrote the question out in Spanish and asked him to answer it and he wrote the answer out in his own writing.

Q.     You said the defendant signed a written statement?

A.     He signed each page at the bottom of the written statement.  He would sign with his signature and myself and Detective Moser would also sign it including the page where the questions were asked.

                    *     *     *     *     *

Q.     Did Detective Cintron tell you about his interview of Mr. Martinez?

A.     Yes.

He briefly had told me - - that was my first time meeting Detective Citron.  He introduced himself and basically told me he had gone in to speak to Martinez and Marroquin.

He informed me that their rights were read, that they signed it and agreed to talk to us and he had an initial - - I don't recall what exactly, but he did show me an initial interview statement of both defendants.

Q.     So when you spoke to Detective Cintron, you understood that Mr. Martinez had made a statement to him, correct?

A.     Yes.

## CROSS-EXAMINATION

Q.     Now, you testified that Detective Citron had showed you what's in front of you as Government's Exhibit 4, which is the <u>Miranda</u> warnings, do you see that?

A.      Yes.

Q.      Do you see a time on that form, on Government's Exhibit 4?

A.      I don't see a time on this, no.

Q.      So you're told by Detective Citron that the defendant has been advised of his <u>Miranda</u> warnings?

A.      Correct.

Q.      You're told he's waived his rights under <u>Miranda</u>, correct?

A.      Correct.

Q.      But you're also aware that this particular defendant, by the time that you get to him, has been up for let's say in excess of 24-hours; fair to say?

A.      I don't know what time he's up.  I know the incident occurred between 12 and one, yeah.

(Tr. at 214, 215, 217, 219, 220, 234, 241).

**D.  The Standards As to the Statement Obtained By Ferrufino**

In <u>Wyrick v. Fields</u>, 459 U.S. 42, 103 S.Ct. 394, 74 L. Ed. 2d 214 (1982), the United States Supreme Court ruled on the issue at hand; namely, whether a first and only <u>Miranda</u> warning would be sufficient to validate a second short-time later interview.  The Court held that, in those factual circumstances, the Court should apply the totality of the circumstances test in determining whether the defendant waived his <u>Miranda</u> rights.  The Court commented on this subject of repeated interrogations, as follows:

> That is, Fields waived not only his right to be free of contact with the authorities in the absence of an attorney, but also his right to be free of interrogation about the crime of which he was suspected.  Fields validly waived his right to have counsel present at "post-test" questioning, unless the circumstances changed so seriously that his answers no longer were

30

voluntary, or unless he no longer was making a "knowing and intelligent relinquishment or abandonment" of his rights.

\* \* \* \* \*

Nor is the rule logical; the questions put to Fields after the examination would not have caused him to forget the rights of which he had been advised and which he had understood moments before. The rule is simply an unjustifiable restriction on reasonable police questioning.

459 U.S. at 42.

In <u>United States v. Andaverde</u>, 64 F.3d 1305 (9th Cir. 1995) the defendant was taken into custody, provided his <u>Miranda</u> warnings and questioned. The next day another officer questioned him without additional <u>Miranda</u> warnings. The Court held that the latter statements were admissible because the totality of the circumstances indicated that they were voluntary, even though the defendant refused to sign the second <u>Miranda</u> warnings. The Court in <u>Andaverde</u> also reviewed other circuit decisions and stated that: "A number of other circuits have also ruled that rewarning is not required simply because some time has elapsed." As the Fifth Circuit has noted, "there is no requirement that an accused be continually reminded of his rights once he has intelligently waived them." <u>United States v. Anthony</u>, 474 F.2d 770, 773 (5th Cir. 1973).

