1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
UNITED STATES OF AMERICA,        :
                                       CR-10-074
        -against-               :
                                     United States Courthouse
HERIBERTO MARTINEZ, also known  : Central Islip, New York
as "Boxer," and CARLOS ORTEGA,
also known as "Silencio" and    :
"Silent,"

                                : February,11, 2013
                Defendants.       9:30 a.m.

-------------------------------X

                    TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE JOSEPH F. BIANCO
     UNITED STATES DISTRICT COURT JUDGE, and a Jury


APPEARANCES:

For the Government:         LORETTA E. LYNCH, ESQ.
                            UNITED STATES ATTORNEY
                            610 Federal Plaza
                            Central Islip, New York 11722
                            BY:  JOHN J. DURHAM, ESQ.
                                 RAYMOND A. TIERNEY, ESQ.
                                 CARRIE N. CAPWELL, ESQ.


For Defendant Martinez:     ELIZABETH MACEDONIO, ESQ.
                            ARNOLD LEVINE, ESQ.


For Defendant Ortega:       MARIANNE RANTALA, ESQ.
                            IRA LONDON, ESQ.


Official Court Reporter:    Ellen S. Combs, CSR
                            Dominick M. Tursi, CM, CSR
                            100 Federal Plaza - Suite 1180
                            Central Islip, New York 11722
                            Phone (631) 712-6107
                            Fax (631) 712-6123

           Proceedings recorded by mechanical stenography
                Transcript produced by Computer

2

1           (Call to Order of the Court.)

2           THE COURT: The United States versus Martinez and

3    Ortega.

4           Counsel, please state your appearance for the

5    record.

6           MR. DURHAM:  John Durham, Raymond Tierney, and

7    Carrie Capwell for the United States.

8           THE COURT:  Good morning.

9           MS. MACEDONIO:  Good morning, your Honor.

10   Elizabeth Macedonio and Arnold Levine for Mr. Martinez.

11          THE COURT:  Good morning.

12          MS. RANTALA:  Good morning, your Honor.

13   Marianne Rantala and Ira London for Carlos Ortega.

14          THE COURT:  Good morning.

15          The defendants are present along with the

16   Spanish interpreters.

17          We do have one juror, Alternate No. 1, who is

18   not here.  She was contacted by the clerk's office and she

19   indicated that her street was not plowed and is snowed in.

20   I hate to lose an alternate on the first day, but I also

21   don't want to lose the day, so unless there is any

22   objection I will excuse her.

23          Any objection?

24          MR. DURHAM:  One moment, your Honor.

25          MS. MACEDONIO:  Judge, no objection.

3

1      MS. RANTALA:  No objection, your Honor.

2      MR. DURHAM:  No objection, your Honor.

3      THE COURT:  Okay.  Just one issue this morning.

4   The procedure with an anonymous jury is that the CSOs

5   escort the jurors when they come in.  They bring them

6   upstairs to the jury room.  That is their normal

7   procedure.

8          As we discussed when I granted the motion, in

9   some anonymous jury cases they also keep them together for

10  purposes of lunch.  I had said that I was not going to do

11  that, but I just wanted to talk to you about one situation

12  we could follow about keeping them together during lunch.

13  One juror asked my staff do we have to stay together for

14  lunch?  So what I was going to explain to them when they

15  came out is that they are free to go wherever they want

16  for lunch.  But I was thinking that in the cafeteria

17  downstairs there is a table in the back.  I was going to

18  tell them there will be a table reserved in the back.  If

19  they want to use that table for their privacy during

20  lunch, I will ask the CSOs to ask the cafeteria to do

21  that.

22         Any objections to that?

23     MS. MACEDONIO:  No, your Honor.

24     MS. RANTALA:  No, your Honor.

25     MR. DURHAM:  No, your Honor.  I know that has

4

1    been done in other anonymous juries in this courthouse.

2              THE COURT:  Any other issues anyone wants to

3    address before I bring the jury out?

4              MS. MACEDONIO:  Just the government has

5    submitted some proposed limiting instructions.  I have

6    supplemented them.  I have gone through it with cocounsel.

7              THE COURT:  Proposed?

8              MS. MACEDONIO:  Limiting instructions.

9              THE COURT:  For what?

10             MS. MACEDONIO:  For evidence that will be coming

11   in with regard to the enterprise and also other types of

12   evidence, particularly the defendant's incarceration at

13   various points during the upcoming trial.  So I have added

14   that and I would like to hand it up to the court.

15             THE COURT:  Sure.

16             MS. MACEDONIO:  The government has no

17   objections.  Neither does cocounsel.  The highlighted

18   portions are what I added.

19             THE COURT:  All right.

20             Mr. London and Ms. Rantala, this is okay with

21   you as well?

22             MS. MACEDONIO:  Yes, your Honor.  We have

23   reviewed it via email already and have no objections.

24             THE COURT:  Have you agreed upon when you want

25   the court to read this?  Is this during a particular

5

1    witness' testimony?  Or at what point do you want me to

2    read this?

3              MR. DURHAM:  Your Honor, I believe there are two

4    instructions there.

5              Just for the record, the government has no

6    objection, although we didn't have a chance, Ms. Macedonio

7    handed that to us this morning; I didn't have a chance to

8    go back and verify the one we had submitted.  But I have

9    no objection to these issues.

10             I think there are two instructions there.  One

11   relates to enterprise evidence.  And obviously in order to

12   establish that the MS-13 is a racketeering enterprise, the

13   government will be introducing evidence of other crimes

14   committed by members of the MS-13.  I would anticipate

15   that at times when we introduce that evidence, defense

16   counsel may want to court to give an instruction, for

17   example, that, you know, these defendants were not

18   personally involved in that particular murder, but it is

19   evidence being offered to establish the racketeering

20   activities alleged in the indictment by the MS-13.

21             THE COURT:  Okay.  So why don't we wait until

22   the appropriate witness when that first comes up and then

23   obviously I'll utilize an instruction at that time.

24             MR. DURHAM:  Yes, your Honor.

25             With respect to the second one, it relates to

6

1    the fact there may be evidence during the trial that the

2    defendants were incarcerated.  For example, their tattoo

3    photographs -- photographs of their tattoos.  It sort of

4    gives away the fact that at least when the pictures were

5    taken they were in custody.  So we just ask the court to

6    give a limiting instruction at that time.

7                   THE COURT:  Okay.

8                   Yes, Mr. Tierney?

9                   MR. TIERNEY:  Yes, judge.

10                   With regards to the opening statements, the

11   government has prepared a short PowerPoint presentation.

12   I have provided the defense with the slides that will be

13   utilized, and I don't believe they have any objection.

14                   MS. MACEDONIO:  I have no objection, your Honor.

15                   MS. RANTALA:  No objection.

16                   MR. TIERNEY:  And, your Honor, I'm going to dim

17   one of the lights, if that is okay.

18                   THE COURT:  Fine.

19                   How long do you anticipate your opening to be?

20                   MR. TIERNEY:  Approximately a half hour, your

21   Honor.

22                   THE COURT:  Okay.  How about the defense?

23                   MR. LEVINE:  Probably 10 minutes or so.

24                   MR. LONDON:  Ten minutes.

25                   THE COURT:  So who is going to go first?

7

1          MR. LONDON:  I am.  Could we have a motion in

2     limine, judge, regarding some photographs that are going

3     to sought to be admitted later today?  They are

4     photographs of tattoos on the hands of my client.  They

5     were not on his hands when he was arrested.

6          THE COURT:  Okay.  Do you want to just wait on

7     that one?  It is not going to come up in the openings,

8     right?

9          MR. LONDON:  It is not.  I just wanted to alert

10    the court.

11         THE COURT:  Okay.  I appreciate that.  We will

12    cover that either during the break or during lunch,

13    depending upon when that evidence is going to come in.  I

14    don't want to keep the jury waiting too long.

15         Anything else for the openings?

16         MS. MACEDONIO:  Not for the opening, judge.

17         THE COURT:  Bring in the jury.

18         (The following ensued in the presence of the

19    jury at 10:55 am.)

20         THE COURT:  Everyone, please be seated.

21         Good morning, members of the jury.  It is good

22    to see you all this morning.  I want to thank you all for

23    your diligence and effort in getting here this morning.  I

24    know it was a very difficult morning.  I appreciate that

25    you were able to get here.

8

1        We did have one juror, Alternate No. 1, who is

2   still snowed in.  Her block hasn't been plowed, so she was

3   unable to get here.  I don't want to lose a day so we're

4   going to excuse her from service in this case and start

5   the trial this morning.

6        There is one logistical thing I want to mention

7   to you.  I know that jurors have questions about lunch.  I

8   guess one of the CSOs had said something to the effect are

9   the jurors going to be together during the lunch break.

10  That is not the case.  You are free to go wherever you

11  want during lunch.  You can eat in the jury room, you can

12  eat in the cafeteria, you can go outside the building, as

13  long as you get back in time to start after lunch.

14       If you do want to eat in the cafeteria, for your

15  privacy I'm going to ask that the CSOs reserve a table in

16  the very back of the cafeteria so that jurors in this case

17  can eat together if they wish to.  So I'm asking for them

18  to set that up this morning.  But you are free to do

19  whatever you like in connection with lunch; or any other

20  time during the day when we are on a break, for that

21  matter.

22       The next order of business is for you to take

23  the oath as jurors, so I'm going ask that all of you

24  please stand.  Raise your right hand.

25       (Jury sworn by the judge.)

9

1      THE COURT:  You can all be seated.  As I

2  mentioned to you last week when I gave you the preliminary

3  instructions in terms of the order of the trial, the first

4  phase of the trial are the opening statements.

5      As I said to you last week, the opening

6  statements are not evidence.  They are simply the lawyers'

7  preview of what they expect the evidence to show in the

8  case.  The order is, the government, because they have the

9  burden of proof, they go first.  So I will ask the

10  government to please give the opening statement.

11      MR. TIERNEY:  Thank you, your Honor.

12      Your Honor, may I turn off one of the lights?

13      THE COURT:  Yes, of course.

14      MR. TIERNEY:  Thank you.

15              OPENING FOR GOVERNMENT

16

17      MR. TIERNEY:  On February 5, 2010,

18  Vanessa Argueta and Diego Torres are murdered both shot in

19  the head and killed in a wooded area in Central Islip

20  located a short distance from this courthouse.

21      12 days later, on February 17, David Sandler is

22  murdered, shot in the head at close range and killed while

23  on a street corner in Brentwood.  Also with David Sandler

24  on that day is his close friend Aaron Galan.  Galan is

25  shot through the face and left for dead but miraculously

10

1    survived.

2         Three weeks later, on March 6 Nestor Moreno is

3    murdered, shot in the head at close range and killed while

4    inside a bar in Hempstead.

5         Eleven days after that, on March 17, 2010, Mario

6    Canton Quijada is murdered, Hacked to death with a machete

7    and knife while on a beach in Far Rockaway, Queens,

8    located in the opposite direction on Long Island from

9    where the Argueta and Torres murders occurred.

10        During a six-week period in the winter of 2010,

11   five people are murdered, one person is seriously injured,

12   in four separate incidents occurring at three different

13   counties.  What, ladies and gentlemen, do all of those

14   incidents have in common?  They were all committed by

15   these defendants and their fellow gang members in the

16   international street gang known as Mara Salvatrucha, or

17   the MS-13.

18        During the late winter of 2006 the defendant

19   Heriberto Martinez, also known as Boxer, and the defendant

20   Carlos Ortega, also known as Silent or Silencio, and the

21   MS-13 cast a path of death and destruction from one end of

22   Long Island to the other.  And all, ladies and gentlemen,

23   for no better reason than to earn respect for their gang.

24        Now, ladies and gentlemen, in order for you to

25   understand why those defendants engaged in such acts of

11

1    violence, you are going to have to understand a little bit

2    about the MS-13.  And during the course of this trial you

3    are going to learn that the MS-13 is a street gang that

4    originated in Los Angeles, California, and from there it

5    soon spread across the United States, including into Long

6    Island, as well as internationally.  Currently the

7    leadership of the MS-13 is based in El Salvador.

8           The gang, itself, is divided into subgroups, or

9    cliques, and these cliques, as I said, are spread

10   throughout the United States, including on Long Island,

11   and internationally.  When an individual becomes a member,

12   becomes initiated into the MS-13, they receive a gang

13   name.

14          That defendant's gang name is *Boxer*.  And

15   depending upon what language you are speaking, that

16   defendant's gang name is *Silent* or *Silencio*.

17          Another thing you are going to learn about the

18   MS-13 is that the sole reason for its existence is to

19   commit the types of violence that I have just outlined for

20   you.  The only way that an individual in the MS-13 can

21   rise through the ranks and earn respect is to try to kill

22   a rival gang member.  It is to try to kill other MS-13

23   members who fail to follow the rules.  It is to try to

24   kill anyone who challenges or disrespects the gang.

25   Assaults.  Shootings.  Stabbings.  This is how you gain

Case 2:10-cr-00074-JFB   Document 1576   Filed 11/30/15   Page 12 of 177 PageID #: 7316

1   respect in the MS-13.

2         And through the course of this trial, ladies and

3   gentlemen, you are going to learn that there were no MS-13

4   members on Long Island that were more respected than Boxer

5   and Silencio.

6         Now, the first murder that occurred in the

7   winter of 2006 was the murder of Vanessa Argueta.  And

8   with regard to that murder, you are going to learn, ladies

9   and gentlemen, that Vanessa Argueta lived in Central

10  Islip.  And Boxer, the defendant Boxer, was a leader of

11  one of these cliques, or subgroups, of the MS-13 known as

12  the Coronados Locos Salvatruchas, or CLS.  And in that CLS

13  clique, Boxer had a member or a soldier by the name of

14  Cruzito.  And for a time Cruzito was dating Vanessa

15  Argueta but they broke up.  And after they broke up,

16  members of a rival gang, the 18th Street, came to

17  Cruzito's house and they tried to attack him.  And Cruzito

18  believed that the 18th Street gang members had been tipped

19  off to where he lived by Vanessa Argueta.

20        And so, like the good little MS-13 soldier that

21  he was, he reported it to the leader of the gang, Boxer.

22  And Boxer and Cruzito decided that Vanessa Argueta had to

23  die for having disrespected the gang in this way.  Not

24  only that, Boxer had also made arrangements for Cruzito to

25  be provided with a gun, a gun which he could use to kill

13

1    Vanessa Argueta, and that gun was a .22 caliber silver

2    handgun.

3            After Cruzito met with his leader, Boxer, you

4    are going learn that Cruzito and two other MS-13 members,

5    all of whom knew Vanessa Argueta, lured her into those

6    woods in Central Islip, and in those woods they shot and

7    killed her.  They shot her once in the head.  Once in the

8    chest.  But not only that, ladies and gentlemen, they also

9    killed Diego Torres.  And you're going learn that Diego

10   Torres had nothing at all to do with the problems between

11   Cruzito, Vanessa, and the MS-13.  He was just in the wrong

12   place at the wrong time.  He had to go.

13           Now, the second murder that occurred is the

14   murder of David Sandler.  With regard to that murder, you

15   are going to learn that David Sandler was close friends

16   with Aaron Galan.  They lived in their Brentwood

17   neighborhood.  Aaron Galan was dating Sandler's sister and

18   they had set up a small marijuana distribution business

19   in.

20           Their neighborhood.  They sold pot in their

21   neighborhood.  You are also going to learn a little bit

22   about that neighborhood in which they lived.  It was

23   saturated with gangs.  Latins Kings, Bloods, Crips, and,

24   of course, the MS-13, so Sandler and Galan would set up

25   precautions.  They always tried to stay together to keep

14

1   from getting jumped.  You are also going to learn a little

2   bit about the MS-13 in that area.

3           Around the time of Sandler's murder, the

4   defendant Silencio moved into the neighborhood.  He is a

5   member of the MS-13 but his subclique, or group, is based

6   in El Salvador.  So when Silencio comes into the area, he

7   wants to prove himself to the other Long Island-based

8   MS-13 members.

9           And with regard to those other Long Island based

10  MS-13 members, they were under the belief that Sandler was

11  a member of a rival gang.  They believed he was a Latin

12  King.  As such, it's a rival gang, someone that the MS-13

13  refers to as a chavala, and as such begins the first rule

14  of the MS-13:  you kill your rivals.  And that is exactly

15  what Silencio did to David Sandler in order to prove

16  himself to the Long Island-based MS-13.

17          You are going that hear that Silencio and

18  two other MS-13 members came up with a plan.  They were

19  going to call Sandler on the phone he used to distribute

20  marijuana and call up under the guise they wanted to

21  purchase marijuana.  They were then going to lure him to a

22  specific area and then they were going to kill him.  So

23  that is exactly what they did.

24          And they were driven to that location by an

25  MS-13 associate -- he is not a member but he is a

15

1    associate -- by the name of Michichi.  You're going to

2    hear Michichi's name a lot through the course of this

3    trial because Michichi had three things that the MS-13

4    found very attractive:  He had a valid license, He had a

5    car, and he was willing to drive them around.

6            So Michichi drives Silencio and two other MS-13s

7    to the area of a purported marijuana deal.  Once they get

8    there, Silencio and another MS-13 member get out of the

9    car and they start walking to the location.  Also walking

10   to the location are Sandler and Galan.  And as they

11   approached one another, Sandler reaches for a $20 bill

12   that is in the hand of the other MS-13 member.  And as he

13   does this, the defendant Silencio from his waist pulls out

14   a .38 caliber handgun and fires at Sandler at close range,

15   hitting him.  But not only that, just like Diego Torres,

16   who was in the wrong place at the wrong time in the woods

17   in Central Islip, he then turns the gun on Galan, shoots

18   him through the face.  Silencio and the MS-13 members then

19   flee back to the car; Michichi drives them from the scene.

20           The second murder that occurred -- and it is

21   probably better to see on the side monitors -- occurred on

22   March 6.  And with regard to that murder, you are going to

23   hear that shortly before the murder, the defendant Boxer

24   and some of his fellow MS-13 members went out for a night

25   of drinking at the El Rancho Bar and Grill in Hempstead,

16

1   New York.  And at the end of the night, the MS-13 members

2   tried to leave the bar without paying.  And Nestor Moreno,

3   who was a bouncer at the bar and who was trying to do his

4   job, stopped one of the MS-13 members.  A fight ensued,

5   and then in the ensuing fight, Nestor Moreno took pepper

6   spray and sprayed Boxer in the face with pepper spray.

7        Now, ladies and gentlemen, you are going to

8   learn that Boxer, as one of the leaders of the MS-13,

9   could not allow that level of disrespect to stand, and he

10  told Nestor Moreno as much before leaving.  He told

11  Nestor Moreno: *You know who we are.  We are La Mara.*  And

12  La Mara is a name that the MS-13 gives itself.  *We're La*

13  *Mara.  This can't stand.  This can't end this way.*

14       And unfortunately for Nestor Moreno, Boxer was

15  true to his word because on March 6, 2010, he returned to

16  that bar.  Nestor Moreno was working that night at that

17  bar.  And, of course, of course, Boxer didn't come alone.

18  He came with three fellow MS-13 members.  And he was

19  driven to that bar by Michichi in the blue Ford SUV.

20       The MS-13 members, their plan was, they were

21  going to kill Nestor Moreno.  They had with them a

22  silver-colored .22 caliber handgun, the same handgun that

23  was used in the Argueta and Torres murders in the woods.

24  They also had a plan.  They figured that Boxer should stay

25  in the car because Nestor Moreno would be most likely to

1    identify him.  Three MS-13 members, they got out.  One

2    member had been at the earlier altercation with Nestor

3    Moreno so he was to point Moreno out to the other two.

4    And another MS-13 member, another soldier in Boxer's CLS

5    clique.  Was given by the MS-13 the honor of killing

6    Nestor Moreno.

7            The three MS-13 members then go the front of El

8    Rancho Bar, but it is very crowded, there are a lot of

9    people out there, and they decide we can't do it.  So they

10   go back to where Boxer is and Michichi, over by the car,

11   and they have a discussion.  And it is decided it doesn't

12   matter; it has to be done; Boxer's humiliation must be

13   answered.

14           So the three individuals, the three MS-13

15   members, they go back out.  And this time fortunately

16   there is less people around the bar.  One MS-13 member

17   opens the bar door.  Nestor Moreno, who is sitting just

18   inside the bar in a chair, like bouncers do, looks up.

19   The third MS-13 member took that handgun, pointed it point

20   blank at Nestor Moreno, said *Adios*, fired it, and killed

21   Nestor Moreno.  The three MS-13 members then run back to

22   the car, get into Michichi's car, and Michichi flees the

23   scene.

24           Ladies and gentlemen, you're going to hear a

25   little bit about the celebration in that car after the

18

1    taking of that human life.  You're going to hear how all

2    the members of the MS-13 screamed *La Mara, La Mara*, and

3    how they screamed, how they indicated that *La Bestia,* or

4    *The Beast*, which is a name that the MS-13 gives to the

5    devil, had been fed with the blood of another.

6         The final murder that happened during the winter

7    of 2006 was the murder of Mario Canton Quijada.  And this

8    murder is a little different, and it is primarily

9    different in two respects.  The first respect is that up

10   till now all of the murders that occurred were committed

11   by Boxer and Silencio apart.  This is a murder that they

12   did together.

13        In addition to that, Mario Canton Quijada also

14   went by the name of Baby Blue and he, himself, was a

15   member of the MS-13.  But Baby Blue had a problem.  Baby

16   Blue's problem was, in the eyes of Boxer and Silencio and

17   a lot of other MS-13 members, he wasn't quite violent

18   enough.  So what, ladies and gentlemen, does the MS-13 do

19   with a member who is not quite violent enough?  Well,

20   Boxer and Silencio and the other MS-13, they kill him.

21        And with regard to that murder, you are going to

22   learn that on the day of Baby Blue's death, the MS-13 were

23   hanging out in Far Rockaway and they were at a gang

24   member's house by the name of Payaso and they were

25   discussing what to do with the problem of Baby Blue.  He

1   wasn't violent enough.  And they came up with the plan.

2   What they were going to do was, they were going to take

3   that .22 caliber silver handgun, they were going to take

4   Michichi's car, they were going to get Baby Blue, and they

5   were going to ride around on the hunt for rival gang

6   members, and they were going give the gun to Baby Blue and

7   they were going to let him prove himself by shooting a

8   rival gang member.

