UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
UNITED STATES OF AMERICA,          :
                                        CR-10-074
     -against-                     :
                                        United States Courthouse
HERIBERTO MARTINEZ, also known :   Central Islip, New York
as "Boxer," and CARLOS ORTEGA,
also known as "Silencio" and   :
"Silent,"
                                   :   February 12, 2013
                   Defendants.         9:30 a.m.

-------------------------------X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT COURT JUDGE, and a Jury

APPEARANCES:

For the Government:          LORETTA E. LYNCH, ESQ.
                             UNITED STATES ATTORNEY
                             610 Federal Plaza
                             Central Islip, New York 11722
                             BY:  JOHN J. DURHAM, ESQ.
                                  RAYMOND A. TIERNEY, ESQ.
                                  CARRIE N. CAPWELL, ESQ.


For Defendant Martinez:      ELIZABETH MACEDONIO, ESQ.
                             ARNOLD LEVINE, ESQ.


For Defendant Ortega:        MARIANNE RANTALA, ESQ.
                             IRA LONDON, ESQ.


Official Court Reporter:     Ellen S. Combs, CSR
                             Dominick M. Tursi, CM, CSR
                             100 Federal Plaza - Suite 1180
                             Central Islip, New York 11722
                             Phone (631) 712-6107
                             Fax (631) 712-6123

Proceedings recorded by mechanical stenography
Transcript produced by Computer

1    (Call to Order of the Court.  Appearances stated

2    as indicated above.)

3        THE COURT:  The defendants are present and we

4    have the interpreter here.  I believe we have a new

5    interpreter as well who is going to be interpreting for

6    the witness.  I would just ask she be given the oath and

7    state her name for the record.

8        (Spanish interpreter Isolina Bernhardt was

9    sworn.)

10       THE COURT:  There are two things I want to cover

11   before we get started.  One of the jurors gave a note to

12   my deputy regarding a diagram that one of the jurors drew.

13   I will mark this, what the juror drew, as Court Exhibit D.

14       Apparently the interpreter is sitting in a spot

15   where it blocks one of the juror's view of the witness.

16   So perhaps the interpreter could just move a chair over

17   there, just not where it was.

18       THE INTERPRETER:  Yes, your Honor.

19       THE COURT:  Thank you.

20       The second issue.  The jurors asked if they

21   could at lunchtime not have to ride the public elevators

22   with family members or participants from the trial so as

23   not to be in an uncomfortable situation getting into an

24   elevator where they're obviously not permitted to speak to

25   anybody.

1          I think that is a reasonable request.  My deputy

2   can bring them at lunchtime each day to a nonpublic

3   elevator so they can disperse for lunch.

4          Any objection to that?

5          MR. DURHAM:  No, your Honor.

6          MS. MACEDONIO:  No, judge.

7          THE COURT:  We have one juror who was a half

8   hour late today without really giving a reason.  That

9   concerns me a little bit but hopefully that won't happen

10  again; otherwise, I will say something.

11         Does anyone have any logistical issues?

12         MR. DURHAM:  No.  Just one brief question, your

13  Honor.

14         The case I think has been joined at this point,

15  correct?  I know we're still filing documents.  I want to

16  see if the court still wants us to file under both docket

17  numbers.

18         THE COURT:  As you know, I joined the case and

19  you put in an order, which I signed, trying to consolidate

20  things for purposes of documents so you won't have to keep

21  filing documents under both.  But I think we were told by

22  people downstairs for some reason they don't do that.  I

23  don't understand.

24         So continue filing documents under both numbers.

25  That is why Michelle called both numbers.  But the case is

1  joined.

2        MR. DURHAM:  In terms of the record, each day a

3  minute entry will be filed under both docket numbers?

4        THE COURT:  Yes.

5        MR. DURHAM:  Sorry.

6        THE COURT:  Okay.  Any other issues before we

7  bring in the jury?

8        So is the government going to call Detective

9  Oliva?

10        MR. DURHAM:  We're going to move him back in the

11  case a little bit.  We may file a supplemental letter to

12  the court.  Some of the other items he was going to

13  testify about are the procedure of firearms.  The

14  government submits it is both relevant and significant

15  evidence, but based on your Honor's ruling yesterday with

16  respect to the other firearms that the current witness is

17  going to testify about, we wanted to submit something in

18  writing to articulate our position.

19        So we're not going to call Detective Oliva

20  today.  We do think he will be called at some other time

21  during the trial.

22        THE COURT:  After we finish Mr. Guevara, you're

23  going to call --

24        MR. DURHAM:  We have a witness here today

25  Francis Braun.  We will probably call him next.  He has a

1  medical appointment so depending upon how fast we go this

2  morning, we may ask to call him slightly afterward, but we

3  will address that later.

4          After him we anticipate calling Detective Dunn.

5  And then Detective Rios.  And, if we get to him, Jimmy

6  Sosa.

7          THE COURT:  All right.  Let's bring in the jury.

8          (The following ensued in the presence of the

9  jury at 10:10 a.m.)

10          THE COURT:  Please be seated.  Good morning,

11  members of the jury.  Good to see you all this morning.

12          We're going to continue now with the direct

13  examination of Mr. Guevara.

14

15  **TONY GUEVARA**

16          called by the Government, having been previously

17          duly sworn/affirmed, continued testifying as

18          follows:

19

20          THE COURT:  Mr. Guevara, I remind you that you

21  are still under oath.  Do you understand?

22          THE WITNESS:  Yes.

23          THE COURT:  Go ahead, Mr. Tierney.

24          MR. TIERNEY:  Thank you, your Honor.

25

183

1   DIRECT EXAMINATION (CONTINUED)

2   BY MR. TIERNEY:

3   Q.   Mr. Guevara, I believe when we left off yesterday we

4   were talking about graffiti.

5            Do you remember those questions?

6   A.   Yes.

7   Q.   Now what I want to talk about is, when you became a

8   member of the MS-13 were you given a nickname?

9   A.   Yes.

10  Q.   What was your nickname?

11  A.   Fantasma.

12  Q.   Who gave you that nickname?

13  A.   I chose it, myself.

14  Q.   And is it common for MS-13 members to choose street

15  names once they become a member of the gang?

16  A.   Yes.

17  Q.   Why is that?

18  A.   Because it is a way for society not to get to know

19  who we are because of the name we have.

20  Q.   Now, how would a member move up or become a leader in

21  the FLS?

22  A.   By committing more criminal acts, more violent acts.

23  Q.   Were you ever a leader in the FLS?

24  A.   No.

25  Q.   Remember yesterday, Mr. Guevara, we were talking

1    about once a MS-13 member becomes a member, he is placed

2    on probation?

3    A.    Yes.

4    Q.    And when you became a member of the FLS, were you

5    placed on probation?

6    A.    Yes.

7    Q.    And did you pass your probationary period?

8    A.    Yes.

9    Q.    And how were you able to do that?

10    A.    By participating in shootings.

11    Q.    And before we get to the shootings.  Did you ever get

12    into any fist fights on behalf of the MS-13?

13    A.    Yes.

14    Q.    And approximately how many?

15    A.    Between 10 and 15 fights.

16    Q.    And who did you fight with?

17    A.    With rival gangs.

18    Q.    What gangs do you remember fighting with?

19    A.    Sangres.

20    Q.    Is that known as the Bloods?

21    A.    Yes.

22    Q.    Any other gangs?

23    A.    The Netas and the Latin Kings.

24    Q.    Were any weapons used in these fights?

25    A.    No.

1   Q.   Was anyone killed in these fights?

2   A.   No.

3   Q.   Did you, other than your fists, did you use any

4   weapons?

5   A.   No.

6   Q.   Now, you indicated that you also participated in

7   shootings on behalf of the FLS?

8   A.   Yes.

9   Q.   I want to call your attention to the fall of 2002.

10          Did you participate in a shooting on Main and

11  Independence Streets in Freeport?

12  A.   Yes.

13  Q.   And who did you participate in that shooting with?

14  A.   Hueso and Travieso.

15  Q.   And Hueso is that the individual you identified

16  before as Government Exhibit 54.7?

17  A.   Yes.

18  Q.   Who is -- he was the leader of the FLS at the time?

19  Or one of the leaders?

20  A.   Yes.

21  Q.   And who is Travieso?

22  A.   He was another FLS gang member.

23  Q.   And what was your role in the shooting?

24  A.   To drive.

25  Q.   What happened?

1  A.    I drove to the location Hueso told me to drive to.

2  And once we arrived at the location, there was a group of

3  the Bloods there, so he told me to park at the corner and

4  he told me, *Wait for me.*

5  Q.    If I can just stop you.  When you say *he*, do you mean

6  Hueso?

7  A.    Yes.

8  Q.    Thank you.  Please continue.

9  A.    And then he got out of the car with a gun.  And then

10  Travieso got out.  And both of them kept walking together

11  to the location where the black people were and they began

12  to shoot.

13  Q.    Did you see where -- did you see them shooting?

14  A.    No.

15  Q.    Did you hear the shots?

16  A.    Yes.

17  Q.    Approximately how many shots do you remember hearing?

18  A.    Between five and six shots.

19  Q.    Then what happened?

20  A.    They ran towards my car and told me to drive off

21  because they saw that they had hit someone.

22  Q.    And did you drive off?

23  A.    Yes.

24  Q.    Was anyone killed with regard to that incident?

25  A.    No.

1    Q.   I'm next going to call your attention to the spring

2    of 2003.

3            On that date did you participate in a shooting

4    on Prospect Avenue in Westbury?

5    A.   Yes.

6    Q.   Who did you participate in that shooting with?

7    A.   Arana and Mejia.

8    Q.   Arana.  Who was Arana?

9    A.   He is another FLS member.

10   Q.   And Mejia, who is Mejia?

11   A.   He is a member of the HLS.  It is the same thing:

12   MS-13.

13   Q.   And HLS, is that a clique in the MS-13?

14   A.   Yes.

15   Q.   What does HLS stand for?

16   A.   Hempstead Locos Salvatrucha.

17   Q.   Why were you participating in the shooting with a

18   member of the HLS?

19   A.   Because that doesn't matter at the time of a crime.

20   Q.   Now, what was your role in this shooting?

21   A.   I drove.

22   Q.   And what happened with regard to the shooting?

23   A.   I drove to the location Arana told me to drive to.

24   And when he saw the individual who was walking, he told me

25   that he was one of the Bloods and he told me to pull off

1   at the corner and he got out of the car with Mejia.

2   Q.   Then what happened?

3   A.   They headed towards the place where the guy was

4   walking and they started shooting at him.

5   Q.   Did you see them shooting at this individual?

6   A.   No, because I am always at a corner.  I am not able

7   to see what's occurring.

8   Q.   Did you hear the shots?

9   A.   Yes.

10  Q.   After you heard the shots, what happened next?

11  A.   They ran towards my car and told me to drive off

12  before the police arrived.

13  Q.   And did you in fact drive off?

14  A.   Yes.

15  Q.   Do you know if anyone was shot with regard to that

16  incident?

17  A.   No.

18  Q.   Do you know whether or not anyone was killed in that

19  incident?

20  A.   No.

21  Q.   No, you don't know?  Or no, no one was killed?

22  A.   No, no one was killed.

23  Q.   I want to next call your attention to a little later

24  in 2003.

25           At that time did you participate in a shooting

1  that occurred in Clinton Park in Hempstead?

2  A.   Yes.

3  Q.   And who were you with on that day?

4  A.   Gigante.  Hueso.  And Travieso.

5  Q.   Now, Gigante:  That was the gang member that you

6  identified yesterday, Government Exhibit 54.2?

7  A.   Yes.

8  Q.   And at the time he was the other leader of the FLS?

9  A.   Yes.

10  Q.   And Travieso:  He is a member of the FLS as well?

11  A.   Yes.

12  Q.   And what happened on this day?

13  A.   Well, I was in Freeport with Gigante.  And Hueso

14  arrived at the location we were at in Freeport.  And he

15  told us that the SWP were in Hempstead at a park.

16  Q.   Now, SWP:  What does that stand for?

17  A.   Salvadorans With Power.

18  Q.   Is that a fellow El Salvadoran street gang?

19  A.   Yes.

20  Q.   What happened with regard to that incident?

21  A.   I drove that day to the location they told me to.

22  And once we got there, they told me to pull up on the side

23  of the street because they were going to go to the park

24  where they were at.

25          So after I parked, they got out with the weapon.

1    And I only heard the shots.

2    Q.    And after you heard the shots, what happened next?

3    A.    They ran towards my car and we drove back to

4    Freeport.

5    Q.    By they, do you mean Hueso, Gigante, and Travieso?

6    A.    Yes.

7    Q.    Do you know if anyone was ever shot in that incident?

8    A.    No.  I don't.

9    Q.    Did the gang members say anything?

10   A.    Yes.  They only said that someone had fallen to the

11   floor.

12   Q.    And was anyone killed with regard to that incident?

13   A.    No.  No one got killed.

14   Q.    I'm next going to call your attention to the fall of

15   2004.

16            Did you participate in a shooting on that date?

17   A.    Yes.

18   Q.    Do you remember where that shooting occurred?

19   A.    It was at a club in Freeport, 440.

20   Q.    Is the 440 Club like a dance club?

21   A.    Yes.

22   Q.    Who were you with on that date?

23   A.    With Ninja and Shaggy.

24   Q.    Who are Ninja and Shaggy?

25   A.    FLS members.

1   Q.   And what was your role with regard to this shooting?

2   A.   I drove.

3   Q.   And what happened with regard to this incident?

4   A.   On that occasion I was driving.  And Ninja saw one of

5   the guys who had beaten him up, and he told me he had to

6   go back to the location, to their 440 location.

7           We went to his place, to Ninja's place, to his

8   house, to get the weapon which we used for the shooting.

9   Q.   What type of weapon was used?

10  A.   A .357.

11  Q.   Handgun?

12  A.   Yes.

13  Q.   After you went back to Ninja's house and got the

14  .357, what happened next?

15  A.   We went back to the 440 location.  And the guy was

16  there.  And Ninja told me to wait for him at the corner of

17  the street.  And Ninja and Shaggy got out of the car with

18  the weapon.  And I only heard the shots.

19  Q.   Then what happened?

20  A.   He ran towards the car and said he hadn't hit

21  anybody.

22  Q.   By *he*, do you mean Shaggy?  Or Ninja?

23  A.   No.  Ninja.

24  Q.   After Ninja went back to the car and said that, what

25  happened next?

1   A.   I dropped him off at his place and I just drove home.

2   Q.   Now, the individual that Ninja claimed beat him up,

3   did he have any gang affiliation?

4   A.   Yes.

5   Q.   What gang affiliation did that individual have?

6   A.   The Latin Kings.

7   Q.   Now, could you describe the relationship between the

8   FLS clique of the MS-13 and the other MS cliques on Long

9   Island and Queens.

10         MS. MACEDONIO:  Can we have a timeframe on that,

11  please.

12  BY MR. TIERNEY:

13  Q.   During the time when you were a gang member between

14  2002 and 2004.

15  A.   To describe that, then I would have to say that the

16  only difference would be between the town letters.  But

17  the gangs are always the same.  We are always MS-13.  It

18  doesn't matter.

19  Q.   And would you have communications with other cliques

20  while you were a member of the gang in 2002 and 2004?

21         MR. LONDON:  Objection to the form of the

22  question:  *Would you*.

23         THE COURT:  Overruled.  Did you --

24         MR. TIERNEY:  It is probably bad grammar.  I

25  apologize.  I will withdraw it.  Sorry.

193

1    I will withdraw the question, your Honor, and

2   reask it.

3   BY MR. TIERNEY:

4   Q.   Did you have any interaction with any of the other MS

5   cliques on Long Island while you were a member of the FLS

6   gang, clique?

7   A.   Yes.

8   Q.   Do you remember the names of some of these cliques?

9   A.   For instance, there is Westbury.  They are located in

10  Westbury and their name is the Normandies.

11        There are Los Pelones in Westbury.  There are

12  the Hempstead guys, the HLS in Hempstead.  In Brentwood

13  the BLS.  In Huntington.  They are also the Roosevelt.

14  Q.   Now, did you ever attend meetings with members of

15  other MS-13 cliques, gang meetings?

16  A.   Yes.

17  Q.   And are these meetings among the cliques, were they

18  called anything?

19  A.   Yes.

20  Q.   What are they called?

21  A.   Universals.

22  Q.   And when you first began going -- withdrawn.

23        When you first joined the gang, who would go to

24  these universal meetings?

25  A.   All the members.

1  Q.   All the members of the individual cliques?

2  A.   Yes.

3  Q.   Did there come a time when the MS changed their

4  policy with regard to that?

5  A.   Yes.

6  Q.   Why was that?

7  A.   We were being more pursued by the police.

8  Q.   And just a large group of people drew attention?

9  A.   Yes.

10  Q.   So how was the policy changed?

11  A.   That less people would attend.

12  Q.   And what happens at universal meetings?

13  A.   Well, there is a discussion about everything that's

14  happening in all the towns.  There is a discussion about

15  collecting money, about buying weapons, and about killing

16  police informants.

17  Q.   Now I'm going to call your attention to September 13,

18  2004.

19            Did you attend a universal meeting of the MS-13

20  on that date?

21  A.   Yes.

22  Q.   Where was that universal meeting held?

23  A.   In Port Washington.

24  Q.   And that is in Nassau County, if you know?

25  A.   Yes.

1   Q.   And who did you go to that meeting with?

2   A.   Well, from my clique, myself, Delincuente, Shaggy,

3   and Caballo attended.