Among the other rulings on this subject, with regard to repeated investigations without additional warnings, the Ninth Circuit held that "a <u>Miranda</u> warning does not lose its efficiency, if a defendant is warned by one officer and then interrogated by another." <u>Jarrell v. Balkcom</u>, 735 F.2d 1242, 1254 (9th Cir. 1984), <u>cert</u> <u>denied</u>, 471 U.S. 1103, 105 S.Ct. 2331, 85 L. Ed. 2d 848 (1985) (a change in interrogators and a three hour interval between warnings did not render statement inadmissible). A number of other circuits have

similarly ruled; see United States ex rel. Patton v. Thieret, 791 F.2d 543, 547 (7th Cir.) (A forty minute interval between the Miranda warning and the suspect's statement did not require readministration of warning), cert. denied, 479 U.S. 888, 107 S.Ct. 284, 93 L. Ed. 2d 259 (1986); Evans v. McCotter, 790 F.2d 1232, 1238 (5th Cir.) (finding a voluntary waiver of Miranda rights where the suspect had been twice advised of rights during a three hour period, even though warnings were not readministered after a half hour break and change of location), cert. denied, 479 U.S. 922, 107 S. Ct. 327, 93 L. Ed. 2d 300 (1986); Stumes v. Solem, 752 F.2d 317, 320 (8th Cir.) (a five hour interval between first and second interview did not by itself invalidate the initial waiver which was obtained at the beginning of the first interview), cert. denied, 471 U.S. 1067, 105 S. Ct. 2145, 85 L. Ed. 2d 502 (1985).

Indeed, one circuit has found that an interval of almost two weeks does not mandate new Miranda warnings. Biddy v. Diamond, 516 F.2d 118 (5th Cir. 1975), cert. denied, 425 U.S. 950, 96 S. Ct. 1724, 48 L. Ed. 2d 194 (1976); see also Martin v. Wainwright, 770 F.2d 918, 930 (11th Cir. 1985) (a one week interval between defendant's waiver and subsequent confession did not make new warnings necessary, when defendant indicated he still understood his rights at the time of the confession, modified, 781 F.2d 1985, cert. denied, 479 U.S. 909, 107 S. Ct. 307, 93 L. Ed. 281 (1986); United States ex re. Henne v. Fike, 563 F.2d 809 (7th Cir. 1977) (no readministration of warnings was required, despite a nine hour gap between the warnings and the subsequent waiver), cert. denied, 434 U.S. 1072, 98 S. Ct. 1257, 55 L. Ed. 2d 776 (1978); Ballard v. Johnson, 821 F.2d 568, 571-72 (11th Cir. 1987) (a three to four hour gap between waiver of rights and third confession did

not render statement inadmissible).

The Second Circuit also concurred in these post Miranda second interrogation rulings.  In United States v. Banner and Forbes, 356 F.3d 478 (2d Cir. 2004), judgment vacated on other grounds sub nom Forbes v. United States, 543 U.S. 1100, 125 S. Ct. 1010, 160 L. Ed. 2d 1002 (2005), after Forbes received a Miranda warning from federal agents and having been interviewed by them, he gave a statement to local police officers who had not themselves given a Miranda warning.  The district court admitted the latter statement, deeming the warning by the federal agents effective as to the subsequent investigation by the local police.  The Court also held that the fact that the interrogations were by different police organizations is of no significance.  Held, affirmed:

> When a Miranda warning is given to a person in custody by someone known by that person to be a law enforcement agent, whether the sovereign of the agent who gave the warning is the same as the sovereign of the agent to which the defendant later gives an incriminating statement is of no moment.  The purpose of the Miranda warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary.  Miranda, 384 U.S. at 467-73; Terry v. Le Fevre, 862 F.2d 409, 412 (2d Cir. 1988).  So long as the person in custody receives this warning from someone in authority, what uniform that person is wearing does not ordinarily affect the person in custody's understanding of his or her rights and therefore is not ordinarily a factor in determining the sufficiency of the Miranda warning.
>
> It is well established that once an arrested person has received a proper Miranda warning, the fact that questioning is stopped and then later resumed does not necessarily give rise to the need for a new warning.  See United States v. Weekley, 130 F.3d 747, 751 (6th Cir. 1997) (collecting cases).  We see no reason to think that the fact that the resumption of questioning is by agents of a different sovereign means that a new Miranda warning is required.  If the person in custody has been sufficiently informed of his or her constitutional rights, his or