9         So that is what they did.  They get in the car.

10  They are driving around.  They're looking for rivals.  But

11  they can't find any and Baby Blue is expressing reluctance

12  to follow through.  And at one point he makes the fatal

13  error of turning to Silencio and apologizing and saying:

14  *I'm sorry.  I just don't live to kill.*

15        Well, in the MS-13 if you don't live to kill,

16  you will cease to live.  And that's what happened.

17  Because after the unsuccessful hunt, they dropped off Baby

18  Blue and they go back to Payaso's house and, just the

19  MS-13, they get together and have a meeting.  No one

20  stands up for Baby Blue.  It is decided.  It is unanimous,

21  Baby Blue has to go.

22        Once again, the MS-13 comes up with a plan.

23  And, just like Vanessa Argueta was lured to those woods

24  and just like David Sandler was lured to that street

25  corner, they decide they're going to lure Baby Blue to a

20

1    remote beach on Far Rockaway where they are going to kill

2    him.  And they are going to use that same silver .22

3    caliber handgun, the same handgun that was used to kill

4    Moreno, the bouncer.  And the same handgun that was used

5    to kill Argueta and Torres in Central Islip.  They're

6    going to use that gun.  And, just in case, the members are

7    going to be armed with a machete and knives as well.  And

8    then they decide who is going to go, who is going to be

9    given -- again, one of the MS-13s -- the honor of killing

10   Baby Blue.  And they decide it is going to be defendant

11   Silencio.  It is going to be the defendant Boxer.  It is

12   going to be Payaso.  And it's going to be a fourth MS-13

13   member.

14          And, of course, they're going to be driven to

15   the location, this location beach in Far Rockaway, by

16   Michichi.  So the four members with Michichi pick up Baby

17   Blue.  They take him to the beach under the guise of

18   attacking the chivala on the beach.  Michichi parks the

19   car and the four MS-13 members, including those two

20   defendants and Baby Blue, get out of the car and they walk

21   out on the beach.

22          Once they are alone in the sand, Payaso takes

23   that silver .22 caliber handgun, points it to Baby Blue's

24   head, pulls the trigger but nothing happens.  The gun

25   misfires.  The gun jams.  And at that point Baby Blue

1    realizes he is about to die so he tries to run.

2           But all of the MS-13 members, including those

3    two defendants, are on him.  They grab him.  They drag him

4    back.  They start assaulting him, stabbing him with the

5    machete and the knives.  At one point Payaso takes the

6    knife and stabs Baby Blue through the eye.  And the knife

7    gets stuck in his skull so Boxer has help him to withdraw

8    it.  Finally, Baby Blue falls for the last time.  After

9    that the MS-13 members, fresh off their latest kill, turn

10   to walk back to Michichi's car.

11          Now, it is difficult to see in that picture, but

12   the beach at Far Rockaway, like most beaches, it's got

13   dunes in the back, and right there, there are designated

14   areas where people can cut through the dunes to get to the

15   beach.  So as the MS-13 members are walking back across

16   the dunes, they can't see what is going on in the parking

17   lot.

18          Unbeknownst to the MS-13 members, as this is all

19   going on an NYPD patrol vehicle has pulled up and is

20   giving Michichi a parking ticket for being in the park

21   illegally after dark.  So as the NYPD is writing up that

22   ticket, the MS-13 members are walking behind the dunes.

23   When they cleared the dunes, they were right in front of

24   the NYPD officer.  The fourth MS-13 member and Boxer play

25   it cool and continue to walk to the car.

22

1        Payaso and the defendant Silencio -- they are

2   back -- they take off down the beach.  They run through

3   the water, go around, and they escape.  They are gone.

4   The NYPD officers notice one of the MS-13 members running

5   away so they ask Boxer and the fourth MS-13 member:  *What*

6   *were you doing on the beach?*  They are told:  *We were*

7   *smoking pot.*

8        *Why did your friend run?*  They have no answer

9   for that.

10        As that is happening, a second NYPD patrol car

11   arrives and so the first officers decide we're going to go

12   out and we're going to try to find the guy who we saw run

13   away.

14        Well, like I said, Silencio and Payaso are long

15   gone.  They don't find them.  But when they turn and face

16   the other direction, what they do find is Baby Blue lying

17   on the sand, gurgling out his last tortured breath before

18   dying.  And it's at that point that the NYPD realizes they

19   have just happened across a murder, so they run back, put

20   Michichi, Boxer, and the other MS-13 member in cuffs.  And

21   the NYPD officer actually cuffing the MS-13 named Boxer,

22   he notices wet blood on their hands.

23        As I said, Boxer was arrested that day.  That is

24   Michichi's car, and that is what it looked like that night

25   after the arrest.  Boxer was arrested that night.  Ortega,

23

1   Silencio, he flees and he's not arrested until March 2012.

2          Now, ladies and gentlemen, that is what the

3   evidence in this case will show.  What I want to talk to

4   you now briefly is just a little bit about the indictment.

5          The defendants are charged in that indictment in

6   part with racketeering; namely, having committed these

7   crimes as part of their membership in what the law calls a

8   racketeering enterprise; in this case the MS-13 gang.

9          Now, I don't want you to be thrown by the term

10  *racketeering*.  Racketeering isn't just for mobsters and

11  mob guys.  At the end of the trial, trial Judge Bianco is

12  going to give you the definition of what a racketeering

13  enterprise is.  And the government must prove that the

14  defendant committed these crimes to increase or maintain

15  their positions within that racketeering enterprise; in

16  this case the MS-13.

17         Now, in addition to the racketeering charges,

18  the defendants are also charged, Silencio is charged with

19  the murder of David Sandler and the attempted murder of

20  Aaron Galan in Brentwood.  He is also charged with the

21  murder on the beach of Baby Blue.

22         The defendant Boxer is charged with the murder

23  of Nestor Moreno, the bouncer in Hempstead.  He is also

24  charged, along with Silencio, with the murder of Baby Blue

25  on the beach.  In addition, Boxer is charged with the

24

1   murder of Vanessa Argueta.  He is not charged with the

2   murder of Diego Torres because, while Boxer gave

3   authorization and assistance to kill Vanessa Argueta, he

4   had no idea that Diego Torres was there and he did not

5   authorize that murder.  He is not charged with that

6   murder.  Boxer is, however, charged with being an

7   accessory after the fact because, after knowing about

8   those murders, he assisted those MS-13 members Cruzito and

9   the other two in fleeing both New York and eventually

10  going all the way to El Salvador in an attempt to avoid

11  responsibility.

12          Finally, with regard to the charges.  Both

13  defendants are charged with having carried and used

14  firearms in the furtherance of the various crimes that I

15  just discussed.

16          Now, that, ladies and gentlemen, is a summary of

17  the case.  I just want to go over the evidence.  The

18  evidence in this case is going to come from testimony of

19  dozens of witnesses.  And those witnesses, in addition to

20  their testimony we're going to introduce physical and

21  documentary evidence which support that these defendants

22  committed the crimes charged.  That evidence is going to

23  include photographs and tattoos of the MS-13 in order to

24  prove the enterprise.

25          Also, witnesses are going to come in and discuss

25

1    a little bit about the MS-13, how it is organized and how

2    it operates.  You are also going to see photographs from

3    all of the crime scenes that we have discussed, and you

4    are going to see how the defendants left those victims at

5    those crime scenes to die.

6         Now, you are also going to hear from these

7    defendants, cooperating defendants, their coconspirators.

8    Coconspirators, fellow MS-13 members who assisted in the

9    murders of Sandler, Moreno, and Quijada, are going come in

10   here and they are going to testify.  They've all accepted

11   responsibility for what they have done.  They've pled

12   guilty to murder.  They are facing life in prison.  They

13   are what we call cooperating defendants.  And they are

14   coming in to receive a reduction or consideration from

15   their sentence by testifying in this case.

16        Now, that is something, ladies and gentlemen,

17   that you can and should consider during their testimony

18   because, when all of the evidence is in in this case,

19   we're not going to ask that you consider their testimony

20   because they are nice people.  They're not nice people.

21   They are MS-13 members.  They're these defendants' friends

22   and they are murderers.  But what we will ask is that you

23   consider their testimony because it will be supported by

24   all of the other in evidence this case.

25        Now, some of that other evidence is going to

26

1    consist of cell phone records.  And you are going to

2    learn, with regard to the cell phone records, that the

3    defendants and their coconspirators at and around the time

4    of the murders were talking with each other and

5    communicating during the times of these murders.  You are

6    also going to see surveillance video.

7              Remember, when we discussed the murder of Mario

8    Canton Quijada, the MS-13 members were at Payaso's house,

9    and Silencio and Boxer, Michichi, a fourth MS-13 member,

10   and Payaso, they leave the apartment on their way to kill

11   Baby Blue?  Well, you're going to see surveillance video

12   from that apartment and you are going to see those five

13   individuals, including those two defendants, doing just

14   that.

15             You are also going to hear from various

16   witnesses.  You're going hear from Aaron Galan, the

17   individual who was with David Sandler when Silencio shot

18   both of them.  You are going to hear from the employees of

19   the El Rancho Bar, both employees who were there at the

20   time of the initial problem between Nestor Moreno and the

21   MS-13 members and Boxer and also on the night when

22   Nestor Moreno was murdered.  You're going to hear from law

23   enforcement officers.  You're going to hear from those

24   NYPD officers who were on the beach that night writing

25   Michichi up the ticket, saw the one MS-13 member take off,

27

1  arrested Boxer and found Baby Blue on the beach.  They are

2  going to come in and testify.  And you are also going to

3  hear ballistics evidence.

4          Remember, through the course of my opening

5  statement I have been telling you with specificity that

6  the murders of Argueta and Torres, that those occurred

7  with a .22 caliber silver handgun.  Moreno:  He was killed

8  with that weapon.  They tried to use that weapon to kill

9  Quijada but it jammed.  The reason why I know that, ladies

10  and gentlemen, is because, at the light of day the next

11  morning, the NYPD found that silver .22 caliber handgun

12  and it was in that position.  It was jammed.  And when

13  they took it and they examined it, there were two bullets

14  jammed in the gun, preventing it from being fired.

15          That gun was recovered by the NYPD.  That gun

16  was then given to ballistics, and the ballistics evidence

17  is that that was the gun that fired the shots that killed

18  Argueta and Torres in the woods and that killed Moreno in

19  that bar.

20          Finally, ladies and gentlemen, you're going to

21  hear from the defendants, themselves, what they said on

22  the night of their arrest.  Remember, I told you that the

23  defendant Boxer was arrested that night by the NYPD.

24  Well, he was taken to a precinct, and at the precinct he

25  waived his rights and, after initially denying any

28

1    involvement in the murders, he admitted to his involvement

2    in the Quijada murder with his fellow MS-13 members on

3    that beach.

4         Not only that.  When investigators in Nassau

5    County and Suffolk County were called in, they questioned

6    Boxer and he admitted again to participating in the murder

7    of the bouncer Moreno with his fellow MS-13 members.  And

8    that night he admitted to being aware of the murders of

9    Torres and Argueta.  Months later Boxer is reinterviewed

10   by the FBI, and again after waiving his rights he admits

11   that he was the one who set in motion, who made it

12   possible for Cruzito, the murderer, to be provided with

13   that gun to kill Vanessa.  You are also going to hear,

14   with regard to the defendant Silencio, he, as I said, was

15   murdered in March 2012.  And again, he was arrested by the

16   FBI.  After his arrest, he waived his rights and he

17   admitted to the FBI to having participated in the murder

18   of Baby Blue on the beach with other MS-13 members.  He

19   also admitted to being the individual who fired the shots

20   that killed David Sandler, again, with his fellow MS-13

21   members.

22        In addition to that, Silencio's house was

23   searched and they found phone records, they found a bat,

24   they found a knife, and also among the belongings in his

25   room they found cutouts and a Spanish-language newspaper

Opening for Defendant Martinez/Mr. Levine

29

1    an article about the death of David Sandler.

2           That, ladies and gentlemen, is what the evidence

3    in this case is going to show.  And at the end of this

4    trial, my colleague is going to have the opportunity to

5    come before you and review that evidence with you again.

6    And at that time, ladies and gentlemen, we're going to ask

7    that you are render a verdict in this case -- the only

8    verdict that will be consistent with all of the evidence

9    in the case -- a verdict of guilty as to both defendants

10   as to all the counts in the indictment.

11          Thank you.

12          THE COURT:  Members of jury, defense counsel for

13   each defendant is permitted, but is not required, to give

14   an opening statement.  The reason they're not required to

15   give an opening statement is because the government has

16   the burden of proof at all times.

17          Defense counsel indicates they wish to give

18   opening statements so we'll hear first from Mr. Levine,

19   counsel for Heriberto Martinez.

20          Go ahead, Mr. Levine.

21          MR. LEVINE:  Thank you, your Honor.

22                     OPENING FOR DEFENSE

23

24          MR. LEVINE:  Good morning.  A couple of things

25   to touch on first.

30

1        The first.  Out of more than 350 juror

2   questionnaires that were completed, we come down to you

3   17.  It was 18.  The snow kept us at 17.  That means that

4   19 out of every 20 who came in here last week and filled

5   out jury questionnaires and were questioned by the parties

6   and the judge couldn't pass muster.  They couldn't follow

7   the law or they wouldn't follow the law.  They couldn't be

8   fair or they wouldn't be fair.  Only you could be trusted

9   by both parties and the judge to do exactly that:  to be

10  fair, to keep an open mind, and to judge the evidence

11  based on the evidence.  Not based on sympathy, not based

12  on emotion.  So you have to keep an open mind.

13        What the AUSA just said sounds very strong;

14  sounds very damning.  He gave very little detail about

15  what each witness was going to say.  He did say it is

16  going to be dozens of witnesses.  It is going to be a

17  tremendous amount of exhibits.

18        You can't be overwhelmed by the number of

19  witnesses the government presents.  What matters is

20  quality, not quantity.  That is, it is not the relative

21  number of witnesses that one side presents or the relative

22  number of exhibits one side gives you; it is the quality

23  those witnesses' testimony and the quality of those

24  exhibits that matter.

25        And the evidence on which the government is

1    going to be relying in this trial is just not sufficiently

2    reliable for to you find Mr. Martinez guilty beyond a

3    reasonable doubt.  Two examples of this unreliable

4    testimony, unreliable evidence, are the cooperators and

5    the so-called confessions.

6           The cooperator testimony is going to come from

7    people who, you heard, are coconspirators.  In this case,

8    some of them are still working on cases in the past, in

9    years past, who have nothing to do with Mr. Martinez,

10   nothing to do with the events in this particular case,

11   They're still working off cases.  Some of them are out,

12   still wandering the streets.  They're not yet deported.

13   They're not in jail.  They are doing whatever they need to

14   do to satisfy the government so they can keep it that way.

15          And these coconspirators who were indicted along

16   with Mr. Martinez, they pleaded guilty.  They pleaded

17   guilty to things like murder, which normally would carry a

18   mandatory life sentence.  It doesn't carry a mandatory

19   life sentence, however, when you're a cooperator.  That

20   mandatory life then suddenly has actually no minimum at

21   all.  They literally can be walking the streets the second

22   this trial ends.  They have every incentive to please the

23   government.

24          It's really just going to be an example of one

25   hand washes the other.  They go to bat for the government

Opening for Defendant Martinez/Mr. Levine

32

1    at this trial; the government will go to bat for them.

2    With the government's help, what would otherwise be a

3    mandatory life sentence suddenly has no minimum.  With the

4    government's help, they won't be deported back to El

5    Salvador.  With the government's help, they and/or their

6    families can be moved to nice areas; some, nicer

7    environments; maybe get into some good schools.

8         In order for them to get that help from the

9    government, the government has to be pleased with their

10   assistance.  And that's exactly what these cooperators

11   intend to do at any cost:  say whatever they must to

12   please the government.

13        You will also hear testimony from these

14   detectives, several detectives, that Mr. Martinez

15   allegedly confessed.  The evidence will show that

16   Mr. Martinez woke up at 7 am, 7:30 or so, on March 16 --

17   Keep that date in mind, March 16, 2010 -- and heads to

18   work at 8:30.  He got to work at 9 am.  He left work at 9

19   pm, after a 12-hour day.  Got home at 9:30.  Went out at

20   10:30.  Got arrested about 12:30 in the morning, that

21   night.  Now we're into March 17.  Got arrested at 12:30.

22        He was eventually taken to the 101st Precinct

23   and processed.  And at 7:15 am -- on March 17 now, about

24   24 hours since he last slept -- the interrogations begin.

25   And you will hear words like *interviews* from these

1    detectives, but, make no mistake, these are not

2    interviews.  These are interrogations.  And there were

3    several of them.

4           You will hear that over the next 20 hours,

5    finally ending at 5 am on March 18 -- almost 48 hours

6    since he woke up to go work on March 16 and nearly 24

7    hours since the interrogations began -- he was

8    interrogated by no less than eight detectives from three

9    different counties in a marathon tag-team interrogation.

10   Each will say he didn't appear tired.  He didn't appear

11   drowsy.  He wasn't yawning.  Each will say he was

12   immediately cooperative and practically eager to implicate

13   himself in the crimes.  Yet, you will also hear that they

14   needed anywhere else from two-and-a-half to five hours,

15   each of them, with him to get these statements, these

16   so-called indictments.

17          You will hear that, despite coming from Nassau

18   to Queens, despite coming from Suffolk to Queens, despite

19   the length of time that he was in that precinct undergoing

20   all this, not a single detective bothered to audiotape or

21   videotape the process.  Not a single one.  They would

22   rather say trust me than let you see for yourselves what

23   happened inside that room.  That, I suggest to you, should

24   be an important consideration for you for when you finally

25   get the opportunity to deliberate in this case.

34

1    It is not simply what they came out of that room

2    with, it is how did they get there that makes it reliable

3    or unreliable.  And they're not going to give you the

4    information you need and let you see what you need to see

5    to make that determination.

6    It reminds me of somebody named Rosie Ruiz.  If

7    any of you are marathon runners, you may remember Rosie

8    Ruiz.  She ran the Boston Marathon -- or so we thought.

9    Rosie Ruiz crossed the finish line first in that Boston

10   Marathon.  But when they went back and looked and talked

11   to other people who were running, they don't remember

12   seeing her.  When they looked at video footage, they

13   didn't really see her along the way.  Turns out,

14   Rosie Ruiz took the subway for most of the marathon, got

15   out a few blocks before the finish line, and crossed the

16   finish line first.

17   She did cross the finish line first.  She was

18   crowned the marathon champion that day.  But what was

19   important was how she got there.  Ultimately, she had to

20   give up that crown because what matters was not where she

21   ended up but how she got there.

22   And that is what you have to consider when you

23   look at these so-called confessions and these

24   interrogations, the length of time, the number of

25   detectives, and how long Mr. Martinez had been up.  It is

35

1   not how the detectives -- it is not what they ended up

2   with when they came out of that room; it is how they got

3   there.  And again, they don't want you to see how they got

4   there.  No audio.  No video.  That is unreliable.

5           So you should not trust the results that they

6   say they came out with.  And given the unreliability of

7   what the cooperators are going to be saying, given what

8   they have to gain and their motives, and given the

9   unreliability of these so-called confessions, there is

10  actually going to be very, very little evidence, if any,

11  that really implicates Mr. Martinez in these crimes.

12          So at the end of this case we will come up and

13  talk to you again about the evidence presented, and we

14  will ask you to find Mr. Martinez not guilty of all these

15  crime.

16          Thank you.

17          THE COURT:  Members of the jury, we'll now hear

18  the opening statement by Mr. London, counsel for

19  Mr. Ortega.

20          MR. LONDON:  Thank you, judge.

21

22                  OPENING FOR DEFENSE

23          MR. LONDON:  Good morning.

24          Carlos Ortega had a dream.  His dream was to

25  come to the United States, get a good job, and send money

1   back to his family to pay for the expense of putting him

2   in the United States and buy his mother some of the things

3   she needed to get by.  And he did that.

4          Let me just tell you a little bit about

5   Carlos Ortega.  He was born April 23, 1989, in a town in

6   El Salvador called San Miguel.  It is actually a city.  It

7   is the third largest city in El Salvador, which is in

8   Central America.  He was raised in a family with

9   four sisters and one brother.

10          When he was eight years old, one of his sisters

11   was killed in a machete attack, another sister was

12   wounded, and he was wounded.  Two years later, when he was

13   age 10, his father was shot to death as an innocent

14   bystander in a police shootout.

15          He came to the United States when he was 18.

16   Before coming he had a minimum amount of education.  He

17   had less than two years of school.  He was in school at

18   age 9 and age 12, both for less than a year.  He had some

19   health problems, heart arrythmia, which kept him out of

20   school.

21          When he came to United States, he was 18 years

22   old.  It was 2007.  He went to Arizona to live with an

23   aunt and an uncle.  He worked in Costco and Best Buy for a

24   year.  He then moved to New York, to Long Island where he

25   worked for LNK International.  It is a company that makes

37

1    generic drugs sold over the counter.  He worked there for

2    four years.  He had an excellent work record.  So he

3    worked there from 2008 until he was arrested in 2012.

4           There are two categories of evidence the

5    government is going to offer against my client,

6    Carlos Ortega.  I will get to that in a moment.  You have

7    been introduced by the judge to me.  I want to introduce

8    Marianne Rantala, my cocounsel.  And you have already met

9    Carlos Ortega.

10          Carlos, if you could stand for a moment and just

11   face the jury.

12          That is my client, Carlos Ortega, about whom I

13   have been speaking.

14          There are two categories of evidence.  The first

15   category is a false confession which the government is

16   going to offer into evidence against Carlos Ortega.  He

17   was arrested on March 26, 2012.  As I said, taken from his

18   place of work by five law enforcement agents.  They took

19   him for questioning.  There is no recording of this

20   questioning.  You will hear testimony by the agent who led

21   the questioning that they have a policy against recording.

22          You will also hear from another law enforcement

23   agent that they have a policy of videotape.  Why would you

24   not videotape a postarrest questioning session with an

25   arrestee?  Why would you not have the best evidence of

38

1  what took place?  Well, you are going to hear about that.

2          I want to say one word about false confessions.

3  False confessions are not unusual in the criminal justice

4  system.  They occur from time to time.  You may have in

5  your experience or having seen --

6          MR. TIERNEY:  Objection.

7          MR. LONDON:  -- or read about false confessions.

8  The Central Park Five.  The Memphis Three.  These are

9  cases where people have confessed to crimes they never

10  committed.  How does that happen?  It is something you are

11  going to have experienced in this case.  The other

12  category -- sorry.  Let me go back.