4   Q.   And were other members -- I'm sorry.  Withdrawn.

5         Were other cliques of the MS-13 represented at

6   this meeting as well?

7   A.   Yes.

8   Q.   In total, approximately how many people attended this

9   universal meeting?

10   A.   Between 25 -- no, excuse me.  Between 20 and 25

11   people.

12   Q.   And what happened at this meeting?

13   A.   Well, there was a discussion about the issue

14   involving the rats, the snitches who rat you out to the

15   police.

16   Q.   And what was discussed with regard to that?

17   A.   That we had to get them and kill them.

18   Q.   And with regard to this meeting, who was primarily

19   doing all the speaking?

20   A.   His name was Joker.

21   Q.   And where was Joker from?

22   A.   El Salvador.

23   Q.   And what if anything did Joker say?

24   A.   Yes.  He tried to intimidate us by telling us that we

25   weren't the actual members of the MS-13.  In order to

1    prove that to him, we had to start out by killing the

2    rats.

3    Q.   And did Joker do anything at the meeting?

4    A.   Yes.  He showed his tattoos.

5    Q.   If you could, just take a look at what has already

6    been marked in evidence as Government Exhibit 80-1 through

7    80-4.  And I just ask if you recognize that, sir.

8            Actually, for the record, it is 80.1, 80.3,

9    80.4, 80.5 and 80.2.

10           I'm just beginning with 80.1.  Who is that?

11   A.   The Joker.

12   Q.   Do you recognize 80.2?

13   A.   I'm just trying to figure out that the M, that's the

14   Mara's symbol.

15   Q.   Just with regard to 80.2.  Who is that?

16   A.   Joker.

17   Q.   And 80.3.  Do you recognize, first off, who that is?

18   A.   Yes.

19   Q.   If I could just --

20           MR. TIERNEY:  I'm having technical difficulties.

21           False alarm, your Honor.

22           THE COURT:  Can you make it lighter?  It is too

23   dark.

24   BY MR. TIERNEY:

25   Q.   What is that on his arm?

1  A.    That's a joker.

2  Q.    And 80.4.  Do you recognize what is depicted on his

3  arms?

4  A.    MS.  And a 13.

5  Q.    And 80.5.  Do you recognize that?

6  A.    Yes.

7  Q.    And what -- are those tattoos that Joker had on his

8  back?

9  A.    Yes.

10 Q.    And what do those tattoos symbolize?

11 A.    Well, the one that has a point sticking out, that's

12 like the beast.  And the other one is like a tombstone.

13 Q.    And the beast, is that the devil?

14 A.    Yes.

15 Q.    Now, with regard to that meeting, that universal

16 meeting, were there any other members of the MS from

17 El Salvador at that meeting in addition to Joker?

18 A.    Yes.

19 Q.    Who else was there from El Salvador?

20 A.    Little Cycle.

21 Q.    And in addition to the FLS clique, do you remember

22 what other cliques on Long Island were represented?

23 A.    Yes.

24 Q.    Who else was there?

25 A.    The guys from Brentwood, Jamaica, Hempstead, and I

1   don't know which other.  In Queens.

2   Q.   And primarily who was doing the speaking at this

3   meeting?

4   A.   Joker and Little Cycle.

5   Q.   And how were you able to see Joker's tattoos on that

6   day?

7   A.   He took off his shirt.

8   Q.   And did Joker tell you or -- withdrawn.

9        Did Joker tell the other members of the Long

10  Island cliques what would happen if they didn't eliminate

11  the rats?

12  A.   Well, that we were the ones that were going to die.

13  Q.   I'm next going to call your attention to October 10,

14  2004.

15       Did you attend another universal meeting on that

16  date?

17  A.   Yes.

18  Q.   Where was that meeting held?

19  A.   Brooklyn.

20  Q.   And who did you go to that meeting with?

21  A.   From my clique, it was Delincuente, Chino, and

22  myself.

23  Q.   And did you, Delincuente, and Chino bring anything to

24  this meeting?

25  A.   Yes.

1  Q.   What did you bring?

2  A.   Three weapons.

3  Q.   What type of weapons did you bring?

4  A.   A .22 revolver, a .38 revolver, and a .40 caliber.

5  Q.   Where did you get these guns from?

6  A.   Delincuente purchased them.

7  Q.   Whose guns were they?

8  A.   Through the FLS.

9  Q.   It was the clique's guns?

10 A.   Yes.

11 Q.   In addition to the FLS, do you remember what other

12 cliques of the MS-13 were represented?

13 A.   Guys from Brentwood were there.  And there was from

14 Jamaica, from Queens, and from Huntington.

15 Q.   And what happened at this meeting?

16 A.   Well, one person, one member, by the name of Necio

17 participated, saying that he had a letter, that he had

18 received a letter that said that we needed to kill the

19 rats.

20 Q.   And Necio:  What clique is he from?  Do you remember?

21 A.   Port Washington.

22 Q.   And so what else happened at the meeting?

23 A.   We were talking about that.  But the only thing is,

24 we have some rules and you cannot speak on the phone.  And

25 he started speaking on the phone so we started discussing

1  that with him, because he was talking on the phone.

2  Q.   Why is there a rule that you can't speak on the phone

3  during a meeting?

4  A.   Because by way of the phone they could be using a

5  camera to record or just record the meeting and inform the

6  police about it.

7  Q.   And was this meeting cut short?

8  A.   Yes.

9  Q.   What happened?

10 A.   Well, the antigang, what do you call them, the

11 squads, these people just burst in and arrested us.

12 Q.   And approximately how many people were in the squad?

13 A.   There were a lot of them.  I couldn't even count

14 them.

15 Q.   And this was law enforcement?

16 A.   Yes.

17 Q.   And how were they dressed?

18 A.   They were dressed in black, some of them.  Clad in

19 black.

20 Q.   Once they came into the house, what did you do?

21 A.   Well, we tried to escape.  I, myself, tried to get

22 out through the roof, through the top of the house, but we

23 couldn't do it.

24 Q.   Did you make it to the top of the roof?

25 A.   Yes.

1  Q.    And were you with anybody when you got to the top of

2  the roof?

3  A.    Yes.

4  Q.    Did you have anything with you when you got to the

5  top of the roof?

6  A.    Yes.

7  Q.    Who were you with and what did you have?

8  A.    I was with Delincuente and Mosca.  And I had a gun.

9  Q.    And which gun did you have?

10  A.    A .22 revolver.

11  Q.    Once you got up to the roof, what did you do with

12  that gun?

13  A.    I was very nervous.  I didn't know what to do with

14  it.  Delincuente grabbed it from my hands and threw it

15  away in a wooded area.

16  Q.    Did Delincuente have guns on him?

17  A.    Yes.

18  Q.    What did he have?

19  A.    A .40 caliber.

20  Q.    And what did Delincuente do with that .40 caliber

21  gun?

22  A.    He also threw it away to this wooded area.

23  Q.    And then did there come a time when the law

24  enforcement came on the roof and arrested you?

25  A.    Yes.

1  Q.  And I'm going to ask that you take a look at

2  Government Exhibit 56.2, 56.4, and 56.7.

3        Do you recognize what is depicted in Exhibit

4  56.2, 56.4 and 56.7?

5  A.  Yes.

6  Q.  What do those pictures appear to be of?

7  A.  Some weapons and a staircase.

8  Q.  I'm just asking you to look at 56.2, 56.4 and 57.7.

9        Do you recognize those weapons?

10  A.  Yes.

11  Q.  What do you recognize those weapons to be?

12  A.  56.2 is the .22 revolver.

13        56.4 is the .38 revolver.

14        56.2 is the .40 caliber.

15        THE COURT:  You said 56.2 twice.

16  BY MR. TIERNEY:

17  Q.  I believe 56.7.

18        THE INTERPRETER:  I'm sorry.

19        56.7 is the .22 revolver.

20        56.4 is the .38 caliber.

21        And 56.2 is .40 caliber.

22        I apologize, your Honor.

23  BY MR. TIERNEY:

24  Q.  Are those the FLS clique's guns?

25  A.  Yes.

203

1    Q.    Do those pictures fairly and accurately depict the

2    way those guns looked when you brought them to that

3    universal meeting on October 10, 2004?

4    A.    Yes.

5    Q.    Prior to that date, how many times had you seen those

6    guns?

7    A.    Twice.

8         MR. TIERNEY:  Your Honor, I move those into

9    evidence at this time.

10         MS. MACEDONIO:  Your Honor, I continue my

11    objection.

12         MS. RANTALA:  We would join in that objection.

13         THE COURT:  Based upon the court's ruling

14    yesterday, 56.2, 56.4, and 56.7 are admitted.

15         (Government Exhibits 56.2, 56.4, and 56.7 in

16    evidence.)

17         MR. TIERNEY:  May I publish, your Honor?

18    BY MR. TIERNEY:

19    Q.    I have just placed on the monitor what has been

20    marked as Exhibit 56.7.

21         Do you recognize that?

22    A.    Yes.

23    Q.    What is that a photograph of?

24    A.    That is the .22 caliber.

25    Q.    And the 56.4, Government Exhibit 56.4, do you

204

1 recognize that?

2 A.    Yes.

3 Q.    What weapon is that?

4 A.    The .38 revolver.

5 Q.    And did that gun sustain any damage when it was

6 thrown off the roof?

7 A.    Yes.

8 Q.    What happened?

9 A.    Because of the impact, it broke.

10 Q.    And 56.2.  Do you recognize that?

11 A.    Yes.

12 Q.    What do you recognize that to be?

13 A.    A .40 caliber.

14 Q.    Now, subsequent to your arrest, were you brought

15 anywhere?

16 A.    Yes.

17 Q.    Where were you brought?

18 A.    As far as I can remember, to a precinct.

19 Q.    And as a result of your arrest on that date, were you

20 charged with any crimes in federal court?

21 A.    Yes.

22 Q.    And did there come a time subsequent to that arrest

23 when you decided to cooperate with the government?

24 A.    Yes.

25 Q.    When did you begin cooperating with the government?

1  A.   Same day of my arrest.

2  Q.   What happened?

3  A.   Well, I recognized a detective from Freeport, and

4  since I knew him I decided to trust him and to tell the

5  truth.

6  Q.   And subsequent to meeting with that detective, did

7  you then meet with the FBI?

8  A.   Yes.

9  Q.   And then after that, were you brought to the United

10  States Attorney's office and did you meet with members of

11  the United States Attorney's office?

12  A.   Yes.

13  Q.   And during those meetings, did you discuss your

14  involvement with the MS-13?

15  A.   Yes.

16  Q.   How did the government find out about your

17  involvement in those four shootings?

18  A.   Because I told them.

19  Q.   Thereafter in federal court did you plead guilty to

20  possession of firearms in furtherance of a crime of

21  violence?

22  A.   Yes.

23  Q.   Did that occur in March of 2005?

24  A.   Yes.

25  Q.   And do you know -- have you been sentenced on that

1    yet?

2    A.    No.

3    Q.    Do you know what the range of imprisonment is for

4    that crime?

5    A.    From five to life.

6    Q.    Now, along with your pleading guilty to that crime,

7    did you plead guilty pursuant to an agreement with the

8    government?

9    A.    Yes.

10   Q.    I'm going to show you what has been marked as

11   Government Exhibit 56 for identification.

12          Do you recognize that?

13          Just take a look at the entire document.

14   A.    Yes.

15          (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

1  DIRECT EXAMINATION  (Continued)

2  BY MR. TIERNEY:

3  Q    What do you recognize that to be?

4  A    That's the agreement.

5  Q    And does it have sentencing assurance?

6  A    No.

7  Q    Now, that agreement, Government Exhibit 65, what is

8  it that you're required to do under that agreement?

9  A    Cooperate with the truth.

10  Q    And what are you required to do under the agreement?

11  A    To tell the whole truth about me and what the guy

12  did.

13  Q    And if you live up to the agreement, what is your

14  understanding of what the government would do for you?

15  A    They will give me a letter.

16  Q    By that you mean by the US Attorney's office?

17  A    Yes.

18  Q    Is that what is known as a 5K letter?

19  A    Yes.

20  Q    And with that letter did you receive a lesser

21  sentence from the judge?

22  A    Yes.

23  Q    Does that letter require the judge to give you a

24  lesser sentence?

25  A    No.

1   Q    What happens here if you lie or otherwise violate the

2   terms of your plea, your cooperation agreement?

3         MS. MACEDONIO:  Objection.

4         THE COURT:  Why don't you approach.

5         (The following occurred at sidebar.)

6         MS. MACEDONIO:  Judge, I think the answer

7   clearly calls for speculation, there's been a number of

8   cooperators who have lied and have broken the terms of

9   their cooperation agreement in various ways and have not

10   had their cooperation agreements ripped up, have still

11   gotten 5K letters.  And what the witness is about to say

12   is his 5K letter would be ripped up and he would be

13   prosecuted to the fullest extent of the law.

14         I don't think that that's clear that that is

15   what would happen, and I would object to the question.

16         MR. LEVINE:  But it is not if he lies to the

17   government, it is if --

18         THE COURT:  You can obviously cross him on the

19   terms of the agreement and his understanding of the

20   agreement, but that's what he's testifying about, what he

21   understands what happened, that's what's important for

22   purposes of his credibility, what has happened in other

23   cases you can point out that the decision whether or not

24   he has breached, whether it should be ripped up is up to

25   the government.

1    MS. MACEDONIO:  But I believe that the witness'

2  question was asked was not what his understanding would

3  be.

4    MR. TIERNEY:  I believe it was, but I'll re-ask

5  the question.

6    MS. MACEDONIO:  Mr. Tierney has been doing a lot

7  of leading which I haven't objected to.  I just ask him to

8  be cautious of that.

9    THE COURT:  I actually didn't notice that he was

10  doing a lot of leading, obviously if the witness already

11  testified about something he is just clarifying, I don't

12  see that as problematic.  But I haven't seen a lot of

13  leading.

14    MS. MACEDONIO:  I just don't want to keep

15  jumping up and down for things that are ultimately going

16  to come out.

17    THE COURT:  Okay.

18    (The following occurred in open court.)

19    MR. TIERNEY:  I'll re-ask the question, your

20  Honor.

21  BY MR. TIERNEY:

22  Q    Mr. Guevara, what is your understanding of what will

23  happen if you lie or otherwise violate the terms of that

24  agreement?

25  A    They will throw the agreement away.

1  Q    And would you be able to take your guilty plea back

2  at that point?

3  A    No.

4  Q    In the end who is the only one who is going to decide

5  what your sentence is going to be?

6  A    Judge Wexler.

7  Q    And Judge Wexler, is he a judge in this courthouse

8  who you pled guilty before?

9  A    Yes.

10  Q    Now, after your arrest on October 10, 2004,

11  approximately how long did you stay in jail?

12  A    Five years.

13  Q    Thereafter were you released on bail pending

14  sentence?

15  A    Yes.

16  Q    When did that occur?

17  A    Around July of 2009.

18  Q    And do you remember, do you know what your bail

19  conditions are currently?

20  A    Yes.

21  Q    What are your bail conditions?

22  A    I'm sorry, conditions like what?

23  Q    Did you sign a bond or do you remember how, did you

24  have to sign any paperwork to get out of jail?

25  A    My family signed for me.

1  Q    Do you remember how many people?

2  A    It was between seven or eight people.

3  Q    And do you know how much money the bond was for?

4  A    Five hundred thousand.

5  Q    And subsequent to your release, were you given a work

6  authorization?

7  A    Yes.

8  Q    And who helped you to get that work authorization?

9  A    The government.

10 Q    The FBI?

11 A    Yes.

12 Q    And in addition, do you know what your immigration

13 status is?

14 A    Right now the only thing I have is a temporary

15 permission.

16 Q    So you're on temporary parole status pending the

17 completion of your cooperation?

18 A    Yes.

19 Q    And are you subject to deportation upon your sentence

20 in this case?

21 A    Um, yes.

22 Q    And has the government promised you anything with

23 regard to your deportation?

24 A    Because I'm cooperating with the government they will

25 try to help me so I wouldn't be in danger in El Salvador.

1  Q   So there is a promise that you wouldn't be deported

2  back to El Salvador?

3  A   Yes.

4  Q   For what reason did the government promise that you

5  wouldn't be deported back to El Salvador?

6           MS. MACEDONIO:  Objection.

7           THE COURT:  Sustained.

8  BY MR. TIERNEY:

9  Q   Since the time of your release from the prison have

10  you been arrested?

11  A   No.

12  Q   Have you been working?

13  A   Yes.

14  Q   What is it that you do, don't tell us who you work

15  for, but what is it that you do?

16           MS. MACEDONIO:  Objection.

17           THE COURT:  Overruled.

18  A   I work installing grass and in construction.

19           MR. TIERNEY:  Your Honor, I move the cooperation

20  agreement in evidence as Government Exhibit 65.

21           MS. MACEDONIO:  No objection.

22           MS. RANTALA:  No objection.

23           THE COURT:  Government Exhibit 65 is admitted.

24           (Government Exhibit 65 in evidence.)

25

1  BY MR. TIERNEY:

2  Q    One more thing, Mr. Guevara, prior to yesterday have

3  you ever seen either of these two defendants?

4  A    No.

5           MR. TIERNEY:  I have nothing further.

6           THE COURT:  Why don't we take a break before

7  cross-examination, we'll take our morning break for 15

8  minutes.  Don't discuss the case.