> her Miranda rights have been vindicated.  Other courts have
> reached a similar conclusion.  See United States v. Nordling,
> 804 F.2d 1466, 1471 (9th Cir. 1986) (finding a Miranda
> warning given by the San Diego Harbor Police to be effective
> as to subsequent interrogation by the federal Narcotics Task
> Force); United States v. Hopkins, 433 F.2d 1041, 1045 (5th
> Cir. 1970) (finding a Miranda warning given by FBI agents
> effective as to a subsequent question by a Dallas police
> officer); United States v. Taylor, 461 F. Supp. 210, 214
> (S.D.N.Y. 1978) ("Since defendant effectively waived his rights
> before the local police, he may not complain of a Miranda
> violation simply because the federal agents did not repeat
> those warnings a short time later.").

356 F.3d 480, 481.

In Wilkins v. Ercole, No. 08 Civ. 2882, 2012 U.S. Dist. Lexis 161356 (S.D.N.Y. Nov. 5, 2012), where a second statement was made eight hours after the initial investigation, the waiver of his Miranda rights was held valid and the latter statement admissible.  The Court held that the relevant factor in this type of analysis includes not only the length of time between interrogations, but also whether the defendant was in continuous custody. In Wilkins, although his third statement was made some eight hours after he was read the Miranda warnings, he remained in continuous custody and he was reminded during the second interrogation that the rights read to him earlier "still applied."

See also United States v. James, No. 10 Cr. 1293, 2011 U.S. Dist. Lexis 145234 (S.D.N.Y. Dec. 16, 2011) (the defendant's statement to ATF agents a few hours after statements to a detective without additional Miranda warnings, is admissible); Cooper v. Graham, No. 10 Civ. 6467, 2011 U.S. Dist. Lexis 132625 (W.D.N.Y. Nov. 17, 2011) ("The state courts were correct in determining that Cooper's waiver of his Miranda rights was not rendered invalid by virtue of the approximately 13 hours which elapsed between the waiver and his making the statements."); Bridges v. Valley, No. 10 Civ. 5950, 2011 U.S. Dist. Lexis

74046 (E.D.N.Y. July 11, 2011) ("Upon his arrest, the petitioner was read his <u>Miranda</u> rights and signed a written advice and waiver at 11:45 pm. The next day at noon he was questioned again, without additional <u>Miranda</u> warnings. After a review of 'the totality of the circumstances,' courts within the circuit have accordingly refused to suppress confessions because of the time period that elapsed between the initial and subsequent interrogations"); <u>James v. Ricks</u>, No. 01 Civ. 4106, 2002 U.S. Dist. Lexis 27813 (E.D.N.Y. Dec. 31, 2002) ("mere passage of time does not require renewed warnings" – here, eleven hours was the time interval); <u>Tobias v. Portuondo</u>, 367 F.Supp.2d 384 (W.D.N.Y. 2004) (same).

Here, the defendant Martinez was given a thorough and careful <u>Miranda</u> warning; was held in continuous custody; and the in the second interrogation, was reminded of his <u>Miranda</u> rights. In this case, the number of hours between interrogations is not a significant amount of time in these "subsequent interrogation" situations. Indeed, the Ninth Circuit has approved a subsequent interrogation occurring two days after the defendant properly waived his <u>Miranda</u> rights. <u>See</u> <u>Villalon v. Calderon</u>, 130 Fed. App'x 126, 127 (9th Cir. 2005).

Accordingly, the statements of the defendant Martinez to Ferrufino can be properly admitted and the motion to suppress these statements, is denied.

## E.  The Opposition

### 1.  Voluntariness and Timing

The defendant's letter memorandum asserts that "the Government has failed to establish by preponderance of the evidence that Martinez voluntarily relinquished his rights

under Miranda and that Martinez had a full awareness of the rights being waived and of the consequences of waiving these rights." (Letter Memorandum at 7). The defendant's Memorandum goes on to state that: "In reviewing the totality of the circumstances, the timing of the interview is paramount. Knowing full well that Martinez had been awake since seven in the morning on March 16, 2010 and had been using drugs and consuming alcohol, law enforcement officials from various counties proceeded to interview Martinez for a twenty-eight hour period without the benefit of food, sleep or counsel." (Letter Memorandum at 8).