13          That was 2012.  In 2010, two years before my

14  client was arrested, the government had evidence that

15  other people had committed the Sandler murder and, in

16  fact, were arrested for it.  There was evidence that Sosa,

17  known as Junior, who you will hear from in this trial, was

18  guilty of the Sandler murder.  And Humansor, known as

19  Perdido, was guilty of the Sandler murder.  This is two

20  years before my client was arrested, they were arrested.

21          (Continued on the following page.)

22

23

24

25

Opening - Defense Ortega/Mr. London

1          MR. LONDON:  The other category of evidence

2    you're going to hear against my client is what you've

3    already heard from the government and my co-counsel,

4    co-conspirator, cooperator testimony.

5          You will learn that these are people who have

6    traded their crimes to the government in exchange for a

7    promise of leniency.  In fact one of them, a witness in

8    this case named Guevara, is already out on the street

9    doing whatever he wants to do.

10         At the conclusion of this case Judge Bianco is

11   going to give you some rules for evaluating cooperating

12   testimony.  He is going to advise you that you must look

13   at cooperator testimony with great care and be suspicious

14   of somebody who is trading his crimes for a ticket to get

15   out of jail free.

16         The question posed by cooperator testimony is;

17   would the witness lie to get out of jail?  It's a simple

18   question, one you're going to have to answer.  It's a

19   major consideration in this trial.  Is this witness

20   reliable, is the test.

21         When you have heard all the testimony and

22   examined all the exhibits in this case, you'll be ready to

23   tell the truth.  I have confidence that you can do that in

24   this case.

25         Thank you.

**40**

1      THE COURT:  Members of the jury that concludes

2   the opening statements.

3      We'll take our 15 minute morning break.  We're a

4   little off schedule because we started late today.  So

5   we'll reconvene at twelve noon, and then we'll go to one

6   o'clock and break for lunch at one o'clock.  Okay?

7      Don't discuss the case.  We'll take a 15 minute

8   break.

9      (The jury left the courtroom at 11:49 a.m.)

10     THE COURT:  Everyone please be seated.

11     Who is the first witness?

12     MR. DURHAM:  It's George Davis, your Honor.

13     MR. LONDON:  Your Honor, I move to exclude all

14   witnesses in the case, other than the case agents.

15     THE COURT:  Are there any witnesses here?

16     MR. DURHAM:  No, your Honor, just the case

17   agents.

18     THE COURT:  And is the witness with the tattoo

19   issue?

20     MR. DURHAM:  Ms. Macedonio also has an objection

21   to five exhibits we intend to introduce through this

22   witness.

23     THE COURT:  Why don't I hear from you first.

24   What is the issue with the tattoo?

25     MR. LONDON:  When my client was arrested he had

1    no gang tattoos.  He had no tattoos.  Whatever tattoos

2    were found on him were placed on him after his

3    incarceration.

4              THE COURT:  You mean what is the probative value

5    after the incarceration.

6              MR. LONDON:  Yes.

7              THE COURT:  Government want to respond to that?

8              MR. DURHAM:  No, your Honor.  We intended to

9    introduce these photographs, the tattoos are on one hand

10   MS and on the other hand STLS, which symbolizes La Mara

11   Salvatruchas and the clique Sitios Locos Salvatruchas.

12   Clearly that has probative value, regardless of when he

13   had added them to his hands.  The government will argue

14   that they demonstrate his membership both in the MS-13,

15   and also cooperator testimony, cooperating witnesses who

16   say this defendant was a member of the Sitios clique.

17             THE COURT:  And what about the timing?  What

18   point in time will these folks say in comparison to his

19   arrest?

20             MR. DURHAM:  He did not have these tattoos at

21   the time of his arrest.  He added them later.  We don't

22   object to that.  We don't object to counsel

23   cross-examining the witnesses about it.  But that goes to

24   the weight of the evidence rather than the admissibility.

25             MR. LONDON:  The point is, if he joined MS-13

42

1    after this conspiracy ended, after he was arrested, what

2    relevance is it?

3         THE COURT:  I understand your point, but I agree

4    with Mr. Durham.  I think that goes to the weight of the

5    evidence.  In other words, the fact that any evidence that

6    he was a member, even after his arrest or continued to be

7    a member would be probative of whether or not he was ever

8    a member, or a member during the alleged time frame of the

9    conspiracy here.

10        So I do think it has probative value even though

11   it was after his arrest.  Obviously you can cross-examine

12   him on that, and be clear that he did not have them at the

13   time of the arrest.

14        If you want me to give some type of limiting

15   instruction on that, you can think about that during the

16   break.  Okay?

17        Also, under 403 I have considered any basis for

18   exclusion.  And I believe that the probative value is not

19   substantially outweighed by any danger of unfair

20   prejudice, or any other grounds under 403.  So I will

21   allow it.

22        Okay, the photos or is there something else?

23        MS. MACEDONIO:  It's the photographs.

24        It is my understanding that George Davis is a

25   member of the Sheriff's Department in Nassau County.  In

43

1    that capacity he has also served as a member of the Joint

2    Task Force of the FBI.

3         I understand that his testimony is going to be

4    going through a number of photographs that he has either

5    taken, or that he witnessed.  My concern quite frankly is,

6    your Honor, that the photographs the government seems to

7    admit at this juncture -- he is not an expert witness, so

8    he is not going to be able to testify to what the

9    photographs represent.  And I'm concerned in that regard.

10        In addition, at the moment, since he is the

11   first witness to come in and in this case at all -- the

12   photographs themselves at this point are not relevant.

13   And so while the government may lay a foundation, without

14   further testimony, the photographs once they are admitted,

15   I would ask that they not be shown to the jury.  That they

16   be subject to objection.  And that they only be published

17   to the jury if and when some witness gives competent

18   testimony to tell these jurors what the photographs are.

19        THE COURT:  Mr. Durham?

20        MR. DURHAM:  Your Honor, these exhibits should

21   be admissible for this witness.  They are photographs that

22   he either personally took or was present for, or objects

23   or things that he personally had seen.  Most, if not all

24   of these exhibits, are self-explanatory.  The speak for

25   themselves.  Even if we don't call any other witnesses who

44

1    can testify about these, the exhibits would be properly

2    admissible, so that the parties can make argument.  For

3    example a tattoo says MS-13, the government would be

4    submitting and make certain arguments of the relevance of

5    that photograph at summation.  Defense counsel can oppose

6    it, and they can make arguments opposed --

7          THE COURT:  So I don't have the photos in front

8    of me.  Are these all photos of tattoos or other things as

9    well?

10          MR. DURHAM:  Well your Honor, defense counsel

11   initially gave me a list of five specific exhibits that

12   she was objecting to.  What she is stating now is her

13   objection is a little bit broader.

14          I misread the note, your Honor.  I'm sorry.

15          In any event there are a number of exhibits that

16   she is --

17          THE COURT:  What are the things other than

18   tattoos?

19          MR. DURHAM:  It's photographs of MS-13 graffiti

20   or paraphernalia.

21          THE COURT:  I just want to -- I think her

22   objection is the -- well she has two objections.  One is

23   whether or not they should be published to the jury at

24   this point.  But the other objection I think relates to

25   whether or not the witness is going to interpret the

1  symbols.

2          If he is not, if he just took the photos or was

3  there when these photos were taken by others, he can say

4  this is what appeared at the time.  You should not ask him

5  any questions about what does this mean or things of that

6  nature.

7          MR. DURHAM:  We don't anticipate offering any

8  opinions regarding the photographs.  I will, I would like

9  to introduce the photographs, publish the photographs so

10  the witness can describe when it was taken, where it was

11  taken, and what it shows, and point out the things in the

12  photograph.  But his testimony would be limited to factual

13  testimony rather than expert testimony.

14          It would also be admissible under Rule 701,

15  which provides:  A witness who is not testifying as an

16  expert, testimony in the form an opinion is admissible if

17  it is; A, rationally based on the witness's perception,

18  helpful to clearly understanding the witness' testimony or

19  to determining a fact in issue; and not based on

20  scientific, technical, or other specialized knowledge.

21          THE COURT:  Can I see the photos for a moment?

22          MR. DURHAM:  Your Honor, there are a lot of

23  them.

24          THE COURT:  Why don't you submit them during the

25  break.  I'll look at them during the break.

1          MR. DURHAM:  I can read you the list.  Would

2    that be helpful?

3          THE COURT:  Yes.  I'll look at them during the

4    break.  But the issue regarding -- I think he certainly

5    can testify as to what photos he took and what he

6    observed.  I just want to look at the photos briefly in

7    terms of the relevance.  And it will be subject to

8    connection.  I believe that they can be published to the

9    jury at this point because they have evidential value

10   independent of some later witness explaining a particular

11   symbol within those types of tattoos, or other photos.

12          But I just want to take a look at them to make

13   sure what I believe the photos display is in fact what

14   they do display.  So let me just look at them during the

15   break.  And I'll place the Court's ruling on them after

16   the break.

17          MR. DURHAM:  Your Honor, the objections are, if

18   counsel will correct me, I have two?

19          MS. MACEDONIO:  I have my objections if your

20   Honor would like me to hand it up.

21          THE COURT:  Let's take a break.

22          (A recess was taken at 11:58 a.m.)

23          (After recess the following occurred.)

24          THE COURT:  I went through the photos.  I'm

25   going to mark this as Court Exhibit C, what Ms. Macedonio

47

1    gave the Court to look at.

2         54.2 which is a photo of someone?

3         MR. DURHAM:  54.2 is a photo of David Vasquez

4    also known as Dante (ph).  And  54.3, 54.4 are photographs

5    of his back and then later 13 is from the side of his

6    face.  All of those photographs are of the same

7    individual.

8         THE COURT:  So I have reviewed the ones that

9    there are an objection to.  I believe that as long as this

10   witness can properly authenticate these photos, because he

11   took the photos or he was present when the photos were

12   taken, that they can be introduced through him.  He should

13   not be interpreting the symbols or interpreting any of the

14   tattoos.

15        And with respect to the issue of whether or not

16   they should be published to the jury now or at some later

17   point; I have reviewed the photos, and again what I

18   believe to be the case before I viewed the photos, which

19   is they have relevance of an enterprise on their face

20   without regard to any future witness, cooperating witness

21   or otherwise interpreting them.  Many of the tattoos make

22   reference to MS-13 itself.  So it is relevant and apparent

23   from the photos themselves.

24        And therefore, I don't believe there is any

25   issue of the jurors seeing them now so that they can look

48

1   at them in the context of this witness's testimony.  So

2   the objection, and obviously I have also considered 403 on

3   issue as well -- so the objection is overruled.

4          And just to go back to Mr. London's point, I

5   thought about it during the break, and what a limiting

6   instruction would be.  But if you have a limiting

7   instruction, I would consider it.  I think the issue that

8   the tattoos did not exist at the time of arrest is

9   something that is the subject of cross-examination.  I

10  don't think -- I don't know what I could craft on that,

11  that would limit their consideration.  Obviously they have

12  to consider whether or not it existed, and the defendant's

13  membership.  So I'll just leave it alone for cross.  Okay?

14          MR. LONDON:  Thank you, judge.

15          THE COURT:  Is it hot in here or is it me?

16          MR. DURHAM:  In order to save time, what I

17  intend on doing is, I want to raise it and make sure there

18  is no objection.  I'm going to take all of the exhibits I

19  intend to use for this witness and leave them on the

20  stand.  We have provided defense counsel with the numbers,

21  so there should be -- so they're aware of which exhibits,

22  and can lodge objections.  And then I'll have it broken

23  down into groups, so rather than having, laying a

24  foundation for each individual photograph, because there

25  are so many, I'm going to try to have the witness review

1  them, move them in as groups, and then go through them

2  individually once they're in evidence.  Rather than me

3  going back and forth, I request the Court's permission --

4  I was just going to leave them on the witness stand.

5          THE COURT:  And this goes for everyone during

6  the course of the trial.  You don't have to ask my

7  permission to approach.  Just approach the witness.  Okay?

8          MS. MACEDONIO:  Thank you, judge.

9          THE COURT:  Okay get the jurors.

10         (The jury entered the courtroom at 12:19 p.m.)

11         THE COURT:  It's a little bit hot in the

12  courtroom today.  Hopefully it will get better shortly.

13  Also if the jurors want something to drink.

14         I'll ask the Government to call the first

15  witness.

16         MR. DURHAM:  Your Honor, the government calls

17  Investigator George Davis.

18

19  **GEORGE DAVIS**

20         called as a witness, having been first duly sworn,

21         was examined and testified as follows:

22         THE COURT:  State your name.  Spell your last

23  name for the record.

24         THE WITNESS:  George Davis, D-A-V-I-S.

25         THE COURT:  Mr. Davis, if you can move a little

**50**

1    closer to the mike or it won't pick up your voice.  Thank

2    you.

3              Okay, Mr. Durham.

4              MR. DURHAM:  Thank you, your Honor.

5

6    DIRECT EXAMINATION

7    BY MR. DURHAM:

8    Q    Sir, what do you do for a living?

9    A    I'm a correction officer at the Nassau County Jail.

10   Right now I'm assigned to the FBI Gang Task Force for the

11   past ten years.

12   Q    And how long have you worked in the Nassau County

13   Jail?

14   A    A total of 24 years.

15   Q    I just ask that you speak right into the microphone.

16   Nice and loud so everyone can hear you.

17             How long have you worked at the jail?

18   A    24 years.

19   Q    And how long have you been assigned to the FBI Gang

20   Task Force?

21   A    12/10.

22   Q    While working at the jail, what are some of the job

23   responsibilities you've had?

24   A    I worked in the CERT team for over 22 years.  I was

25   assigned to work on the floors doing security for inmates.

Davis - for the Government - Direct/Mr. Durham

51

1    Q    You said CERT team.  What is that?

2    A    That's the Emergency Response Team.

3    Q    And what about -- since you began working with the

4    FBI Gang Task Force, what are some of your

5    responsibilities there?

6    A    Our job is basically to disrupt and dismantle violent

7    street gangs.

8    Q    And what is your current rank or title?

9    A    I'm an investigator.

10   Q    Now during your time working with Gang Task Force

11   over a decade, have you become familiar with street gangs

12   here on Long Island?

13   A    Yes, I have.

14   Q    And what gangs do we have here?

15   A    We have MS, Bloods, Crips, Latin Kings, Netas.

16   Q    N-E-T-A-S?

17   A    Yes, and various other street gangs.

18   Q    And you mentioned MS, what is the MS?

19   A    Mara Salvatruchas.

20   Q    And during your career have you had involvement with

21   members and associates of the Mara Salvatruchas or MS?

22   A    Yes, I have.

23   Q    And in what capacity have you had that?

24   A    Interviews at the jail, on the street, and during

25   arrests.

Davis - for the Government - Direct/Mr. Durham

52

1    Q    And as a result of your experience have you become

2    familiar with symbols of the MS-13?

3    A    Yes, I have.

4              MS. MACEDONIO:  Your Honor, I object to this

5    line of questioning going any further.

6              THE COURT:  Sustained.

7    BY MR. DURHAM:

8    Q    During the course of your career, have you

9    investigated the MS-13?

10   A    Yes, I have.

11   Q    And during the course of those investigations have

12   you taken photographs?

13   A    Yes, I have.

14   Q    And what are some of the locations you have taken

15   photographs?

16   A    Basically Hempstead, Westbury, Brentwood, Roosevelt,

17   Uniondale, various locations on Long Island.

18   Q    Have you ever taken photographs in connection with

19   those investigations outside of Long Island?

20   A    Yes, I have.

21   Q    Where?

22   A    El Salvador.

23   Q    Have you been to El Salvador?

24   A    Yes, I have.

25   Q    How many times?

Davis - for the Government - Direct/Mr. Durham

53

1    A    Three times.

2    Q    And what was the purpose of your visit to El

3    Salvador?

4         MS. MACEDONIO:  Objection.

5         THE COURT:  Sustained.

6    BY MR. DURHAM:

7    Q    You have been to El Salvador more than one time?

8    A    Yes, I have, three times.

9    Q    And you testified you would take photographs of

10   MS-13, during MS-13 investigations on Long Island?

11   A    Yes, I have.

12   Q    And are some of those photographs you have taken of

13   graffiti?

14   A    Yes, it is.

15   Q    I would ask you to look in front of you at a stack of

16   documents.

17        The first set has been marked Government

18   Exhibits 13 through 22, and Exhibit 48.  I ask you to take

19   a moment to review those items.

20   A    Yes.  I took all of these pictures right here.

21   Q    Do you recognize them?

22   A    Yes, I do.

23   Q    What are they?

24   A    Graffiti.

25   Q    What type of graffiti?

Davis - for the Government - Direct/Mr. Durham

54

1    A    MS gang graffiti.

2              MS. MACEDONIO:  Objection, your Honor.

3              THE COURT:  Sustained.

4              I'm just going to ask the witness to describe

5    where he took them.  But I don't want him to comment on

6    what they are.  Okay?

7    BY MR. DURHAM:

8    Q    The photographs that are in front of you, who took

9    them?

10   A    I did.

11   Q    And during what period of time did you take these

12   photographs?

13   A    The period from 2001 to approximately 2002, 3.  This

14   one probably was taken, on Exhibit 48 was probably taken

15   about three days ago.

16   Q    Taken over a period of time?

17   A    Yes, sir.

18   Q    And looking at those photographs, you testified you

19   took them?

20   A    I took them.

21   Q    And are they fair and accurate depictions?

22   A    Yes, they are.

23             MR. DURHAM:  Your Honor, at this time the

24   government offers Exhibits 13 through 22 and 48.

25             THE COURT:  Any objection?

Davis - for the Government - Direct/Mr. Durham

55

1          MS. MACEDONIO:  I have an objection, your Honor

2     if.

3          MS. RANTALA:  We would join in that objection,

4     your Honor.

5          THE COURT:  Exhibits 13 through 22 and 48 are

6     admitted.

7          MR. DURHAM:  Thank you, your Honor.

8          (Government's Exhibits 13 through 22 and 48 in

9     evidence.)

10          MR. DURHAM:  Could I just publish the exhibits?

11          THE COURT:  Yes.

12          Again, I don't want the witness to comment on

13     the individual exhibits when you publish them to the jury.

14          MR. DURHAM:  We understand.

15     BY MR. DURHAM:

16     Q    Sir, looking at Government Exhibit 13, do you see

17     that on the monitor?

18     A    Yes, I do.

19     Q    And where did you take that photograph?

20     A    Glen Cove.

21     Q    And approximately when did you take that?

22     A    2001.

23     Q    And would you briefly describe, looking at the

24     screen, what is depicted there?

25     A    It's MS graffiti with a --

Davis - for the Government - Direct/Mr. Durham

56

```
 1              MS. MACEDONIO:  Objection.

 2              THE COURT:  Sustained.

 3   BY MR. DURHAM:

 4   Q    On the left side of the photograph there are two

 5   letters.  Can you describe those letters.

 6   A    MS.

 7   Q    And then at the top right-hand corner is the word --

 8   what is that word?

 9   A    Mara Salvatruchas.

10   Q    Let me show you Government Exhibit 14.

11              Do you recognize this item?

12   A    Yes, I do.

13   Q    And when was that taken?

14   A    About 2001.

15   Q    And where was it taken?

16   A    Hempstead.

17   Q    And again on the left side of that there are two

18   letters.  What are those letters?

19   A    MS.

20   Q    And directly to the right there is letters SWP 15 and

21   it's crossed out?  What is that?

22   A    That is a --

23              MS. MACEDONIO:  Objection.

24              THE COURT:  Sustained.

25   BY MR. DURHAM:
```

Davis - for the Government - Direct/Mr. Durham

57

1  Q    When you -- before you testified about gangs on Long

2  Island.  Are you familiar with the gang SWP?

3             MS. MACEDONIO:  Objection.

4             THE COURT:  Sustained.

5  BY MR. DURHAM:

6  Q    Let me show you Government Exhibit 15.  Where was

7  this photograph taken?

8  A    Hempstead.

9  Q    And approximately when?

10  A    About 2001.

11  Q    On the far left side on this photograph, the three

12  items, what are those three items?

13  A    Three dots, that represents death --

14             MS. MACEDONIO:  Objection.

15             THE COURT:  Sustained.  The jury is instructed

16  to disregard.

17             Again, Mr. Davis, the only thing I want you to

18  do is, or there will be continuing objections, that you

19  tell where the photo, where you took it, when you took it.

20  And you can read letters or words on the photo, but not

21  what it means.  Okay?

22             THE WITNESS:  Okay.

23  BY MR. DURHAM:

24  Q    Just describe what is shown, not what it means.

25  Thank you.

Davis - for the Government - Direct/Mr. Durham

58

1   A    It is HLS and 13.

2   Q    And turning to Government Exhibit 16.  Where was this

3   taken?

4   A    Taken in Uniondale.

5   Q    And in the center of that photograph what is that?

6   A    MS.

7   Q    And on the right side what are those letters?

8   A    ULS.

9   Q    And showing you Government Exhibit 17.  Do you

10  recognize that?

11  A    Yes, I do.

12  Q    Where was that taken?

13  A    Uniondale.

14  Q    When?

15  A    About 2001.

16  Q    And when in relation to the exhibit we previously

17  showed you, Government Exhibit 16?

18  A    They were taken a few months apart.

19  Q    Let me show you Government Exhibit 18.  Do you

20  recognize this?

21  A    Yes, I do.

22  Q    Who took that picture?

23  A    I did.

24  Q    And where was that taken?

25  A    Hempstead.

59

1    Q    And looking at the center of the picture, what is

2    shown there?

3    A    We have MS and 13 crossed out along with SWP-15, with

4    feces over 15.

5    Q    And showing you Government Exhibit 19.  Do you

6    recognize those items?

7    A    Yes, I do.

8    Q    What is that?

9    A    That's more MS-13, and SWP being crossed out on the

10   building.

11   Q    Is that the same building depicted in Government

12   Exhibit 18?

13   A    Yes, it is.

14   Q    Show you Government Exhibit 20.  Do you recognize

15   that?

16   A    Yes, I do.

17   Q    Where was that taken?

18   A    Hempstead.

19   Q    What who took that picture?

20   A    I did.

21   Q    And on the left side of the picture, can you describe

22   what is shown?