9           (A recess was taken at 11:18 a.m.)

10          (The jury left the courtroom at 11:18 a.m.)

11          THE COURT:  The Court's ruling with respect to

12  the last objection, Ms. Macedonio objected to the

13  government asking the witness what his work, whether he

14  was working or what work he was doing.  The reason I

15  allowed that is I think based upon both opening statements

16  defense clearly suggested to the jury that the government

17  is allowing some cooperating witnesses to remain in the

18  United States and they would be engaging in dangerous

19  activity.  So I think it opened the door for the

20  government to bring out from the witness what he's

21  currently doing while he's out on bail.  So that's why I

22  allowed it in.

23          Mr. London?

24          MR. LONDON:  Nothing.

25          MR. DURHAM:  Your Honor, just briefly, with the

1  Court's permission we have a witness available as I

2  mentioned earlier, Francis Braun, who has a medical

3  appointment this afternoon.  With the Court's permission I

4  just spoke to Ms. Macedonio, I didn't have a chance to

5  speak to Mr. London or Ms. Rantala, I would like to call

6  that witness out of order before they begin their

7  cross-examination of Mr. Guevara.

8          THE COURT:  Do you have any problem with that?

9          MR. LONDON:  I don't, judge.

10         THE COURT:  I'll explain to the jury the

11 scheduling issue and the order doesn't matter.

12         MR. DURHAM:  We anticipate him being a very

13 short witness.

14         THE COURT:  Okay.  Thank you.

15         MR. DURHAM:  Thank you.

16         (A recess was taken at 11:20 a.m.)

17         (After recess the following occurred.)

18         THE COURT:  Members of the jury, because of a

19 scheduling issue with a witness I'm going to have a

20 witness called out of turn so we're going to hear another

21 witness' testimony.  I believe it is going to be brief and

22 then we'll go back to or we'll begin the cross-examination

23 of Mr. Guevara.  This happens from time to time during a

24 trial based upon scheduling for the witnesses and you

25 should obviously -- the order of witnesses is not

1  important, you should consider the testimony as you would

2  any other situation.  Okay?

3          Okay.  Who would you like to call?

4          MS. CAPWELL:  Francis Braun, your Honor.

5

6  **FRANCIS BRAUN**

7          called as a witness, having been first duly sworn,

8          was examined and testified as follows:

9          THE CLERK:  Please state your name and spell it

10  for the record.

11         THE WITNESS:  It's Francis Braun, and it's

12  F-R-A-N-C-I-S, B-R-A-U-N.

13         THE COURT:  If you would just pull your chair

14  close to the mic so everyone can hear you.  Thank you.

15         Ms. Capwell?

16         MS. CAPWELL:  Thank you, your Honor.

17

18  DIRECT EXAMINATION

19  BY MS. CAPWELL:

20  Q    Good morning, Mr. Braun.

21  A    Good morning.

22  Q    Are you currently employed?

23  A    No.

24  Q    Were you previously employed?

25  A    Yes.

1  Q    And what was your work, what did you do for a living?

2  A    I was a police officer with the New York City Police

3  Department.

4  Q    And for how long were you a police officer?

5  A    Eight years.

6  Q    Why did your employment end with the NYPD?

7  A    I got out on a disability.

8  Q    And what year did you leave the NYPD?

9  A    2003, I believe.  It was a shooting.

10 Q    And I want to now draw your attention to

11 February 17th of 2010, where were you on that date?

12 A    At a soccer tournament.

13 Q    And where was that soccer tournament?

14 A    I believe it was in the KK Athletics.

15 Q    And where were you?

16 A    I was inside of the facility, and I believe it's in

17 Brentwood.

18 Q    In Brentwood.  Okay.

19        And what were you doing there that day?

20 A    I was coaching my daughter's soccer team at a

21 tournament, we had played approximately about three games.

22 Q    Okay.  And approximately what time period were you

23 there at the athletic complex on February 17th, 2010?

24 A    I was there the whole time.

25 Q    Do you remember what time, from what time of day

1  until about what time of day?

2  A    Probably two o'clock until late, you know, about

3  6:00, you know, if I can estimate.  I'm not too sure, I

4  don't remember.  It was three games so it was probably --

5  you know, it ended in the evening, towards evening.

6  Q    Was it dark out when you left?

7  A    Oh, yes, it was dark out, yes.

8  Q    Okay.  And while you were at KK Athletics that day,

9  did anything significant happen?

10  A    Yes.

11  Q    Okay.  Please tell the members of the jury what

12  happened.

13  A    We had just finished a soccer tournament.  We had, I

14  believe, got some type of medal, it was second place.  I

15  was heading --

16  Q    Could you slow down a little bit?

17  A    Oh, I'm sorry.  What was that?

18  Q    Slow down a little bit.  Thank you.

19  A    Okay.  I had just handed out medals to my girls and

20  the director from the soccer tournament came in from

21  outside and said there was a shooting.  And keep everybody

22  inside.  So I was instructing the parents to stay inside.

23  Q    I'm sorry --

24  A    The parents of the kids, I instructed them to keep

25  everybody inside.

1  Q    And what you did do at that point?

2  A    After I told the team to stay inside I went outside

3  to see if I could be of any assistance and help out.

4  Q    Okay.  And when you went outside what did you see?

5  A    When I first exited the building I -- to my left I

6  could see one victim in the middle of the street.  And

7  that was all I could see at that time.

8  Q    And upon seeing the victim in the middle of the

9  street what did you do?

10  A    I proceeded to walk to my left down a walkway.  There

11  were cars parked on the road.  So by the time I got to the

12  road and I turned to my right I realized there was another

13  victim laying against the car that I could see from where

14  I was, when I walked out.

15  Q    And did you go up close to any of the victims?

16  A    Yes.  I approached the victim that was closest to me

17  which is on the ground by the vehicle and I went down and

18  I was wondering -- I asked him if he could hear me and I

19  got no response.

20       I then went to the second victim.  As I

21  approached him I crouched down, I asked him if he could

22  hear me.  He did gurgle.  At that moment I looked up and I

23  noticed somebody was on a cell phone dialing 911.  I told

24  them this person was alive and breathing, to get an

25  ambulance here.

1  Q    And did you at some point get on the phone yourself

2  with 911?

3  A    Yes.

4  Q    And just going back briefly to the first body that

5  you approached.  Is that the one that was closer to the

6  side of the road?

7  A    Yes, that was closer to the side of the road.

8  Q    And as best you can remember, what did that victim

9  look like, what kind of condition he was in?

10 A    You know, he was -- he had a shot to the head and you

11 could see that there was blood and some tissue and, you

12 know, other -- over his face and eyes and stuff like that.

13 Q    Okay.  And is that the victim who you said was not

14 responsive?

15 A    He was not responsive.

16 Q    And you approached the second victim and what did he

17 look like?

18 A    He was laying on his back looking up at the sky and

19 he had got shot in the forehead.  And when I went down to

20 see if he could hear me, he started gurgling and making,

21 you know, gurgling sounds.

22 Q    And is it at that point that you saw an individual

23 who appeared to be on the phone with 911?

24 A    Yes, I looked up and I saw a gentleman on the phone

25 with -- which I assumed he was on the phone with 911.

1  Q    And then you used his phone to actually speak to a

2  911 dispatcher?

3  A    Yes.

4  Q    I'm going to show you a couple of photographs that

5  are already in evidence.  I'm going to start with Exhibit

6  251.  And I'll ask you to take a look.  It should be on

7  your monitor.  Is it there?

8  A    Yes.

9  Q    Do you recognize what is depicted in the photograph?

10 A    Yes, I do.

11 Q    And can you tell us what this photograph shows?

12 A    It's the facility of the soccer tournament, as I

13 said, it's KK Athletics.

14 Q    KK Athletics.  Okay.  And can you describe the

15 building for us in this picture?

16 A    It's the square building with the blue front top,

17 that's the front.

18 Q    Okay.  And also there's a laser pointer right there

19 on the desk to your left.  And if you would turn around

20 there is an enlargement of Exhibit 251 behind you so the

21 jury can see.  Can you just point out KK Athletics?

22 A    (Indicating).

23      MS. CAPWELL:  Let the record reflect the witness

24 is indicating the building on the left side of the

25 photograph.

1    THE COURT:  Yes.

2    MS. CAPWELL:  Thank you, your Honor.

3  BY MS. CAPWELL:

4  Q    And can you -- using -- actually, let me now put

5  Exhibit 252 on the overhead.  And do you recognize what is

6  shown now in this photograph?

7  A    The same facility.

8  Q    Okay.  Fair to say it's a little closer up shot?

9  A    Yeah, it's a closer view of the same facility.

10  Q    And can you show us when you exited KK Athletics to

11  go outside after you were informed there was a shooting,

12  can you show us which doors you used?  Is it in the

13  photograph?

14  A    Yes.

15  Q    Could you just use the pointer to show the jury?

16  A    I exited these doors right here.

17  Q    And those are double doors?

18  A    Yes.

19    MS. CAPWELL:  And let the record reflect the

20  witness is indicating on the left side of the photograph

21  the doors to the KK Athletics.

22    THE COURT:  Yes.

23    MS. CAPWELL:  Thank you, your Honor.

24  BY MS. CAPWELL:

25  Q    And can you use the laser pointer and just show us

1 the route that you used out of KK Athletics?

2 A    I exited right here and I walked down the sidewalk to

3 the street.

4 Q    Okay.  Do you know the name of that street?

5 A    Offhand I do not.

6 Q    Okay.  But just for the record, that is the street

7 that is running kind of vertically in the photograph?

8 A    Yes.

9 Q    Okay.  And can you show us where you saw the body

10 that you described as being on the side of the road?

11 A    Yes, it was about right here.

12 Q    Okay.  And closer to the curb?

13 A    Yes.  Like I said, there were cars parked along this

14 side here and he was right next to the car.

15 Q    And also, do you remember what the weather was like

16 that day?

17 A    I think it was dark, it was winter so there was some

18 snow on the ground already.  You know, it wasn't raining

19 or snowing at the time.

20 Q    Okay.  But there were cars parked along that street?

21 A    Yes, because this is -- the whole parking lot was

22 filled and some were on the side.

23        THE COURT:  Just for the record, the witness is

24 indicating where the body was, he indicated on the left

25 side of the vertical street where the sidewalk meets.

1    MS. CAPWELL:  Thank you, your Honor.

2   BY MS. CAPWELL:

3   Q    And Mr. Braun, if you would take the laser pointer

4   from the first victim that you approached and take us to

5   where you found the next victim?

6   A    The second victim was about, you know, right about

7   here.

8   Q    Okay.  So fair to say about south on that street?

9   A    Pardon me?

10  Q    South on that street?

11  A    Yes, south.

12  Q    And I believe your testimony was that the second

13  victim was closer to the middle of the road?

14  A    Yes, he was right facing the middle of the road.

15  Q    And can you put the laser pointer back on

16  approximately where the second victim was?

17       MS. CAPWELL:  If the record would reflect that's

18  approximately where the edge of the structure on the right

19  side of the photograph is.

20       THE COURT:  It would be in the middle of the

21  street, straight across from where the stores are on the

22  right side of the photo.

23       MS. CAPWELL:  Thank you, your Honor.

24  BY MS. CAPWELL:

25  Q    And, sir, after you spoke to 911 did you remain at

1    the scene?

2    A    Yes, I did.

3    Q    And did the police arrive while you were there?

4    A    Yes.

5    Q    Did you speak with any police?

6    A    Yes, I did.

7    Q    And did you provide them with any information you had

8    at that point?

9    A    Yes, I provided them with the information I had.

10            MS. CAPWELL:  Your Honor, I have no further

11   questions.

12            THE COURT:  Cross-examination?

13            MS. MACEDONIO:  I have no questions of the

14   witness.

15            MS. RANTALA:  No questions.

16            THE COURT:  You can step down, sir.

17

18   **TONY GUEVARA**

19           called as a witness, having been previously duly

20           sworn, was examined and testified further as

21           follows:

22            THE COURT:  Okay.  Members of the jury, we'll

23   now continue with the testimony of Mr. Guevara.  We're up

24   to the cross-examination first with Ms. Macedonio.

25            MS. MACEDONIO:  Thank you, your Honor.

1   CROSS-EXAMINATION

2   BY MS. MACEDONIO:

3   Q    Good morning, Mr. Guevara.

4   A    Good morning.

5   Q    Can you tell us how old you were when you first came

6   to the United States?

7   A    14 years old.

8   Q    So how old are you now?

9   A    33.

10  Q    So you have been in this country almost 20 years.  Is

11  that fair to say?

12  A    Yes.

13  Q    You went to school here for a while?

14  A    Yes.

15  Q    You worked in this country?

16  A    Yes.

17  Q    And you speak English.  Is that fair to say?

18  A    Yes.

19  Q    You testified on direct examination that you at some

20  point had a nickname.  Is that correct?

21  A    Yes.

22  Q    And you chose that nickname, correct?

23  A    Yes.

24  Q    And you chose the nickname Fantasma, right?

25  A    Yes.

1  Q    Why did you choose that particular name?

2  A    It was something that came to my mind.

3  Q    Is it fair to say that the term fantasma means

4  phantom or ghost?

5  A    It's possible, yes.

6  Q    Is there another possibility as to what the term

7  would be?

8  A    Not that I know of.

9  Q    Okay.  So you chose to be known as the phantom,

10  correct?

11  A    Yes.

12  Q    And you said in part that these nicknames were used

13  so that law enforcement would have no idea what was going

14  on, correct?

15  A    And also by society.

16  Q    So you the phantom didn't want society or the police

17  to know what you were up to.  Fair to say?

18  A    Right.

19  Q    And you testified I think yesterday that there were a

20  lot of rules involved with MS-13.  Is that correct?

21  A    Yes.

22  Q    And isn't it true, Mr. Guevara, that one of the MS-13

23  rules was that if you were asked questions by the police

24  you were to lie to them?

25  A    Depending.  In that circumstance I have to tell the

1   truth, I cannot go on lying.

2   Q    I'm not asking you about a circumstance, I'm asking

3   you, sir, if it was one of the rules in MS-13 that if you

4   were approached by the police, that you were to lie to

5   them.  Was that one of the rules?

6   A    True.

7   Q    That was a rule, right?

8   A    Yes.

9   Q    And when you got arrested in October of 2004, you

10  totally cooperated with the police right away.  Fair to

11  say?

12  A    Yes.

13  Q    On the very night of your arrest you started talking

14  to the police, right?

15  A    Yes.

16  Q    And as you sit there right now, you've received an

17  enormous amount of benefit from talking to the police,

18  haven't you?

19  A    Actually, I do not know how to answer that.

20  Q    Okay.  Well, you were charged in a federal indictment

21  in this very courthouse, were you not, sir?

22  A    Yes.

23  Q    And that indictment charged you with two separate

24  counts, correct?

25  A    Yes.

1 Q    And as part of your agreement with the government you

2 only have to plead guilty to one of those counts, correct?

3 A    Right.

4 Q    And when you went in and you spoke to the government,

5 you told them about all sorts of crimes you had committed,

6 correct?

7 A    Right.

8 Q    And you told them that for years you had been hunting

9 people with other members of MS-13 and you were never

10 charged with those counts, were you?

11        THE INTERPRETER:  I'm sorry, for years you had

12 been hunting other people?

13 BY MS. MACEDONIO:

14 Q    You had been hunting other people with members of the

15 MS-13 and you were never charged with those counts?

16 A    True.

17 Q    So you told us that in the fall of 2002 you were

18 driving around Freeport looking to shoot African-American

19 men who you believed were members of the Bloods.  Is that

20 true?

21 A    True.

22 Q    And not only did you do that once in the fall of 2002

23 but you did it twice because the first time you couldn't

24 find anybody, right?

25 A    What first time are you talking about?

1    Q    In the fall of 2002, were you the driver of the

2    vehicle that was in Freeport with other people who you

3    claimed to be members of MS-13 driving around Freeport

4    looking to shoot African-American men simply because you

5    believed they were members of the Bloods?

6    A    True.

7    Q    So you were looking to kill them.  Fair to say?

8    A    True.

9    Q    Shots were fired, correct?

10   A    True.

11   Q    And according to your testimony, no one died.  Is

12   that correct?

13   A    Yes.

14   Q    So would it be fair to say, if you know, that you

15   could have been charged with a conspiracy to commit

16   murder?

17   A    True.

18   Q    Attempted murder, correct?

19   A    True.

20   Q    That you had a weapon that you used to commit a

21   crime?

22   A    True.

23   Q    And you got a pass on all of that, didn't you, sir?

24   A    True.

25   Q    And you did it on multiple occasions, correct?

1   A   True.

2   Q   In the spring of 2003, you did the same thing,

3   searching for African-American men in Westbury simply

4   because you believed or someone told you that they were

5   members of the Bloods, correct?

6   A   True.

7   Q   Again, you could have been charged with numerous

8   crimes for that, right?

9   A   True.

10  Q   But you got a pass on that too, right?

11  A   True.

12  Q   In fact, two weeks before you were arrested you were

13  driving around Freeport looking for members of the Latin

14  Kings, correct?

15  A   True.

16  Q   And you got a pass on that too, didn't you?

17  A   True.

18  Q   So because of your agreement with the government --

19          THE INTERPRETER:  Because of your?

20  BY MS. MACEDONIO:

21  Q   Because of your agreement with the government, you

22  have been allowed to plead guilty to a single crime

23  despite the fact that you have probably committed dozens

24  upon dozens of crimes.  Is that fair to say?