However, notwithstanding the lengthy interviews on March 17, 2010, the evidence revealed that the interviews with the defendant could be described as cordial. The witnesses uniformerly described the defendant's demeanor as "calm", "very cooperative", "forthcoming", "responsive" and "relaxed". (Tr. at 55-56, 74, 104, 112, 216). He freely spoke to the police officers; signed Miranda rights cards; wrote out a statement in his own handwriting; and identified photographs of co-conspirators. Having reviewed the evidence at the Hearing, the Court finds that there is no doubt that the defendant was willingly cooperating. In that regard, when Special Agent Heslin was transporting the defendant from Rikers to the FBI Office, the defendant told him that "he was already cooperating with the police, that he told them everything he knew about a murder that occurred in Queens." (Tr. at 177).

In fact, in the defendant's letter Memorandum, it is stated that "it is unclear from the record what coercive tactics were taken to induce Martinez to speak . . .." (Letter Memorandum at 2). The Court finds that the evidence introduced during the hearing clearly established that none of the law enforcement officers who interviewed the

defendant acted inappropriately in any manner. Further, the Court finds that the officers who interviewed the defendant and obtained statements from him acted appropriately in all respects and did not threaten, abuse, mistreat or coerce the defendant in any manner. In sum, the Court finds that the interrogating officers went far beyond what the law requires by repeatedly advising the defendant of his <u>Miranda</u> rights both orally and in writing, and in Spanish by Spanish speaking officers.

As to timeliness, the officers all testified that despite the length of the total interrogation, the defendant did not appear to be tired or intoxicated. On the contrary they testified that he was calm, very cooperative, forthcoming, responsive and relaxed. Also, the witnesses testified that they offered the defendant something to drink, food and the use of the bathroom. He accepted the soft drink. (<u>See</u> Tr. at 73, 103, 111 and 224).

## 2. <u>As To Unnecessary Delay</u>

The defendant also contends that his statements should be suppressed because of the "unnecessary delay" between his arrest and his arraignment. Under Federal Rules of Criminal Procedure 5(a)(1), a defendant arrested in the United States must be arraigned "without unnecessary delay" before a magistrate judge or a "state local judicial officer". In this "unnecessary delay" contention, the defendant relied on 18 U.S.C. § 3501(c), which sets forth a six hour trial period with certain exceptions, in which to bring a defendant before a magistrate judge. However, § 3501(c) does not apply to a defendant held in custody solely on state court charges. <u>United States v. Alvarez-Sanchez</u>, 511 U.S. 350, 358, 114 S. Ct. 1599, 128 L. Ed. 2d 319 (1994) ("If, instead, the person is arrested and held on state charges, § 3501(c) does not apply . . ..") In this case, the defendant was

arrested on March 17, 2010 by the New York City Police Department and was arraigned on March 18, 2010. During that period he was interviewed by officers from the New York City Police Department, the Nassau County Police Department, and the Suffolk County Police Department, at the 101 Precinct in Queens County. No federal agents interviewed the defendant during the period of March 17-18, 2010. He was arraigned in Queens County Court and was not charged with a federal crime until more than a month later, on April 23, 2010, when he was transferred into federal custody.

However, even if § 3501(c) did apply in this case, even in a federal case a statement obtained in excess of six hours after arrest is admissible if any delay in arraignment is deemed to be "reasonable". The instructions in Fed. R. Crim. P. 5(a)(1)(B), are that a person making an arrest must take the defendant "without unnecessary delay" before a magistrate judge. The rule in the federal jurisdiction was enunciated in United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995), as follows:

> Finally, regarding appellants contentions that the statements were inadmissible due to unreasonable delay in appearing before a magistrate, this court has held that "a lapse of hours between arrest and arraignment, standing alone, does not require exclusion of a statement made during the period." United States v. Rubio, 709 F.2d 146, 153 (2d Cir. 1983). In this instance, justifiable circumstances existed which delayed the defendants' appearance before the magistrate, and no evidence of any kind of coercion exists. Therefore, the district court's ruling with respect to admissibility of defendants' post-arrest statements is affirmed.