23   A    MS and HLS-13.

24   Q    And then in the center of the photograph, what does

25   it say?

Davis - for the Government - Direct/Mr. Durham

60

1    A    La Mara Salvatrucha 15.

2    Q    And on the far right side what is shown?

3    A    MS crossing out 15 graffiti.

4    Q    Government Exhibit 21, when did you take that

5    picture?

6    A    About 2010.

7    Q    And where was that taken?

8    A    Taken over in Brentwood.

9    Q    And Government Exhibit 22?

10   A    That was also taken in Brentwood.

11   Q    And the center of that photograph on the wall, what

12   does that say?

13   A    MS.

14   Q    And on the far right side, what is depicted there?

15   A    Also MS.

16   Q    And just above that?

17   A    MS too.

18   Q    Let me show you Government Exhibit 48.  Do you

19   recognize that item?

20   A    Yes, I do.

21   Q    Where was that taken?

22   A    Hicksville.

23   Q    And can you read for the jury what it says?

24   A    MS-13, barrio kill cops.

25   Q    During the course of your investigations, have you

Davis - for the Government - Direct/Mr. Durham

61

1    also photographed the clothing worn by MS-13 members?

2    A    Yes, I have.

3    Q    Take a look in front of you at Exhibits 8 through 12.

4         Do you recognize those items?

5    A    Yes, I do.

6    Q    And what are they?

7    A    They are shirts worn by MS-13 during an El Salvador

8    parade.

9    Q    Are they shirts or are they photographs?

10   A    They're photographs but they're shirts.

11   Q    And who took those photographs?

12   A    I did.

13        MR. DURHAM:  Your Honor, at this time we offer

14   Exhibits 8 through 12.

15        THE COURT:  Any objection?

16        MS. MACEDONIO:  Same objection, your Honor.

17        MS. RANTALA:  We would join in that.

18        THE COURT:  Same ruling.  Exhibits 8 through 12

19   admitted.

20        (Government Exhibits 8 through 12 in evidence.)

21   BY MR. DURHAM:

22   Q    Let me show you Government Exhibit 8.  When did you

23   take those pictures?

24   A    2001.

25   Q    And do you know who the individual is in the picture?

Davis - for the Government - Direct/Mr. Durham

62

1  A   Yes, I do, Fernando Pacheco.

2  Q   Is that P-A-C-H-E-C-O?

3  A   Yes.

4  Q   And do you know him to go by any other names?

5  A   His a/k/a is Hinkley.

6  Q   Hinkley, as in the person who shot President Reagan?

7  A   Yes.

8  Q   And how do you know him?

9  A   I dealt with him on the street many times.

10 Q   I show you Government Exhibit 11.  Do you recognize

11 that?

12 A   Yes, I do.

13 Q   And what is it?

14 A   MS belt buckle.

15 Q   And whose belt buckle was that?

16 A   That's Fernando Pacheco.

17 Q   And is Mr. Pacheco a member of the MS-13?

18 A   Yes, he is.

19 Q   Show you Government Exhibit 12.  Do you recognize

20 that?

21 A   Yes, I do.

22 Q   What is that?

23 A   Salvatrucha 13.

24 Q   And whose shirt is that?

25 A   Fernando Pacheco.

63

1   Q    Showing you Government Exhibit 9.  Do you recognize

2   that?

3   A    Yes, I do.

4   Q    And can you describe what this shirt is?

5   A    This is a member 13 shirt, they alternate, they put

6   MS on the shirt.

7   Q    Government Exhibit 10, is that the same shirt?

8   A    Same shirt, added MS-13 to the shirt.

9   Q    Now, you testified before you traveled to El Salvador

10  during the course of your responsibilities?

11  A    Yes, I have.

12  Q    And while you were in El Salvador did you take any

13  photographs?

14  A    Yes.

15  Q    Where did you take photographs?

16  A    At a prison called Zacatecoluca.

17       MS. RANTALA:  Objection as to this line of

18  questioning, relevance.

19       THE COURT:  Why don't you approach.

20       (The following occurred at sidebar.)

21       THE COURT:  What is this?

22       MR. DURHAM:  I'm just laying the foundation for

23  the photographs, the tattoos from El Salvador.  And the

24  relevance is, we've alleged a racketeering enterprise in

25  the indictment.  We need to establish that that enterprise

Davis - for the Government - Direct/Mr. Durham

64

1   exists over the course of time and geography.  And

2   essentially the gang in El Salvador is the same gang here.

3   So we need to introduce these photographs to establish

4   that.

5           MS. RANTALA:  I would object on 403 grounds.  I

6   mean, it's prejudiced as to the kind of relativity or

7   relevance in this particular matter.  There are no crimes

8   that are alleged to have been charged that involve the

9   location of El Salvador.

10          THE COURT:  Look, I sustained the objection to

11  the expert witness part on these matters that they have to

12  prove existence and enterprise.  They want to prove it's

13  international nature and prove a little bit of its

14  history.  And one way to do that is these pictures.  If

15  you wish I'll give a limiting instruction that they're

16  only considering this as to the existence of the

17  enterprise.

18          Do you want me to give that instruction?

19          MS. MACEDONIO:  Part of my objection to these

20  exhibits was that in most of them you can see that the

21  individuals are in custody.  So that is another part of

22  the objection.  I mean, I think it would be fair for this

23  witness to testify that he traveled to El Salvador and

24  that he had witnessed graffiti and other tattoos while in

25  El Salvador on other individuals, I don't know that it's

65

1    necessary that we bring in any photographs of the prison.

2              THE COURT:  How many photographs of El Salvador?

3              MR. DURHAM:  We limited it, your Honor, to only

4    six or seven.

5              THE COURT:  It is cumulative.

6              MR. LEVINE:  Also, these photographs, pictures

7    were taken inside the jail.  There are jail officers and

8    guards that have their faces covered, which would seem to

9    me that you see that in pictures now, these days, where

10   they don't want the prisoners to know who they are.  You

11   see it in Mexico all the time.  The police and Army with

12   their faces covered from Mexican gang members.

13             MS. MACEDONIO:  I don't know that those are --

14             MR. LEVINE:  There are some.  There is at least

15   one.

16             THE COURT:  Take that one out.  Okay.

17             MR. DURHAM:  Your Honor, what I'll try to do is

18   I'll use that on the Elmo, and I'll put a piece of paper

19   blocking that portion of it so the witness can still

20   identify the photograph.

21             MS. MACEDONIO:  And still come in as evidence?

22             THE COURT:  It is going to be cumulative.  Do

23   you have any other ones?

24             MR. DURHAM:  Let me just double-check, your

25   Honor, and make sure there isn't something unique about

Davis - for the Government - Direct/Mr. Durham

66

1    it.

2            MR. LONDON:  There was one other issue.

3            MR. DURHAM:  I'm sorry, I didn't mean to step on

4    you.  Go ahead.

5            MR. LONDON:  We don't have a monitor where we're

6    sitting, Ms. Rantala and I.  And I don't have the view of

7    any of the monitors.

8            THE COURT:  Okay.

9            MR. LONDON:  I don't want to take time now, but

10   maybe for this afternoon the government could provide us

11   with a monitor because where we sit we don't get to see

12   anything.

13           MR. DURHAM:  We'll see if we have another

14   monitor.

15           THE COURT:  For you, you can move your chair

16   wherever you want.

17           MR. LONDON:  I knew you would say that.

18           MR. LEVINE:  Why don't you turn the laptop.

19           THE COURT:  So do you want me to give the

20   instruction as well?

21           MS. RANTALA:  I would, yes.

22           MS. MACEDONIO:  Thank you, judge.

23           THE COURT:  Mr. Durham, if you need to offer the

24   photo you have to come back and show it to me.

25           MR. DURHAM:  Understood, your Honor, yes.

Davis - for the Government - Direct/Mr. Durham

67

1          (The following occurred in open court.)

2          THE COURT:  Members of the jury, before any

3     further questioning I want to give you what is called a

4     limiting instruction.  During the course of the trial

5     there will be times where I give an instruction with

6     regard to a piece of evidence or a piece of testimony.

7     When I give you those instructions, you're only allowed to

8     consider that evidence or testimony for a limited reason

9     that I'm telling you.  You can't consider it for any other

10    reason.

11         With respect to these various photographs that

12    we're going to introduce in evidence through Mr. Davis,

13    you are only permitted to consider these photographs on

14    the question of the existence of the MS-13 enterprise.

15    One of when of elements that was indicated the government

16    has to prove is that this racketeering enterprise that

17    they've alleged, the MS-13 exists.  And this is the only

18    purpose for which this evidence can be considered, and for

19    no other purpose.  Okay?

20         MR. DURHAM:  May we approach?

21         THE COURT:  Yes.

22         (The following occurred at sidebar.)

23         MR. DURHAM:  I think there's, subject to

24    counsel's objection, there are two photographs, Government

25    Exhibit 1 on the far right side, and 7 we have guys in the

Davis - for the Government - Direct/Mr. Durham

68

1    background.

2              THE COURT:  Yes.  I'm going to sustain the

3    objection.  I think these are cumulative of whatever

4    photos, and given the dress of the guards in these two,

5    they should be excluded.

6              MR. DURHAM:  Your Honor, can we admit Exhibit 1?

7    We'll redact it.

8              MS. MACEDONIO:  Okay.

9              THE COURT:  Yes, so 7 is out and 1 you can

10   redact it.

11             MR. DURHAM:  Yes.  Thank you, your Honor.

12             MS. MACEDONIO:  So redacted.

13             (The following occurred in open court.)

14   BY MR. DURHAM:

15   Q    I was going to ask you a couple of questions about

16   your travels to El Salvador.

17   A    Yes.

18   Q    When you went to El Salvador you took some

19   photographs?

20   A    Yes.

21   Q    And where did you take those photographs?

22   A    In a prison called Zacatecoluca.

23   Q    And is that spelled Z-A-C-A-T-E-C-O-L-U-C-A?

24   A    Yes.

25   Q    I had to write it down.

Davis - for the Government - Direct/Mr. Durham

69

1      That photograph in front of you, Government

2  Exhibits 1, 3 and 4.

3  A    Yes.

4  Q    Do you recognize those items?

5  A    Yes, I do.

6  Q    And what are they?

7  A    These are pictures of the prison, prison cell in El

8  Salvador.

9  Q    And who took those photographs?

10  A    I did.

11  Q    And are they fair and accurate pictures?

12  A    Yes.

13      MR. DURHAM:  Your Honor, we would offer Exhibits

14  1, 3 and 4.  1 will be consistent with your Honor's ruling

15  at sidebar.

16      THE COURT:  Okay.

17      MS. MACEDONIO:  Same objection, judge.

18      MS. RANTALA:  We will join in that objection.

19      THE COURT:  Okay.  1, 3 and 4 are admitted.

20      (Government Exhibits 1, 3 and 4 in evidence.)

21  BY MR. DURHAM:

22  Q    And, sir, looking first at Government Exhibit 1.  Can

23  you describe in the center of the photograph what is

24  depicted?

25  A    Yes.  It's the El Salvadoran seal along with the MS

Davis - for the Government - Direct/Mr. Durham

70

1    hand sign.

2              MS. MACEDONIO:  Objection.

3              THE COURT:  Sustained.  The jury will disregard

4    that.

5              MR. DURHAM:  Your Honor, because of the court's

6    ruling I'll come back to these.

7              Just to confirm, Government Exhibit 1 is in

8    evidence?

9              THE COURT:  Yes, 1 is in, subject to the

10   redaction.  Okay.

11   BY MR. DURHAM:

12   Q    And looking at Government Exhibit 3.

13   A    Yes.

14             MR. DURHAM:  Technical problems, your Honor.

15   BY MR. DURHAM:

16   Q    This was a photograph you took?

17   A    Yes.

18   Q    And where did you take it?

19   A    In El Salvador at Zacatecoluca.

20   Q    And checking Government Exhibit 4, again, what is

21   this?

22   A    Another cell picture at Zacatecoluca.

23   Q    And in the bottom left-hand corner of that

24   photograph, what is shown?

25   A    That's MS-13.

Davis - for the Government - Direct/Mr. Durham

71

1    Q    And what color is that?

2    A    Blue and black actually, but usually white.

3              MS. MACEDONIO:  Objection.

4              THE COURT:  I didn't hear.

5              MR. DURHAM:  The question was what color it was.

6              THE COURT:  And what is the objection?

7              MS. MACEDONIO:  He testified as to the usual

8    color.

9              THE COURT:  Yes, I didn't hear the last part of

10   the answer?  You'll disregard any interpretation he gives.

11   Disregard it, okay?  Just stick to what is there.

12             MR. DURHAM:  That question was just the color on

13   the screen is not showing up, and that is what color it

14   was.

15             THE COURT:  No, I'm not -- he answered it's

16   usually white.  That's what I'm striking.

17   BY MR. DURHAM:

18   Q    And when you were in El Salvador, did you also take

19   photographs of individuals?

20   A    Yes, I did.

21   Q    Looking at photographs 2, 5 and 6.

22   A    Yes.

23   Q    And do you recognize those items?

24   A    Yes, I do.

25   Q    What are they?

Davis - for the Government - Direct/Mr. Durham

72

1    A    The tattoos of, MS tattoos on prisoners.

2    Q    Were they photographs you took?

3    A    Yes, I did.

4    Q    And are they fair and accurate pictures?

5    A    Yes.

6              MR. DURHAM:  Your Honor, we offer 2, 5 and 6.

7              MS. MACEDONIO:  Objection, judge.

8              MS. RANTALA:  I would object also on different

9    grounds.  If we may approach?

10             (The following occurred at sidebar.)

11             MS. RANTALA:  My objection is they are very

12   prejudicial pictures that show tattoos all over the face.

13   Neither of our codefendants here have those kinds of

14   tattoos.  And they're just over the top.  There has to

15   come a point at some point which 403 concerns have to be

16   considered that it's just more prejudicial than the

17   probative value.

18             THE COURT:  Again, the government is required to

19   prove the existence of an enterprise.  They're permitted

20   to show it is of an international character.  They only

21   have -- these are the only few photos from El Salvador.

22   It's not as if they're introducing a hundred photos from

23   El Salvador.

24             How many more of these do you have?

25             MR. DURHAM:  These are the last three, your

Davis - for the Government - Direct/Mr. Durham

73

1    Honor.

2           THE COURT:  So I'm allowing these three in.  As

3    I said before, I'm considering the number of these as well

4    as not particularly inflammatory, but the location of the

5    tattoos.  And the location of the tattoos again goes to

6    the existence of the enterprise and the strength of the

7    enterprise and its membership.  So I'm going to allow it.

8    And I hope the government doesn't have a whole -- I mean,

9    how many photographs do you have besides these in terms of

10   number?

11          MR. DURHAM:  Three more photographs from El

12   Salvador.  And then we have photographs of MS-13 members

13   here.  And again, it is to establish this is part of the

14   same enterprise.  The photographs of tattoos that are

15   common there are common here as well.

16          THE COURT:  I'm going to allow it.  Okay?

17          MS. MACEDONIO:  Thank you, judge.

18          (The following occurred in open court.)

19          THE COURT:  Exhibits 2, 5 and 6 are admitted.

20          (Government Exhibits 2, 5 and 6 in evidence.)

21          MR. DURHAM:  Your Honor, may I publish?

22          THE COURT:  Yes.

23   BY MR. DURHAM:

24   Q    Showing Government Exhibit 2.  Do you recognize that?

25   A    Yes.

Davis - for the Government - Direct/Mr. Durham

74

1    Q    And what is that?

2    A    Tattoos of a prisoner.

3    Q    And you took that picture?

4    A    Yes.

5    Q    And where?

6    A    In Zacatecoluca.

7    Q    And looking at that picture on the chest, what does

8    that show?

9    A    MS.

10   Q    And the bottom picture in the center, what is shown?

11   A    A hand sign.

12   Q    I show you Exhibit 5.

13        MS. MACEDONIO:  Objection.

14        THE COURT:  I'll allow him -- don't interpret

15   what any of these photos are.  I'll allow him to say what

16   these are without interpreting it.

17        MR. DURHAM:  Thank you, your Honor.

18   BY MR. DURHAM:

19   Q    I show you Government Exhibit 5.  Do you recognize

20   that?

21   A    Yes, I do.

22   Q    And what is that?

23   A    Tattoos.

24   Q    And looking at the individual's head, what is shown?

25   A    A hand sign.

75

1   Q    And the bottom of the photograph on the left and

2   right side of the back, what is shown?

3   A    MS.

4   Q    And showing you Government Exhibit 6.  Do you

5   recognize that?

6   A    Yes, I do.

7   Q    And who took that picture?

8   A    I did.

9   Q    And will you describe for the jury what is shown on

10  the person's cheeks?

11  A    MS.

12  Q    What about the neck?

13  A    MS.

14  Q    And sort of around on the stomach, would you read

15  what that is.  What does that say?

16  A    La Mara Salvatrucha.

17  Q    And these picture were taken in El Salvador?

18  A    Yes, sir.

19  Q    And you also photographed tattoos of individuals here

20  on Long Island?

21  A    Yes, I have.

22  Q    Have you seen individuals with tattoos here?

23  A    Yes, I have.

24  Q    How many?

25  A    Hundreds.

76

1    Q    And in what capacity have you seen these tattoos?

2    A    On just about all of the prisoners we have.

3              MS. MACEDONIO:  Objection.

4              THE COURT:  Sustained.

5    BY MR. DURHAM:

6    Q    In what capacity, what were you doing at the time you

7    saw these tattoos?

8    A    Doing an arrest.

9    Q    I ask you to look at the next stack of photographs

10   there, Government Exhibit 28, 29, 30 through 34, 52, 53,

11   54.2 -- excuse me -- yes, 54.2, 54.4 and 54.3.  And also

12   80.1 through 80.5 and 83.1 to 83.4.

13             And 119, 120 and 121.

14             THE COURT:  119?

15             MR. DURHAM:  Yes.

16   BY MR. DURHAM:

17   Q    Do you recognize those?

18   A    Yes.

19   Q    And what are they?

20   A    Tattoos.

21   Q    And are they photographs?

22   A    Yes.

23   Q    Who took the photographs?

24   A    I did.

25   Q    And are they fair and accurate depictions?

Davis - for the Government - Direct/Mr. Durham

77

1    A    Yes.

2              MR. DURHAM:  Your Honor, at this time the

3    government offers Exhibits 28, 29, 30 through 34, 52, 53,

4    54.2 through 54.3, 80.1 through 80.5, 83.1 through 83.4,

5    119 through 121.

6              THE COURT:  I thought you mentioned earlier to

7    the witness 54.4.  Is that in there or not?

8              MR. DURHAM:  It's 54.2 through 54.4.  There are

9    three photographs in the series.

10             THE COURT:  Same objection?

11             MS. MACEDONIO:  Same objection.

12             MS. RANTALA:  And we would follow too, your

13   Honor.

14             THE COURT:  Sale ruling.  Those exhibits are

15   admitted.

16             (Government Exhibits 28, 29, 30 through 34; 52,

17   53, 54.2 through 54.4; 80.1 through 80.5; 83.1 through

18   83.4; 119 through 121 in evidence.)

19             MR. DURHAM:  Thank you, your Honor.  May I

20   publish?

21             THE COURT:  Yes.

22   BY MR. DURHAM:

23   Q    I show you first Government Exhibit 29.  Who took

24   that?

25   A    Yes, I did.

Davis - for the Government - Direct/Mr. Durham

1  Q    Who is that individual?

2  A    Shawn Wegner (ph) a/k/a Trivy.

3  Q    That's T-R-E-V-Y?

4  A    T-R-I-V-Y.

5  Q    Thank you.

6           And where did you take that photograph?

7  A    Hempstead.

8  Q    Approximately when?

9  A    2001.

10 Q    And again, without saying what the meaning is, there

11 is an image on his stomach.  What is that?

12 A    It's a hand sign.

13          MS. MACEDONIO:  Objection.

14          THE COURT:  Sustained.  The jury will disregard

15 that.

16 BY MR. DURHAM:

17 Q    When did you take the picture?

18 A    About 2001.

19 Q    And afterward did you ever encounter this individual

20 again?

21 A    Yes, I did.

22 Q    Did you photograph him again?

23 A    Yes.

24 Q    Show you Government Exhibit 28.  Do you recognize

25 that?

Davis - for the Government - Direct/Mr. Durham

1    A    Yes, I do.

2    Q    Same individual?

3    A    Same individual.

4    Q    And what is that?

5    A    He covered up his tattoo.

6    Q    Now I show you Government Exhibit 30.  Do you

7    recognize that?

8    A    Yes, I do.

9    Q    And who is that?

10   A    Fernando Pacheco.

11   Q    Is that the individual you identified before?

12   A    Yes, I have.

13   Q    Also goes by Hinkley?

14   A    Yes.

15   Q    And looking at that picture, what is shown on the

16   individual's arms?

17   A    1 and 3.

18   Q    Showing you Government Exhibit 31.  What is shown

19   there?

20   A    Happy and sad faces.

21   Q    Government Exhibit 34.  Do you recognize that?

22   A    Yes.

23   Q    And what is it?

24   A    MS.

25   Q    And at the bottom of the photograph?

Davis - for the Government - Direct/Mr. Durham

80

1   A     Yes.

2   Q     And what about right in the center, what's depicted

3   there?

4   A     That's a marijuana leaf.

5   Q     I show you Government Exhibit 52.  Do you recognize

6   that?

7   A     Yes.

8   Q     And who's that taken of?

9   A     Luis Ruiz a/k/a Chucky.

10  Q     Is that R-U-I-Z?

11  A     Yes.

12  Q     And what is shown on this photo?

13  A     MS-13.

14  Q     And Government Exhibit 53.  Do you recognize that

15  individual?

16  A     Guido Ruiz (ph) a/k/a Danpero (ph).

17  Q     And how did you encounter him?

18  A     On the street.

19  Q     And what is depicted there on his chin?

20  A     The number 13.

21  Q     And I forgot to ask you, Exhibit 52, you said that

22  was MS-13 on a member named Chucky?

23  A     Yes.

24  Q     How did you encounter him?

25  A     Arrested him.

81

1           MS. MACEDONIO:  Objection.

2           THE COURT:  Sustained as to -- again, no comment

3   on their membership.  Comment on where he got the photo

4   and what it says.