25  A   True.

1  Q    The same is true with the shooting in Clinton Park?

2  A    True.

3  Q    And are you aware, sir, that these -- a lot of these

4  counts have a maximum term of incarceration of life?

5  A    Yes.

6  Q    And that some of these crimes to which you have not

7  been required to plead guilty have consecutive sentences

8  which means that one sentence would be piled on top of the

9  other and on top of the other and on top of the other.

10  Are you aware of that, sir?

11  A    Yes.

12  Q    Now, prior to your testimony yesterday and your

13  continued testimony today, in exchange for these passes

14  that you got, you have done absolutely nothing for the

15  government except talk to them.  Is that fair?

16  A    True.

17  Q    You didn't do any proactive work, you weren't making

18  any recordings, correct?

19  A    No.

20  Q    You didn't act in any sort of undercover capacity,

21  right?

22  A    No.

23  Q    The only thing you did was talk to them, right?

24  A    True.

25  Q    Now, you did go to jail for a period of time,

1  correct?

2  A    Yes.

3  Q    But then you were released on bail, right?

4  A    Right.

5  Q    And the government agreed to your release, didn't

6  they?

7  A    Right.

8  Q    So even though you testified that you're facing a

9  life sentence, the government has already agreed that you

10  should be released from prison.  Isn't that right, sir?

11  A    Right.

12  Q    And you talked about a bond that your family signed.

13  Do you remember that?

14  A    Right.

15  Q    And you said you thought the bond was $500,000.  Is

16  that correct?

17  A    Yes.

18  Q    But that was just signatures required by your family,

19  they didn't post $500,000, right?

20  A    Right.

21  Q    They didn't have to put up any money to get you out

22  of jail?

23  A    Right.

24  Q    They just came in and they signed for you, correct?

25  A    Right.

1   Q   Now, you were subject to mandatory deportation

2   because of the crimes or the crime that you pled guilty

3   to. Is that correct?

4   A   Right.

5   Q   And that mandatory deportation, that is going to come

6   into effect, if you understand, when you're sentenced, if

7   you know, when you're sentenced?

8   A   Right.

9   Q   How long have you been out of jail now?

10   A   About three-and-a-half years.

11   Q   And you pled guilty in the spring of 2005?

12   A   Right.

13   Q   And you don't have a sentence date, do you, sir?

14   A   Right.

15   Q   No one is telling you, *Gee, Mr. Guevara, you better*

16   *start packing your bags because we're going to have you*

17   *sentenced*, right?

18   A   Right.

19   Q   Instead, the FBI has helped you stay in this country.

20   Isn't that correct, sir?

21   A   Right.

22   Q   In fact, they got you permission to go to work,

23   right?

24   A   Right.

25   Q   Are you paying taxes on that money, Mr. Guevara?

1  A    Right.

2  Q    You file your taxes as required?

3  A    Yes.

4  Q    Do you know what an S visa is?

5  A    I don't have much knowledge about it.

6  Q    Okay.  But you testified on direct examination that

7  the government has promised to try to keep you in this

8  country, sir?

9  A    Right.

10  Q    In addition to the FBI helping you, giving you

11  authorization so that you could go to work, you also have

12  all of your reporting conditions or bail conditions

13  removed.  Isn't that correct, sir?

14  A    Right.

15  Q    So you don't have to report to anyone, do you?

16  A    I always communicate with the FBI.  I always do.

17  Q    You always do, but you don't have to report to

18  anybody from pretrial services, do you?

19  A    True.

20  Q    In other words, you're not being monitored by the

21  courts anymore, are you?

22  A    Yes.

23  Q    That condition of your release has been eliminated,

24  right?

25  A    Right.

1  Q    So you're free to do what you want.  You don't have

2  to come to this building and report to anybody.  Is that

3  fair to say?

4  A    Right.

5  Q    And it's true even though you're facing a life

6  sentence and mandatory deportation?

7  A    True.

8       MS. MACEDONIO:  May I have a moment?

9       THE COURT:  Yes.

10      (There was a pause in the proceedings.)

11 BY MS. MACEDONIO:

12 Q    Mr. Guevara, when you were arrested in 2004, did you

13 then end your ties, if any, with MS-13?

14      THE INTERPRETER:  I'm sorry, could you repeat

15 that?

16 BY MS. MACEDONIO:

17 Q    When you were arrested in October of 2004, is it your

18 testimony that you ended or severed your ties with MS-13?

19 A    Right.

20 Q    So your testimony at this trial is historical, in

21 other words, you have no idea about what, if anything, is

22 going on with MS-13 now, do you, sir?

23 A    Right.

24 Q    Finally, sir, during your direct examination you

25 talked about your cooperation agreement with the

1    government.

2    A    Right.

3    Q    And that is it your understanding that these

4    prosecutors at the table are going to write a letter for

5    you to Judge Wexler?

6    A    Right.

7    Q    And they're going to describe to Judge Wexler that

8    you came in on multiple occasions and talked to them,

9    right?

10    A    What can I say about it?  They are the ones that make

11    the decision.

12    Q    And that is your understanding of what is going to be

13    in that 5K letter?

14    A    Saying that I have cooperated with them and that I

15    have told the truth.

16    Q    Right.  And your cooperation with them includes going

17    in and talking to them, right?

18    A    Right.

19    Q    For which you have already received enormous benefit.

20    Isn't that correct, sir?

21    A    Right.

22    Q    And the other part of the cooperation, the 5K letter

23    is going to include your testimony at a trial when you

24    don't know either one of the defendants.  Isn't that

25    correct, sir?

1    A    Right.

2           MS. MACEDONIO:  I have no further questions.

3    Thank you.

4           MR. LONDON:  No questions.

5           THE COURT:  Redirect?

6           MR. TIERNEY:  Thank you.

7

8    REDIRECT EXAMINATION

9    BY MR. TIERNEY:

10   Q    Do you remember being asked on cross-examination with

11   regard to the charge you pled guilty to?

12   A    Yes.

13   Q    What charge did you plead guilty to?

14   A    Possession of a weapon.

15   Q    And what is the maximum term of incarceration you

16   could -- withdrawn.

17          What is the maximum term of jail you could get

18   on that charge?

19   A    Five years to life.

20   Q    So you could be sentenced up to life imprisonment?

21   A    Yes.

22   Q    And who is going to sentence you?

23   A    Judge Wexler.

24   Q    Again, Judge Wexler is another judge in this

25   building, correct?

1    A    Right.

2    Q    And do you remember being asked on cross-examination

3    with regard to the letter that the US Attorney's office is

4    going to write to Judge Wexler?

5    A    Yes.

6    Q    And that letter is going to contain all the

7    assistance that you provided to the government.  Is that

8    your understanding?

9    A    Right.

10    Q    It's also going to contain information about those

11    four shootings you participated in, correct?

12            MS. MACEDONIO:  Objection.

13            THE COURT:  Overruled.

14    A    Right.

15    BY MR. TIERNEY:

16    Q    And is that something the judge can consider when he

17    sentences you?

18            MS. MACEDONIO:  Objection.

19            THE COURT:  Overruled.

20    A    Yes.

21    BY MR. TIERNEY:

22    Q    Now, you were also asked questions with regard --

23    withdrawn.

24            With regard to your pretrial services, do you

25    remember those questions you were asked?

1    A    Yes.

2    Q    And after your release, were you reporting to

3    pretrial services for a time?

4    A    Right.

5    Q    And you reported to a particular pretrial services

6    officer?

7    A    Right.

8    Q    Did you have any problems while reporting to that

9    pretrial services officer?

10    A    No.

11    Q    And there came a time when you were no longer

12    required to report to that pretrial services officer?

13    A    Right.

14    Q    Whose decision was that?

15    A    I'm not one hundred percent sure how that decision

16    was taken.

17    Q    Now, who ordered the fact that you didn't have to

18    report to pretrial services, was that Judge Wexler?

19    A    Yes.

20    Q    Now, you were also asked with regard to being subject

21    to mandatory deportation upon your conviction for the

22    crime you pled guilty to.  Do you remember those

23    questions?

24    A    Yes.

25    Q    And did the US Attorney's office discuss with you

1 | your deportation to El Salvador?

2 | A    Right.

3 | Q    And what did the US Attorney's office promise you

4 | with regard to your deportation to El Salvador?

5 | A    That they would help me because of the danger that I

6 | would be in El Salvador.

7 |            MS. MACEDONIO:  Objection.

8 |            THE COURT:  Overruled.

9 | BY MR. TIERNEY:

10 | Q    What danger would you be in if you were deported to

11 | El Salvador?

12 |            MS. MACEDONIO:  Objection.

13 |            THE COURT:  Overruled.

14 | A    Because the mere fact of being a police informant,

15 | then the MS-13 would kill me.

16 | BY MR. TIERNEY:

17 | Q    The MS-13 in El Salvador or in the United States?

18 | A    In El Salvador.

19 |            MR. TIERNEY:  Nothing further, your Honor.

20 |

21 | RECROSS-EXAMINATION

22 | BY MS. MACEDONIO:

23 | Q    On redirect you reiterated that you were facing a

24 | life sentence, correct?

25 | A    Right.

1    Q    And that only Judge Wexler was going to decide your

2    sentence.  Is that fair to say?

3    A    Right, yes.

4    Q    You are aware, sir, that Judge Wexler was familiar

5    with your case because you pled guilty in front of him,

6    didn't you?

7    A    Right.

8    Q    And then you appeared in front of Judge Wexler again

9    for bail purposes, correct?

10   A    Right.

11   Q    And Judge Wexler is the very judge who is going to

12   sentence you, who understands that you're facing life,

13   decided to release you on bail, correct?

14            THE INTERPRETER:  I'm sorry, could you please

15   repeat, I lost it?

16   BY MS. MACEDONIO:

17   Q    Okay.  Judge Wexler, the judge who understands that

18   you're facing life imprisonment, decided to release you on

19   bail.  Is that correct?

20   A    Right.

21   Q    And the government agreed to that, right?

22   A    Right.

23   Q    And then there was another application made to Judge

24   Wexler that even though you're facing life imprisonment

25   that your pretrial services reporting conditions be

1    eliminated, right?

2    A    Right.

3    Q    And that even though you're facing life imprisonment,

4    right?

5    A    Right.

6    Q    You also testified that you believe that you might be

7    in some type of danger because of your cooperation with

8    the government, correct?

9    A    Right.

10    Q    But you have been out on bail for three-and-a-half

11    years.  Isn't that correct, sir?

12    A    Right.

13    Q    You haven't changed your name, right?

14    A    Right.

15    Q    You're still living on Long Island?

16         MR. TIERNEY:  Objection.

17         THE COURT:  I'll allow that.

18    A    Actually, I don't live in Long Island.  I could say

19    whether I live there or I don't.

20    BY MS. MACEDONIO:

21    Q    But you're living openly on your own means.  Is that

22    correct?

23    A    Right.

24    Q    And you're not in the witness protection, are you?

25    A    No.

1    Q    So despite the danger that you think you're in,

2    you're living openly and working openly under your true

3    name.  Is that correct, sir?

4    A    Right.

5             MS. MACEDONIO:  No further questions.  Thank

6    you.

7             MR. TIERNEY:  Just one question, your Honor.

8             THE COURT:  Yes.

9

10   REDIRECT EXAMINATION

11   BY MR. TIERNEY:

12   Q    Mr. Guevara, is this the first time that you

13   testified in open court as a cooperator with the United

14   States government?

15   A    No.

16   Q    You testified earlier?

17   A    You are talking about this one or different cases?

18   Q    You testified in court before?

19   A    Yes.

20   Q    And was that in a trial, was that in an earlier

21   trial?

22   A    Yes.

23   Q    And do you know if it was the government or the

24   defense who called you?

25   A    The defense.

1  Q    Is this the first time you testified in open court

2  for the United States government?

3  A    Yes.

4            MR. TIERNEY:  Thank you.  Nothing further.

5            THE COURT:  Anything further, Mr. Macedonio?

6            MS. MACEDONIO:  No, your Honor.

7            THE COURT:  Step down, Mr. Guevara.

8            Next witness?

9            MS. CAPWELL:  Your Honor, the government calls

10 Eugene Dunn.

11            THE COURT:  Before we take the witness, members

12 of the jury, as I said, we're going to go up to one

13 o'clock today because we're going to break early.  But I

14 need to speak to the lawyers just for a moment.

15            This is not a 15-minute break, this is like a

16 three-minute break.  So please go to the jury room and

17 don't discuss the case.

18            (The jury left the courtroom at 12:29 p.m.)

19            THE COURT:  Please be seated.

20            I think that I heard from the government that

21 you wanted me to give a witness an instruction, that I

22 believe about Detective Dunn?

23            MR. DURHAM:  Yes, your Honor.  He is going to

24 testify based upon David Sander's murder where he took the

25 on the ground crime scene photographs, as well as the

1  murder with the aerial photographs.

2          THE COURT:  Okay.  And the defense has seen

3  those photos, right?

4          MR. DURHAM:  Yes, your Honor.

5          THE COURT:  Okay.  Let me just bring him in so

6  that I can give him that instruction.

7          MR. DURHAM:  Your Honor, just for the record, I

8  believe it will be very limited testimony from this

9  witness about those murders.

10          THE COURT:  Those are aerials.

11          MR. DURHAM:  However, on our list we just in an

12  abundance of caution --

13          THE COURT:  Will you have seat right there in

14  the witness chair before I bring the jury out.

15          I know the prosecutors mentioned this to you

16  this morning.  I just wanted to emphasize the ruling that

17  I have made with respect to the Diego Torres's murder.  I

18  have ruled that the jury should not know the age of Diego

19  Torres or the fact that he was a boy or a child, that they

20  should not know that at all.

21          So to the extent that that would come up during

22  your testimony, you're not to mention that in any way.

23  Just simply refer to him.  If you need to refer to him by

24  his name or that individual, but without reference to his

25  age or the fact he's a child.

1         Do you understand that.

2         THE WITNESS:  I understand, your Honor.  Thank

3  you.

4         THE COURT:  Okay.

5         MS. CAPWELL:  I'm sorry, just one other matter

6  to let the Court know.  Detective Dunn took the crime

7  scene video at the David Sandler murder crime scene.  So I

8  would like to introduce that through the detective it's 11

9  minutes.  To play it and ask the detective about certain

10  portions of it.

11         THE COURT:  Okay.  We'll go to about five to

12  1:00 or so and break.  Okay?  Okay.  Let's bring in the

13  jury.

14         (The jury entered the courtroom at 12:33 p.m.)

15         MS. CAPWELL:  Your Honor, Detective Eugene Dunn.

16

17  **EUGENE A DUNN**

18         called as a witness, having been first duly sworn,

19         was examined and testified as follows:

20         THE CLERK:  Please state your name and spell it

21  for the record.

22         THE WITNESS:  Eugene, middle initial A, Dunn,

23  D-U-N-N, Junior.

24         THE COURT:  Please be seated.  Pull your chair

25  closer to the mic and keep your voice up.  Thank you.

1          Go ahead, Ms. Capwell.

2          MS. CAPWELL:  Thank you, your Honor.

3

4  DIRECT EXAMINATION

5  BY MS. CAPWELL:

6  Q    Good afternoon, sir.

7  A    Good afternoon, ma'am.

8  Q    How are you employed?

9  A    I'm employed by the Suffolk County Police Department.

10  Q    And what is your job title?

11  A    I'm a detective assigned to the identification

12  section.

13  Q    How long have you been a detective?

14  A    For seven years.

15  Q    And how long have you been with the identification

16  section?

17  A    Also for seven years.

18  Q    Now, prior to being a detective with the

19  identification section, what, if any, other positions did

20  you hold with the Suffolk County Police Department?

21  A    I was in uniform patrol in the Fifth Precinct for

22  seven years.  And I was assigned to the crime scene

23  section for ten years.

24  Q    And you mentioned the Fifth Precinct.  Where is that?

25  A    That is in Patchogue.

1  Q    And were you with the crime scene, did that cover a

2  particular area, geographic area?

3  A    Yes, it covered the Suffolk County Police District,

4  which is the five western towns within the county of

5  Suffolk.

6  Q    And can you name those five towns, please?

7  A    It's Brookhaven, Smithtown, Islip, Huntington and --

8  did I say Smithtown, yes.

9  Q    Thank you.

10        And you have been with the identification

11  section for seven years?

12  A    Yes, ma'am.

13  Q    And speaking generally, what were your duties and

14  responsibilities as a detective in that section?

15  A    I am a trained latent fingerprint examiner.  I

16  process and examine items of evidence for the presence of

17  fingerprints and examine these fingerprints for comparison

18  purposes.  I also respond to major crime scenes throughout

19  Suffolk County, such as homicide and death investigations

20  and bank robberies.  I perform aerial photographs in

21  regards to those investigations.  And I respond to the

22  Suffolk County Medical Examiner's Office in order to

23  fingerprint deceased persons.

24  Q    Directing your attention now to February 17th of

25  2010, did you work on that date?

1   A   Yes, ma'am, I did.

2   Q   Did your duties that day take you to a crime scene in

3   Brentwood?

4   A   Yes.

5   Q   And where in Brentwood?

6   A   In front of number 89, Timberline Drive in Brentwood.

7   Q   Now, what is the major intersection there?

8   A   It would be Second Avenue.

9   Q   And can you describe that intersection?

10  A   The north side of the intersection is primarily

11  industrial.  And there is several businesses.  And north

12  of the businesses there is a school.  On the south side of

13  Second Avenue is primarily residential.

14  Q   Did you report to that crime scene alone or with

15  other members of the identification section?