New York law also put forth the "unnecessary delay" standard in this regard. The rule is set forth in New York Criminal Procedure Law § 140.20(1), namely that "a police officer after performing without unnecessary delay the required preliminary police duties, must without unnecessary delay bring a person arrested without a warrant to a local

criminal court for arraignment." The cases ruling on New York law affirm that there was no "unnecessary delay" in this case. In <u>Williams v. Ward</u>, 845 F.2d 374 (2d Cir. 1998) <u>cert. denied</u> 488 U.S. 1020, 109 S. Ct. 818, 102 L. Ed. 2d 807 (1989), it was stated that: "We believe procedural benefits provided to arresters under New York arraignment system justify constitutionally arrest-to-arraignment periods of seventy-two hours in length." Also, in <u>People v. Gause</u>, 38 A.D.3d 999, 830 N.Y.S.2d 859, leave to appeal denied, 9 N.Y.2d 865, 840 N.Y.S.2d 894, 872 N.E.2d 1200 (2007), the rule in New York was clearly set forth:

> In any event, the length of the delay is not the determinative factor, particularly where, as here, defendant was duly advised of his rights and admittedly waived them in his initial interview with police, he was then in continuous custody but not continuously interrogated or threatened, and he was not deprived of food, water or rest . . .. In short, there is no evidence of coercion here and, inasmuch as this delay was justified, the testimony of one of the investigating officers that he wanted another interview with defendant before arraignment does not establish unnecessary delay.

In this case, the Court finds that the defendant was arraigned within the time periods established by the courts and there was no "unnecessary delay." The police were investigating a brutal machete execution murder which occurred shortly after midnight on March 17, 2010. The defendant and two others were taken into custody; Spanish speaking detectives had to be found and brought in from Brooklyn to advise the defendant of his rights and to interview him; detectives for the Nassau County Police Department and the Suffolk County Police Department were waiting to speak to the defendant about several other murders; they interviewed the defendant and completed the interviews in the early morning hours of March 18, 2010; after the interviews the defendant was transported to the Queens County Court where he was arraigned later that day. The detectives were in

contact with the Queens District Attorneys Office throughout the night and during the day as to his transfer for arraignment. The Spanish speaking defendant was involved in the investigation of multiple murders in different areas and was questioned by three different law enforcement agencies. The Court finds that there was no "unnecessary delay" in the arraignment of the defendant.

## F. As to the Statement Obtained by Federal Bureau of Investigation Special Agent Heslin As to the Quijada Murder

Finally, with respect to the defendant's April 23, 2010 statements to the FBI Special Agent, it is apparently undisputed that the defendant was not represented by counsel when he was interviewed as to his statements regarding the Argueta/Torres and Moreno murders. These statements are not suppressed. However, with respect to the defendant's statements to Special Agent Heslin regarding the Quijada murder, apparently the defendant was represented by counsel at that time and the Government has agreed not to seek to introduce those statements during the direct examination of Agent Heslin at the trial. However, the Government does reserve the right to introduce those statements during redirect examination if defense counsel should "open the door" during cross-examination, and to cross-examine the defendant should he testify.

## III. CONCLUSION

For the foregoing reasons, the defendant's motions to suppress his statements to Detective Benjamin Cintron, Detective Roberto De Pietro, Detective Milton Aponte, Detective Ralph Rivera and former Detective/Sergeant Oscar Ferrufino, are all denied.

Also, for the reasons set forth in this opinion, the defendant's motion to suppress his statements to Federal Bureau of Investigation Special Agent Edward J. Heslin

regarding the defendant's alleged participation in the Argueta/Torres and Moreno murders, is denied.

Finally, the Court notes that the Government has agreed not to seek to introduce the statement made by the defendant to Special Agent Edward J. Heslin regarding the Quijada murder during his direct examination.

**SO ORDERED.**

Dated:      Central Islip, New York
            January 10, 2013

                             */s/ARTHUR D. SPATT*
                              ARTHUR D. SPATT
                     United States District Judge