5   BY MR. DURHAM:

6   Q    How did you encounter Mr. Ruiz?

7   A    Email.

8   Q    And what was he arrested for?

9   A    Murder.

10          MS. MACEDONIO:  Objection, your Honor.

11          THE COURT:  Sustained.  The jury will disregard

12  that.

13  BY MR. DURHAM:

14  Q    Showing you 54.2.  Do you recognize that individual?

15  A    Yes, David Vasquez a/k/a Dante (ph).

16  Q    Dante?

17  A    Yes.

18  Q    And when did you take that photograph?

19  A    This one I took in the jail.

20          MS. MACEDONIO:  Objection.

21  BY MR. DURHAM:

22  Q    Approximately when?

23          THE COURT:  Overruled.

24  A    About 2004.

25  BY MR. DURHAM:

82

| | | |
|---|---|---|
| 1 | Q | And I show you 54.3. Do you recognize that? |
| 2 | A | Yes. |
| 3 | Q | What is that? |
| 4 | A | It's a tattoo. |
| 5 | Q | And who is that tattoo on? |
| 6 | A | David Vasquez. |
| 7 | Q | Same individual in the last picture? |
| 8 | A | Yes. |
| 9 | Q | And again, can you just describe what is shown here? |
| 10 | A | MS-13 and FLS. |
| 11 | Q | FLS is written at the bottom? |
| 12 | A | Yes. |
| 13 | Q | And 54.4, who is shown there? |
| 14 | A | That is Dave Vasquez. |
| 15 | Q | And when was that photograph taken? |
| 16 | A | Around 2009. |
| 17 | Q | This is after the initial photograph? |
| 18 | A | Yes. |
| 19 | Q | Show you Government Exhibit 80.1. Do you recognize |
| 20 | | that individual? |
| 21 | A | Yes. |
| 22 | Q | Who is that? |
| 23 | A | Edward Enriquez (ph). |
| 24 | Q | And how did you encounter him? |
| 25 | A | At the Nassau County Jail -- Melville. |

1    Q    And Exhibit 80.2, who is that?

2    A    Edward Enriquez.

3    Q    And what is depicted there in the center of his

4    chest?

5    A    MS.

6    Q    And 80.3 on the shoulder?

7    A    That's the Joker.

8    Q    Does Mr. Enriquez go by anything?

9    A    His a/k/a was Joker.

10   Q    And again, 80.4, what is shown there?

11   A    MS-13.

12   Q    And that is, MS and the 13 are inside his forearms?

13   A    Yes.

14   Q    And 80.5.  What is shown there?

15   A    It's a hand sign.

16        MS. MACEDONIO:  Objection.

17        THE COURT:  Again, no interpreting.

18   BY MR. DURHAM:

19   Q    It's a photograph of a hand sign?

20        MS. MACEDONIO:  Objection.

21        THE COURT:  Well, he testified it's a hand.  You

22   can testify it is a hand, okay, but not what it is.

23   BY MR. DURHAM:

24   Q    And showing you Government Exhibit 119.  Do you

25   recognize that individual?

Davis - for the Government - Direct/Mr. Durham

1    A    Yes.

2    Q    Who is that?

3    A    Rene Mejia.

4    Q    Does he go by any nickname?

5    A    A/k/a Zorro.

6    Q    Showing you Government Exhibit 120.  What is shown

7    there?

8    A    A tattoo of the El Salvador seal.

9    Q    And Exhibit 121.  What is shown there?

10   A    MS on his chin.

11   Q    Is that also Mr. Mejia?

12   A    Yes.

13   Q    And when was that tattoo done?

14   A    About 2010.

15   Q    Before or after his arrest?

16   A    After his arrest.

17   Q    And during the course of your experience working at

18   the jail, did you photograph graffiti or seen graffiti?

19   A    Yes, I have.

20   Q    And one time or many times?

21   A    Many times.

22   Q    And recently have you seen that?

23   A    Yes.

24   Q    Where?

25   A    A cell, one of our MS guys who is in a cell in the

Davis - for the Government - Direct/Mr. Durham

85

1    Nassau County Jail, the cell was covered with gang

2    graffiti.

3              MS. MACEDONIO:  Objection.

4              THE COURT:  Sustained.  Just disregard that.

5    BY MR. DURHAM:

6    Q    Just answer my question.

7              Whose cell did you observe it in?

8    A    Jonathan L A.

9    Q    Do you know him by any other name?

10   A    Bang Bang.

11   Q    And I ask you to look in front of you at Exhibits

12   45.1 through 45.9.

13   A    Yes.

14   Q    Do you recognize those items?

15   A    Yes, I do.

16   Q    What are they?

17   A    MS graffiti.

18   Q    Are they photographs?

19   A    Yes.

20   Q    Who took the photographs?

21   A    An officer at the Nassau County Jail.

22   Q    Had you personally seen that cell?

23   A    Yes, I have.

24   Q    Are those photographs fair and accurate depictions?

25   A    Yes, it is.

86

1    MR. DURHAM:  Your Honor, at this time I would

2    offer Exhibit 45.1 through 45.9.

3    MS. MACEDONIO:  Same objection.

4    MS. RANTALA:  We would continue in that

5    objection as well.

6    THE COURT:  Same ruling.

7    How many more photos are there?  At some point

8    it becomes cumulative.  Why don't we put these in and

9    we'll take a lunch break.

10    MR. DURHAM:  Thank you, your Honor.

11    THE COURT:  So 45.1 through 45.9 are admitted.

12    (Government Exhibit 45.1 through 45.9 in

13    evidence.)

14    BY MR. DURHAM:

15    Q    And looking at Exhibit 45.1, what does that show?

16    A    MS and BLS.

17    Q    And 45.2, what does that say?

18    A    SALVA.

19    Q    45.3?

20    A    E M E S E.

21    Q    And 45.4?

22    A    MS-13.

23    Q    45.5?

24    A    MS.

25    MR. DURHAM:  Your Honor, this would be a logical

Davis - for the Government - Direct/Mr. Durham

87

1  breaking point if the Court wants to break.

2  THE COURT:  So let's take our afternoon break.

3  We'll meet again at 2:15.

4  Don't discuss the case.

5  Have a good lunch.

6  (The jury left the courtroom at 1:02 p.m.)

7  THE COURT:  So unless there is something

8  different about any other photos that you're asking for

9  submission for purposes of -- is there something different

10  about any of the other ones that you intend to offer?

11  MR. DURHAM:  Your Honor, if I can take a few

12  minutes during the break and review and see if there is

13  anything or any additional exhibits.  If so, we'll bring

14  those to the Court's attention.

15  THE COURT:  Okay.  And then any issue we need to

16  discuss with respect to the next witness -- who is the

17  witness after Mr. Davis?

18  MR. DURHAM:  Your Honor, it's going to be Aaron

19  Galan.

20  THE COURT:  Any issues with Mr. Galan?

21  MS. RANTALA:  I'd really like to point out that

22  in the 3500 material there were a couple of prior arrests.

23  I believe there were a couple, and another one in Ohio, a

24  driving incident.  And we don't have any complaints.  I

25  know the ones in Arizona were dismissed, but we don't have

1    any complaints or any kind of underlying factual basis for

2    any of these arrests.  And we don't know if there is

3    credibility or anything.  So I would seek to preclude this

4    witness.

5            THE COURT:  What information do you have about

6    the arrests?

7            MS. CAPWELL:  Your Honor, we provided a letter

8    to defense counsel.  And in there I put down the charges

9    and the dates of those arrests and the fact that they were

10   both dismissed.  The arrests were for criminal damage to

11   property, the second one was for assault.  And I let

12   Ms. Rantala know this morning that they're both related to

13   altercations or fights with his significant other.

14           And also my position would be that defense

15   counsel not be permitted to inquire about these arrests

16   during cross-examination.  They're not probative of

17   truthfulness, and so they should not be a matter of

18   cross-examination for this witness.

19           MS. RANTALA:  I would add that we have no idea

20   of what the factual basis is other than a general

21   statement.  That was in the letter.  Granted, I did

22   receive that I think it was at 9:35 on a Saturday night.

23           But we don't have any opportunity to review any

24   kind of statement of fact or anything.

25           THE COURT:  Do you have any more information

Davis - for the Government - Direct/Mr. Durham

1    other than that?

2            MS. CAPWELL:  I do not, your Honor.  And it came

3    to my attention that Ms. Rantala actually obtained

4    information independent of the information I had provided

5    to her.  Obviously the court records would be a public

6    matter if she wanted to try to get those.  But again, the

7    incidents, neither of them go to the issue of truthfulness

8    on their face.  They're assault charges and criminal

9    property charges.

10           THE COURT:  First of all, the government doesn't

11   have additional information I was hoping from you on this.

12   But what probative value if it was a dismissed charge,

13   what probative value, if any?

14           MS. RANTALA:  Well, we don't know why they were

15   dismissed or what the underlying factual basis is of

16   either of those charges to determine whether there are

17   credibility issues there or anything.

18           THE COURT:  I'm not going to preclude the

19   witness.

20           I'm going to overrule the government's

21   objection.  If you want to question regarding them you

22   can.

23           MS. RANTALA:  I'm sorry.  Can you clarify that?

24           THE COURT:  They don't have additional

25   information regarding them.  I'm not going to preclude the

Davis - for the Government - Direct/Mr. Durham

90

1    witness.  They go to credibility.  If you want to question

2    him regarding those charges and why they were disposed of

3    or what, I'll permit it.

4              MS. RANTALA:  Thank you.

5              THE COURT:  Anything else?

6              MS. MACEDONIO:  Thank you, judge.

7              THE COURT:  See you at 2:15.

8              (A luncheon recess was taken at 1:06 p.m.)

9              (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

91

1              A F T E R N O O N    S E S S I O N

2                          2:15

3

4              (The following ensued in the absence of the

5       jury.)

6              THE COURT:  Mr. Davis, you can come up again.

7              MR. LONDON:  On a personal note, I want to

8       acknowledge my brother is going to be discharged from the

9       hospital this afternoon and I'm very pleased about that.

10             THE COURT:  I'm pleased to hear that, too.  That

11      is great.

12             Are you going to move on to another area?

13             MR. DURHAM:  We have one more photograph from

14      the jail, one physical item, and this is going to be the

15      end of this line of questioning. Then we are going to show

16      the witness photographs of the defendants and that will be

17      the end of the examination.

18             THE COURT:  Let's bring in the jury.

19             MR. DURHAM:  Your Honor, also one exhibit that

20      went into evidence I skipped over.  I'm just going to go

21      back to that very briefly and then I will move on.

22             THE COURT:  Okay.

23             (The following ensued in the presence of the

24      jury.)

25             THE COURT:  Please be seated.  Members of the

Davis - for the Government - Direct/Mr. Durham

92

1    jury, we will continue now with the direct examination of

2    Mr. Davis.

3            Go ahead, Mr. Durham.

4            MR. DURHAM:   Thank you, your Honor.

5

6    **GEORGE DAVIS**

7            called by the Government, having been previously

8            duly sworn/affirmed, continued testifying as

9            follows:

10

11   DIRECT EXAMINATION   (CONTINUED)

12   BY MR. DURHAM:

13   Q.   Good afternoon.

14   A.   Good afternoon.

15   Q.   Before we broke for lunch an exhibit was admitted and

16   received that I didn't show you.  I just want to move

17   back.

18            I show you what has been marked as Government

19   Exhibit 83.1, which is already in evidence.

20   A.   Mario Jiminez a/k/a Gato.

21   Q.   When was that photograph taken?

22   A.   About 2010.

23   Q.   Were you present when it was taken?

24   A.   Yes.

25   Q.   Looking at the center of his chest, right below the

Davis - for the Government - Direct/Mr. Durham

93

1    neckline, would you read for the jury what that shows.

2    A.    Mara Salvatruchas.

3    Q.    Looking at his stomach, could you say what is there?

4    A.    MS.

5    Q.    Showing you 83.2.  Again, who is depicted here?

6    A.    Mario him necessary.

7    Q.    What does that say on the back?

8    A.    MS.

9    Q.    And looking at 83.4, what does that show?

10   A.    Mario Jiminez.

11   Q.    Top of his head?

12   A.    MS.

13   Q.    What about his shoulders?

14   A.    MS-13.

15   Q.    Now I place a document in front of you that has been

16   labeled Government Exhibit 49.  Would you take a minute to

17   look at that.

18         Do you recognize that item?

19   A.    Yes, I do.

20   Q.    What is it?

21   A.    It is writings on the wall.

22   Q.    Where was that written?

23   A.    At the Nassau jail.

24   Q.    And where within the jail?

25   A.    It was in Ayala.

Davis - for the Government - Direct/Mr. Durham

94

1   Q.   Ayala?

2   A.   Yes.

3   Q.   Is it known by any other nickname?

4   A.   Pajaro.

5   Q.   P-a-j-a-r-o?

6   A.   Yes.

7   Q.   Did you physically see that with your own eyes?

8   A.   Yes.  I instructed officers to take a picture of it.

9   Q.   Is that photograph a fair and accurate depiction?

10  A.   Yes, it is.

11           MR. DURHAM:  The government offers Exhibit 49.

12           MS. MACEDONIO:  Continue the same objection.

13           THE COURT:  Yes.  Why don't you approach,

14  Mr. Durham.

15           (Discussion at sidebar ensued as follows.)

16           THE COURT:  I'm going to exclude this under 403.

17  It contains some inflammatory language.  I think we have

18  seen sufficient amounts of these at this point so I'm

19  excluding this under 403.

20           MR. DURHAM:  Your Honor, I may make an argument

21  on that?  Would the court consider allowing us to redact

22  it?  I understand the top half of it contains the

23  inflammatory language.  At the bottom there is a reference

24  to The Beast and that is going to tie into our other

25  witnesses who will testify that The Beast is essentially

Davis - for the Government - Direct/Mr. Durham

95

1    an icon that the MS-13 worship or otherwise giving homage

2    to after they commit acts of violence.

3            THE COURT:  I don't think we need to redact this

4    out just to reflect that.

5            (Discussion at sidebar was concluded.)

6            MR. DURHAM:  Your Honor, may I approach?

7            THE COURT:  Yes.

8            For the jury.  I sustained the objection to 49

9    so 49 is not coming into evidence.

10   BY MR DURHAM:

11   Q.   I show you what has been marked as Government Exhibit

12   44.

13           Do you recognize this item?

14   A.   Yes, I do.

15   Q.   What is it?

16   A.   It is a jail graffiti cut off from sheets at the

17   Nassau County jail.

18   Q.   From whom was this seized?

19   A.   Pajaro.

20   Q.   Pajaro?

21   A.   Pajaro.

22   Q.   The same individual you just testified about?

23   A.   Yes.

24   Q.   Did you take custody of this item?

25   A.   Yes, I did.

96

1   Q.    Directly from him or someone e;se

2   A.    Directly from another officer.

3   Q.    Since that time it has been in your custody and

4   control?

5   A.    Yes.

6             MR. DURHAM:  Your Honor, at this time the

7   government would offer Government exhibit 44.

8             THE COURT:  Let me take a look at it.

9             Do you have the same objection?

10            MS. MACEDONIO:  Yes.

11            THE COURT:  Same objection?

12            MS. RANTALA:  Same objection, your Honor.

13            THE COURT:  The objection is overruled.  44 is

14  admitted.

              (Government Exhibit 44 in evidence.)

              MR. DURHAM:  Would you step down for a minute.

              THE COURT:  I don't want him to explain it.

BY MR DURHAM:

Q.    Just on the far left and far right side of this, what

is shown?

A.    M and S.

Q.    In the middle?

A.    Just a hand of two figures sticking up with a 1, a 3,

and MS in the middle.

Q.    Thank you.  I want to direct your attention to April

Davis - for the Government - Direct/Mr. Durham

23, 2010.  Were you working that day?

A.    Yes, I was.

Q.    What was your assignment?

A.    My assignment was to pick up Heriberto Martinez at Rikers Island.

Q.    Why were you picking him up?

A.    On murder charges.

Q.    And after you picked him up, where did you bring him?

       MS. MACEDONIO:  Your Honor?  Could we have a limiting instruction.

       THE COURT:  Yes.

       With respect to the testimony you just heard, I want to give you a limiting instruction, and obviously this will apply; if this issue should come up again during the course of the trial, I may repeat it to you at that time.

       Members of the jury, you may hear that one more defendants were incarcerated in jail pending trial.  The fact that a defendant may have been incarcerated at some point during the pendency of this case has no bearing on the issue of guilt.  You are instructed to ignore that fact in determining whether the government has satisfied its burden of proof as to the charges in the indictment.

       MR. DURHAM:  Thank you, your Honor.

BY MR DURHAM:

Davis - for the Government - Direct/Mr. Durham

98

Q.    Where did you transport the defendant to?

A.    To Melville.

Q.    Is that an FBI office?

A.    Yes.

Q.    Were you involved in the arrest process?

A.    I was taking pictures.

Q.    And what did you take pictures of?

A.    Tattoos.

Q.    I ask you to look at Exhibits 36 through 40 in front of you.

        Do you recognize those items?

A.    Yes, I do.

Q.    What are they?

A.    Tattoos.

Q.    Whose tattoos?

A.    Heriberto Martinez.

Q.    Look around the courtroom.  Do you see the individual whose tattoos they are?

A.    Yes.

Q.    Would you please point him out and identify him for the record.

A.    The guy in that black and gray shirt.

Q.    And starting on the right side of the table moving left, which person is he?

A.    He is the third one.

99

MR. DURHAM:  Your Honor, we ask that the record reflect that the witness has identified the defendant Heriberto Martinez.

THE COURT:   Yes, the record shall reflect that.

BY MR DURHAM: Are?

Q.   You were present when these photographs were taken?

A.   Yes, sir.

Q.   Are they fair and accurate depictions of the defendant?

A.   Yes, they are.

MR. DURHAM:  Your Honor, the government offers Exhibits 36, 37, 38, 39, and 40.

MS. MACEDONIO:  I have no objection.

THE COURT:  Government Exhibits 36 through 40 are admitted.

(Government Exhibits 36 through 40 received in evidence.)

THE COURT:  Again, Mr. Davis, don't interpret any of them.  Just read what you see.  Okay?

THE WITNESS:  Okay, your Honor.

BY MR DURHAM:

Q.   First looking at Exhibit 36.  What do you see on the defendant's chest?

A.   The El Salvadorian seal and LA.

Q.   And the seal, where is that located?

A.    On his stomach.

Q.    And the LA, where is that located?

A.    That is on his chest.

Q.    Government Exhibit 37.  Is that a closeup of what you

just described?

A.    Yes, it is.

Q.    Showing you Government Exhibit 39.  Do you recognize

that?

A.    Yes.

Q.    What is that?

A.    CLS.

Q.    Where is that?

A.    That is in -- you want to know where?

Q.    What part of the body is it located on?

A.    Oh.  The finger.

Q.    The defendant's hand?

A.    Yes.

Q.    On the inside of the middle finger?

A.    Yes.

Q.    It shows CLS?

A.    Yes.

Q.    Showing you Government Exhibit 40.  What does that

say?

A.    503.

Q.    And were you also involved with the arrest of the

Davis - for the Government - Direct/Mr. Durham

101

defendant Carlos Ortega also known as Silencio?

A.    Yes.

Q.    Was that in March of 2012?

A.    Yes.

Q.    At that time did you observe his hands?

A.    Yes.

Q.    Did he have any tattoos on his hands?

A.    Not at all.

Q.    Subsequently have you observed his hands?

A.    Yes, I have.

Q.    Did he add any tattoos to his hands?

A.    Yes, he did.

Q.    What tattoos?

A.    MS.  And STLS.

Q.    And at some point have you seen photographs of those
tattoos?

A.    Yes, I have.

Q.    I ask you to you look in front of you at Government
Exhibit 77.1, 77.2, and 77.3.

        Do you recognize those?

A.    Yes, I do.

Q.    What are they?

A.    MS.  And STLS.

Q.    But those items in your hand, what are they?

A.    They are tattoos.

Davis - for the Government - Direct/Mr. Durham

102

Q.    Are they photographs?

A.    Yes.

Q.    And are those photographs fair and accurate
depictions of the defendant's tattoos?

A.    Yes, they are.

Q.    For the record, did you see the defendant Carlos
Ortega in the courtroom?

A.    Yes, I do.

Q.    Where is he seated?

A.    He's sitting in fourth seat.

          MR. LONDON: Indicating Carlos Ortega.

          THE COURT:  Yes.

BY MR DURHAM:

Q.    Are those photographs fair and accurate depictions?

A.    Yes, they are.

          MR. DURHAM:  The government offers 77.1, 77.2,
and 77.3.

          MR. LONDON:  May I have a voir dire on this,
judge?

          THE COURT:  Sure.

          So that you understand, members of the jury.

          A voir dire allows the opposing counsel to
question regarding the exhibit that is being offered into
evidence only.  Obviously, Mr. London will have an
opportunity to do a cross-examination when the direct is

Davis - for the Government - Direct/Mr. Durham

103

done, but he is allowed to ask questions before I rule on the admission of those items.

Go ahead, Mr. London.

MR. LONDON: Thank you, judge.

VOIR DIRE EXAMINATION

BY MR. LONDON:

Q.   Investigator Davis, did I understand you to say that in March of 2012 when Carlos Ortega was arrested he had no tattoos?

A.   No, he did not.

Q.   And at some point at a later time, you heard or observed that he had tattoos?

A.   I observed that he had tattoos.

Q.   What time was that?

A.   That was a few weeks ago.

Q.   Just a few weeks ago from today.

A.   Yes.

Q.   And that was the first time you observed that he had any tattoos?

A.   Yes.

MR. LONDON:  I have no further questions, judge.

THE COURT:  Okay.  Same objection as earlier?

MR. LONDON:  Same objections.

THE COURT:   I'm going to admit 77.1, 77.2, and 77.3.

104

I will just say with respect to those exhibits, members of the jury, like any other exhibits, it is up to you to determine what weight should be given any piece of evidence.  And that applies to all evidence in the case.

MR. DURHAM:  Thank you, your Honor.

(Government Exhibits 77.1, 77.2, and 77.3 received in evidence.)