16  A   With other members of the identification section.

17  Q   And who else went with you?

18  A   There was Detective Sergeant Gary Jambor,

19  J-A-M-B-O-R, Evidence Specialist Karen Oswald,

20  O-S-W-A-L-D, Evidence Specialist Steven Goerges,

21  G-O-E-R-G-E-S.

22  Q   And at approximately what time did you arrive at the

23  scene?

24  A   10:15 pm.

25  Q   What did you do upon arriving at the scene?

1  A    We met with Detective Jacobs, Steven Jacobs,

2  J-A-C-O-B-S, of the Suffolk County Police homicide section

3  and we conducted a walkthrough of the scene at that point.

4  Q    Can you describe what a walkthrough is?

5  A    A walkthrough of a scene is when the personnel

6  involved with performing the investigation will physically

7  walk through the scene and determine what items there are

8  of evidentiary value and what agency, whether it be the

9  Suffolk County Police identification section or the

10 Suffolk County crime lab is going to be responsible for

11 collection and processing those items.

12 Q    And after the walkthrough what happened?

13 A    Then we did a videotaped survey of the scene.

14 Q    And who took that videotape survey?

15 A    I did.

16 Q    And what was the purpose of a videotaped survey of

17 the scene?

18 A    The purpose of that is an overall viewing of the

19 scene as it was when we arrived prior to doing any

20 processing of the scene to show a relationship of any

21 items of evidence where they are in relation to buildings

22 and such.

23 Q    And when you arrived at the scene were the victims

24 still present?

25 A    No, they were not.

1    Q    Now, after the -- you took the videotape, what

2    happened next?

3    A    Then we documented the scene by still photography, a

4    series of still photographs were taken depicting the scene

5    as it was when we arrived.  After that then items of

6    evidence were marked by placards both from the

7    identification section and the Suffolk County crime lab.

8    And those individual items of evidence were then

9    photographed individually.

10   Q    You mentioned the crime lab.  Can you just explain

11   the relationship between the identification section and

12   the crime lab?

13   A    The identification section at a scene such as this is

14   responsible for all photography duties and for collecting

15   and processing all evidence as it relates to fingerprints.

16         The Suffolk County crime lab would be

17   responsible for collecting items for other types of

18   examinations such as DNA, serological, trace evidence,

19   ballistics and they also prepare a diagram of the scene.

20   Q    Thank you.

21         So after the placards were placed that you just

22   mentioned what happened after that?

23   A    Then another series of photographs were taken showing

24   those placards in place.

25   Q    Okay.  And did you participate in the photography?

1    A    Yes.

2    Q    All right.  What was your role in connection with the

3    photography that night?

4    A    I was the assist.  I was evidence specialist to

5    assist with the photography.  And I also documented all

6    the photographs by handwritten notes.

7              (Continued on the following page.)

253

1    DIRECT EXAMINATION (Continued)

2    BY MS. CAPWELL:

3    Q.    After the photographs were taken with the placards in

4    place, what was next step that night?

5    A.    Then various items of evidence were recovered.

6    Q.    And what happened during the recovery process?

7    A.    The items are picked up individually using

8    single-use, or disposable, nonlatex plastic gloves and are

9    then placed in an appropriate container for transport,

10   whether it be a paper bag or cardboard box.

11        That bag or box is then sealed and initialed and

12   transported back to the identification section, if it's my

13   case; or, in the crime lab's case, back to the crime

14   laboratory in Suffolk.

15   Q.    Sir, what I'm going to do at this point is show you

16   Government Exhibit 249.

17        Do you recognize that item?

18   A.    Yes, I do.

19   Q.    What is it?

20   A.    It is a DVD that I prepared with all the photographs

21   as it relates to this central complaint number from the

22   identification section on it.

23   Q.    Could you take a look.  Is this the DVD with the

24   photographs, or is it the crime scene video?

25   A.    This is the one with the video.

1    Q.    The video?

2    A.    Yes.

3    Q.    How do you recognize that disk?

4    A.    I recognize it by my handwriting on it, the central

5    complaint number, and also my initials and shield number.

6    Q.    Did you have an opportunity to review the contents,

7    the video that is on that disk, recently at the United

8    States Attorney's office?

9    A.    Yes, I did.

10   Q.    Did you provide the US Attorney's office with that

11   disk?

12   A.    Yes, ma'am.

13   Q.    And you took the video that night.  Correct?

14   A.    Correct.

15   Q.    And the video that you recently reviewed at the US

16   Attorney's office, does it fairly and accurately depict

17   the scene, the crime scene, that night, on February 17,

18   2010, at Timberline Drive and Second Avenue?

19   A.    Yes, it did.

20          MS. CAPWELL:  Your Honor, at this point I would

21   like to play the video, which is approximately 11 minutes,

22   and have Detective Dunn narrate certain portions.

23          THE COURT:  First, put it in evidence.

24          Is there any objection?

25          MS. CAPWELL:  I'm sorry I skipped that

255

1   step, your Honor.

2           THE COURT:  Any objection?

3           MS. MACEDONIO:  No, your Honor.

4           MS. RANTALA:  No objection, your Honor.

5           THE COURT:  Government exhibit 249 is admitted

6   and can be played for the jury.

7           MS. CAPWELL:  Thank you, your Honor.

8           (Government Exhibit 249 in evidence.)

9           (Video playing.)

10  BY MS. CAPWELL:

11  Q.   Detective Dunn, right there, the home that is

12  pictured in the video, do you know what if any

13  significance that home has?

14  A.   Yes.  That home is No. 101 Timberline Drive.  And

15  that was reported to me to have been the residence of the

16  victims.

17          That is on the southeast corner of Timberline

18  and Second Avenue.

19          We're now turning and facing northbound on

20  Timberline from the intersection of Second Avenue.

21  Q.   The building now, with the red neon lights, do you

22  know what building that is?

23  A.   Yes.  This is a building called KK Athletics.

24  Q.   That is on the west side of Timberline?

25  A.   That's correct.

256

1    Q.    Again, there are some neon lights in the background

2    there on top of the car there.  What does that show?

3    A.    That is a beauty supply store.

4    Q.    And do you see snow on the ground on the side of the

5    road?

6    A.    Yes.  There was quite a bit of snow at that time.

7    Q.    Also, are there cars parked along the side of

8    Timberline Drive?

9    A.    Yes.  There were numerous vehicles within the scene.

10          I see several vehicles on the right, which would

11   be on the west side of the road.  And there is also a

12   pickup truck on the left, which would be on the east side

13   of the road.

14   Q.    If you know, are those law enforcement vehicles

15   responding to the scene?  Or they were there prior to law

16   enforcement's arrival?

17   A.    They were there prior to my arrival.

18          To the best of my knowledge, none of them are

19   law enforcement vehicles.

20   Q.    Again, now toward the right of the screen at about a

21   minute and 55, what were we just seeing there?

22   A.    That was a view, there was a Volkswagen parked on the

23   side of the road on the side of the beauty supply store.

24          At this point we're just documenting the

25   vehicles that are present in the scene at that time.

1  Q.   What is the purpose of documenting the vehicles and

2  their license plates?

3  A.   In case we had to get any information on them later,

4  we would have their registration and their numbers.

5  Q.   Now, in the background what are we seeing on the

6  right-hand side of Timberline Drive?

7  A.   There's a building north of the beauty supply:  Los

8  Hermanos grocery store.  As we are walking northbound, you

9  see some medical debris in the middle of the road after

10 that dark-colored Volkswagon that was reported to be the

11 area of one of the victims.

12 Q.   Also, just for your knowledge, there is a laser

13 pointer right there next to you.  If at any point you want

14 to turn around on the big screen and point something out,

15 feel free to do that.

16 A.   Thank you.

17          Again, this is just documenting the vehicles in

18 place at that time.

19 Q.   Again, what is coming into focus right at the middle

20 of the screen?

21 A.   Yes.  Right in this area is a large area of what

22 appeared to be blood.

23 Q.   And this is where you said there was some medical

24 debris?

25 A.   Yes, ma'am.

1  Q.    Does that mean from paramedics?

2  A.    Yes.

3        They also have here, this item is a key with a

4  key ring and a Pathmark Supermarket Advantage Card.  And a

5  United States $20 bill.

6  Q.    Is it fair to say the $20 bill is stained with a red

7  substance?

8  A.    Yes, ma'am.

9        We have here what appears to be a hand-rolled

10 type of cigarette.

11       That is the medical debris I spoke of, latex

12 gloves, and other medical debris.

13 Q.    Straight ahead there appears to be some kind of bus.

14 What is that?

15 A.    That's the Suffolk County Command Post.  And next to

16 that is a Suffolk County Crime Labs truck.

17       Those vehicles, you'll see some tape in front

18 them, crime scene tape, those are just outside the scene.

19 Q.    What is coming up now into focus?

20 A.    We are coming into focus another area of red stain on

21 the west side of the road.  And this was reported to be

22 the area of rest of victim No. 2.

23       There is also quite a bit of medical debris in

24 the area as well as some other items of evidence, which

25 you will see in a little bit closer up.

259

1    This is a small glassine bag containing a

2 greenish-brown leafy substance.  And again you see another

3 bag of that green leafy substance in the red stain in the

4 snow.

5 Q.   Sir, if you could, turn and look at the screen behind

6 you.

7    Is it fair to say the red that we're seeing on

8 our smaller monitors is not really appearing very well on

9 the large screen?

10 A.   It does not show very well on the large screen, no.

11    Again, more greenish-brown leafy substance.  And

12 a cell phone with a broken screen.

13 Q.   There is what appears to be dirt in the large screen.

14 It is actually what color on the smaller monitor?

15 A.   That is red.

16 Q.   What is that there?

17 A.   That is another small plastic bag with a green-brown

18 substance within it.

19    This is a view of the Los Hermanos grocery,

20 which again was on the west side -- I'm sorry, east side

21 of Timberline Avenue.

22 Q.   And that is with the yellow signage on top of it?

23 A.   Yes, ma'am, it is.

24 Q.   Do you recall at approximately what time of the night

25 you made the video?

260

1    A.    That was approximately from 11:31 pm until 11:42 pm.

2    Q.    Now we are at about eight.  What are looking at?

3    A.    We are looking at the side of the KK Athletics

4    building.

5          We will zoom in and show you the security

6    cameras that were mounted on the building.  One on the

7    side of the building, right near Timberline Drive, facing

8    northbound.  And there is another one that you will see

9    momentarily, closer to the entrance.

10         It does not show very well on the large screen,

11   but it should show well on your monitors.  Again, there is

12   one facing somewhat southbound near the front parking lot

13   of KK Athletics.

14         This is an overall view of the scene as viewed

15   southbound, again, documenting the vehicles that were at

16   the scene.

17   Q.    Is it fair to say this car here that you are focusing

18   in on is parked partially on top of packed snow?

19   A.    Yes, it is.

20   Q.    Coming back again to the first pool of blood that we

21   saw.

22   A.    Yes, ma'am.

23   Q.    That was at about 9:45 seconds?

24   A.    Yes.

25         Now we are looking over towards the side wall of

261

1  the beauty supply shop.  It is a driveway and sidewalk on

2  the side of the building.  And you will see a cone that

3  was placed there.  And where that cone is denoting you

4  will see in a moment there is a pocket knife on the

5  sidewalk at that location.

6  Q.  Again, what view are we looking at right now?

7  A.  Now we are looking westbound, towards the front

8  parking lot of KK Athletic, turning towards northwest at

9  this time.

10 Q.  Does that conclude the video?

11 A.  Yes, it does.

12 Q.  What we are seeing there at the end is the caption?

13 A.  Yes.

14          (Video was stopped.)

15 BY MS. CAPWELL:

16 Q.  Sir, I'm going to hand up to you two packets of

17 photographs.  I ask you to take a look at this group

18 first.  I will identify them for the record in one moment.

19          The first group I handed you, Government

20 Exhibits 203 and 205 through 232, sir, just review those

21 and let me know when you have had enough time to look at

22 them.

23 A.  Yes, ma'am.

24          All right.

25 Q.  Thank you.  Do you recognize the location and the

262

1    objects depicted in those photographs?

2    A.   Yes, ma'am, I do.

3    Q.   And, generally speaking, what do those photographs

4    depict?

5    A.   Those are photos that were taken at the crime scene

6    on the night of February 17, 2010.

7    Q.   And do those photographers fairly and accurately

8    depict the scene and various items as they appeared that

9    night?

10   A.   Yes, they do.

11          MS. CAPWELL:  Your Honor, at this time the

12   government offers to admit into evidence Government

13   Exhibit 203, and 205 through 232.

14          MS. MACEDONIO:  No objection, judge.

15          MS. RANTALA:  No objection, your Honor.

16          THE COURT:  Government Exhibit 203 and 205

17   through 232 are admitted.

18          (Government Exhibits 203 and 205 through 232 in

19   evidence.)

20   BY MS. CAPWELL:

21   Q.   Now, sir, can I ask you to turn to that second stack

22   of photographs, which are labeled Government Exhibit 201,

23   202, 204, and 253 through 256.

24   A.   Yes, ma'am.

25   Q.   Do you recognize the locations depicted in those

263

1  photographs?

2  A.   Yes, I do.

3  Q.   Generally speaking, what do those photographs depict?

4  A.   They depict aerial photographs that were taken of

5  this crime scene.

6  Q.   And approximately when were they taken?

7  A.   Some of them were taken on February 19, 2010.  Some

8  of them were taken on March 2, 2010.

9  Q.   By looking at the photographs, is there a way to

10 distinguish which ones were taken on which dates?

11 A.   Yes.  The ones that were taken on February 19 have a

12 fairly substantial amount of snow in them.  And the ones

13 that were taken on March 2, the snow was absent.

14 Q.   Thank you.  Who took those photographs?

15 A.   Evidence specialist Karen Oswald.

16 Q.   Do those aerial photographs fairly and accurately

17 depict the scene of Timberline Drive and Second Avenue

18 back in February of 2010 and early March of 2010?

19 A.   Yes, they do.

20          MS. CAPWELL:  Your Honor, at this time the

21 government moves to admit Government Exhibits 201, 202,

22 204, and 253 through 256.

23          MS. MACEDONIO:  I have no objection, your Honor.

24          MS. RANTALA:  No objection.

25          THE COURT:  Government Exhibits 201, 202, 204,

264

1   253 through 256 are admitted.

2            (Government Exhibits 201, 202, 204, 253 through

3   256 in evidence.)

4            MS. CAPWELL:  Thank you, your Honor.

5            My plan at this time was to start going through

6   photograph by photograph and asking the witness questions.

7            Would your Honor like me to start that now or --

8            THE COURT:  Yes.  I want to go a little bit

9   longer.

10           MS. CAPWELL:  Okay.

11           Your Honor, may I publish the photographs to the

12  jury?

13           THE COURT:  Yes.

14  BY MS. CAPWELL:

15  Q.   Starting with photograph 203, can you tell us what

16  we're looking at, please.

17  A.   Yes.  This is a view of the west side of No. 101

18  Timberline Drive.  The house is located at the southeast

19  corner of Timberline Drive and Second Avenue, Brentwood.

20  Q.   And I believe that you testified earlier, but what

21  was that the significance of taking a picture of that

22  home?

23  A.   It was reported to us that that was the residence of

24  the victims.

25  Q.   On the left side of the photograph, the red neon, as

265

1   it will appear on our monitors -- again it is not really

2   reflected on the large overhead screen -- what does the

3   red neon show?

4   A.   That is the neon sign on the front of the beauty

5   supply store.

6   Q.   I want to turn now to photograph 205.

7        What does this photograph show?

8   A.   That's a view of the front of the Hermanos grocery

9   store.

10  Q.   What side of Timberline Drive is that on?

11  A.   That is on the east side of Timberline Drive.

12  Q.   Now go to Photograph 206.  And what are we seeing

13  here?

14  A.   That is an overall still photograph of Timberline

15  Drive as viewed from, just northbound from this

16  intersection of Second Avenue.

17  Q.   And, again, as best you can make out -- maybe you can

18  use your laser pointer on the big screen -- does it depict

19  that first blood-stained area?

20  A.   Yes.  That would be right here.

21  Q.   Okay.  Thank you.

22        THE COURT:  Indicating the middle of the

23  picture.  The middle of the road.

24  BY MS. CAPWELL:

25  Q.   Now I'm going to show you Government Exhibit 220.

1   And what does this picture show?

2   A.   That again is that red stain in the middle of the

3   street.  And it also shows the $20 bill and the key on the

4   key ring.

5   Q.   For the record, the red stain being on the left side

6   of the photograph?

7   A.   Yes, ma'am.

8   Q.   Now I'll place 222 on the overhead.  And what do we

9   see here?

10  A.   Another view of that red stain in the street in

11  relation to the vehicles that were in place at that time

12  and also in relation to the wall at the side of the beauty

13  supply store.

14  Q.   So this is a photograph taken, looking in what

15  direction?

16  A.   This is viewed facing eastbound.

17  Q.   I want to now show Government Exhibit 221.  What is

18  the difference here?

19       All of a sudden we're seeing one of those yellow

20  and green things?