BY MR DURHAM:

Q.   First looking at Government Exhibit 77.1.  Describe what is depicted there.

A.   An M and an S.

Q.   Is that on defendant Carl Ortega's right hand?

A.   Yes.

Q.   M is on the ring finger and S is on the middle finger?

A.   Yes.

Q.   I'm showing you Government Exhibit 77.2.  Can you describe what is depicted there.

A.   A tattoo of ST and LS on all four fingers.

Q.   Finally, showing you 77.3.  What is shown there?

A.   MS.  STLS.

MR. DURHAM:  No further questions, your Honor.

THE COURT:  Okay.  Cross-examination Ms. Macedonio?

MS. MACEDONIO:  May we be heard at sidebar?

Case 2:10-cr-00074-JFB Document 1576 Filed 11/30/15 Page 105 of 177 PageID #: 7409

THE COURT: Sure.

(Discussion at sidebar ensued as follows.)

MS. MACEDONIO: Judge, I would move to strike Investigator Davis' testimony. While I appreciate the court sustaining most of my objections, I don't think the bell can be unrung. I thinks he really has testified as an expert in this case. There is no way for the jury not to have heard his testimony that he interpreted the photographs to be tattoos and graffiti that he claims was depictions of MS-13, testimony which should never have been given.

So while I appreciate the court sustaining most of my objections, the bell cannot be unrung and I move that it be stricken from the record.

MS. RANTALA: I join.

THE COURT: I will overrule the objection. I told the jury and I will again tell the jury that they should disregard any interpretations that he made during his direct. As I said before, most of the exhibits speak for themselves. At certain times, there was nothing intentional about it in my view, but when I saw him trying to identify something that maybe required some interpreting, I immediately told him to disregard it. But I will do so again just to make sure that they understand that.

MS. MACEDONIO:  Judge, I know that your Honor had given a limiting instruction before, but I'm not sure that you gave the limiting instruction with regard to the racketeering conspiracy, the evidence that has just come in that we had drafted today.  I'm not sure.  You may have done it.

THE COURT:  No, I didn't do it.  Do you want it now?

MS. MACEDONIO:  Yes.  Thank you.

MS. RANTALA:  Can I note the fact that these people may have been at some point in the prior few weeks or years in jail.  I mean, there was another limiting instruction.

MS. MACEDONIO:  That is why we did that.

MS. RANTALA:  All right.

(Discussion at sidebar was concluded.)

THE COURT:  Before we go ahead, first two things.

Firstly, I want to emphasize something I said prior to lunch, which is -- and I sustained, as you heard, a number of objections on the record to testimony; you are not to consider any of Mr. Davis's interpretation of any of these various symbols or words.  He, as a witness, is simply identifying what he saw, what pictures he took, and that is it.  So anything else that he says regarding any

interpretation you should disregard because that is not
his role as a witness in this case.

I also want to give you another limiting
instruction again that will apply to this evidence as well
as to other evidence that you will hear during the course
of the trial as relates to MS13 racketeering enterprise.

As I said before lunch, this evidence is being
offered for that limited purpose.  The question is whether
or not the MS-13 racketeering enterprise existed and I
want to give you a more full instruction with respect to
that now.

Members of the jury, the indictment in this case
alleges that the MS-13 is a racketeering enterprise.  In
order to qualify as a racketeering enterprise, an
organization must engage in one or more activities
designated as racketeering activities.

Here the indictment alleges that the MS-13
engaged in unlawful racketeering acts, including acts and
threats involving murder, robbery, narcotics trafficking,
extortion, witness tampering, and witness retaliation, in
violation of the laws of the State of New York and/or of
the United States.

One of the elements that the government must
prove beyond a reasonable doubt is that the MS-13 engaged
in these racketeering activities.  Thus, you may hear

evidence about crimes allegedly committed by members and associates of the MS13 who are not on trial.

The indictment does not allege these defendants personally participated in these crimes.  Indeed, the government does not contend that the defendants were personally involved in them.  Evidence I have permitted in this case related to such racketeering activities is offered solely to establish the nature of the alleged enterprise of the MS-13.  It has no bearing on these defendants personally and should not be considered for any other reason.

During the course of the trial you will hear that evidence may be allowed for a limited purpose or that it only applies to one of the defendants.  When I identify evidence as being limited to a purpose or for a defendant, you will consider that evidence for its limited purpose. You are not to consider such testimony and evidence in finding any other issue or related to another defendant. Whenever such evidence is admitted, I will instruct you as to its proper use, and to the extent that you find that the evidence is credible, you are permitted to use the evidence only as instructed.  Any other use of that testimony would be improper.

That concludes the limiting instruction.

Cross-examination, Ms. Macedonio?

109

MS. MACEDONIO:  Judge, I have no questions, judge.

MS. RANTALA:  No questions, your Honor.

THE COURT:  Okay.  You can step down.  Thank you.

(The witness was excused.)

THE COURT:  Next witness.

MS. CAPWELL:  Your Honor, the government calls Aaron Galan.

May I have permission to place the exhibits and laser pointer at the witness stand?

THE COURT:  Yes.

MS. CAPWELL:  And may we dim the lights a little bit?

THE COURT:  Sure.


**AARON GALAN**

called by the government, having been first duly

sworn/affirmed, was examined and testified as

follows:

THE COURT:  Pull your chair up so that you're very close to the microphone.  And keep your voice up.

Go ahead, Miss Capwell.

MR. DURHAM:  Thank you, your Honor.

110

DIRECT EXAMINATION

BY MS. CAPWELL:

Q.   Good afternoon, sir.  How old are you?

A.   23.

Q.   Where did you grow up?

A.   Brentwood, New York.

Q.   I'm sorry.  Where was that?

A.   Brentwood.

Q.   Is that in Suffolk County here on Long Island?

A.   Yes.

Q.   Did you know an individual named David Sandler?

A.   Yes.

Q.   How old were you when you first met David Sandler?

A.   I was 15.

Q.   Was he your age?

A.   Yes.

Q.   How did you meet David Sandler?

A.   Through mutual friends.

Q.   How would you describe your relationship with
David Sandler.

A.   David was my best friend.

Q.   Did you ever live with David Sandler?

A.   Yes.

Q.   When was that?

A.   Since I met him, really.

Q.    From the time you met him up until what point?

A.    Until we got shot.

Q.    Okay.  What date did that happen?

A.    February 17, 2010.

Q.    Sir, if you could, would you look at that first photograph that is on the witness podium there.  That has been marked as Government Exhibit 248.

          Do you recognize the individual in that photograph?

A.    Yes.

Q.    Who is that?

A.    That's David Sandler.

Q.    Does that photograph fairly and accurately show David Sandler as you knew him?

A.    Yes.

          MS. CAPWELL:  Your Honor, the government moves to admit and to publish Government Exhibit 248.

          MS. MACEDONIO:  No objection.

          MS. RANTALA:  No objection, your Honor.

          THE COURT:  Government Exhibit 248 is admitted.

          (Government Exhibit 248 in evidence.)

          MS. CAPWELL:  Thank you, your Honor.

          Could I just have a moment to publish this to the jury?

          THE COURT:  Yes.

BY MS. CAPWELL:

Q.   So, Mr. Galan, that is David Sandler?

A.   Yes.

Q.   And what happened to Mr. Sandler?

A.   We both got shot.

Q.   And did he survive?

A.   No, he didn't.

Q.   And you were shot, too?

A.   Yes.

Q.   And you told us that was February 17 of 2010?

A.   Yes.

          MS. RANTALA:  Objection, leading.

          THE COURT:  I think he stated that already.  But try not to lead.

          MS. CAPWELL:  Yes, your Honor.

BY MS. CAPWELL:

Q.   Where did the shooting occur?

A.   On Second Avenue and Timberline, Brentwood, New York.

Q.   Was that Brentwood?

A.   Yes, it was.

Q.   How old were you at the time of the shooting?

A.   I was 20.

Q.   Where were you living at that time?

A.   I was living at 101 Timberline Drive in Brentwood.

Q.   Do you currently live at 101 Timberline Drive in

113

Brentwood, New York?

A.    No, I do not.

Q.    Now I ask you to take a look at the next photograph there, which is labeled as Government Exhibit 251.

Do you recognize the location that is depicted in that photograph?

A.    Yes.

Q.    And what location does that picture show?

A.    That is Second Avenue and Timberline.

Q.    In Brentwood?

A.    Yes.

Q.    Is that the neighborhood where you used to live?

A.    Yes.

Q.    Does that photograph fairly and accurately depict that intersection or area of Timberline Drive and Second Avenue back when you lived there?

A.    Yes, it does.

MS. CAPWELL:  Your Honor, the government moves to admit Government Exhibit 251 and to publish it to the jury.

MS. RANTALA:  Could I see a picture of that?

MS. CAPWELL:  It is 251.

MS. MACEDONIO:  I have no objection.

MS. RANTALA:  No objection.

THE COURT:  251 is admitted.

MS. CAPWELL:  Thank you, your Honor.

(Government Exhibit 251 in evidence.)

BY MS. CAPWELL:

Q.    Mr. Galan, I will just ask you to take a look at the picture.  It is in front of you and it is also behind you. In the larger overhead projection.  Sorry.

Can you point out, does that picture show where you used to live?

A.    Yes, it does.

Q.    Can you, actually there is laser pointer right there and there's a little button on it.  Can you use it just to point out --

A.    Right there.

Q.    What address was that?

A.    That's 101 Timberline.

THE COURT:  So that the record is clear.  The witness indicated the house in the lower right-hand corner of the screen.  Above the yellow sticker.

MS. CAPWELL:  Thank you, your Honor.

BY MS. CAPWELL:

Q.    And did you live alone at that location?

A.    I lived with my wife Jasmine Sandler, David, and my youngest son.

Q.    You said your wife's name was Jasmine Sandler?

A.    Yes.

115

Q.    How was she related to David Sandler?

A.    They are brother and sister.

Q.    Using the laser pointer again, can you please point out Timberline.

A.    This is Timberline.

Q.    And for the record, is it fair to say that is the street that runs vertical in this photograph?

A.    Yes.

Q.    What direction, if you know, does Timberline Drive run in?

A.    North and south.

Q.    And can you point out where Second Avenue is, please.

A.    This is Second Avenue.

Q.    Okay.  Thank you.

            THE COURT:  Indicating the horizontal street.

            MS. CAPWELL:  Thank you.

BY MS. CAPWELL:

Q.    Can you please turn now to Government Exhibit 252. Do you recognize the scene that is depicted in that picture?

A.    Yes.

Q.    What is that?

A.    It is Second Avenue and Timberline.

Q.    Is it similar to Exhibit 251, a photograph in Exhibit 251?

Galan - for the Government - Direct/Ms. Capwell

A.    Yes.   This is a closer view.

Q.    A closer view?   Okay.   And does Exhibit 252 fairly and accurately depict the intersection of Timberline Drive and Second Avenue?

A.    Yes.

          MS. CAPWELL:   Your Honor, the government moves to admit Exhibit 252 and to publish it to the jury.

          MS. MACEDONIO:   No objection.

          MS. RANTALA:   No objection.

          THE COURT:   Government Exhibit 252 is admitted.

          MS. CAPWELL:   Thank you.

          (Government Exhibit 252 in evidence.)

BY MS. CAPWELL:

Q.    Government Exhibit 252 is now on the screen.

          And looking there to the buildings that are on the right-hand of the screen, can you please, Mr. Galan, just describe for us what is in those buildings.   What are we seeing there?

A.    That is a beauty supply salon and the laundromat. That is the Los Hermanos grocery.   That is a restaurant. And that is indoor soccer field.

Q.    Okay.   So the indoor soccer field that you pointed out, can you describe the building for the record.

A.    This building, right here.

Q.    What are the colors of the building?

Galan - for the Government - Direct/Ms. Capwell

A.    Blue and white.

THE COURT:  He is indicating the top left

corner.

BY MS. CAPWELL:

Q.    And looking then you said -- you mentioned Los

Hermanos.  What kind of establishment is that?

A.    That is like a grocery store.

Q.    And can you point it out again for the jurors, with

the laser pointer.

Okay.  Is it fair to say that is on the

right-hand side of the photograph?

A.    Yes.

Q.    Okay.  It might be hard to see on the big screen, but

on the smaller screen can you see, is there any kind of

color or signage related to the Los Hermanos grocery

store?

A.    Yes.  I think it is like yellow.

Q.    And does this photograph show 101 Timberline Drive

where you used to live?

A.    Yes.

Q.    Using the laser pointer, can you point out where you

used to live.

A.    Right over here.

Q.    Okay.  Is it fair to say the exhibit sticker is

covering part of the front lawn?

Galan - for the Government - Direct/Ms. Capwell

118

A.    Yes.

Q.    You mentioned that you, at the time right before the shooting you were living with Jasmine Sandler, David Sandler, as well as your son?

A.    Yes.

Q.    And are you and David Sandler's sister still together?

A.    Yes.

Q.    Now let's talk about the events that occurred on February 17, 2010, prior to the shooting.

       What did you do that day?

A.    I went to work.

Q.    Where were you working at the time?

A.    Model Classics.

Q.    What kind of a store is that?

A.    It is a custom furniture store.

Q.    Approximately what time did you get home that day?

A.    I want to say 4. 4ish. 5.

Q.    Are we talking about the afternoon?

A.    Yes, in the afternoon.

Q.    What was the weather like on that day?

A.    It was like just had snowed, it was slushy and, you know, just lots of snow on the floor.

Q.    Okay. And aside from your work at the furniture store, did you make money in any other way?

Galan - for the Government - Direct/Ms. Capwell

A.    Yes.

Q.    How did you make money?

A.    I sold weed.

Q.    And when you say weed, what are you referring to?

A.    Marijuana.

Q.    Were you selling marijuana on your own or with others?

A.    I was selling with David.

Q.    By David, you mean David Sandler?

A.    David Sandler, yes.

Q.    For how long had you and David been selling marijuana together?

A.    Since we were kids.  Since we just met, like 15, 16.

Q.    Where did you and David typically sell marijuana?

A.    On the corner of Second Avenue and Timberline, that little area you can see in the picture.

Q.    Referring to Government Exhibit 252?

A.    Yes.

Q.    And did you have a cellular telephone back then?

A.    Yes, I did.

Q.    Did anyone else use the cell phone besides you?

A.    Yes.  David.

Q.    Now when you got home from work on February 17, 2010, was David home?

A.    Yes, he was.

Galan - for the Government - Direct/Ms. Capwell

120

Q.    After getting home that evening from work, did you receive any phone calls in connection with your marijuana business?

A.    Yes.

Q.    And can you describe that call for me.

A.    I got a call from an unknown number.

Q.    I'm sorry.  What did you say?

A.    An unknown number.

Q.    Okay.

A.    It was a blocked number.  Some guy called me and, you know, I didn't understand him.  He really sounded drunk and --

Q.    Let me interrupt you quickly.  What language was he speaking?

A.    He was speaking Spanish.

Q.    Okay.  And what did he say to you during the conversation?

A.    He wanted weed, marijuana, and he was trying to get me to meet him over off Hilltop or Claywood, one of those other blocks on the side.

Q.    In Brentwood?

A.    Yes.

Q.    And about how far would Hilltop or -- what was the second street you mentioned?

A.    Claywood.

Q.    Claywood, about how far?

A.    That's about like three or four blocks.

Q.    But you could walk there?

A.    Yes, from my house.

Q.    Okay.  Did you agree to meet him there?

A.    Yes.  No, I didn't.  I did not.  I told him to meet
at the bodega because I didn't know who it was or --

Q.    Let me break that down a little bit.

      When you told him to meet at the bodega, what
were you referring to by the bodega?

A.    The grocery store right there on Second Avenue.

Q.    The one you pointed out earlier?

A.    Yes.

Q.    The name of it is Los Hermanos?

A.    Yes.

Q.    And why didn't you want to go to the location that he
had suggested?

A.    Because over there is no light, there is no -- it is
just dark, so I'd rather meet somebody I didn't know at
the grocery store because I usually went there.  I knew
the owners.

Q.    Okay.  And you mentioned somebody that I didn't know,
is what you said.  So did you recognize this person's
voice?

A.    No.  I never heard this guy before.

Galan - for the Government - Direct/Ms. Capwell

122

Q.    Okay.  And did you agree that you would meet him at the bodega?

A.    Yes, I did.

Q.    Now, given that you did not recognize the voice and you did not know who this caller was, other than that he was speaking Spanish and he was a male, correct?

A.    Yes.

Q.    Did you have any idea who this guy on the phone was?

A.    No, I didn't.

       David had told me he met somebody earlier and he said that could have been him, so we were assuming that it was that guy.

Q.    Okay.  And when David said that, did that mean earlier that day?

A.    Yes.

Q.    All right.  Did David indicate where he met this person?

A.    On the little strips of stores right off of Second and Timberline.

Q.    The ones that are depicted in Government Exhibit 252?

A.    Yes.

Q.    And what telephone were you using when you received this call from this unknown number?

A.    I was using my phone, G1.

Q.    G1 refers to what?

Galan - for the Government - Direct/Ms. Capwell

123

A.    It is just a kind of phone.  T-Mobile phone.

Q.    T-Mobile. And what was your telephone number back in February of 2010?

A.    It was like 715-9221 or something like that.

Q.    Which area code?

A.    631.

      MS. CAPWELL:  Your Honor, may I have a moment to retrieve this evidence?

      THE COURT:  Yes.

BY MS. CAPWELL:

Q.    Sir, I'm handing you what has been marked for identification as Government Exhibit 219A.

      Can you please take a look at that exhibit, that item, and let me know if you recognize it.

A.    Yes, that's my phone.

Q.    Is that the telephone that you just referred to?

A.    Yes.

Q.    How do you recognize it as your old telephone?

A.    It's got a crack in the screen.

Q.    Okay.  And were those cracks on the screen there when you --

A.    Yes.  I had a little crack but it wasn't cracked like that.

Q.    Okay.  So is it in substantially the same condition --

Galan - for the Government - Direct/Ms. Capwell

124

A.   Yes.

Q.   -- as it was at that time?

A.   Yes.

Q.   And after the shooting on February 17, 2010, were you able to -- did you have your phone after that time, after that date?

A.   I'm sorry.  Can you repeat the question?

Q.   Sure.  After you were shot on February 17, 2010, did you keep the phone?

A.   No, I didn't.  I didn't know what happened to the phone.

Q.   And at some point after you were shot, did you see the phone?

A.   Yes.

Q.   Who showed it to you?

A.   The Suffolk County detective.

Q.   And have you had that phone since the day of the shooting?

A.   No.

        MS. CAPWELL: Your Honor, the government moves to introduce Exhibit 219A into evidence.

        MS. MACEDONIO:  No objection, your Honor.

        MS. RANTALA:  No objection.

        THE COURT:  Government Exhibits 219 is admitted.

        (Government Exhibit 219 in evidence.)

125

BY MS. CAPWELL:

Q.    What did you do?  After you got off the phone with the Spanish speaking caller who called you from the unknown number, what did you do at that point?

A.    We were iffy about it but we started looking outside the window to see if we could see anybody and we didn't.

Q.    When say we were iffy about it, who is we?

A.    Me and David.

Q.    Why were you iffy about it?

A.    Because we didn't know really, like really, who it was and we had a lot of problems in the neighborhood.

Q.    Okay.  When you say problems in the neighborhood, with whom?

A.    With the MS.

Q.    Okay.  By MS, who are you referring to?

A.    MS-13.  It is a gang.

Q.    And how long had you, was there both you and David who had problems with MS-13?

A.    Yes.

Q.    And how long had you and David had those problems with the MS-13?

A.    David had them a lot longer than I have, but for about a couple of years.

Q.    When you say a couple of years, that's prior to the date of the shooting?

Galan - for the Government - Direct/Ms. Capwell

126

A.    Yes.

Q.    And so you testified you and David were feeling iffy
about this deal, but what did you do?

A.    We continued to -- we just said, you know what?
Let's just go.  And we started walking out of the house to
go meet up with these guys.

Q.    Okay.  And who was carrying the marijuana?

A.    I'm not really sure who was carrying it.

Q.    Okay.  Was it just you and David, though, walking?

A.    Yes, it was just me and David.

Q.    Okay.  And in what quantity did you and David
typically sell marijuana?

A.    We sold them in nick bags.  Little Ziploc sealed
bags.

Q.    Okay.  What was the size of the baggies?

A.    About like a half-inch wide.

Q.    An inch.  Okay.  What kind of color, if any, were
they?

A.    We had clear bags.  We had black bags.

Q.    Okay.  Could I ask you to take a look at what would
be marked Government Exhibit 214.  I'm not sure if it is
the next one or to skip one.

          Do you see it there?

A.    Yes, I see it.

Q.    Okay.  And what is depicted in that photograph?

Galan - for the Government - Direct/Ms. Capwell

127

A.    Bag of weed.

Q.    And is that similar to the type of baggy that you just described that you and David would use to package marijuana?

A.    Yes.

MS. CAPWELL:  Your Honor, I move to admit Government Exhibit 214 into evidence and to publish it to the jury.

MS. MACEDONIO:  Can I have a moment, your Honor?

THE COURT: Yes.

(There was a pause in the proceedings.)

MS. MACEDONIO:  May I have a brief voir dire?

THE COURT:  Sure.


VOIR DIRE EXAMINATION

BY MS. MACEDONIO:

Q.    The picture that you have in front of you, which is labeled Government Exhibit 214, you said that that was depicted and that it is similar to the type of weed that you sold with Mr. Sandler?

A.    Yes.

Q.    But you didn't take that picture, did you?

A.    No.

Q.    And you can't identify that particular bag as a bag of weed --

Galan - for the Government - Direct/Ms. Capwell

128

A.   No, I can't.  But it looks the same.

Q.   It just looks similar.  Right?

A.   Yes.  Just exactly the same.

          MS. MACEDONIO:  Judge, I would object to this

exhibit coming in.

          THE COURT:  Why don't you approach for a minute.

Let me see the picture.

          (Discussion at sidebar ensued as follows.)

          THE COURT:  Are you going to have another

witness from the crime lab?

          MS. CAPWELL:  Yes, your Honor, from the crime

scene and from the Suffolk County Crime Lab.

          THE COURT:  Okay.  I'm not going to allow it.

Just refer to it or use it later when that witness comes

on.  Okay?

          MS. MACEDONIO:  Okay.

          (Discussion at sidebar was concluded.)

BY MS. CAPWELL:

Q.   Now using Government Exhibit 252, which is right

behind you, can you please describe to the members of the

jury, use the laser pointer if it helps you, the route

that you took on February 17, 2010, when you went to go

meet the caller for the marijuana deal.