21  A.   This photograph is viewed northwesterly.  At the

22  upper left, right here, you can see the ara of rest of

23  Victim No. 2.

24       You see a bunch of yellow placards towards the

25  middle and right side of the photograph.  What that

1   depicts is a trail of red stains that were heading up

2   Timberline Drive.

3   Q.   Those are the placards you were referring to that

4   were placed both by the crime lab and by the

5   identification section?

6   A.   Yes.

7          You will see, as we get into some closer-up

8   photographs you will see two colors of placards.  You will

9   see yellow ones and bright green ones.

10          The yellow placards belong to the crime lab.

11  And the green placards, as you see in No. 1 and 2 there --

12  Q.   We're on Photo 223 right now.

13  A.   -- belong to the identification section.

14          The reason we do that is to denote which

15  evidence item is being taken by which agency.

16  Q.   Okay.  So again, just because the colors aren't

17  coming out crystal clear on the overhead, the placards

18  marked 1 and 2, toward the bottom left --

19  A.   That would be right here.

20  Q.   -- photograph?

21  A.   Photograph.

22  Q.   Those are green?

23  A.   Yes, they are.

24  Q.   And those are the identification section?

25  A.   That's correct.

268

1  Q.  And the placards just north of No. 2, the placards

2  No. 6 --

3  A.  No. 6.

4  Q.  -- and the letters A, B, C, D, those are what color?

5  A.  Those are yellow.  And they belong to the crime lab.

6  Q.  Okay.  Now showing you Government Exhibit 225.  What

7  do we see in this photograph?

8  A.  This, again, is that red stain with the ID placards

9  numbered 1 and 2.  Placard No. 1 is depicting this key and

10  key ring.  Placard No. 2 is depicting this $20 bill.

11  Q.  So those two items were collected by the

12  identification section?

13  A.  Yes, they were.

14  Q.  Now I'm showing you Government Exhibit 207.  What

15  does this photograph depict?

16  A.  This is a snow bank at the west side of Timberline

17  Drive.  You see a telephone pole at the side of the road.

18  And this is reported to be the area of rest of victim

19  No. 2.

20  Q.  Again, turn around and look at the photograph behind

21  you.

22       Can you point out where the area where victim

23  No. 2 was reported, victim No. 2 was found?

24  A.  Right in this general area.  Center of the photo.

25  Q.  Okay.  And what appears to be kind of black marks in

1   the snow where you were?

2   A.   This area all appears to be a red stain.  The color's

3   not coming out too well on this screen, but that is a red

4   stain.  And that is a cell phone.

5   Q.   Okay.  And do you also see medical debris toward the

6   middle right of the photograph?

7   A.   Yes, you see a pair of medical shears.  More medical

8   debris, papers, and other tubing and such.

9   Q.   I will now place Government Exhibit 210 on the

10  screen.

11        What are we looking at here?

12  A.   We're looking at the same area that was viewed in the

13  previous slide; however, at this point the placards have

14  been put in place by both the identification section and

15  the crime lab.

16        Again, due to the colors not showing too well on

17  the screen, I'll draw your attention to No. 4 and No. 5,

18  which are the small green placards belonging to the

19  identification section.  Those are items that were

20  recovered by us.  And placards No. 7, 8, 9, 10, 11, 12,

21  and 16 are items that were denoted and recovered by the

22  Suffolk County Crime Lab.

23  Q.   Now turning to Government Exhibit 212.  What do we

24  see here?

25  A.   A closer view of what we saw in the last slide.

1  Again, with the colors being washed out, this entire area

2  is a red stain.

3  Q.   All right.  In Government Exhibit 215, what does this

4  photograph focus in on?

5  A.   This is placard No. 8 that we actually saw in the

6  center of the last two slides.  What it is is a small

7  plastic bag with a greenish-brown leafy substance.

8  Q.   Is that a Ziploc style bag?

9  A.   Yes, it is.

10  Q.   What is that small piece of paper that is in front of

11  the small baggy with the green substance?

12  A.   That is a scale to show the size of the item.  It is

13  denoted in inches to 2-inch scale within the ruled portion

14  of it from here to here as the central complaint number

15  assigned to this case.  It also has the evidence item on

16  it, No. 8, the date, and the initials of both the crime

17  lab personnel and evidence specialist Oswald.

18  Q.   And the central complaint number that you have

19  mentioned, what number is that in this case, in the David

20  Sandler and Aaron Galan case?

21  A.   It's 10-78629.

22  Q.   And fair to say that this scale or small marker shows

23  that it is going to go to the crime lab as well?

24  A.   Yes, ma'am.

25       THE COURT:  Why don't we break for lunch now.

1    It's a little after 1, so we will recess until 2:15.

2            Don't discuss the case.  Have a good lunch.

3            (The following ensued in the absence of the jury

4    at 1:05 pm.)

5            THE COURT:  Let's try to start right at 2:15

6    since we obviously have a short afternoon.

7            (Lunch recess taken.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

272

1        A F T E R N O O N   S E S S I O N

2                    2:15 pm

3

4            (The following ensued in the absence of the

5    jury.)

6            THE COURT:  Let's bring in the jury.

7            (The following ensued in the presence of the

8    jury.)

9            THE COURT:  Please be seated.

10           Miss Capwell, go ahead.

11

12   **EUGENE DUNN**

13           called by the Government, having been previously

14           duly sworn/affirmed, continued testifying as

15           follows:

16

17   DIRECT EXAMINATION (CONTINUED)

18   BY MS. CAPWELL:

19   Q.   Detective Dunn, before the lunch break you were going

20   through various crime scene photographs, and I believe we

21   had concluded on Government Exhibit 215, which is up on

22   the monitors.

23           And again, can you just tell us what photograph

24   215 depicts.

25   A.   215 depicts crime lab evidence No. 8, which is a

1    small Ziploc-type bag containing a greenish-brown

2    substance.

3    Q.    Thank you.  I will turn Exhibit 214.  Can you tell us

4    what this picture shows.

5    A.    That is crime lab evidence No. 7.  That is also a

6    small plastic Ziploc-type bag containing a green leafy

7    substance.

8    Q.    I am now putting 217 on the overhead.  What do we see

9    here?

10   A.    It is crime lab evidence No. 9.  Again, a small

11   plastic Ziploc-type bag with a green-brown leafy

12   substance.

13   Q.    Where is the small Ziploc bag compared to the other

14   items in the photograph?

15   A.    It is just above the scale.  I will highlight it with

16   the laser pointer.

17   Q.    Thank you.  Government Exhibit 216, what does this

18   photograph show?

19   A.    That is crime lab evidence item No. 10.  That is

20   another small plastic Ziploc-type bag of green-brown leafy

21   substance.

22   Q.    Government Exhibit 218.  What do we see here?

23   A.    You are seeing the placards from crime lab evidence

24   items No. 7, 8, 9, and 10.  And also identification

25   section No. 235, which is a cell phone.

1  Q.   Thank you.  And in terms of the colors we mentioned

2  before, I think the color on the monitors has improved.

3         And can you, just again, what is the difference

4  between Placard 5, for example, versus Placard 9?

5  A.   Placard 5, which you see here, is a smaller placard.

6  It's a bright green color, as opposed to the other

7  placards in this picture, which are yellow in color.

8         The yellow placards belong to the Suffolk County

9  Crime lab.  The green placards belong to the police

10  department identification section.

11  Q.   Thank you.  Now looking at Government Exhibit 219,

12  the photograph.  What does it show here?

13  A.   That is identification section item No. 5, the

14  cellular telephone.

15  Q.   I will ask you now to look at two items which I have

16  placed on the corner of the desk there, which are labeled

17  Government Exhibits 219A and 219B.

18  A.   Yes, ma'am.

19  Q.   As to Government Exhibit 219A, what is that?

20  A.   That is the cell phone that was recovered, as

21  depicted in the photographs, which are shown as

22  identification section item No. 5.

23  Q.   How about Government Exhibit 219B?  What is that?

24  A.   219B is the paper bag that was the -- Item No. 5 was

25  originally placed in when it was recovered at the scene.

275

1  Q.   How do you recognize both of those items, 219A and

2  219B?

3  A.   219A has Evidence Specialist Oswald's initials on it.

4  And 219B also contains her initials along with the central

5  complaint number and the date of the recovery.

6  Q.   As for the date of the recovery, and this on 219B,

7  which I believe you described as a brown paper

8  evidence bag?

9  A.   Yes.

10  Q.   What is the date of recovery of that black cell

11  phone?

12  A.   February 18, 2010.

13  Q.   And can you just explain why it says February 18

14  instead of February 17.

15  A.   While the scene began for us on February 17, it

16  continued past midnight.  And this item was not recovered

17  until after midnight, therefore bringing it into

18  February 18.

19  Q.   Okay.  So any items that were actually recovered on

20  February 18 would have that date on any paperwork of any

21  of the items?

22  A.   Yes, ma'am.

23  Q.   Thank you.

24       MS. CAPWELL:  Your Honor, the government moves

25  to admit Government Exhibits 219A and B into evidence.

276

1    MS. MACEDONIO:  No objection, your Honor.

2    MS. RANTALA:  No objection.

3    THE COURT:  219A and B are admitted.

4    (Government Exhibits 219A and 219B in evidence.)

5 BY MS. CAPWELL:

6 Q.   Let me go now to a few more photographs.

7    Showing you Government Exhibit 226.  It appears

8 the photo is a little bit off color, but if you can tell

9 us, if you can see it, what it is?

10 A.   Yes, I can.

11    This is the $20 bill that was in the red stain

12 in the middle of the street.  And this was recovered by

13 the identification section as our Item No. 2.

14 Q.   I put 227 on the screen, which appears to be coming

15 out even better.

16 A.   Yes.

17 Q.   I'm sorry.  Can you tell us what us what we're

18 looking at again?

19 A.   Yes.  This is the $20 bill that was in that puddled

20 red stain in the middle of Timberline Drive.  It was

21 recovered as identification section No. 2, a $20 bill.

22 Q.   Thank you.

23    Now Government Exhibit 228.  What are we looking

24 at there?

25 A.   This is item No. 6, the pocket knife that was on the

1   sidewalk alongside the west wall of the beauty supply.

2   Q.   Now Government Exhibit 231 is on the screen. Can you

3   just tell us what we're looking at.

4   A.   This is the front parking lot of the beauty supply

5   store.

6         If you look in the background, you can't see it

7   too well on the large screen but you can probably see it

8   better on your monitors, in this area is what was reported

9   to be the victim's residence at 101 Timberline Drive.

10         The placard in the middle of the parking lot

11   here as lab item No. 17 is a projectile that was recovered

12   at that location.

13   Q.   And placard No. 17 is roughly the center of this

14   photograph?

15   A.   Yes, ma'am, it is.

16   Q.   Now I will turn to Government Exhibit 232. What are

17   we looking at here?

18   A.   That is a closeup photo of lab item No. 17. That is

19   the projectile that was recovered from the parking lot.

20   Q.   Who recovered this projectile? What agency?

21   A.   Suffolk County Crime Lab.

22   Q.   Now I'm going turn to the second photograph that you

23   looked at, the aerial photograph. This is Government

24   Exhibit 201.

25         Just very briefly, what are we looking at in

1 this aerial photograph?

2 A.   This is an aerial photograph of the crime scene.  It

3 was taken on March 2.  On the left side you see the KK

4 Athletic building.  On the right side, this is the beauty

5 supply shop.  At the lower corner, just in the corner of

6 the photo, you see No. 101 Timberline Drive.  And the area

7 we recovered the evidence was right along Timberline Drive

8 here, north of Second Avenue.

9 Q.   Thank you.  Now I will place Government Exhibit 204

10 on the screen.

11          Is this also one of the aerial photographs?

12 A.   Yes, it is.

13 Q.   Using a laser pointer, can you show us where the area

14 of Timberline Drive and Second Avenue is.

15 A.   It would be right here.  Timberline Drive runs north

16 and south.  Second Avenue runs east-west.  This would be

17 KK Athletics.

18 Q.   Which is pretty much right smack in the middle of the

19 photograph?

20 A.   Yes, ma'am.

21          This would be the beauty supply store.

22          This would be the Los Hermanos grocery.

23 Q.   These photographs that you mentioned, the aerial

24 photographs that were taken on February 19 of 2010?

25 A.   Yes.

1   Q.   And is it fair to say there was a lot of snow on the

2   ground and on top of buildings?

3   A.   Yes.

4   Q.   And far in the background of the pictures, toward the

5   middle rear of the photograph, do you see a structure

6   there?  A large building?

7   A.   This building right here?

8   Q.   Yes.

9   A.   Yes.

10  Q.   What is that?

11  A.   That is where we are right now, the federal

12  courthouse.

13  Q.   I would like to turn your attention now to a

14  different date, February 8, 2010, nine days prior to the

15  shootings on Timberline Drive that you were just

16  discussing with us.

17         On February 8, 2010, did you receive an

18  assignment?

19  A.   Yes, I did.

20  Q.   What was the assignment?

21  A.   I was requested to take a series of aerial

22  photographs of a wooded area behind No. 111 Windsor Place

23  in Central Islip.

24  Q.   In connection with that assignment, firstly, describe

25  what you did.

280

1  A.   I flew, by Suffolk County Police helicopter, to that

2  location and took a series of approximately 34 photographs

3  depicting the general area and also the wooded area behind

4  that location.

5  Q.   And if you would, now turn to a group of pictures

6  that is to the left of the monitor, with a clip.

7           Yes.  Thank you.  Those have been marked for

8  identification as Government Exhibits 101.1 through

9  101.34.

10          Please take your time and review them and just

11  let me know when you are done.

12          THE COURT:  While that is being done, could the

13  lawyers approach for a minute.

14          (Discussion at sidebar ensued as follows.)

15          THE COURT:  I want to make sure that we're not

16  going to go through 34 aerial photos.

17          MS. CAPWELL:  No.  Actually, only one of them.

18          THE COURT:  Thank you.

19          (Discussion at sidebar was concluded.)

20          THE WITNESS:  Very well.

21  BY MS. CAPWELL:

22  Q.   Do you recognize those 34 photographs?

23  A.   Yes, I do.

24  Q.   What are they?

25  A.   Those are the aerial photograph that I took on

281

1  February 8, 2010.

2  Q.  Do they fairly and accurately depict aerial views of

3  the area of 111 Windsor Place in Central Islip?

4  A.  Yes, they do.

5      MS. CAPWELL:  Your Honor, the government moves

6  to admit Government Exhibits 101.1 through 101.34.

7      MS. MACEDONIO:  I have no objection, your Honor.

8      MS. RANTALA:  No objection, your Honor.

9      THE COURT:  Government Exhibits 101.1 through

10  101.34 are admitted.

11      (Government Exhibits 101.1 through 101.34 in

12  evidence.)

13      MS. CAPWELL:  And, your Honor, may I publish one

14  of the photographs to the jury?

15      THE COURT:  Yes.

16  BY MS. CAPWELL:

17  Q.  I place 101.9.  Sir, can you just point in the

18  photograph approximately where the area or vicinity of 111

19  Windsor Place is.

20  A.  It would be this large building here.  I was

21  concentrating on not only this building but this wooded

22  area behind the building.

23  Q.  All right.  Thank you.

24      Again, in the background of this photograph, do

25  you see a large white building?

1  A.   Yes.  Right up at the top of the picture here.

2  Q.   What building is that?

3  A.   That is where we are now, the federal courthouse.

4  Q.   Do you know the distance between approximately 111

5  Windsor and this courthouse?

6  A.   Direct line, as the crow flies, approximately

7  2.3 miles.

8         THE COURT:  Just the wooded area is reflected as

9  indicated in the middle of the photograph.  Is that right?

10        THE WITNESS:  Yes, your Honor.

11        MS. CAPWELL:  Your Honor, no further questions.

12        THE COURT:  Okay.  Cross-examination?

13        MS. MACEDONIO:  I have no questions for this

14  witness.

15        MS. RANTALA:  No questions, your Honor.

16        THE COURT:  You can step down.

17        THE WITNESS:  Thank you, your Honor.

18        (The witness was excused.)

19        THE COURT:  Next witness.

20

21        MS. CAPWELL:  Your Honor, the government calls

22  Jodi Rios.

23        THE COURT:  Step forward to the witness stand,

24  please.

25

283

1   JODI RIOS

2           called by the government, having been first duly

3           sworn/affirmed, was examined and testified as

4           follows:

5               THE COURT:  Go ahead, Miss Capwell.

6               MS. CAPWELL:  Thank you, your Honor.

7

8   DIRECT EXAMINATION

9   BY MS. CAPWELL:

10  Q.    Good afternoon.

11  A.    Good afternoon.

12  Q.    How are you employed?

13  A.    I'm employed by the Suffolk County Police Department.

14  Q.    What is your job title?

15  A.    Crime scene officer.

16  Q.    How long have you been a crime scene officer?

17  A.    I've been a crime scene officer for approximately

18  six years.

19  Q.    Speaking generally, what are your duties and

20  responsibilities as a crime scene officer?

21  A.    Crime scene unit works at the crime scene.  We are a

22  support service of the Suffolk County Police Department.

23  We work at the direction of the detectives.

24              MR. LONDON:  Excuse me.  Could the witness talk

25  into the microphone.

284

1      THE COURT:  Yes.  It doesn't pick up your voice

2  unless you're really close.

3  A.  Crime scene unit is a support services of the Suffolk

4  County Police Department.  We respond to crime scenes and

5  we work at the direction of the detectives on the scene.

6  We will document the process and collect evidence at the

7  scene.