A.   Yes, we were going north, right here.

Q.   Okay.  Along -- what street is that?

Galan - for the Government - Direct/Ms. Capwell

129

A.    Second Avenue.

Q.    So you went out of your home.  Is that right?

A.    Yes.  Right here.  And went out this way.

Q.    Okay.  So you started at the bottom right-hand corner
where your home was and you crossed Second Avenue?

A.    Yes.

Q.    Which is a horizontal street.  And then where were
you walking along Timberline approximately?

A.    On this side.

Q.    Okay.  So on the -- is that the east side of
Timberline Drive?

A.    Yes.

Q.    And while you were walking, you were headed toward
the bodega.  Is that right?

A.    Yes.

Q.    While you were walking what happened?

A.    We were walking, just laughing, and the next think I
know I heard somebody just say like *mira*.  And something
like that.

Q.    Okay.

        MS. RANTALA:  I didn't understand.

        MS. CAPWELL:  I'm going to get there.

BY MS. CAPWELL:

Q.    So what language was the person speaking that you
heard?

Galan - for the Government - Direct/Ms. Capwell

A.   It was Spanish.

Q.   Just said some words in Spanish?

A.   Yes.

Q.   Are you a Spanish speaker?

A.   Yes.

Q.   Can you translate more of what you heard that individual say that night out on Timberline Drive.

A.   Look.  So you don't bother, like something like that bag.  I don't know like exactly how to explain it.

Q.   The best you can translate it in English.

A.   Just like look.  So you don't bother.

Q.   So you don't bother?

A.   Yes.

Q.   And was it a male voice or a female voice?

A.   A male voice.

Q.   When you heard a male say those things, what did you do?

A.   I turned around.

Q.   Okay. Where was the voice coming from as you and David are walking north on Timberline Drive?

A.   Yes.

Q.   Okay.  Where did the voice come from, your left or your right?

A.   It was -- I think it was behind me.

Q.   Okay.

Galan - for the Government - Direct/Ms. Capwell

131

A.     Like behind me.  Like this side.

Q.     Pointing to your right?

A.     Yes.

Q.     Behind you to the right, you heard the voice say those statements.  And what did you do?

A.     I turned around and I just seen two hoody guys and I heard a gunshot.

Q.     Okay.  Let's break that down.  You saw, correct me if I'm wrong, you saw two hoody guys?

A.     Yes.  Two guys in hoodies.

Q.     Okay.  Two guys wearings hoodies.  What do you mean by hoodies?

A.     A sweatshirt with a hoody on it.

Q.     And what does a hoody do?

A.     I just heard shots.

Q.     I'm sorry.  When you say the sweatshirt with the hoody, this is probably obvious but can you tell us what part of the body the hoody was on?

A.     The head.

Q.     Was the hoody covering the head?

A.     Yes.

Q.     Of both individuals?

A.     Yes.

Q.     Okay.  Then I believe you mentioned that you heard gunshots?

Galan - for the Government - Direct/Ms. Capwell

132

A.   Yes.

Q.   And when you heard gunshots, what did you do?

A.   I wanted to run.

Q.   You began to run?

A.   Yes.

Q.   And in what direction did you run?

A.   I ran in, like we were on this side, I ran this way.

Q.   So toward the left on Timberline --

A.   Yes, toward the left like north.

Q.   Okay.  All right.  As you were running, what if anything happened?

A.   Like when I swung around, I heard the gunshots.  I just seen David with his hands out, and, I don't know, I just ran.

Q.   You ran?

A.   Yes.

Q.   Okay.  And did you feel any injuries to your body?

         MS. MACEDONIO:  Objection.  Leading the witness.

         THE COURT:  Sustained.  Rephrase the question.

BY MS. CAPWELL:

Q.   You mentioned that you ran.  What happened next?

A.   I got shot.  I felt like an impact hit me in the back of my neck.  I hurt my head.  Just something.  I don't know.  I don't know how to explain it.  Some feeling like -- it just never happened to me before so it is hard

Galan - for the Government - Direct/Ms. Capwell

133

to explain.

Q.    Okay.  And after you got hit in what you described as
the back your head and your neck, what did you do?

A.    I just kept running and felt like a lot pain here and
I just fell.

Q.    When you say another pain here?

A.    Like in my elbow.

Q.    Your elbow.  Which arm?

A.    My right arm.

Q.    And after that what happened after you felt the
second pain in your right elbow?

A.    I fell.  I hit the floor.

Q.    Okay.  And at that point approximately how many
gunshots had you heard?

A.    It is like a couple, like four or five, something
like that.

Q.    Okay.  And you fell down.  What do you remember, the
next thing you remember after you fell down?

A.    After that I just remember, you know, people asking
me if I was okay.  I heard my wife scream.

Q.    When you say wife, who are you referring to?

A.    My wife, Jasmine Sandler.

Q.    All right.

A.    That's pretty much it.  I woke up in the ambulance, I
think, briefly.  They were asking me, you know, if I knew

134

what happened.  And I just, I felt like -- that was -- I don't remember too much.

Q.    Now, you mentioned that the two individuals were wearing hoodies.  Could you see their faces?

A.    No.

Q.    And how many individuals had you seen?

A.    I seen two.

Q.    How many of them were shooting?

A.    I believe it was just one.

Q.    What hospital were you taken to?

A.    Good Samaritan.

Q.    What were your injuries?

A.    I got shot in my lower neck.  The bullet came out of my face.  I don't know.  I was shot in my arm.

Q.    How long approximately did you stay at Good Samaritan Hospital?

A.    I didn't stay at Good Samaritan very long.  I was paranoid.  For about a week.  I was in a coma for three days, and I signed myself out of Good Samaritan.

Q.    While you were at Good Samaritan, did you have any surgery?  Or let me rephrase that.

         Were any bullets or pieces of bullet removed from your body during surgery?

A.    Yes.  My arm and my face.

Q.    I will ask you to look now at Government Exhibit 236

marked for identification.

          Do you recognize the individual in that photograph?

A.   Yes.

Q.   Who is that?

A.   That's me.

Q.   Where were you at the time that photograph was taken?

A.   Good Samaritan.

Q.   And does that fairly and accurately show what you looked like at Good Samaritan Hospital?

A.   Yes.

          MS. CAPWELL:  Your Honor, I move to admit Government Exhibit 236 into evidence and publish it to the jury.

          MS. MACEDONIO:  May I have a moment, judge?

          THE COURT:  Sure.

          (Pause in the proceedings.)

          MS. MACEDONIO:  No objection, your Honor.

          MS. RANTALA:  No objection, your Honor.

          THE COURT:  Government Exhibit 236 is admitted.

          (Government Exhibit 236 in evidence.)

BY MS. CAPWELL:

Q.   Mr. Galan, that is you in the hospital in Exhibit 236?

A.   Yes.

Galan - for the Government - Direct/Ms. Capwell

Q.    You mentioned that you signed yourself out of Good

Samaritan Hospital.  You mentioned that you were paranoid.

A.    Yes.  I didn't know what happened to me.  I was

paranoid.  I didn't know who did it.  My best friend was

just shot.  I just found that I was in the hospital.

Q.    After you left Good Samaritan Hospital, did you go

into another hospital?

A.    Yes.  I initially went to a hotel and then I -- my

sister came and found me and she told me I needed to go to

the hospital, that I was doing pretty bad, so she brought

me to Stony Brook.

Q.    What if any procedures did you undergo at Stony Brook

Hospital?

A.    I had my jaw wired shut.  My jaw was broken.  My nose

was broken and my neck was still broken so they had to

leave me in a neck brace.

Q.    Neck brace?  How long did you stay at Stony Brook?

A.    I want to say for like a week and a half, about

two weeks.

Q.    And after leaving Stony Brook Hospital, were you on

any medications due to the injuries you sustained?

A.    Yes.  I was on Percocet, Vicodin, and something

called Plavix.  It is a blood thinner.

Q.    The first two medications that you mentioned, are

those some type of pain killer?

Galan - for the Government - Direct/Ms. Capwell

137

A.   Yes, they're pain killers.

Q.   And did you have issues with pain killers after you were released from the hospital?

A.   Yes.  I wasn't going to the doctor so I started self medicating --

Q.   You were or were not?

A.   I was not going to the doctor after that because I was just, I was paranoid, I didn't want to be outside, and I started to get morphine pills.  And I just started taking morphine pills so I didn't have to deal with the pain.  And I ended up addicted to morphine pills.

Q.   Okay.  Were you able to subsequently overcome your addiction to the morphine pills?

A.   Yes, I did.  My aunt seen how bad I was and she ended up locking me in her basement so that I could get over it. I was like 80 pounds wet.

Q.   Okay.  How long did you have this morphine pill addiction?

A.   It's hard to say.  It was probably a couple months, something like that.

Q.   Okay.  Do you still have any effects today due to the shooting and the injuries that you sustained that night?

A.   Just constant migraines, nightmares.  I don't really go out much.  Stay home.  Work home.  I don't do anything any more.  I just stay to myself just...

Galan - for the Government - Direct/Ms. Capwell

138

Q.    How about your -- you said, I believe, you also felt

injuries to your arm or how --

A.    I had an injury to my arm.  I can't bend my arm any

more like it should have been.  It is always in pain.  All

I have ever done was general labor so every day I come

home in pain.

          MS. MACEDONIO:  We object to the relevance of

this.

          THE COURT:  Yes.  Sustained.

          MS. CAPWELL:  I'm moving on, your Honor.

BY MS. CAPWELL:

Q.    Mr. Galan, if you can, look at what has been marked

Exhibits 274 through 278.  They should be on the desk in

front of you.

A.    Yes.

Q.    Let me just ask you, prior to your testimony here

today, did you have an opportunity to examine your old

T-Mobile cell phone, the one that is marked as Government

Exhibit 219A?

A.    Yes.

Q.    Was that actually yesterday afternoon at the US

Attorney's office?

A.    Yes.

Q.    Did you review the call logs from the evening of

February 17, 2010?

Galan - for the Government - Direct/Ms. Capwell

139

A.    Yes.

Q.    Were you also provided with various pictures that were taken of your phone screen?

A.    Yes.

Q.    And looking at those exhibits, Government Exhibits 274 through 278, do you recognize those photographs?

A.    Yes.

Q.    What are they?

A.    It is a call log of February 17, incoming, outgoing phone calls.

Q.    Speaking generally, not -- we don't need to identify each one, but are they pictures from -- pictures of different screen shots of your phone?

A.    Yes.

Q.    And did you have a chance to compare those pictures, Exhibits 274 through 278, to your actual phone yesterday?

A.    Yes.

Q.    Did the pictures fairly and accurately depict and show the information that is on your phone?

A.    Yes.

          MS. CAPWELL:  Your Honor, we move to admit Government Exhibits 274 through 278 into evidence and to publish some of them to the jury.

          THE COURT:  Any objection?

          MS. MACEDONIO:  No, your Honor.

MS. RANTALA:  No objection, your Honor.

THE COURT:  274 and 278 are admitted.

MR. DURHAM:  274 through 278?

THE COURT:  Excuse me, 274 through 278.

MS. CAPWELL:  Thank you.

(Government Exhibits 274 through 278 in evidence.)

BY MS. CAPWELL:

Q.   Now I'm placing on the overhead Government Exhibit 276.

Do you see that, Mr. Galan?

A.   Yes.

Q.   What are we looking at there?

A.   We are just looking at my call log for that day.  Two unknown calls I got.

Q.   You say from that date.  What date are we referring to?

A.   February 17.

Q.   And do you see, toward the bottom of the screen, shots of your phone two calls that are labeled *Unknown*?

A.   Yes.

Q.   Now turning to Exhibit 277.  It is a little difficult to see on here.  You might have to read it to us.  You have a better copy up there.

But 277, what is that showing?  If you can just

Galan - for the Government - Direct/Ms. Capwell

read on the top what it says.

A.    It is unknown.  Unknown call.

Q.    Right.  Unknown --

A.    8:11, Wednesday, February 17, 2010.

Q.    I'm sorry.  What time did you say?

A.    8:11.

Q.    What was the duration of that call?

A.    8 seconds.

            (Continued on the following page.)

142

DIRECT EXAMINATION  (Continued)

BY MS. CAPWELL:

Q    Now let me turn to Exhibit 278.  There we go.  I have
278 now in the overhead and on the screen.

        Can you read for us what it says right in the
middle of the screen on your phone?

A    It says *unknown*.

Q    And looking at the top, does that say the call?

A    It's an *incoming call*.

Q    Can you read that very small print under *incoming
call* for us?

A    It says *8:05 pm, Wednesday, February 17, 2010*.

Q    Does it have a duration under there?

A    *51 seconds*.

Q    Let me ask you a few more questions about the
marijuana business that you and David Sandler had going
back in 2009 or 2010 before you were shot.  Generally
speaking, who were your customers?

A    Salvadorans.

Q    And were any of your customers members of a gang?

A    Yes.

Q    And which?

A    Yeah, MS mostly, and Bloods, Latin Kings, but mostly
all MS.

Q    And the members of these gangs that you just

143

mentioned, did they live in your neighborhood or in that area in Brentwood?

A    Yes.

Q    Were you in a gang at any point before you were shot?

A    No.

Q    What about David Sandler, was he ever in a gang as far as you knew?

A    No, he wasn't.

Q    Was David friendly with any gang members?

A    Yeah, he was friendly.

Q    With which gang?

A    With the Latin Kings.

Q    Did you spend any time with the Latin Kings?

A    Yes.

Q    And did he spend time with members of the Latin Kings in your neighborhood?

A    Yes.

Q    Did David wear any gang colors?

A    Yes; black and yellow, black and gold, red and black, blue.

        MS. MACEDONIO:  Judge, can we get a basis for all of his understanding of all of his testimony?

        THE COURT:  Yes.  Can you ask him how he knows this?

A    I lived with David since I was about 15, 16.  We were

always together, we ate together.  There were times we went to the bathroom together, like.  That was my best friend.  He was one of my best friends.

BY MS. CAPWELL:

Q    And when you testified, Mr. Galan, you started living together around age 15 and 16, and you lived together until time that he was murdered and you were shot?

A    Yes.

Q    Did David have any family members who were members of the Latin Kings?

A    Yeah, he had cousins, brother, you know most of his family.

Q    Okay.  And how about yourself, going back to 2009, or early in that time period were you friendly with any gang members?

A    Yeah, I talked to everybody.

Q    Okay, were you friendly, friendlier with one gang or another?

A    No, not like -- I just talked to like the Latin Kings more.

Q    And you have testified that you used to sell marijuana.  Did you sell any other type of illegal drug?

A    Occasionally, you know for a weekend we would sell coke.

Q    And by *coke*, what are you referring to?

Galan - for the Government - Direct/Ms. Capwell

145

A     Cocaine.

Q     Cocaine.  When you say *we*, who are you referring to?

A     Me and David.

Q     How often did you sell cocaine?

A     Just like sporadically.  Like it wasn't an ongoing thing.  Sometimes a weekend, somebody would ask for something.  We would just go get it for him, make a couple of bucks on it.

Q     Fair to say that marijuana was your primary drug that you sold?

A     Yes.

Q     Now, you testified that you sold marijuana in certain areas.  Did you smoke marijuana as well?

A     Yes.

Q     And starting at what age did you smoke marijuana?

A     Young, 12, 13, around that area.

Q     And have you ever used any other illegal drug besides marijuana?

A     Yeah, I used coke.

Q     Okay, and how often have you used cocaine?

A     Not, never an often thing.  It was just like a party.  Like it wasn't like I used coke.

Q     Well, when was the last time you used cocaine?

A     Like two years ago, something like that.

Q     And how about marijuana, how long ago did you smoke

marijuana?

A     It's been about two years ago as well.

Q     And when you were using marijuana, how often were you using it?

A     Every day.

          THE COURT:  This is a good point to break.

          Are you almost done?

          MR. DURHAM:  It is.  I'm actually done.

          THE COURT:  We'll take the afternoon break before across.  We'll take 15 minutes.

          Don't discuss the case.

          (A recess was taken at 3:25 p.m.)

          MS. MACEDONIO:  Your Honor, I don't believe there is going to be any cross-examination of this witness.  But I do have some issues with regard to the next witness being called.  I don't know if you want to do that now.

          THE COURT:  Yes, let's do that now.

          Who is the next witness?

          MR. TIERNEY:  Tony Guevara.

          THE COURT:  What issue?

          MS. MACEDONIO:  I think the government intends to elicit from Mr. Guevara that he was involved -- he was arrested in 2004 at a meeting -- he was a member of a clique of MS-13.  At that meeting when he was arrested,

there were three weapons that were seized at that time.
Again it was 2004.

        The government has opened this morning that
these defendants, although we're not in agreement with
this -- but that these defendant were involved in MS-13 in
2006.  I know that the indictment in this case charges
that back to 2001.  But there is also a worldwide
organization.  I mean you can't bring into this trial
everything that MS-13 did.

        I think with regard to Mr. Guevara he may have
some issues about MS-13, but I don't think that the crime
he is goings to offer from him, particularly the weapons
coming in, I don't think that is sufficiently related to
the crime charged in this indictment.  And I think there
has got to be some continuity of the crimes in advance.

        So for example, while that crime occurred in
2004, the crimes that are charged in this indictment, the
subject of the charges in this indictment all occurred in
a span in 2010.  So I think under the Second Circuit there
has got to be, there has to be, the crime has to be
sufficiently related, and there has to be some type of
continuity.

        Here there is a complete absence of continuity
between 2004 and 2010.  So given that, and under 403 I
think the government should be precluded from bringing

that information in.

THE COURT:  Mr. Tierney?

MR. TIERNEY:  Judge, I would just say that with
regard to that, this is a pure enterprise witness.  He is
going to testify with regard to the enterprise of the
MS-13, the activities they engage in.  And he is going to
say that he has nothing whatsoever to do with these
defendants, but he was a member of the MS-13.  And it was
the same, or very similar in 2004 as it is in 2010.

We have to establish the enterprise.  And there
are only, you know, a few ways that I can think of to do
it; one of which is to bring a witness in, an MS-13 member
in, where our other witnesses are being precluded.  So how
else can we establish the enterprise that is the MS-13
without bringing in gang members to testify?

MS. MACEDONIO:  Judge, Mr. Guevara was arrested
in 2004 and started cooperating immediately.  I'm not
quite sure how he is going to be able to testify that
MS-13 was run the same way in 2004 as it is run in 2010.

Moreover, the government has in its arsenal
several cooperating witnesses who are going to come in and
testify with regard to things that are related in time to
the counts charged in the indictment.  In fact these two
defendants are part of a much bigger indictment.  And so
there are certainly plans that the government had in

advance that there are other cooperating witnesses who
will testify about, that are related in time.

MR. TIERNEY:  Judge, both defendants opened on
the fact that we were going to have cooperating defendants
in here, and they're essentially dancing to the tune that
the government tells them to dance to.  So they're going
to call into question all of that evidence with regard to
the way the enterprise is run.

So the defense can't have their cake and eat it
too.  They can't say all of that stuff back there about
MS-13 is all lies, and by the way the government is also
precluded from bringing in enterprise evidence separate
and independent from the cooperating defendants in this
case.

MS. MACEDONIO:  Well, this isn't a cooperating
defendant that we're talking about.  So we make the same
argument.

THE COURT:  I'm going to overrule the objection.

I understand the time frame issue focus in this
case.  And it is obviously in 2010.  Racketeering acts are
in the indictment.  But the government does have to
establish the existence of the enterprise and the pattern
of racketeering activity.  Obviously if a witness
testifies that he was part of the gang and certain rules
and procedures apply to the gang back in 2004, the

government can establish through proof of other
cooperating witnesses, the same rules that existed in
2010.  How else can they properly prove the existence of
the enterprise and the pattern that is required under the
law.

          So I'm going to allow this witness to testify.
I'm not going to repeat the instruction, but I will
reference the instruction during that witness's testimony
that I gave just to highlight to the jury that his
testimony relates to the establishment of the racketeering
enterprise.  Okay?

          MS. MACEDONIO:  Is the Court going to allow the
actual weapons to be produced?

          THE COURT:  No.  I didn't understand.  You're
going to bring the weapons themselves?

          MR. TIERNEY:  Your Honor, that was my intention
to establish the elements.  Actually these were guns that
were brought in from outside New York State.  What I could
do, judge, I could show them pictures and we can get them
in through an agent that seized them.

          MS. MACEDONIO:  Judge, my objection would be the
same, that it is one thing for them to be an enterprise
witness and testify about the rules and consequences for
members of the MS-13.  But to bring in actual weapons and
photographs of weapons from 2004, the government is going

to have ample opportunity to prove the very elements that
the defense -- prove that the weapons that are going to be
involved in the actual homicides in this case.  And we all
know that the weapons were not manufactured in this --

THE COURT:  Okay, I think under 403 I'm going to
allow him to testify about the enterprise.  But I don't
think the weapons need to come in.  The government has
plenty of proof in the case besides introducing weapons
from 2004.  So I think under the 403 balancing, I'm going
to preclude the weapons themselves.  Okay?

MR. TIERNEY:  Very well, your Honor.

May I just, can I show pictures of the weapons?

THE COURT:  I guess --

MR. TIERNEY:  Which were seized on his arrest?

THE COURT:  Yes.  I'll allow those pictures of
the weapons to corroborate his testimony with regard to
his gang activity membership.  I believe under 403 that is
the proper balancing.  The weapons themselves, because
obviously that is an important part of the government's
case to show that the gang utilizes these weapons, and it
would corroborate the testimony that he was in fact part
of the gang, I will allow the photos under 403.  I don't
think the actual weapons need to be admitted for the
purpose for which this witness's testimony is offered.
Okay?

152

MR. LONDON:  Your Honor.

MS. RANTALA:  We want to put on the record that we want to join in the objection.

THE COURT:  It is preserved.  You're joined.

MS. RANTALA:  Can we just briefly approach sidebar on an issue?

THE COURT:  Yes.

(The following occurred at sidebar.)

MS. RANTALA:  I just wanted to see if your Honor would allow us to automatically join in codefendant counsel's objections unless we state otherwise.  Because sometimes there is not enough time to insert myself up, and the fact that I'm joining in their particular motion.

THE COURT:  So every time, every time one objection is made I should assume it is made for both defendants?

MS. MACEDONIO:  No, your Honor.