8  BY MS. CAPWELL:

9  Q.  Very well.  Let me direct your attention now to

10  February 22 of 2010.

11      Did you work on that date?

12  A.  Yes, I did.

13  Q.  Did your duties on that date take you to a crime

14  scene in Brentwood?

15  A.  Yes, it did.

16  Q.  Where in Brentwood?

17  A.  On Timberline Drive and Second Avenue in Brentwood.

18  Q.  I'm going to show you a photograph that is already in

19  evidence.  Government Exhibit 252.

20      Do you recognize the area depicted in this

21  photograph?

22  A.  Yes, I do.

23  Q.  What area does this photograph show?

24  A.  It is showing Timberline Drive at the intersection of

25  Second Avenue.

285

1   Q.   Okay.  Which road is Timberline Drive?

2   A.   Timberline Drive is going north and south.

3   Q.   On the vertical, slightly to the left of this

4   picture?

5   A.   Yes.

6   Q.   And did you report to Timberline Drive and Second

7   Avenue, in Brentwood, alone or with another officer that

8   date?

9   A.   I was the assistant.

10  Q.   What does that mean, that you're the assistant?

11  A.   It was -- the call was assigned to PO Mingoia.  I was

12  his assistant.  There are usually two of us at each call.

13  Q.   Is that Police Officer Mingoia?

14  A.   That's correct.

15  Q.   Is that M-I-N-G-O-I-A?

16  A.   Yes.

17  Q.   What were his responsibilities that day?

18  A.   PO Mingoia's responsibilities that day was

19  photographing the area and collecting whatever evidence

20  that we should find.

21  Q.   You were assisting him in that assignment?

22  A.   I was.  I would record the photographs that were

23  taken.

24  Q.   And what was your understanding when you -- when you

25  reported to Timberline Drive and Second Avenue, what did

1  you do first?

2  A.   When we respond to a call, we will try to talk with

3  the detectives on the scene; ask them exactly they want.

4         In this particular scene on Timberline Drive and

5  Second Avenue, they were requesting a metal detector

6  search for any kind of ballistic evidence that might be in

7  the area on Timberline Drive.  West and east of Timberline

8  Drive.

9  Q.   Okay.  Along Timberline Drive, to the west and to the

10  east?

11  A.   Yes.  Yes.

12  Q.   And what was your understanding of when the crime had

13  occurred?

14  A.   It happened prior.  I don't have time details of the

15  prior incident, only on what took place here.

16         I know that they were just looking for

17  ballistics evidence and they wanted a metal detector

18  search done.

19  Q.   Do you have an understanding of the reason that you

20  were asked to search the scene after the crime; not

21  immediately afterwards, but days after?

22  A.   Yes.  They said that it evidently had snowed prior

23  and they were waiting for the snow to melt to see if there

24  was any evidence underneath the snow.

25  Q.   Okay.  And where specifically did you search that

287

1    day, on February 22?

2           What area in general?

3    A.    I searched the west side of Timberline Drive.

4    Q.    Using the laser pointer, there should be a laser

5    pointer on the desk there, if you can turn around using

6    that, just show the members of the jury, you know, roughly

7    where you walked.

8           And you said you were using a metal detector?

9    A.    Yes.  I was going from this side all the way down to

10   this side here.

11   Q.    Okay.

12          MS. CAPWELL:  Let the record reflect that the

13   witness is pointing to the curb adjacent to the west side

14   of Timberline Drive between, I guess, the middle of the

15   photograph.

16          THE COURT:  Yes.

17          MS. CAPWELL:  Thank you.

18   BY MS. CAPWELL:

19   Q.    While you were using the metal detector that day to

20   assist you in your search, did you find any ballistic

21   evidence?

22   A.    Yes, I did.

23   Q.    And what did you find?

24   A.    I found a projectile.

25   Q.    Can you show us, using the laser pointer, on Exhibit

288

1    252, approximately where you found that projectile?

2    A.    Right around here.

3          MS. CAPWELL:  May the record reflect the witness

4    is pointing to, let's see, Timberline Drive, the west side

5    near the dark vehicle and the trees that appear near the

6    corner of Timberline Drive and Second Avenue?

7          THE COURT:  Yes.

8    BY MS. CAPWELL:

9    Q.    Thank you.  Now, after you located the projectile,

10   what did you do?

11   A.    After the projectile was located, I brought it to the

12   attention of PO Mingoia and at that point we both notified

13   the detective.  He made the determination, yes, we are

14   going to collect this.

15   Q.    Who, I'm sorry, was *he*?

16   A.    I'm sorry.  The detectives on the scene.

17   Q.    Okay.

18   A.    So we photographed the projectile and proceeded to

19   collect it after it has been photographed.

20   Q.    All right.  Before photographing the projectile that

21   you found, had you taken any photographs before that at

22   the scene, you or Officer Mingoia?

23   A.    Yes.  Prior to doing any kind of work upon any scene,

24   we will photograph the whole scene, as is, upon arrival.

25   Yes.

289

1  Q.   Okay.  I'm going to show you a group photographs.

2  And I'm just going to identify them for the record and I

3  will hand them up.

4         Government Exhibit 257, 258, 259, 261, 260, 263,

5  233, 262, 264, and 234.

6         I'm going to hand them to you in that order.

7  And if you're able to keep them in that order, that would

8  be great.

9  A.   Sure.

10  Q.   Have you had time to review them?

11         Once you have reviewed them, do you recognize

12  those photographs?

13  A.   Yes, I do.

14  Q.   Speaking generally, what do those photographs show?

15  A.   They are showing the area of Timberline Drive and

16  Second Avenue and the area that we used the metal detector

17  on.

18  Q.   Do some of the photographs also show the projectile

19  that you located that day?

20  A.   Yes, they do.

21  Q.   And are those the photographs that Officer Mingoia

22  took on February 22 while you were assisting him?

23  A.   Yes.

24  Q.   Do those photographs fairly and accurately depict the

25  scene and the projectile as they appeared on that date?

290

1    A.   Yes.

2            MS. CAPWELL:  Your Honor, the government moves

3    to admit Exhibits 233, 234.

4            THE COURT:   257 through 264 and 233 and 234?

5            MS. CAPWELL:  That sounds right.

6            THE COURT:  Any objection?

7            MS. MACEDONIO:  No, your Honor.

8            MR. LONDON:  No, your Honor.

9            THE COURT:   257 through 264 and 233 and 234

10   admitted.

11           (Government Exhibits 257 through 264 and 233 and

12   234 in evidence.)

13           MS. CAPWELL:  May I publish them to the jury?

14           THE COURT:  Yes.

15   BY MS. CAPWELL:

16   Q.   I'm putting 261 on the screen.

17           Can you just describe to the jury what we're

18   looking at here.

19   A.   We are looking southbound on Timberline Drive section

20   of Second Avenue.  Basically, the area of which the

21   projectile was located.

22   Q.   And on this right side of the photograph, what is

23   that large straight item?

24   A.   The telephone pole.

25   Q.   Okay.  And then, if you can see it on your screen,

1    going toward the stop sign at the left side of the

2    photograph, do you see an item that you used that day to

3    mark the location of the projectile?

4    A.    Yes.  It is a flag.  That is just a flag.  And what

5    is written on the flag is evidence.

6          It is basically the location of the projectile.

7    Q.    And we will have some closer-up photos of that that

8    we will get to.  But the telephone pole on the right side

9    of the picture, does that have any significance?

10   A.    Whenever we collect evidence, we like to take some

11   kind of measurement to the evidence, so we use a fixed

12   object, being the telephone pole, and we measured from the

13   telephone pole, using the curb as a baseline, to measure

14   from the pole to the evidence item.

15   Q.    Okay.  Is that why you included the telephone pole in

16   one of the pictures of the scene?

17   A.    That's correct.

18   Q.    Now we're going turn to Exhibit 260.  Just briefly,

19   describe what we're looking at there.

20   A.    Basically, the same.  Still looking southbound on

21   Timberline, showing the evidence flag.

22          It's a little bit closer.  We will take further

23   pictures and take closeup ones.

24   Q.    Let me move to 263.  What range photo is this?

25   A.    This is a little bit of a mid-range.  We will do

292

1   further out and then we will work our way in and then we

2   will do close in.

3          So this is just kind of getting close up to

4   where the projectile was so that you have an idea of

5   approximately where it was.

6   Q.   And using the laser pointer, can you just circle

7   where the evidence flag is on the photograph behind you.

8   A.   Here.

9   Q.   Let the record reflect the witness is pointing to

10  approximately in the middle of the photograph, right in

11  the center of the photograph.

12          THE COURT:  Yes.

13          MS. CAPWELL:  Thank you, your Honor.

14  BY MS. CAPWELL:

15  Q.   Now placing Government Exhibit 233 on the overhead.

16  What do we see here?

17  A.   Just a closer-up of the evidence flag in the

18  proximity of where the projectile was located, prior to

19  photographing it with a scale.

20  Q.   Okay.  Now I will place 262 on the overhead.  What

21  kind of shot, what kind of photograph is this?

22  A.   I believe this is one that was taken with scale.

23  This is basically showing scale.

24  Q.   Feel free, if you would like, to look at the hard

25  copy.  If that is easier, that's fine.

293

1  A.  In this area here is where the scale is.  We would

2  usually take the photos without scale, with scaling, and

3  at location.

4        This photo here is showing the basic location

5  and the scale in relation to where the evidence was.

6  Q.  Okay.  We will move a little bit closer.

7        All right.  Government Exhibit 264.  What do we

8  see in this photograph?

9  A.  Picture of the projectile that was found.

10  Q.  Okay.  And is it fair to say this is approximately in

11  the center of this photograph?

12  A.  That's correct.

13  Q.  What appears to be to the right of the projectile?

14  A.  A puddle.

15  Q.  I will place 263 on the overhead -- 234 on the

16  overhead.

17        Is that the scaling you mentioned in the middle

18  of photograph?

19  A.  That's correct.  We will take the photo without, then

20  one with, and then we will do it at scale -- at location.

21  I'm sorry.

22  Q.  And you mentioned you used a telephone pole in order

23  to assist you in taking measurements?

24  A.  Yes.

25  Q.  All right.  What is the purpose of taking

294

1  measurements?

2  A.   Just that if we had to put the evidence back to where

3  we originally found it, we would have a general vicinity

4  of where it was and where we located it from.

5  Q.   I'm going to hand up to you what is marked as

6  Government Exhibit 3500-JR-10.

7        Do you recognize that document?

8  A.   Yes, I do.

9  Q.   What is it?

10 A.   Just a rough diagram of measurements that we do at

11 the scene.

12 Q.   Who made that diagram?

13 A.   I drew this one up.

14 Q.   When did you prepare it?

15 A.   When we were at the scene.

16 Q.   And does that drawing fairly and accurately depict

17 certain landmarks at the crime scene and certain

18 measurements that you took at the scene?

19 A.   Yes, they do.

20      MS. CAPWELL:  Your Honor, the government moves

21 to admit and to publish Government Exhibit 3500-JR-10.

22      MS. MACEDONIO:  No objection.

23      MS. RANTALA:  I'm sorry.  I just lost attention

24 a little bit.

25      We were talking about which exhibit.

1     MS. CAPWELL:  The diagram 3500-JR-10.

2     MS. RANTALA:  No objection.

3     THE COURT:  3500-JR-10 is admitted.

4     MS. CAPWELL:  Thank you, your Honor.

5     Miss Rios, I can take that back from you and I

6  will put it on the overhead.

7     Thank you.

8     (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

296

1  DIRECT EXAMINATION  (Continued)

2  BY MS. CAPWELL:

3  Q    Officer Rios, can you just tell us what a 1

4  represents here at the top of the diagram on the top left

5  of the diagram?

6  A    A-I represents the telephone pole.

7  Q    And what does A represent, just to the right of A-1?

8  A    The curb.

9  Q    And what does B represent approximately in the middle

10  of the diagram?

11  A    B represents the evidence item.

12  Q    What is that?

13  A    The projectile.

14  Q    And what does B-1 represent?

15  A    The location of the projectile.  A B is a measurement

16  that we take to where the projectile is.  The location

17  then from B to B-1 we're measuring out exactly where the

18  projectile is.

19  Q    Okay, so from A which is the -- A which was the curb

20  and the telephone pole to B, what was distance?

21  A    That was 62 feet 5 inches.  And then it's 2

22  and-a-half inches off the curb would be the location of

23  the projectile.

24  Q    And that would be the distance between B and B-1?

25  A    That's correct.

1   Q   And then looking down at C about an inch under B,

2   what does C represent?

3   A   That's just a stop sign, where the stop sign was.

4   Q   Okay, and it represents the curb at the stop sign?

5   A   Yes.

6   Q   And what is the distance between B and C on your

7   diagram?

8   A   34 feet 7 inches.

9   Q   And then looking over here in front of the parking

10   lot.  The parking lot is for what structure?  The parking

11   lot that is noted on your diagram on the right-hand side

12   of the diagram, that is the parking lot for what building?

13   A   The beauty school parking lot.  I just kind of put

14   this diagram here just to reference where the school was,

15   the parking lot, the beauty school was and the parking

16   lot.

17   Q   Okay, and after all the photographs and measurements

18   were taken, what did you do?

19   A   We collected the evidence item.

20   Q   And can you describe for us the procedure in

21   collecting this projectile?

22   A   Well, we used a glove hand pickup.

23   Q   What does that mean?

24   A   Wearing gloves.  The item was then placed in a slide

25   box.  And from the slide box it's put into a paper bag.

1    It's transported then back to the facility and it's put

2    into an evidence locker.

3    Q    And at the scene that day you located the projectile,

4    correct?

5    A    That's correct.

6    Q    And who actually recovered, picked up the projectile

7    and put it in the slide box?

8    A    Officer Mingoia.

9    Q    And were you with him when he did that?

10   A    Yes.

11   Q    I'm going to show you what has been labeled

12   Government Exhibit 266B.  Just the bottom half of this

13   plastic case exhibit.  If you would just take a look at

14   that.

15          Do you recognize the items that are inside

16   Government Exhibit 266B?

17   A    Yes.

18   Q    And what do you see there?

19   A    I see the slide box that I taped shut, and I see

20   evidence bag that I marked with the evidence items on it,

21   the evidence item number 1 on it and the seal.

22   Q    So there is some of your handwriting on the evidence

23   bag?

24   A    That's correct.

25   Q    Okay, let me take you back just a couple of steps.

1    You mentioned that Officer Mingoia recovered the

2  projectile and placed it into the slide box.  Did you both

3  go back to the office after that?

4  A    Yes.

5  Q    And what did Officer Mingoia do with the projectile

6  at that point?

7  A    He took the evidence that was collected and placed it

8  in an evidence locker.

9  Q    And then turning to the next day, February 23rd.

10  Were you working that day?

11  A    Yes, I was.

12  Q    And did you do anything in connection with that

13  evidence that was found on the 22nd of February?

14  A    Yes.  I do.

15  Q    What did you do?

16  A    I packaged the evidence for Officer Mingoia.

17  Q    And by *packaging the evidence*, what did you do?

18  A    The slide box was taped.

19  Q    And you did that you taped the slide box?

20  A    I taped the slide box and filled out the evidence bag

21  and sealed it with the evidence tape.

22  Q    And what kind of information did you put onto the

23  evidence bag?

24  A    I put the evidence number, the case number, the date,

25  P.O. Mingoia's name.  And I then I signed the evidence

1    tape that I packaged it.

2    Q    And after you did that, what did you do with the

3    evidence?

4    A    After I did that I go into the lab locker, the

5    secured locker that we have at the base.  And it went into

6    the lab locker and I locked it.

7    Q    What is the purpose of putting a piece of evidence

8    inside the lab locker?

9    A    From that point on somebody on the day tour would

10   usually take all the evidence that has to go to the lab

11   and bring it to the lab.  They'll sign it out of the book,

12   take the evidence to the lab.

13   Q    And by the *lab*, which laboratory are you referring

14   to?

15   A    Suffolk County, Suffolk County lab.

16   Q    So looking again at 266B, I believe you mentioned you

17   see a slide box in there?

18   A    Yes.

19   Q    And is there any of your handwriting on there?

20   A    No, no, not on the slide box.

21   Q    Do you see Officer Mingoia's handwriting on the slide

22   box?

23   A    Yes.

24   Q    And do you see the piece of tape that he used and the

25   marking?

1    A    Yes.

2    Q    And then do you see the evidence bag that you

3    mentioned you wrote on and put the information related to

4    the case and you then sealed?

5    A    Yes.

6    Q    And if you manipulate it a little bit, do you see

7    where you wrote your name or your initials on the bag and

8    sealed it up?

9    A    Yes.

10         MR. DURHAM:  Your Honor, the government moves to

11   admit Government Exhibit 266B into evidence at this time.

12         MS. MACEDONIO:  May I see the exhibit?

13         THE COURT:  Sure.

14   BY MS. CAPWELL:

15   Q    Besides the slide box and the evidence bag, what else

16   is in that compartment labeled 266B?

17         MS. MACEDONIO:  I have no objection, judge.

18         MS. RANTALA:  No objection, your Honor.

19         THE COURT:  Government Exhibit 266B is admitted.

20         (Government Exhibit 266B in evidence.)

21   BY MS. CAPWELL:

22   Q    Officer, I'm going to ask you, besides the slide box

23   and the brown evidence bag that we discussed, what is in

24   that plastic pouch that is labeled Government Exhibit

25   266B?  Is there any actual ballistic evidence in there?

1   A    Yes, the projectile.

2   Q    And that is the projectile you found on February

3   22nd?