THE COURT:  I don't usually do that.  It only takes a second to say, we join.

MS. RANTALA:  Okay.

MR. TIERNEY:  With regard to the exhibits, are you guys going to be objecting to any of them?

MS. MACEDONIO:  I don't think other than what I have already objected to.  The others are already in.  Right?

153

          MR. TIERNEY:  And also the weapons aren't coming
in.

          MS. MACEDONIO:  Right.

          MR. TIERNEY:  I'll let you make the objection
with regard to the weapons, and I'll just --

          THE COURT:  What other photos besides the photos
of the weapons?

          MR. TIERNEY:  Just some photos of other things.

          MS. MACEDONIO:  Both of those are already in,
right?

          MR. TIERNEY:  One is, actually one is.

          THE COURT:  Okay.

          (The following occurred in open court.)

          THE COURT:  Mr. Galan, come up.

          (The jury entered the courtroom at 3:59 p.m.)

          THE COURT:  Juror number 1 if you want to move
up that's fine.

          If at any point in the trial you have trouble
seeing something or hearing something, you don't have to
wait for a break.  You can just raise your hand and let us
know there is some kind of a problem, so we can deal with
it right away.  Okay?

          Any cross-examination of this witness?

          MS. MACEDONIO:  No, Thank you, judge.

          MS. RANTALA:  No questions, judge.

154

THE COURT:  You can step down.  Thank you.

Okay, your next witness?

MR. TIERNEY:  Your Honor the Government calls their next witness, Tony Guevara.

I apologize, your Honor, we didn't anticipate there was going to be no cross-examination.

MR. DURHAM:  He's in the building.

(There was a pause in the proceedings.)

THE COURT:  While we're waiting, there is a slightly modified schedule for tomorrow.  We will start at 9:30, but we're only going to go to 3:30 rather than 4:30.  So what we'll do is, as we did today, we'll take a little bit of a later lunch, maybe from 1 to 2:15, and we'll go from 2:15 to 3:30.  So there won't be any afternoon break okay?

MR. TIERNEY:  I apologize for the delay, your Honor.

(There was a pause in the proceedings.)


**TONY GUEVARA**

called as a witness, having been first duly sworn,

was examined and testified as follows:

THE COURT:  State your name and spell it for the record.

THE WITNESS:  Tony Guevara, T-O-N-Y,

G-U-E-V-A-R-A.

        THE COURT:  Mr. Guevara, just pull your chair up and keep close to the mike so it picks up your voice.

        MR. TIERNEY:  Your Honor, we're going to use the Spanish interpreter for the witness.

        THE COURT:  Okay.

        (The interpreter was duly sworn.)

        THE COURT:  State your name for the record.

        THE INTERPRETER:  --- Michelena, M-I-C-H-E-L-E-N-A.

        THE COURT:  Okay.  If you can just confirm that the witness is speaking through the interpreter, Mr. Tierney.

        MR. TIERNEY:  I will, your Honor.


DIRECT EXAMINATION

BY MR. TIERNEY:

Q    What is your name?

A    Tony Guevara.

Q    And do you speak English?

A    Yes.

Q    What is your native language?

A    Spanish.

Q    Are you more comfortable speaking in the Spanish language?

156

A      Yes.

Q      How old are you?

A      33.

Q      And have you ever been a member of a street gang?

A      Yes.

Q      What gang is that?

A      MS-13.

Q      And how long were you a member of the MS-13 street
gang?

A      For about two or three years.

Q      From what period of time to what period of time?

A      From 2002 to 2004.

Q      And was that for approximately three years?

A      Yes.

Q      Where were you born?

A      El Salvador.

Q      And when did you come to the United States?

A      In 1994.

Q      And how old were you in 1994, approximately?

A      14.

Q      And how did you get to the United States?

A      With a -- car.

Q      And when you came to the United States, where did you
live?

A      Freeport.

Q    And did you go to school?

A    Yes.

Q    And for how long?

A    Four years.

Q    Did you graduate?

A    No.

Q    Why not?

A    The reason why that I was getting confused with
myself, I was coming up with problems.

Q    And did you become involved with the MS-13 at all
when you lived back in El Salvador?

A    I'm sorry, could you repeat the question?

Q    Did you have any involvement with the MS-13 while you
lived in El Salvador?  And sir if you could just speak
into the microphone?

A    No.

Q    At some point after you came to the United States did
you become involved with the gang here in the United
States?

A    Yes.

Q    Approximately what year did you become involved with
the MS-13?

A    2002.

Q    And how old were you in 2002?

A    Approximately 22 or 23.

Guevara - for the Government - Direct/Mr. Tierney

158

Q     And in what area of Long Island did you first become involved with the MS-13?

A     In Freeport.

Q     And how did you become involved with the MS-13 in Freeport?

A     Because of the friends I had.

Q     And did there come a time when you were asked to join the MS-13?

A     Yes.

Q     And that was in 2002?

A     Yes.

Q     And did you join a particular clique of the MS-13?

A     Yes.

Q     What was that clique?

A     The Freeport one, the division abbreviation is FLS.

Q     And FLS what does that stand for?

A     Freeport Locos Salvatruchas.

Q     And what is a clique?

A     It's like a branch of the MS-13 gang.

Q     And at the time that you joined were there other cliques in Long Island and Queens in addition to the Freeport clique?

A     Yes.

Q     And approximately how many members in the Freeport clique were there when you joined?

A     Between 25 and 30.

Q     And when you joined, who were the leaders of the
Freeport clique at the time?

A     Ledwin Castro and David Vasquez (ph).

Q     Ledwin Castro, did he have an MS-13 name?

A     Yes.

Q     What was that?

A     Hueso.

Q     I show you what is marked as Government Exhibit 54.7.
Do you recognize that?

A     Yes.

Q     If you can just look at -- you have a picture in
front of you, 54.3.  Do you recognize that?

A     Yes.

Q     What is that?

A     That was Hueso.

Q     Does that fairly and accurately depict the way Hueso
looked when you knew him?

A     Yes.

        MR. TIERNEY:  Your Honor, I move Government
Exhibit 54.7 into evidence at this time?

        MS. MACEDONIO:  I have no objection, judge.

        MS. RANTALA:  No objection.

        THE COURT:  54.7 is admitted.

        (Government Exhibit 54.7 in evidence.)

Guevara - for the Government - Direct/Mr. Tierney

160

BY MR. TIERNEY:

Q    Who is that Mr. Guevara?

A    That's Ledwin Castro.

Q    And one of the other leaders of the FLS clique was David Vasquez.  Did he have an MS-13 name?

A    Yes.

Q    What was that MS-13 name?

A    Gigante.

Q    Showing you what is marked in evidence as 54.2.  Do you recognize that individual?

A    Yes.

Q    Who is that?

A    That's David Vasquez.

Q    Gigante?

A    Yes.

Q    Now, what was your reason for joining the MS-13?

A    Well, because back then I was having a little problems with the Bloods and the Netas, and the Latin Kings, because they would assume I was a members of the MS-13 and they would try to get into fights with me.

Q    And so now the Latin Kings the Bloods and Netas, are those street gangs?

A    Yes.

Q    So you joined the MS-13 for protection?

A    Yes.

Q    Now, is there a particular ceremony that is attached with joining the MS-13?

A    Yes.

Q    Could you explain to the jury what that ceremony is?

A    It's a ceremony where all the members participate and they call up the person who is going to become a member of the gang.  And once I am there, they tell me what awaits me when I become part of the gang.  And they say they're going to jump me for 13 seconds.

Q    And you just indicated that they were going to jump you for 13 seconds.  What does that mean to you to be jumped for 13 seconds?

A    That means that when you have gone through the 13 seconds you are part of the gang.

Q    And who jumps you for 13 seconds?

A    Three members of the gang.

Q    So you're called up and three members of the gang jump you for 13 seconds?

A    Yes.

Q    And this happened to you?

A    Yes.

Q    Who jumped you for 13 seconds?

A    The nicknames were Dragon, Fifa and Duran.

Q    And while they beat you for 13 seconds, did somebody count?

162

A    Yes.

Q    Who counted in your case?

A    Hueso did.

Q    And again Hueso was one of the leaders of the gang?

A    Yes.

Q    I believe you said earlier that you're called up and you're told how it's going to be in the gang.  Is that correct?

A    Yes.

Q    What is it that you're told?

A    Well, they tell you that there is no way out from the gang.  That you have to act, that you have to commit violent crimes.  And that you have to prove to them that you want to be with them.

Q    Now, do they also go over some of the rules of the gang with you?

A    Yes.

Q    And what are some of the rules of the gang that they go over with you at the time of your initiation?

A    Well, the main one is not to become an informant to the police.  And also to commit the crimes that they want you to commit so that you can continue being a gang member.

Q    What is the punishment in the MS -- withdrawn.

        What is the punishment in the MS-13 for gang

members who cooperate with law enforcement?

       MS. MACEDONIO:  Objection, leading the witness.

       THE COURT:  Rephrase the question.

BY MR. TIERNEY:

Q    I believe you indicated that they tell you that you
can't cooperate with law enforcement.  Was that your
testimony?

A    Yes.

Q    And do they tell you if there is any sanction
attached to cooperating with law enforcement?

A    Yes.

Q    What is that sanction or punishment?

A    Death.

Q    Now, are you familiar with the terms *probation*?  I'm
sorry, with the term *probation*.

A    Yes.

Q    What does *probation* mean?

A    *Probation* means that after you are jumped in, you
have two weeks to commit a violent act to prove that
you're actually willing to do what they want you to do.

Q    What type of violent act?

A    To kill.

Q    What happens if you don't commit a violent act during
this probation period?

A    They put you through what they call a calenton.

Q    What is a calenton?

A    A calenton is a kind of warning where they beat you up for 13 seconds again.

Q    So it's the same as the initiation, and they use it as a punishment?

A    Yes.

Q    Were you able to commit a violent act during the period of your probation?

A    Yes.

Q    During the course of your membership with the MS-13, had you ever seen new members who weren't allowed to commit a violent act during his probation period?

A    Yes.

Q    What happened with regard to those members?

A    They left.  They went to other states or other countries.

Q    They fled the Freeport area?

           MS. MACEDONIO:  Objection.

           THE COURT:  Sustained.

BY MR. TIERNEY:

Q    And what happens to these individuals, these probationary MS-13 members who fled the area?

           MS. MACEDONIO:  Objection.

           THE COURT:  Sustained.  Form.

BY MR. TIERNEY:

Q    Are you aware of -- withdrawn.

   Now after a probationary member would flee --

   MS. MACEDONIO:  Objection.

   THE COURT:  Sustained to the use of the term.

BY MR. TIERNEY:

Q    After the these probationary MS-13 members would leave, would there be a meeting?

A    Yes.

Q    And what would be discussed about these individuals who left at the meeting?

   MS. MACEDONIO:  May we have a basis for --

   THE COURT:  Can you ask whether he was present at this time?

BY MR. TIERNEY:

Q    Were you present at these meetings?

A    Yes.

Q    And what was discussed at these meetings with regard to the probationary MS-13 members who left?

A    Well, what is said is that if a person doesn't return, you would have what they call a *green light*, which means that whoever gets to see them can kill them.

Q    Now the FLS, after you became a member, would they call meetings of the gang?

A    Yes.

Q    And how often would they call these meetings?

A    Every week.

Q    Who was required to attend meetings?

A    All the members.

Q    What would happen if you failed to attend these meetings without authorization from the leader?

A    A calenton.

Q    Now during the course of your time as an MS-13 member with the FLS clique, what was discussed during the FLS meetings?

A    Well, one would discuss what we needed, to gather money.  That we needed to get weapons.  That we needed to help the ones in jail with the money that we have would also help other cliques that couldn't get it, to get money or to lend them money.

Q    And the money that was collected during these meetings, was it called anything?

A    Yes.

Q    What was it called?

A    Rent.

Q    Now, how much money did you have to give the MS-13 per week?

A    The normal was $10.  But depending on needs, the amount could be raised.

Q    And what was your understanding as to what this money

was used for?

A     To buy weapons.

Q     Now while a member of the FLS, did you ever see any weapons?

A     Yes.

Q     How often?

A     Weekly.

Q     And what types of weapons did you see?

A     9 millimeter, shotguns, 357, 22, a revolver, a 32, and 38, and a 40 caliber.

Q     And now who owned these guns?

A     The clique.

Q     The FLS clique?

A     Yes.

Q     And during the course of your time as an MS member with the FLS clique, would the FLS clique ever allow other MS-13 cliques in the area to borrow these guns?

A     Yes.

Q     Now, did you ever get any tattoos in combination with your membership in the MS-13?

A     No.

Q     Why not?

A     That was a personal decision.  I always said, no.

Q     Now, is it common for members of the MS-13 to get tattoos?

A    Yes.

Q    Typically what types of tattoos would members of the MS-13 get?

A    They could get tattoos with the MS-13, or the sign of the gang, or the three dots.

Q    Now, when you say a tattoo with the MS-13, you mean they would tattoo MS-13 on their bodies?

A    Yes.

Q    And you also indicated the three dots?

A    Yes.

Q    What are the three dots?

A    Death, cemetery and hospital.

Q    But where would the MS-13 members get these three dots tattooed on their body?

A    Right here or right here, in the middle here.

Q    You're indicating, you mean you're indicating on your wrist or like the webbing in your hand between the thumb and forefinger?

A    Yes.

Q    And the three dots, did those three dots signify anything?

A    Yes.

Q    What would those three dots represent to the MS-13?

A    As I said before, it's death, cemetery and hospital.

Q    And what does *death, cemetery and hospital* mean to a

Guevara - for the Government - Direct/Mr. Tierney

member of the MS-13?

A    That that is the future of the life that awaits us.

Q    That is the future of a member of the MS-13?

A    Yes.

Q    And you also indicated that MS-13 members would get the sign of the gang.  What is the sign of the gang?

A    (Indicating).

Q    Can you just -- for the record, you're holding up your hand with your thumb and your little finger stretched wide, and you have the other fingers of your hand curled?

A    Yes.

Q    And what did that hand -- what does that hand signal signify?

A    That we represent the gang MS-13 and it can also represent the devil.

Q    By the *devil*, you mean the horns?  Your two fingers outstretched represent the horns of the devil?

A    Yes.

Q    Now, are you familiar also with certain types of graffiti that is associated with the MS-13?

A    Yes.

Q    And what types of graffiti were common to the MS-13 when you were a member?

A    The normal thing in the gang was to write MS-13 or to put what they call the *big plate*, which is your nickname

in a place where it's very visible.

Q    And by a place that's very visible, you mean like a building?

A    Yes.  And also sometimes where all the gangs used to hang out so that they can see that we can also take over their territory.

Q    And when you were a member of the FLS clique, would you and the other members place graffiti in the area?

A    Yes.

Q    What areas would you place the MS-13 graffiti?

A    We always did it in neighborhoods where we used to hang out.  We would do like the big plates with our names and the names of the gang.  Or we also go to the places or the areas where we knew the other gangs gathered to put the big plate with our names.

Q    And placing the graffiti in the area of your neighborhood, what did that signify?

A    That it was our territory.

Q    And placing the graffiti in the area of the rival gang members, what did that signify?

A    Well, that's like a call out to violence, like saying we're going after them and we want them.

Q    Now --

        THE COURT:  Why don't we stop.  It's 4:30. We're going stop for the day, members of the jury.

Tomorrow we'll begin at 9:30 and end at 3:30.

I expect that the commute will be much easier tomorrow morning than it was today, so we'll start on time.

Don't read anything or listen to anything about the case.  Don't discuss the case with anyone.  Okay.

Have a safe trip home.  I'll see you tomorrow morning at 9:30.

(The jury left the courtroom at 4:35 p.m.)

THE COURT:  You can step down.

Let me just go through the list for tomorrow.

MR. DURHAM:  One moment, your Honor.

Tomorrow we anticipate finishing up with Mr. Guevara.  And then we'll call Detective John Oliva. We'll then call Detective Eugene Dunn and Francis Braun. Oh, Mr. Braun is not available tomorrow.  So if we get through Detective Oliva and Dunn we'll call Jimmy Sosa.

THE COURT:  Any issues anyone wants to raise with regard to the witnesses?

MS. MACEDONIO:  I had this morning given a list of objections with regard to the exhibits the government intends to introduce into evidence with regard to Detective Oliva.  Specifically, judge, I believe the government intends to elicit from this witness evidence related to a homicide that is not charged.  It's the

Valentin homicide.  There are a number of photographs, they're labeled 61.1 to 61.11.

He has no firsthand knowledge about this homicide.  It's not a homicide that's charged in the indictment.  And again, it is similar to my objection to Mr. Guevara's testimony, but quite frankly, more so. Because Mr. Guevara allegedly was a member of MS-13.  And the detective only has hearsay information about the Valentin murder.

Clearly I don't think it's sufficiently related to the crimes charged in the indictment.  Again, I think it was 2002 homicide, 2003 homicide.  I think there's got to be some kind of a continuity.  I don't think he possesses any firsthand knowledge.  And I ask that he be precluded from testifying about anything with respect to the Valentin murder.

MS. RANTALA:  We would join in that and the 403 objection as well.

THE COURT:  Mr. Durham?

MR. DURHAM:  Your Honor, Detective Oliva does have firsthand knowledge regarding the homicide, he was present at the crime scene and actually located the body. He also arrested the individual responsible for that murder.

There are hundreds of crime scene photos that

we've narrowed it down to 11 photographs of the crime
scene that we intend to introduce with Detective Oliva
based on his firsthand experience at the crime scene. We
say he's the person who saw the things depicted in those
photographs.

          And again, this goes -- the defense is objecting
at every turn to our ability to establish a racketeering
enterprise. The enterprise is described at length in the
indictment. We are obligated to prove what we charged in
the indictment. We also have to establish specific
racketeering activities that are alleged in the indictment
including murder, acts and threats involving murder. And
one of the ways to do this is establishing prior murders
committed by members of the MS-13.

          THE COURT: Is there going to be another witness
that is going to testify to the MS-13's involvement in
that murder, or are you going to point that out other than
the crime scene photos?

          MR. DURHAM: Judge, he's going to testify to the
two tattoo photographs of the individual he arrested.
There's graffiti at the scene where MS-13 is carved in a
tree which linked that murder to the MS-13.

          MS. MACEDONIO: It sounds to me like the
information with regard to the homicide, but anything this
detective is going to be offering other than an arrest and

the discovery of the body would be hearsay.  I mean, he has no firsthand knowledge of the murder.  He just discovered the skeletal remains of somebody.

THE COURT:  Obviously I overrule the objection with respect to Mr. Guevara because I understand the government's obligation to prove that the enterprise -- but not the particular crimes charged in the indictment. However, under 403 the probative value of linking the homicide with any evidence of the MS-13's relationship would be the graffiti and tattoo, I believe is insufficient to link it to the group right before the value of establishing the MS-13's involvement in that particular homicide.  I think it's substantially outweighed by the nature of the prejudice.  Cooperators are going to testify regarding the MS-13 involvement.

But I don't think crime scene photos for a murder under 403 should come in simply because it was MS-13 graffiti and a tattoo on somebody who was arrested. So I'm going to sustain that objection.  I don't know if Detective Oliva has any other proof.

MR. DURHAM:  Your Honor, Detective Oliva arrested an MS-13 gang member.  He then interviewed that gang member, not telling the defense what was said.  But based on those statements they went and found the body.

THE COURT:  Again, but he recovered a body is

**175**

insufficient probative value simply because the linkage to the gang is simply graffiti and a tattoo, is insufficient probative value outweighed under 403.  All of the other issues that the defense has raised.

I don't think you can find any case where racketeering proof, that a court has allowed in a murder with the only evidence linking enterprise was a tattoo and/or graffiti.  I would be somewhat surprised.  But it is a matter of discretion.  The government has plenty of other proof in this case.

So I'm going to preclude it under 403.

MS. MACEDONIO:  Is there some way we can leave our --

THE COURT:  You can keep whatever you want here. But to be honest with you, we don't monitor the room all the time.  So you need to understand that I'm not monitoring people coming in and out every day.

MS. MACEDONIO:  Is there a way perhaps to lock the back or one of the conference rooms?

THE COURT:  I don't think so.

MS. MACEDONIO:  Thank you.

THE COURT:  I guess you are going to call Dunn and then Sosa.

Mr. Durham?

MR. DURHAM:  Your Honor, we may still call

176

Detective Oliva, but his testimony will be limited.

        THE COURT:  Okay.  I'll see you at 9:20.  Have a good night.

        MS. MACEDONIO:  Thank you, judge.

        (The trial was adjourned for the day at 4:42 p.m.)

177

<u>**I N D E X**</u>

OPENING FOR GOVERNMENT                              9
OPENING FOR DEFENSE                                29
OPENING FOR DEFENSE                                35

**GEORGE DAVIS**                                   49
DIRECT EXAMINATION                                 50
BY MR. DURHAM
DIRECT EXAMINATION   (CONTINUED)                   92
BY MR. DURHAM
VOIR DIRE EXAMINATION                             103
BY MR. LONDON
**AARON GALAN**                                   109
DIRECT EXAMINATION                                110
BY MS. CAPWELL
VOIR DIRE EXAMINATION                             127
BY MS. MACEDONIO
DIRECT EXAMINATION   (Continued)                  142
BY MS. CAPWELL
**TONY GUEVARA**                                  154
DIRECT EXAMINATION                                155
BY MR. TIERNEY

<u>**EXHIBITS**</u>

Government's Exhibits 13 through 22 and 48 in       55
evidence
Government Exhibits 8 through 12 in evidence        61
Government Exhibits 1, 3 and 4 in evidence          69
Government Exhibits 2, 5 and 6 in evidence          73
Government Exhibits 28, 29, 30 through 34;          77
52, 53, 54.2 through 54.4; 80.1 through 80.5;
83.1 through 83.4; 119 through 121 in
evidence
Government Exhibit 45.1 through 45.9 received       86
Government Exhibit 44 in evidence                   96
Government Exhibits 36 through 40 received          99
Government Exhibits 77.1, 77.2, and 77.3          104
received
Government Exhibit 248 in evidence                111
Government Exhibit 251 in evidence                114
Government Exhibit 252 in evidence                116
Government Exhibit 219 in evidence                124
Government Exhibit 236 in evidence                135
Government Exhibits 274 through 278 in            140
evidence
Government Exhibit 54.7 in evidence                159