4   A    That's correct.

5   Q    And on the brown paper evidence bag that is within

6   266B, do you see the initials of the individual who

7   transported the evidence to the crime lab?

8   A    Yes, I do.

9   Q    And who was that, whose initials are those?

10  A    Initials TT and the shield number 3931.

11  Q    And do you know who that is?

12  A    That's Thomas Tavelka.

13  Q    What is the spelling, do you know?

14  A    T-A-V-E-L-K-A.

15  Q    And was he working with your Crime Scene Unit at that

16  time back in February of 2010?

17  A    Yes.

18          MS. CAPWELL:  Your Honor, the government has no

19  further questions.

20          MS. MACEDONIO:  With the Court's permission can

21  we go out of order with this witness?

22          THE COURT:  Sure.

23          MS. MACEDONIO:  And if we can have just two

24  minutes?

25          THE COURT:  Sure.

1    (There was a pause in the proceedings.)

2    MS. MACEDONIO:  Thank you, your Honor.

3    THE COURT:  Ms. Rantala is going to go first?

4    MS. RANTALA:  Yes, your Honor.

5

6  CROSS-EXAMINATION

7  BY MS. RANTALA:

8  Q    Good afternoon.

9        You say you discovered this projectile in

10 Exhibit 234, correct?

11 A    That's correct.

12 Q    And you had found that with a metal detector?

13 A    We would were using a metal detector at the time.

14 The metal detectors are going off.  We're also looking at

15 the ground and it's beeping at the same time.  It picks up

16 a lot of metal in the area.  So we're looking and using

17 the metal detector at the same time.

18 Q    Now there was snow a few days prior to the time that

19 you found -- you found it on February 22, 2010?

20 A    That's correct.

21 Q    So to your knowledge there was snow a few days prior

22 to that date on the ground?

23 A    That is what I was told.

24 Q    Now, if you could look to the right of the scale and

25 the little pebble above the right-hand corner of the

1   scale.  It looks like there is some possible marks there

2   in the dirt.  Would that be possible?

3   A    Yes.

4   Q    Like a car tread or a shoe tread or even a plow

5   tread?  Is that a possibility?

6   A    Could be something.  Could be --

7   Q    It could be any of those?

8   A    It could be anything.

9   Q    Now, you don't know personally where that projectile

10  came from, correct?

11  A    No.  I located it that day.

12  Q    You don't know how long it had been there?

13  A    I have no idea.

14  Q    Now, if there was a tread mark there, that could

15  potentially mean a car picked it up from somewhere else.

16  Could it not?

17  A    It could be walking.  It could be foot marking.  It

18  could can anything.  As I'm walking up and down, is it a

19  foot mark?  It could be anything.

20  Q    So that projectile essentially could have come from

21  anywhere.  Is that a fair statement?

22  A    It could come from anywhere.

23  Q    Thank you.

24       MS. RANTALA:  Nothing further.

25       MS. MACEDONIO:  I have no questions.

1    THE COURT:  Any redirect.

2    MS. CAPWELL:  No, your Honor, thank you.

3    THE COURT:  You can step down.

4    MR. DURHAM:  The government calls Jimmy Sosa.

5  He is in custody, so we ask the courtroom deputy top have

6  the marshals bring him into the courtroom.

7    THE COURT:  Why don't we take a five minute

8  break, a short break.  We're only going to 3:30, so we'll

9  take a short break so the marshals can bring him up.

10    (A recess was taken at 3:08 p.m.)

11    (After recess the following occurred.)

12    THE COURT:  Mr. Sosa, please stand while the

13  oath is administered.

14

15  **JIMMY SOSA**

16    called as a witness, having been first duly sworn,

17    was examined and testified as follows:

18    THE CLERK:  Please state your name and spell it

19  for the record.

20    THE WITNESS:  Jimmy Sosa.

21    THE COURT:  Spell it?

22    THE WITNESS:  S-O-S-A.

23    THE COURT:  Okay, Mr. Durham.

24    MR. DURHAM:  Thank you, your Honor.

25  DIRECT EXAMINATION

1  BY MR. DURHAM:

2  Q    Sir, what is your primary language?

3  A    Spanish.

4  Q    Do you need to testify here in court with the

5  assistance of a Spanish interpreter?

6  A    Yes.

7  Q    Are you in jail right now?

8  A    Yes.

9  Q    Mr. Sosa, why are you in jail?

10  A    Because of the death of David Sandler.

11  Q    Did you commit the murder of David Sandler alone or

12  with other people?

13  A    With other people.

14  Q    Who else was involved in Mr. Sandler's murder?

15  A    Michichi, Perdidi and Silencio.

16  Q    And the individual you named as Silencio, do you know

17  his true name?

18  A    No.

19  Q    Looking around this courtroom, do you see the

20  individual you know as Silencio?

21  A    Yes.

22  Q    Please point him out and describe what he is wearing.

23  A    He is there.  He's wearing a striped shirt and

24  glasses.

25  Q    Is he the fourth person from the right?

1    A    Yes.

2              MR. DURHAM:  Your Honor, we would ask the Court

3    to recognize the witness has identified the defendant

4    Carlos Ortega as Silencio.

5              THE COURT:  Yes.

6    BY MR. DURHAM:

7    Q    At this time, at the time Mr. Sandler was killed, was

8    anyone else shot?

9    A    Somebody else.

10   Q    At the time did you know that person's name?

11   A    No.

12   Q    Did you later learn his name was Aaron Galan?

13   A    Yes.

14   Q    And how was Mr. Sandler killed, and Mr. Galan

15   wounded?

16   A    How was, like exactly how it happened?

17   Q    Yes.

18   A    David Sandler was standing in front of me.  Silencio

19   was by my side and he shot him.

20   Q    What did he shoot him with?

21   A    With a .38 revolver.

22   Q    Who shot Mr. Galan?

23   A    Silencio also did that.

24   Q    And were you there?

25   A    Yes.

1  Q    You saw him do it?

2  A    Yes.

3  Q    Now at the time of Mr. Sandler's murder and the

4  attempted murder of Mr. Galan, were you a member of any

5  street gang?

6  A    Yes.

7  Q    What gang?

8  A    MS-13.

9  Q    Is that also known as La Mara Salvatruchas?

10  A    Yes.

11  Q    And the individual you know as Silencio who is

12  sitting at this table, was he a member of the MS-13?

13  A    Yes.

14  Q    How do you know that?

15  A    I met him before this happened.

16  Q    And are you familiar with the term *clique*?

17  A    Yes.

18  Q    And within the MS-13, what is a clique?

19  A    It's a group of people who have a sector or area that

20  they run.

21  Q    And are you familiar with what clique Silencio

22  belonged to?

23  A    Yes.

24  Q    What clique?

25  A    Sitios.

1    Q    Is that S-I-T-I-O-S?

2    A    Yes.

3    Q    Was that also known as Sitios Locos Salvatruchas?

4    A    Yes.

5    Q    And you said another individual by the name of

6    Perdidi was involved in Mr. Sandler's murder, correct?

7    A    Yes.

8    Q    And was the individual you know as Perdidi a member

9    of the MS-13 at the time?

10   A    Yes.

11   Q    What clique did he belong to?

12   A    Carlington.

13   Q    Did the Carlington clique go by anything else?

14   A    Carlington Locos Salvatruchas.  That's the complete

15   name.

16             MR. DURHAM:  Your Honor, may I approach?

17             THE COURT:  Yes.

18             MR. DURHAM:  I'm going to show the witness what

19   has been marked as Government Exhibits 54.37 and 54.39.

20   BY MR. DURHAM:

21   Q    I'll ask you first about Exhibit 54.37.  Do you

22   recognize that.

23   A    Yes.

24   Q    What is it?

25   A    That's Perdidi.

1   Q    Is that a photograph?

2   A    Yes.

3   Q    Is that a fair and accurate depiction of the

4   individual you knew as Perdidi?

5   A    Yes.

6   Q    Do you know Perdidi's real name?

7   A    No.

8        MR. DURHAM:  Your Honor, at this time the

9   government offers 54.37.

10       THE COURT:  Any objection?

11       MS. MACEDONIO:  May I have a moment, your Honor?

12       No objection.

13       MS. RANTALA:  No objection, your Honor.

14       THE COURT:  54.37 is admitted.

15       (Government Exhibit 54.37 in evidence.)

16       MR. DURHAM:  Your Honor, may I publish?

17       THE COURT:  Yes.

18  BY MR. DURHAM:

19  Q    Mr. Sosa, just looking at the screen in front of you,

20  is that a photograph of the individual you knew as

21  Perdidi?

22  A    Yes.

23  Q    You testified he is a member of the MS-13?

24  A    Yes.

25  Q    You also testified that somebody you knew by the name

1  of Michichi was involved in the murder of David Sandler.

2  Was Michichi a member of the MS-13?

3  A    Yes.

4  Q    Was he a member or was he just involved with the

5  gang?

6           A VOICE:  Objection.

7           THE COURT:  Sustained.

8  BY MR. DURHAM:

9  Q    How would you characterize Michichi's involvement

10  with the MS-13?

11  A    He's just a friend of them.  He just drives them

12  around, gives them rides.  He is not involved with any

13  clique or anything of that.

14  Q    And Mr. Sosa, looking in front of you is a document

15  that has been marked as Government Exhibit 54.39.  Would

16  you please take a look at that.

17           Do you see that document?

18  A    Yes.

19  Q    Do you recognize it?

20  A    Yes.

21  Q    What is it?

22  A    That's Michichi.

23  Q    Again, do you know Michichi's real name?

24  A    No.

25  Q    Is that photograph a fair and accurate depiction of

1    the person you know as Michichi?

2    A    Yes.

3         MR. DURHAM:  Your Honor, the government offers

4    Exhibit 54.39.

5         MS. MACEDONIO:  No objection.

6         MS. RANTALA:  No objection.

7         THE COURT:  All right, Exhibit 54.39 is in

8    evidence.

9         (Government Exhibit 54.39 in evidence.)

10   BY MR. DURHAM:

11   Q    Sir, I ask you to look at the screen.  Do you

12   recognize that?

13   A    Yes.

14   Q    Who is that?

15   A    That's Michichi.

16   Q    Why did you, Silencio, Perdidi and Michichi kill

17   David Sandler?

18   A    Perdidi said that he was a Chavala.

19   Q    And when you use the term Chavala, would you explain

20   to the jury, what does that mean?

21   A    It is like someone, someone that has a problem with

22   the gang.  Maybe a member of a rival gang or somebody who

23   has a problem with them.

24   Q    And who are some of the MS-13's rivals here on Long

25   Island?

1  A    The Bloods, also the Crips, Latin Kings.  There is a

2  few others, but I don't know exactly their names.

3  Q    Are you familiar with a gang known as the 18th

4  Street?

5  A    Yes.

6  Q    What is the relationship between the MS-13 and the

7  18th Street?

8  A    They are rivals.

9  Q    And you said that Silencio shot Mr. Sandler because

10  he believed that he was a Chavala?

11  A    Yes.

12  Q    Why did he shoot Mr. Galan?

13  A    Because he showed up alongside him, and he didn't

14  know what he could do at any moment.

15  Q    So Silencio shoot him as well?

16  A    Yes.

17  Q    Now, while you were her on Long Island, did you ever

18  meet an MS-13 member by the name of Boxer?

19  A    Yes.

20  Q    And do you know his real name?

21  A    No.

22  Q    And looking around the courtroom, do you see the

23  individual who you knew by the street name of Boxer?

24  A    Yes.

25  Q    Would you please point him out and describe what he

1    is wearing?

2    A    He is there.  He's wearing a white shirt and he is

3    side by side with the other one who has a striped shirt.

4    Q    Is he the third person from the right?

5    A    Yes.

6          MR. DURHAM:  Your Honor, we ask the record

7    reflect that the witness has identified the defendant

8    Heriberto Martinez as the person he knew as Boxer.

9          THE COURT:  Yes.

10   BY MR. DURHAM:

11   Q    Now prior to your arrest, did you know Boxer to be a

12   member of the MS-13?

13   A    Yes.

14   Q    And do you know what clique Boxer belonged to?

15   A    To the Coronados.

16   Q    And how did you know that?

17   A    He was introduced to me over the phone, and I spoke

18   to him and he told me that he was running Coronados.

19   Q    You say he was running the Coronados.  What do you

20   mean by that?

21   A    Like he was running the clique, the Coronados group.

22   Q    I understand.  But when you use the word *running*,

23   what does that mean?  What was he doing when you say he

24   was running the Coronados?

25          MR. LEVINE:  Your Honor, I'm going to object to

1 | -- this is a conversation had over the phone. I believe

2 | he couldn't indicate who was actually speaking on the

3 | phone.

4 |     THE COURT: I'll allow him to answer.

5 | Overruled.

6 | A    Could you repeat the question, please.

7 | BY MR. DURHAM:

8 | Q    You said that Boxer was running the Coronados clique.

9 | Would you just explain to the jury what you mean when you

10 | say he was running the clique?

11 | A    It's like when they're having the meetings, he is the

12 | one that they go to see that everything is okay. And he

13 | is giving out orders. Things like that.

14 | Q    Would it be fair to say he was a leader of the

15 | Coronados group?

16 | A    Yes, that's what it means to be running the clique.

17 | Q    You testified on one occasion you spoke to Boxer on

18 | the telephone. After that did you meet him in person?

19 | A    Yes, once.

20 | Q    And do you go by any nickname?

21 | A    Yes.

22 | Q    What nickname?

23 | A    Junior.

24 | Q    How old are you now?

25 | A    22.

1    Q    And where were you born?

2              THE COURT:  Okay, before you go into this area,

3    we're going to break for the day.

4              We'll continue tomorrow morning promptly at

5    9:30.

6              Don't discuss the case with anyone.

7              Don't read or listen to anything regarding the

8    case.

9              If anyone else in your family or a friend should

10   read anything about the case and may try to talk to you

11   regarding this case or say something, don't let them tell

12   you what they read or had seen about the case.  Okay?

13             Good night.  Have a safe trip home.

14             (The jury left the courtroom.)

15             THE COURT:  I just want to put one ruling on the

16   record from earlier today.

17             There was an objection during the redirect of

18   Mr. Guevara by Ms. Macedonio.  And the Court overruled

19   those objections for the following reasons.  The line of

20   questioning I believe -- again, the door was opened for

21   Mr. Tierney to question him regarding the reason why he

22   stayed in the United States.

23             He was crossed extensively regarding the fact

24   that he remained in the United States, the government is

25   helping him remain in the United States.  And so I think

1    it was proper redirect for him to ask him what his

2    concerns were regarding returning to El Salvador in terms

3    of danger.

4         And the other areas related to his agreement and

5    whether or not Judge Wexler would be made aware of his

6    criminal activity, his relevant conduct that he did not

7    physically plead guilty to.  And obviously that is

8    something that the judge can be made aware of at the time

9    of sentencing.

10        So again, I believe that all of those areas

11   regarding his agreement as well as the immigration issue

12   were proper redirect.  I sustained the objection in the

13   direct as to why he stayed in the United States because I

14   wanted to see whether or not he was going to be impeached

15   on that.  And when he was, I believed it was proper on

16   redirect.  Okay?

17        So I'll see everybody tomorrow morning at 9:30.

18   Have a good night.

19             (The trial was adjourned at 3:34 p.m.)

20

21

22

23

24

25

1                         I N D E X

2

3   **TONY GUEVARA**                                    182
    DIRECT EXAMINATION (CONTINUED)                     183
4   BY MR. TIERNEY
    DIRECT EXAMINATION  (Continued)                    207
5   BY MR. TIERNEY
                                                       215
6   **FRANCIS BRAUN**                                  215
    DIRECT EXAMINATION                                 215
7   BY MS. CAPWELL
                                                       224
8   **TONY GUEVARA**
    CROSS-EXAMINATION                                  225
9   BY MS. MACEDONIO
    REDIRECT EXAMINATION                               237
10  BY MR. TIERNEY
    RECROSS-EXAMINATION                                240
11  BY MS. MACEDONIO
    REDIRECT EXAMINATION                               243
12  BY MR. TIERNEY
                                                       246
13  **EUGENE A DUNN**
    DIRECT EXAMINATION                                 247
14  BY MS. CAPWELL
    **EUGENE DUNN**                                    272
15  DIRECT EXAMINATION (CONTINUED)                     272
    BY MS. CAPWELL
16
    **JODI RIOS**                                      283
17  DIRECT EXAMINATION                                 283
    BY MS. CAPWELL
18  DIRECT EXAMINATION  (Continued)                    296
    BY MS. CAPWELL
19  CROSS-EXAMINATION                                  303
    BY MS. RANTALA
20
    **JIMMY SOSA**                                     305
21  DIRECT EXAMINATION                                 305
    BY MR. DURHAM

22

23

24

25

## <u>EXHIBITS</u>

Government Exhibits 56.2, 56.4, and 56.7 in          203
evidence
Government Exhibit 65 in evidence                    212
Government Exhibit 249 in evidence                   255
Government Exhibits 203 and 205 through 232          262
in evidence
Government Exhibits 201, 202, 204, 253              264
through 256 in evidence
Government Exhibits 219A and 219B in evidence        276
Government Exhibits 101.1 through 101.34 in          281
evidence
Government Exhibits 257 through 264 and 233          290
and 234 in evidence
Government Exhibit 266B in evidence                  301
Government Exhibit 54.37 in evidence                 310
Government Exhibit 54.39 in evidence                 312