UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,          :

                                            CR-10-074

      -against-                    :

                                   United States Courthouse
HERIBERTO MARTINEZ, also known :   Central Islip, New York
as "Boxer," and CARLOS ORTEGA,
also known as "Silencio" and   :
"Silent,"

                                   :   February 14, 2013
                    Defendants.        9:30 a.m.

------------------------------X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT COURT JUDGE, and a Jury

APPEARANCES:

For the Government:        LORETTA E. LYNCH, ESQ.
                           UNITED STATES ATTORNEY
                           610 Federal Plaza
                           Central Islip, New York 11722
                           BY:  JOHN J. DURHAM, ESQ.
                                RAYMOND A. TIERNEY, ESQ.
                                CARRIE N. CAPWELL, ESQ.


For Defendant Martinez:    ELIZABETH MACEDONIO, ESQ.
                           ARNOLD LEVINE, ESQ.


For Defendant Ortega:      MARIANNE RANTALA, ESQ.
                           IRA LONDON, ESQ.


Official Court Reporter:   Ellen S. Combs, CSR
                           Dominick M. Tursi, CM, CSR
                           100 Federal Plaza - Suite 1180
                           Central Islip, New York 11722
                           Phone (631) 712-6107
                           Fax (631) 712-6123

Proceedings recorded by mechanical stenography
Transcript produced by Computer

1          (The following ensued in the absence of the

2     jury.)

3          (Call to Order of the Court.  Appearances stated

4     as indicated above.)

5          THE COURT:  The jurors are all here.  There is

6     one issue I wanted to raise that came up last night.

7          A juror who is sitting in seat No. 1 mentioned

8     to my deputy, he pulled her to the aside at the end of the

9     day yesterday and said that he was confused about the

10    interpreter; that he said other jurors are confused about

11    the interpreter.

12          I don't know what that means exactly.  I think

13    it is possible he may know some Spanish, maybe some other

14    jurors know some Spanish, and it is possible that they are

15    debating whether or not, especially due to the issue

16    regarding the translation yesterday where we took a break.

17          So my inclination, and I will hear if anybody

18    disagrees, was to tell them that I heard there was some

19    issue regarding the interpreter; that the interpreter

20    translates what the witness says and that is controlling.

21    If they know a little bit of Spanish or a lot of Spanish,

22    it doesn't matter.  They are not allowed to use their own

23    individual translation of the witness' testimony.

24          I think that is the best instruction to give

25    them.  If they have any issues regarding that issue, I

1  will explain to them that sometimes, as they see, the

2  interpreter will try to clarify with the witness or the

3  interpreters will talk amongst each other to try to get

4  the most accurate translation of a particular word or

5  phrase, but that they have to accept the interpreter's

6  translation.

7         Is there any disagreement with that?

8         MR. DURHAM:  No, your Honor.  We agree.

9         MR. LONDON:  None from me.

10        MS. MACEDONIO:  And I noted yesterday when we

11 took the break, it was probably about 4:20 in the

12 afternoon because the witness did clarify something, and

13 when the jurors came back in, there are two female jurors

14 in the back row; when your Honor said that the witness

15 needed to clarify something with the interpreter, they

16 were both shaking their heads as if in agreement, as if

17 there was some confusion that they understood as well.

18        So I think that was probably the issue.

19        THE COURT:  Anything else?

20        MR. LONDON:  I would like to reopen my cross to

21 offer in evidence the affidavit regarding the robbery and

22 the affidavit regarding the burglary.

23        THE COURT:  Any objection to that?

24        MR. DURHAM:  Yes, your Honor.

25        Mr. London did not lay a proper foundation.  He

1    already read a majority of, if not the entire, document

2    into the record.  The witness answered the questions.

3    Therefore, there is no basis to introduce those documents.

4              MR. LONDON:  I will lay the foundation.  That is

5    easy.

6              THE COURT:  Yes.  He essentially did read the

7    documents.

8              I will let you reopen it to show it to him to

9    make sure.

10             Is his signature on it?

11             MR. LONDON:  No.  I read from the printed

12   version, which is the detective's grand jury testimony

13   because it is clear.  There is a handwritten version that

14   I could show him.

15             THE COURT:  I don't think you can put in the

16   detective's testimony.  But if there is a written

17   statement that he signed, I will let you put that in.

18             MR. DURHAM:  Your Honor, I am also objecting.

19   I'm not sure what document that was.  That is part of my

20   objection.  Mr. London didn't provide us with copies of

21   these documents.

22             So we would object on that ground as well.

23             MR. LONDON:  I thought they had copies.  I will

24   review it with the government.

25             And we don't need to publish it now, with an

1　understanding that they can come in.  I can mark them as

2　exhibits or -- should I offer them now, judge?

3　　　　　THE COURT:  Yes.  I guess show it to the

4　government now.  But it is only if it is something that he

5　signed himself, Mr. London.  Okay?

6　　　　　(There was a pause in the proceedings.)

7　　　　　MR. DURHAM:  Your Honor, we have no objection to

8　the document Mr. London just showed us.

9　　　　　THE COURT:  Okay.

10　　　　　Let's bring in the jury.

11　　　　　MS. RANTALA:  There are actually two documents.

12　　　　　MR. DURHAM:  I would request a copy once the

13　document has been marked.

14　　　　　THE COURT:  Okay.  I'm sorry, Mrs. Rantala.

15　　　　　MS. RANTALA:  I want to mention there were two

16　separate documents, two separate affidavits.

17　　　　　THE COURT:  Okay.

18　　　　　MS. MACEDONIO:  So the record is clear, how do

19　you want us to mark the defendant's exhibits?  Ortega 1,

20　Ortega 2?

21　　　　　MR. LONDON:  Do you want them with digits, not

22　letters?

23　　　　　THE COURT:  Use letters.  Do it by the

24　defendant.

25　　　　　MR. LONDON:  Shall I formally move to reopen, in

1  front of the jury?

2         THE COURT:  I'm going to tell them that I am

3  going to allow you to.

4         MR. DURHAM:  What has that been marked as?

5         MR. LONDON:  Defendant A and B.

6         MR. DURHAM:  You only showed me one document.

7         (The following ensued in the presence of the

8  jury at 9:55 am.)

9         THE COURT:  Please be seated.  Good morning,

10  members of the jury.

11         I see we are missing Juror No. 1.

12         (Juror 1 enters the courtroom.)

13         THE COURT:  Okay.  Good morning, everyone.  It

14  is good to see you all.

15         Fortunately, we didn't have any snow last night,

16  which is good.

17         Before we continue, there is one issue I wanted

18  to discuss with you.  One of the jurors, as we finished

19  for the day yesterday, mentioned there was some issue with

20  an interpreter's interpretation with respect to the

21  witness.  I want to say two things with regard that.

22         First of all, these are court-certified

23  interpreters.  As you can see, if there is an issue

24  regarding the translation of a particular word or term in

25  English, sometimes they will ask the witness to clarify or

1  sometimes they will speak with each other to make sure

2  they're getting the most accurate translation into English

3  as is possible.

4         With respect to jurors, the rule is very clear.

5  Whether you know a little bit of Spanish, a lot of

6  Spanish, whatever Spanish you may or may not know, jurors

7  are not permitted to do their own translation of what the

8  witnesses say.  Whatever the translator says is what you

9  accept.

10        That is the record and that is what you accept.

11  You can't say well, I know some Spanish and I heard it

12  differently.  You're not permitted to do that.  It is only

13  what are the translator said.  Okay?

14        We'll continue with the cross-examination.

15        I'm going to let Mr. London reopen his cross for

16  a moment to enter into evidence two documents.

17

18  **JIMMY SOSA**

19        called by the Government, having been previously

20        duly sworn/affirmed, continued testifying as

21        follows:

22        THE COURT:  Mr. Sosa, I remind you that you are

23  still under oath.

24        Do you understand?

25        THE WITNESS:  Yes, I understand.

453

1           THE COURT:  Go ahead, Mr. London.

2           MR. LONDON:  Thank you.

3

4    CROSS-EXAMINATION (CONTINUED)

5    BY MR. LONDON:

6    Q.   Good morning, Mr. Sosa.  Yesterday I was asking you

7    some questions about two sworn statements that you gave to

8    the Suffolk County Police Department.

9           Do you remember that?

10   A.   Yes.

11   Q.   I'm going to place two which have been marked for

12   identification as Defendant Ortega's A and Defendant

13   Ortega's B before you and I'd like you to look at them.

14   Don't say anything until I ask you a question.

15          When you finish looking at both of them, just

16   look up.

17          Do you recognize those statements?

18   A.   Yes.

19   Q.   Are those the statements you gave to the Suffolk

20   County Police Department under oath after you were

21   arrested for the robbery and burglary?

22   A.   Yes.

23          MR. LONDON:  I offer them in evidence as

24   Defendant Ortega A and Defendant Ortega B.

25          MR. DURHAM:  No objection.

454

1    THE COURT:  Defendant Ortega Exhibits A and B

2    are admitted.

3         (Defense Exhibits Ortega A and B in evidence.)

4         MR. LONDON:  Thank you, your Honor.

5         THE COURT:  Mr. Levine.

6

7         MR. LEVINE:  Thank you, judge.

8    CROSS-EXAMINATION

9    BY MR. LEVINE:

10   Q.   Good morning, Mr. Sosa.

11   A.   Good morning.

12   Q.   Mr. Sosa, Mr. London and I believe Mr. Durham asked

13   you questions regarding the Suffolk County case.  Right?

14        Yes?

15   A.   Yes, he was asking me questions.

16   Q.   And in that case you pled guilty to the charge of

17   attempted robbery in the second degree and received a

18   sentence of two years in state prison?

19   A.   Yes.

20   Q.   And, in fact, your sentence on that case expired

21   two days ago.  Correct?

22   A.   Yes.

23   Q.   And you were advised at the time that you took the

24   plea in that case, or even before, that a plea to that

25   charge and that sentence would require you to be deported

455

1  from this country.  Right?

2  A.    Yes.

3  Q.    And that is separate and apart from anything that

4  happens to you in this case or whether you were -- whether

5  you were ever arrested in this particular case, federal

6  case.

7  A.    Yes.

8  Q.    And your understanding is that the efforts the

9  government would make for you in regards to an S-visa or

10 otherwise allowing you to stay in this country also

11 applied to your conviction on that case.  Correct?

12 A.    Yes.  But I could fight that case.

13 Q.    Okay.  Now, in that particular case you committed

14 those crimes with, you said, your brother-in-law and a

15 female named Jocelyn?

16 A.    Yes.

17 Q.    They were not members of MS-13.  Right?

18 A.    No.

19 Q.    They were not associates of MS-13.  Right?

20 A.    No.

21 Q.    And that crime had nothing to do with MS-13.  Right?

22 A.    No.

23 Q.    So even though you were a member of MS-13, that crime

24 had nothing to do with the gang?

25 A.    Right.

456

1    Q.    And so they are crimes that MS-13 members can commit

2    that really have nothing to do with the gang itself.

3    Right?

4              MR. DURHAM:  Objection.

5              THE COURT:  Overruled.

6    A.    Yes.

7    BY MR. LEVINE:

8    Q.    So not every crime committed by a member of MS-13 is

9    for the purpose of advancing or maintaining their position

10   within the gang.  Right?

11             MR. DURHAM:  Objection.

12             THE COURT:  Sustained.

13             MR. DURHAM:  Calls for a legal conclusion.

14             THE COURT:  Sustained.

15   BY MR. LEVINE:

16   Q.    Not every crime committed by an MS-13 member is done

17   for the purpose of or with having in mind how it affects

18   their membership in the gang.

19             MR. DURHAM:  Objection.  He asking for the

20   mindset of every MS-13 member who commits a crime.

21             THE COURT:  I will permit it as it relates to

22   his knowledge as a gang member.

23             Go ahead.

24   A.    Could you repeat the question?

25             THE COURT:  Just phrase it as to his knowledge,

1  not what is in the mind of others.

2  BY MR. LEVINE:

3  Q.   Mr. Sosa, to your knowledge, not every crime you have

4  committed has been for the purpose of maintaining or

5  enhancing your position with the gang.  Right?

6  A.   Right.

7  Q.   And are you aware of crimes committed by other MS-13

8  members that had nothing to do with the gang?

9  A.   Whether I am aware?

10       The majority, that I know of, have been as part

11  of the gang because they are members.

12  Q.   But simply being a member doesn't mean that

13  everything you do is on behalf of the gang.  Right?

14  A.   Only there is a difference if you do it with several

15  members then practically it has to do with the gang.

16  Q.   Are members of the gang also friends?

17  A.   Some of them.

18  Q.   And some of them will hang out with each other

19  separate and apart from other gang members?

20  A.   With other members, I'm not sure.  Not that I know

21  of.

22  Q.   You said that you have spoken to the person you

23  believe to be Boxer, on the phone.  Right?

24  A.   Yes.

25  Q.   And that was before you ever met him, the person?

1    A.    Yes.

2    Q.    You had never heard his voice before?

3    A.    No.

4    Q.    Do you know what date that was?

5    A.    I'm not sure as to the date.

6    Q.    Do you know what month that was?

7    A.    I met both of them sometime between mid-January and

8    February.

9    Q.    You say both of them.  Are there two Boxers?

10   A.    No.  I was referring to Boxer and to another person.

11   Q.    So you actually spoke to Boxer on the phone before

12   you participated in the murder of David Sandler?

13   A.    Yes.

14   Q.    Have you been shown your phone records by the

15   government?

16   A.    The records, I have the records.  That was among the

17   discovery on my case.

18   Q.    Okay.  And --

19             THE COURT:  Let me just explain the term to the

20   jurors.

21             When he refers to discovery in the case, as part

22   of the criminal process the government produces discovery

23   of documents to the defendant that they are entitled to

24   under the law.  When he refers to discovery, that is what

25   he is referring to:  what the government produced to him

1    or his attorneys during the case.

2    BY MR. LEVINE:

3    Q.    Would you agree that your phone records don't

4    indicate any phone communication between you and a

5    cellular phone for Boxer, the person you know as Boxer?

6    A.    Do you mean whether I would agree with that?  Is that

7    what you are saying?

8    Q.    Yes.

9    A.    It is possible.

10   Q.    Now, as part of your cooperation agreement with the

11   government, you agreed not to tell anybody that you were

12   cooperating with the government without the government's

13   consent.  Correct?

14   A.    Yes.

15   Q.    And that is something that you really wouldn't want

16   to tell anybody anyway.  Right?

17   A.    Yes.

18   Q.    Right.  So even if the government didn't tell you

19   that, it is not something that you would go to jail and be

20   bragging about.  Right?

21   A.    No.

22   Q.    And you were confident that you would be able to lie

23   to people about whether you were cooperating.  Right?

24   A.    Depending.  Depend on the situation that I am in.

25   Q.    You are not confident about your ability to lie about

1  your cooperating?

2  A.  You mean, like telling other people that I am

3  cooperating?

4  Q.  I mean, telling people you are you not cooperating.

5  A.  Yes.  Maybe I have had to lie about it.

6  Q.  And you had to lie about it to people who were

7  suspicious about you.  Right?

8  A.  Yes.

9  Q.  And you had to do so convincingly.  Right?

10  A.  They haven't asked me directly just like that.  Only

11  that when the subject is mentioned, I was always clean.

12  That's it.

13  Q.  You were always clean, meaning you were always saying

14  that you were not cooperating or going to cooperate?

15  A.  The only thing was that they didn't have suspicions

16  about me because I have gone down to the states and that

17  was my case so they have no suspicion.

18              (There was a pause in the proceedings.)

19  A.  I had gone down to the state, to the state jail, so

20  they had no suspicions about me.

21  Q.  How long have you been in the federal jail?

22  A.  I just came back, about a month ago.

23  Q.  From the state prison?

24  A.  Yes.

25  Q.  That was the Bare Hill Correctional Facility?

1  A.   Yes.

2  Q.   Nobody up there ever asked you or accused you of

3  being a cooperator?

4  A.   Not directly like that.

5  Q.   Did they do so indirectly?

6  A.   Well, some people say things but they never said

7  anything directly in front of me, personally.

8  Q.   What about in the federal jail?  Have you been

9  accused of being a cooperator?

10  A.   It is the same thing.  They say things in jail, but

11  they don't ask you directly because they have no evidence

12  about anything.

13  Q.   You knew that if you were asked directly, you would

14  have to say -- you would have to lie about it.

15  A.   Maybe yes, for my safety.

16  Q.   For your safety and because the government required

17  you to.

18          MR. DURHAM:  Objection.

19          THE COURT:  Sustained.  Asked and answered.

20  BY MR. LEVINE:

21  Q.   So you were confident that for your own interests you

22  would be able to lie convincingly?

23  A.   Could you please explain the question in a different

24  way?

25  Q.   Yes.  If it were in your interest, you were able to

1  lie about that convincingly?

2  A.   Yes, sir.  As I told you, also for my sake.

3  Q.   Now, when the FBI came to your house to arrest

4  Demente, they spoke to you.  Yes?

5  A.   Yes.

6  Q.   And they asked you questions.  Correct?

7  A.   Yes.

8  Q.   And you lied to them?

9  A.   Yes.

10  Q.   They asked you whether you were MS-13?

11  A.   Yes.

12  Q.   And you told them no?

13  A.   Yes.

14  Q.   Because at that particular time in speaking to the

15  FBI it was in your interest to lie to the FBI.  Correct?

16  A.   I didn't want to get in trouble.  That was all.

17  Q.   Right.  So it was in your best interest to lie to the

18  FBI at that time?

19  A.   You can say so.

20  Q.   Now, you also said yesterday that when the FBI asked

21  you that, you actually wanted out of the gang.

22  A.   Yes.

23  Q.   You didn't tell the FBI that.  Right?  At that time.

24  A.   No, because they weren't going to understand my

25  situation.

463

1    Q.    You didn't say to the FBI:  *Yes, I'm in the MS-13.  I*

2    *can help you out and you can help me out*?

3    A.    I did not.

4    Q.    Now with respect to the David Sandler and Aaron Galan

5    incident.

6              After setting up David Sandler to be killed, did

7    you actually get more respect from the gang?

8    A.    My clique was not here so practically what happened

9    was that they wanted to prove whether I was okay.

10   Q.    Did you get respect?  Did they call you sir?  Did you

11   get a better parking spot?

12             MR. DURHAM:  Objection.

13             THE COURT:  Sustained.

14   BY MR. LEVINE:

15   Q.    Did you get more respect from them somehow?

16             MR. DURHAM:  Objection.  Asked and answered.

17             THE COURT:  I will allow it.

18   A.    I didn't hang out with them in particular.  And

19   besides, I got arrested a week later.  And besides, I got

20   away from all that.

21   BY MR. LEVINE:

22   Q.    Okay.  You pleaded guilty before Judge Bianco a long

23   time ago.  Right?

24   A.    Yes.

25   Q.    Was that November 21, 2011?

1    A.    Yes.

2    Q.    And didn't you tell Judge Bianco at that time:

3              *I participated in the murder of David Sandler*

4    *and the attempted murder of John Doe 8 in order to*

5    *maintain and increase my position in MS-13, and afterwards*

6    *I was given more respect from other MS-13 members because*

7    *I put in work for the gang?*

8              Did you say that to Judge Bianco at that time?

9              THE INTERPRETER:  Counsel, could you please go

10   more slowly so that I can take notes?  Or give me a copy?

11             MR. LEVINE:  I will go more slowly.

12   BY MR. LEVINE:

13   Q.    *I participated in the murder of David Sandler and the*

14   *attempted murder of John Doe No. 8 in order to maintain*

15   *and increase my position in MS-13, and afterwards I was*

16   *given more respect from other MS-13 members because I put*

17   *in work for the gang.*

18             Did you say that at that time?  Yes or no?

19   A.    I said that I pled guilty for the killing.

20   Q.    And as a requirement, the government required you to

21   also say that it was for the purpose of increase -- of

22   getting respect, and that you in fact got more respect.

23   Right?

24   A.    Yes.

25             What happens is that every time something like

1   that happens, that is the purpose of the gang.

2   Q.   The question was, the government required you to say

3   that at the time that you pleaded guilty.

4   A.   It's not required.  Practically, that is what

5   happens.

6   Q.   Okay.  So the agreement that you had with the

7   government didn't require you to say that?

8   A.   It didn't specifically say that.

9           MR. DURHAM:  Your Honor, may we approach?

10         THE COURT:  Yes.

11         (Discussion ensued at sidebar as follows.)

12         MR. DURHAM:  Your Honor, I think we are in a

13   somewhat difficult area here.

14         Counsel is referring to the government requires

15   you to say that.  This is a requirement of the statute.

16   It is not a requirement of the government.  It is an

17   element of the offense.

18         THE COURT:  I understand.

19         There are two things going on here.  One is, he

20   did say today that he doesn't get any respect, and he did

21   say at the time of the plea that it was for respect.  So I

22   think all that is legitimate.  But you are starting to get

23   into what is required and it is the law that requires

24   that.

25         MR. LEVINE:  I will try to do it from a

1  different angle.

2          MR. DURHAM:  I didn't object initially.  I

3  understand that point was made.  But now it is getting

4  into a matter of what the court or the government requires

5  or the law requires.

6          THE COURT:  The law requires.  It is not the

7  government.

8          MR. LEVINE:  Right.  Okay.  I will try to do it

9  from a different --

10         THE COURT:  I think I covered it.  All right.

11         MR. LEVINE:  I will see.

12         (Discussion at sidebar was concluded.)

13  BY MR. LEVINE:

14  Q.   Mr. Sosa, it was your understanding at the time you

15  pleaded guilty, wasn't it, that if you did not say that,

16  your guilty plea would not be accepted?  Right?

17         There are a lot of words there.  Yes or no?

18  A.   Yes --

19  Q.   Yes or no?

20         MR. DURHAM:  Objection.

21         THE COURT:  No.  If he said something, you

22  should translate what the witness said.

23  A.   Yes, you could say so, because that is part of what

24  happened.

25  BY MR. LEVINE:

1  Q.   And if you didn't say it, you wouldn't plead

2  guilty -- your plea would not have been accepted.  Yes or

3  no?

4  A.   No.

5  Q.   And then if the plea wasn't accepted, there wouldn't

6  be any cooperation agreement.  Right?

7  A.   No.

8       THE COURT:  Do you want to clarify the answer.

9  BY MR. LEVINE:

10  Q.   When you say no, you mean I'm correct?

11  A.   Yes, that if my, the acceptance of my plea, my plea

12  would not be accepted.  Yes, I said you were correct.

13  Q.   Okay.  Thank you.

14       Still talking about now the David Sandler

15  incident.  You and some others made a plan to kill

16  David Sandler.  Right?

17  A.   Yes.

18  Q.   And you made that plan in the car?

19  A.   Yes.

20  Q.   And then you personally called Mr. Sandler?

21  A.   Yes.

22  Q.   And you used a ruse to get him to come to meet with

23  you?

24  A.   Yes.

25  Q.   That was another lie at that point.  Right?

1  A.   Another lie related to the victim.

2  Q.   Yes.  So that was a lie you told to David Sandler at

3  that time.  Right?

4  A.   Yes.

5  Q.   And you convinced Mr. Sandler that you really wanted

6  to buy marijuana from him?

7  A.   Yes.

8  Q.   And at that time it was in your interest to convince

9  Mr. Sandler that you were telling the truth, even though

10  you were lying?

11  A.   Yes, because that was part of the plan.

12  Q.   And the plan was for you then to be the lookout after

13  that.  Correct?

14  A.   Yes.

15  Q.   You were not going to be the shooter?

16  A.   No.

17  Q.   And in fact you were not the shooter.

18  A.   No.

19  Q.   And you didn't tell David Sandler to bring anybody

20  else with him.

21  A.   No.

22  Q.   You didn't know David Sandler was going to bring

23  anybody with him.

24  A.   No.

25  Q.   You were very surprised when you saw David Sandler

1  approaching with somebody else.  Correct?

2  A.   Yes.

3  Q.   You had never seen that other person before in your

4  life.  Right?

5  A.   No.

6  Q.   It is correct?

7  A.   Yes, I haven't ever seen him.

8  Q.   And you had no plan then when you were in the car to

9  kill that man.  Right?

10  A.   No.

11  Q.   I'm sorry.  I have to stop using *right* in my

12  questions.

13         You mean I'm correct?

14  A.   Yes.

15  Q.   And so there was no discussion about killing that

16  man.

17  A.   No.

18  Q.   And you didn't tell anybody to kill that man.

19  A.   No.

20  Q.   You didn't request that anybody kill that man.

21  A.   No.

22  Q.   You didn't take the gun and try to kill that man,

23  yourself.

24  A.   No.

25  Q.   You, personally, didn't do anything towards that

1  person.

2  A.    No.

3  Q.    And what happened with him -- that is, Mr. Galan that

4  we are talking about; the other person.  Right?

5  A.    Yes.

6  Q.    And what happened with him, happened very fast.

7  A.    Yes.

8  Q.    In fact you were still looking at Mr. Sandler and

9  then turned around and saw that somebody was chasing

10  Mr. Galan away.  Right?

11  A.    Yes.

12  Q.    And you didn't go over and assist that person in

13  shooting Mr. Galan.

14  A.    No.

15  Q.    And you personally had no intention that Mr. Galan

16  get killed.  Right?

17  A.    No.

18  Q.    That's correct?

19  A.    Yes, that's right.

20  Q.    When you pleaded guilty in this case, to the federal

21  case, you pleaded guilty to the charge of attempted murder

22  of Mr. Galan.  Right?

23  A.    Yes.

24  Q.    And the government required that that be one of the

25  counts that you plead guilty to under the terms of the

1    cooperation agreement.

2    A.    Well, but the problem was that that charge, I already

3    had that charge and I knew I was involved in that, so

4    that's why I pled guilty.

5    Q.    But you also were told that to be guilty of that

6    charge you had to have the intent to kill Mr. Galan.

7    Right?

8              MR. DURHAM:  Your Honor, may we approach again?

9    I apologize.

10             THE COURT:  Yes.

11             (Discussion at sidebar ensued as follows.)

12             MR. DURHAM:  Your Honor, I don't claim to be a

13   mind reader, but I think I know where Mr. Levine is going.

14   I understand it but we are getting into complicated areas

15   of law here in terms of Pinkerton liability and reasonable

16   foreseeability.

17             This witness obviously has a minimal education.

18   He didn't go to law school.  And these are concepts that

19   many lawyers don't fully understand.  So I would object to

20   this line of questioning.

21             THE COURT:  I have to say I'm concerned.  And

22   I'm not suggesting that either defense counsel is doing

23   anything wrong in their cross.  I understand the purpose

24   of it.  But I was concerned yesterday and I'm concerned

25   today that the jury is being left with the impression that

1  there is no such as aiding and abetting and he pled guilty

2  to something he didn't do and that the government is

3  alleging that he discharged the weapon because he pled

4  guilty or there was a charge of 924C and I'm worried that

5  the jury is getting very confused over this whole issue.

6         MR. LEVINE:  The problem with that is -- I will

7  address both of your concerns -- there was a requirement

8  regardless of the aiding and abetting theory.  The

9  requirement is that he had the intent to kill.  The aiding

10 and abetting goes to whether he actually committed it or

11 not but he has to have that mens rea to be guilty of

12 attempted murder.

13        THE COURT:  But if he is walking down the street

14 and they kill David Sandler and he's standing next to him,

15 he can be guilty as an aider and abettor even though he

16 had no intent.

17        MR. LEVINE:  No, if he doesn't have the intent,

18 he can't be guilty of it.

19        THE COURT:  He knows that the shooter has a gun,

20 can be killed, is he guilty of --

21        MR. LEVINE:  No.  He has to have the intent that

22 Galan be killed to be guilty of attempted murder of

23 Mr. Galan.

24        MR. DURHAM:  Mr. Ortega had the intent to kill

25 and he is aiding and abetting that; therefore, he has the

1  intent.  He is also guilty under a Pinkerton theory on

2  that.

3          And if counsel continues on this line, we are

4  going to request that the court give the jury an

5  instruction at this time on aiding and abetting liability

6  as well as conspiracy law.

7          THE COURT:  This is irrelevant to him.  You find

8  out what his understanding is.  I am concerned that the

9  jury is a bit confused over it.  I'm going to tell them

10  that they are going to get an instruction on what the law

11  is, at the end of the case, regarding the elements of the

12  crime and aiding and abetting.  I've allowed these

13  questions to be asked of the witnesses with that

14  understanding, but I don't know how much more you want to

15  do on this.  We have been through this for a long time

16  now.

17          MR. LEVINE:  We haven't really been through this

18  for so long, judge.  The point is, when he said that he

19  intentionally, that he aided in the killing of Mr. Galan

20  and did so with the intent that Mr. Galan be killed, he

21  wasn't guilty of the intentional attempted murder of Mr.

22  Galan, and because he had to say it, that was part of the

23  plea.

24          THE COURT:  That is argument.  You may ask him

25  these questions, about what he intended at the time.  You

1   brought out what he pled guilty to, the jury is going to

2   hear the instructions.  Make whatever argument you want

3   but I don't want to have to try to explain what the law is

4   in this area.  It's going to confuse the jury more.

5           What more is there to ask him on this?

6           MR. LEVINE:  That he was told, you read it to

7   him, you told him at the time that he had to have the

8   intent to kill Mr. Galan and he said yes, I understand

9   that, and then later he even tried, he even balked at it

10   during the plea, he even said --

11           THE COURT:  You can read to him what he said at

12   the plea, if you want, but I don't want to have him try to

13   explain what the law is on this, what he is required to

14   plead to or not plead to.

15           If he said something at the plea that suggested

16   he had a specific intent, you can read that to him, but I

17   don't want you to ask him what the government required.  I

18   don't want that question.  Okay?

19           MR. LEVINE:  Judge --

20           THE COURT:  You have already asked him whether

21   the government required him to plead guilty to the count.

22   So we have already covered that.

23           MR. LEVINE:  Okay.

24           (Discussion at sidebar was concluded.)

25           THE COURT:  Members of the jury, let me explain

1 something to you because I don't want to have any

2 confusion on this issue.

3       I have allowed questioning of the witness as to

4 what his understanding is of what he pled guilty to. I

5 want to say, with respect to what the law is, what the

6 elements are for the particular crimes, you will hear all

7 that at the end of the case, what the law is on the

8 particular statutes that are at issue here.

9       But on what conspiracy is, what aiding and

10 abetting is, what I say as to the law is what controls.

11 If the witness starts describing what their understanding

12 is and what they pled guilty to, you can consider that to

13 assess the credibility of their testimony. But as to what

14 the law is on a particular charge, you have to listen to

15 what I tell you at the end of the case.

16       Thank you.

17       MR. LEVINE: Sorry. I'm just looking for

18 something.

19 BY MR. LEVINE:

20 Q. Mr. Galan, at the time that you pleaded guilty --

21       THE COURT: You mean Mr. Sosa.

22       MR. LEVINE: I'm sorry. Yes, Mr. Sosa. Thank

23 you, judge.

24 BY MR. LEVINE:

25 Q. Mr. Sosa, at the time that you pleaded guilty,

1  Judge Bianco informed you of the nature of the charges.

2  Correct?

3  A.  Yes.

4  Q.  And didn't Judge Bianco say to you, with respect to

5  the charge Count 47, which was the charge of the attempted

6  murder of Mr. Galan, didn't he say:

7  *With respect to Count 47, that you knowingly and*

8  *intentionally attempted to murder John Doe No. 8, and they*

9  *have to prove each of those same elements as well, except*

10  *this was an attempt so they have to prove Section 110 of*

11  *New York Penal Law as well, which says a person is guilty*

12  *of an attempt to commit a crime when, with the intent to*

13  *commit the crime, he engages in conduct with intent to*

14  *effect the commission of the crime --*

15  THE INTERPRETER:  I'm sorry, sir.  You have to

16  break that into two parts.

17  MR. DURHAM:  I object to the question, judge.

18  THE COURT:  This is exactly what I don't want

19  to do.  I don't want to go through -- you are now giving

20  him a portion of what I said to him regarding the law in

21  the area, and the jury is going to hear the law at the end

22  of the case.

23  If you want to go into what he allocuted to

24  regarding the crime, I will permit that.  But I don't want

25  him to be questioned regarding my explanation of the law.

1  Okay?

2      MR. LEVINE:  Okay, judge.

3      THE COURT:  It is not a complete version of what

4  the law is.  It's a summary for purposes of the guilty

5  plea.  I don't go through all the contents of aiding and

6  abetting, for example, and it's going to be confusing to

7  both him and to the jury.

8      MR. LEVINE:  Note my exception.

9      THE COURT:  You can ask him any question you

10  want regarding what he said.  Okay?

11  BY MR. LEVINE:

12  Q.   You told the judge at the time, that you understood

13  that that crime, attempted murder of Mr. Galan, meant that

14  you intended to kill Mr. Galan.  Right?  Or you intended

15  that he be killed.  Right?

16  A.   Yes.  I pled guilty to that.

17  Q.   And if you didn't plead guilty to that charge, you

18  wouldn't get the cooperation agreement.

19      MR. DURHAM:  Objection.  Asked and answered.

20      THE COURT:  Sustained.

21  BY MR. LEVINE:

22  Q.   Now, by the way, when you pleaded guilty, you were

23  under oath.  Correct?

24  A.   Yes.

25  Q.   Now, there came a time that you learned of the murder

478

1  of Baby Blue?

2  A.   Yes.

3  Q.   And there was some talk among the MS-13 members

4  about it?

5  A.   Yes.

6  Q.   And you came to learn that the green light had been

7  put on Boxer.  Correct?

8       MR. DURHAM:  Objection.

9       THE COURT:  Overruled.

10  A.   Not at the time.

11  BY MR. LEVINE:

12  Q.   When did you learn it?

13  A.   I was already in the process of being in jail and

14  everything when people were talking about that.

15  Q.   You came from El Salvador, you said, when you were

16  about 15 years old.  Right?

17  A.   Yes.

18  Q.   And MS-13 members in El Salvador, according to you,

19  communicate with MS-13 members in Long Island.

20  A.   Yes.  Through all the countries.

21  Q.   You told us yesterday that there was a green light

22  for you in El Salvador because you left without

23  permission.

24  A.   Yes.  They do put a green light on me because I left

25  without permission.

1    Q.   Well, did they or didn't they?

2    A.   It is a no, because I never spoke to them again.

3    Q.   Well, a green light would have required or allowed

4    any other MS-13 member to kill you on sight.  Right?

5    A.   That's right.

6    Q.   And that is really the only time that MS-13 members

7    are allowed to kill other MS-13 members.  Right?

8    A.   That's right.

9    Q.   Any other time that happens, that a MS-13 member

10   kills another MS-13 member without there being a green

11   light on that member, that is really those people acting

12   on their own.  Right?

13              MR. DURHAM:  Objection.

14              THE COURT:  Sustained as to form.

15   BY MR. LEVINE:

16   Q.   When a MS-13 member kills a fellow MS-13 member

17   without there being a green light on that MS-13 member,

18   then the killer is not doing something sanctioned by the

19   gang.

20              MR. DURHAM:  Objection.

21              THE COURT:  No.  I will allow that.

22   A.   That's right.  Unless he has a reason.

23   BY MR. LEVINE:

24   Q.   Well, the reason has to be approved by the

25   higher-ups.  Right?

1  A.    I think it can be approved by a clique leader.

2  Q.    And if there was no green light on the member who got

3  killed, then the people who killed that person can have a

4  green light put on themselves.  Right?

5  A.    That's right.

6  Q.    So rather than enhance that person, that killer's

7  position within MS-13, it actually could result in his own

8  death.  Right?

9  A.    That's right.

10  Q.    Now, when you came to New York, you came directly to

11  Long Island?

12  A.    Yes.

13  Q.    You had a brother who was living on Long Island at

14  the time.  Right?

15  A.    Yes.

16  Q.    Is that the brother who paid the coyote to get you

17  here?

18  A.    Yes.

19  Q.    Did that brother live in Brentwood at the time?

20         MR. DURHAM:  Objection.

21         THE COURT:  Why don't you approach, Mr. Levine.

22         (Discussion at sidebar ensued as follows.)

23         THE COURT:  What is the relevance of where the

24  brother lives?

25         MR. LEVINE:  Because the brother was living in

481

1   Brentwood and the MS-13 was in Brentwood and the brother

2   would obviously know it.  And the fact that this witness

3   moved to Brentwood from El Salvador thinking there could

4   be a green light on him by MS-13 I think raises critical

5   issues.

6          MR. DURHAM:  I object on relevancy grounds as

7   well as 403.  He has made his point about the green light

8   with respect to this witness independently.  We don't need

9   to bring his brother into it.

10         MR. LEVINE:  That is a different green light

11  issue.  One green light issue goes to the charge against

12  my client.  This one is about this person's credibility,

13  what his real motivation was for coming here.

14         THE COURT:  I understand that.  But what does

15  the brother, explain to me, where the brother was living

16  at the time, what does that have to do with?

17         MR. LEVINE:  The brother would know that MS-13

18  was prominent in Brentwood, and this witness moved to

19  Brentwood.

20         MR. DURHAM:  That inquires about the brother's

21  state of mind.

22         THE COURT:  Why don't you ask him whether he

23  knew that the MS-13 was in Brentwood.

24         MR. LEVINE:  I thought he would have to have a

25  foundation for knowing.

1        MS. MACEDONIO:  I think he already testified

2    that there was MS-13, the relevance --

3        MR. LEVINE:  Did he know before he got here.

4        THE COURT:  Did you understand before you got

5    here, at the time you arrived.

6        MR. LEVINE:  Okay.

7        (Discussion at sidebar was concluded.)

8    BY MR. LEVINE:

9    Q.   Mr. Sosa, before you arrived in Brentwood, you were

10   aware that MS-13 was in Brentwood.  Right?

11   A.   Not exactly.

12   Q.   What does *not exactly* mean?  Does it mean you knew?

13   You didn't know at all?

14   A.   I had no idea.

15   Q.   So while you were in El Salvador, you had no idea of

16   any communications then between MS-13 in El Salvador and

17   MS-13 in Brentwood?

18   A.   Not directly to Brentwood.  I knew there was

19   communication to this country.

20   Q.   And MS-13 is in different places within this country.

21   Right?

22   A.   Right.

23   Q.   So you didn't know anything about any actual

24   communication between MS-13 in El Salvador and the MS-13

25   in Long Island.

1  A.    What happens is that each clique had his own rule and

2  had its own communications.  So my own clique had

3  communication with certain areas or places, but I didn't

4  know about other cliques or what they communicated with.

5  Q.    When you came to -- withdrawn.

6         You said -- I believe yesterday, it could have

7  been the day before -- that there came a time that you met

8  an MS-13 member in the mall.  Right?

9  A.    That's right.

10  Q.    And that was in 2008?

11  A.    Approximately 2008.

12  Q.    And you had said in court here that that person was

13  known to you as Gato?

14  A.    Yes.

15  Q.    Back on July 29, 2010, you were in custody.  Correct?

16  A.    Yes.

17  Q.    And you had a conversation with Agents Lopez and

18  Negro?

19  A.    I'm not sure about the names.

20  Q.    But there were two agents that you had a conversation

21  with on or about July 29, 2010?

22  A.    Yes, I had some conversations.

23  Q.    And you told them about the time that you met an

24  MS-13 member in the mall in 2008.  Right?

25  A.    I believe so.  I'm not totally sure.  I believe so.

484

1   Q.   Didn't you tell them that the person who recognized

2   you when you met in the mall in 2008 went by the name

3   Danger?

4   A.   That was not the date that they brought me in federal

5   custody.

6   Q.   I didn't ask whether it was the date they brought you

7   into federal custody.  But you were in custody already?

8   A.   Yes.  But I had just been brought into federal

9   custody so I was getting things back to my memory at that

10  point.  I wasn't totally sure about the people.

11  Q.   Well, would you agree that back in July -- withdrawn.

12          July 29, 2010, was the first time you gave a

13  statement to them.  Right?

14  A.   I think so.

15  Q.   And how long had you already been in custody up until

16  that point?

17  A.   Could you repeat the date, please?

18  Q.   July 29, 2010.

19  A.   I was in jail already but I was in the state.

20  Q.   Well, the question really is, didn't you tell them on

21  July 29, 2010, that the person you met in the mall in 2008

22  went by the name Danger?

23  A.   Yes.  But I also remember as well that at that same

24  moment I wasn't totally sure.  And I said that, too.

25  Q.   Okay.  And you exchanged numbers at that time with

1    the person you met in the mall in 2008?

2    A.    Yes.

3    Q.    And the person you met in the mall in 2008 you said

4    had recognized you from El Salvador.  Right?

5    A.    Yes.

6    Q.    And you didn't know for sure whether or not there was

7    actually a green light on you from El Salvador.  Right?

8    A.    That's right.

9    Q.    You gave that person who you met in the mall, who

10   knew you from El Salvador, your real phone number?

11   A.    Yes, because when he asked me, he was already

12   dialing it.

13   Q.    Okay.  Well, you mean he didn't know your phone

14   number before you gave it to him.  Right?

15   A.    No.

16   Q.    And I believe it was your testimony that you didn't

17   start actually hanging out, though, with MS-13 until

18   January of 2010.

19   A.    Yes.

20   Q.    So during those two years, from the time you met that

21   person in the mall until January 2010, you committed no

22   crimes with MS-13?

23   A.    No.

24   Q.    And nobody forced you to join MS-13?

25   A.    I was already a member.

1  Q.   Okay.  Did they know you were a member?

2  A.   That's what I was saying, that that's why this guy in

3  the mall recognized me, because he knew I was a member

4  from El Salvador.

5  Q.   Okay.  And then even though he knew you were a member

6  from El Salvador and even though you exchanged numbers,

7  you were not engaging in any activities with MS-13 from

8  2008 to 2010 in Long Island?

9           MR. DURHAM:  Objection.

10          THE COURT:  Sustained.

11  BY MR. LEVINE:

12  Q.   Now, you told us yesterday that there is something

13  called reporting in.  Right?

14  A.   Right.

15  Q.   And reporting in is when you basically transfer from

16  El Salvador MS-13 to an MS-13 here in the US.  Right?

17  A.   Well, the MS-13 is just one.

18          THE COURT:  Mr. Levine, I think one of the

19  jurors needs a break, so we're going to take the morning

20  break.  Take a 15-minute break.

21          Don't discuss the case.

22          (The following ensued in the absence of the jury

23  at 11 am.)

24          THE COURT:  Would everyone be seated.

25          How much more do you have, Mr. Levine?

487

1          MR. LEVINE:  Not much.

2          THE COURT:  Okay.  Let's take our break.

3          (Recess taken at 11 am.)

1    (After recess the following occurred.)

2    CROSS EXAMINATION  (Continued)

3    BY MR. LEVINE:

4    Q    Mr. Sosa, under the terms of your cooperation

5    agreement with the government, whether or not you have

6    told the truth at this trial is not determined at all by

7    defense counsel, right?

8         THE INTERPRETER:  Whether or not?

9    Q    Whether or not you told the truth at the trial is not

10   determined by the defense lawyers?

11   A    No.

12   Q    No.  That's correct, right?

13   A    Yes.

14   Q    It's not even determined by the judge?

15   A    No.

16   Q    It's determined solely by the government, the lawyers

17   for the government?

18   A    I believe so.

19   Q    And only the lawyers for the government have the

20   authority to say whether you should get the benefits of

21   the agreement?

22        MR. DURHAM:  Objection.

23        THE COURT:  Overruled.

24   A    I figure so.

25        MR. LEVINE:  I have nothing further.

1          THE COURT:  Redirect?

2          MR. DURHAM:  May I have a moment, your Honor?

3          (There was a pause in the proceedings.)

4

5    REDIRECT EXAMINATION

6    BY MR. DURHAM:

7    Q    Mr. Sosa, who sentences you?

8    A    Judge Bianco.

9    Q    Judge Bianco who sat here and heard all of the

10   testimony?

11   A    Yes.

12   Q    And earlier this morning Mr. Levine asked you some

13   questions about your cooperation.  Did you tell any other

14   inmate in jail that you were cooperating?

15   A    No.

16   Q    Why not?

17   A    Because I didn't believe it he would be safe for me.

18          MR. DURHAM:  Your Honor, may I approach?

19          THE COURT:  Yes.

20   BY MR. DURHAM:

21   Q    I'm showing you what is marked as defense exhibits,

22   or excuse me -- well Defense Exhibit Ortega A and Ortega

23   B.

24          Do you recognize those documents?

25   A    Yes.

1    Q    When you were interviewed in connection with that

2    case --

3              MR. LONDON:  I can't understand the question.

4    BY MR. DURHAM:

5    Q    When you were interviewed about that case did the

6    detective speak Spanish?

7    A    No.

8    Q    And before you signed those documents were they read

9    to you in Spanish?

10   A    No.

11   Q    Now, yesterday afternoon and earlier today both

12   Mr. London and Mr. Levine asked you a lot of questions

13   about the law.  How far did you go in school?

14             MR. LONDON:  Objection.

15             THE COURT:  Restate the question.

16   BY MR. DURHAM:

17   Q    Mr. Sosa, how far did you go in school?

18   A    Up to eighth grade.  But that was in my country.

19   Q    Did you ever study law?

20   A    No.

21   Q    Did you go to law school at all?

22   A    No.

23   Q    Do you know what *Pinkerton liability* is?

24             MS. MACEDONIO:  Objection.

25             MR. LEVINE:  Objection.

1    THE COURT:  Sustained.

2  BY MR. DURHAM:

3  Q    Now, what charges did you plead guilty to?

4  A    For the killing of David Sandler and the attempted

5  killing of the other victim.

6  Q    And the actual charges, was that murder in aid of

7  racketeering?

8  A    Yes, that is the way it's in the papers.

9  Q    And attempted murder in aid of racketeering?

10 A    Yes.

11 Q    And what is the mandatory minimum sentence for murder

12 in aid of racketeering?

13 A    The minimum sentence you mean?

14 Q    Yes.

15 A    I was assured that I was supposed to get life for the

16 charges.

17 Q    That was the most serious charge you were charged

18 with, correct?

19 A    Yes.

20 Q    And why did you plead guilty?

21 A    Because I know that I'm guilty because I was involved

22 in what happened.

23 Q    You helped cause David Sandler's death?

24 A    Yes.

25 Q    You helped in the attempted murder of Aaron Galan?

1  A    Yes.

2  Q    Did you make a plan to kill Mr. Sandler?

3  A    A plan was cooperated with the members of the gang.

4  Q    Would else did you make the plan with?

5  A    You want the name?

6  Q    Yes.

7  A    With Perdidi and Silencio was there, and Michichi who

8  was driving.

9  Q    Silencio being the defendant Carlos Ortega?

10 A    Yes.

11 Q    Did you call the victim?

12 A    Yes.

13 Q    And did you see the two shootings?

14 A    Yes.

15 Q    Who shot David Sandler?

16 A    Silencio.

17 Q    Who shot Aaron Galan?

18 A    Silencio.

19 Q    Now the murder of David Sandler and the attempted

20 murder of Aaron Galan, what was the purpose of those

21 crimes?

22          MS. MACEDONIO:  Objection.

23          This question has been asked answered on

24 numerous occasions.

25          THE COURT:  It was asked on cross.  I'll allow

1   the question on the issue of purpose.

2   A   The purpose was for us to show that we were okay.

3   For us to prove ourselves. And also the purpose of the

4   gang, which is to be respected. And like that you have

5   respect of all the members.

6   Q   Did you prove yourself?

7   A   Yes.

8   Q   And finally, you were asked a number of questions

9   about lying in different situations.

10   A   Yes.

11   Q   Mr. Sosa, is it in your best interest today to lie or

12   to tell the truth?

13           MS. MACEDONIO: Objection.

14           THE COURT: Overruled.

15   A   I know that I'm guilty and my life is on the line. I

16   am not willing to tell any lies. I came here to tell the

17   truth.

18   BY MR. DURHAM:

19   Q   What happens if you lie here today?

20           MR. LEVINE: Objection, judge, for the

21   government to --

22           THE COURT: Overruled.

23   A   The agreement that I have with the government would

24   be shattered, and I am supposed to get life for the

25   charges.

1    MR. DURHAM:  No further questions.

2    THE COURT:  Any recross?

3

4  RECROSS-EXAMINATION

5  BY MR. LONDON:

6  Q    Good morning, Mr. Sosa.

7         Did you plead guilty pursuant to the cooperation

8  agreement?

9  A    Yes.

10  Q    And did you do that in the hope of getting a reduced

11  sentence?

12  A    Yes.

13  Q    Now with respect to the two exhibits before you.  Do

14  you know what I'm referring to?

15         THE COURT:  Just so the record is clear, it's

16  Ortega Exhibits A and B.

17         MR. LONDON:  Thank you, judge.

18  A    Yes.  I know them.

19  BY MR. LONDON:

20  Q    Did you sign those documents?

21  A    Yes.

22  Q    And are they detailed statements of what you did in

23  committing a robbery and a burglary?

24  A    Yes.

25  Q    Did you tell anyone before you signed them that you

1  didn't understand them?

2  A    Yes.  I told them that I didn't speak perfect

3  English.

4  Q    That isn't my question.

5        My question is, did you tell anyone before you

6  signed them that you didn't understand what you had

7  written in the statement?

8  A    Yes.

9  Q    And did they make a note of it and make corrections

10 for you?

11 A    They picked up the paper.  They started looking at

12 them and they told me that everything was fine.

13 Q    Did you look them over?

14 A    I saw them, but I can not understand exactly what it

15 says.  I can not read English like that.

16 Q    So you're saying that you just signed the statement

17 under oath?

18       They gave you an oath, didn't they, that you had

19 to tell the truth?

20 A    It was the first time that I got arrested.  I didn't

21 know anything about that.  I didn't know how it was.

22 Q    You didn't understand what an oath to tell the truth

23 means?

24 A    The problem was that nobody was explaining to me in

25 Spanish.  I couldn't understand exactly what they were

1   saying.

2   Q    That isn't my question, Mr. Sosa.  My question is,

3   Did you understand what an oath to tell the truth means?

4   A    Not at that moment.

5   Q    So when someone said, *Do you swear to tell the truth*,

6   you didn't understand that?

7   A    At that moment I didn't speak English.  I didn't

8   understand English like that.

9   Q    You did not understand what it means to tell the

10  truth?

11              MR. DURHAM:  Objection.

12              THE COURT:  Asked and answered.

13  BY MR. LONDON:

14  Q    And in spite of the fact that you didn't understand

15  the oath to tell the truth, and what was contained in the

16  two statements, you signed them?

17              MR. DURHAM:  Objection.

18              THE COURT:  I'll allow it.  Overruled.

19  A    Yes.

20  BY MR. LONDON:

21  Q    Mr. Sosa, isn't it a fact that you're lying to this

22  jury about that?

23              MR. DURHAM:  Objection.

24              THE COURT:  Sustained.

25  Q    Mr. Sosa, isn't it a fact that you lied to this jury

1    about your role in the robbery?

2              MR. DURHAM:  Objection.

3              THE COURT:  Sustained.

4    BY MR. LONDON:

5    Q    Isn't it a fact that you're lying to this jury about

6    your role in the burglary?

7              MR. DURHAM:  Objection, your Honor.

8              THE COURT:  Sustained.

9              MR. LONDON:  No further questions.

10

11   RECROSS-EXAMINATION

12   BY MR. LEVINE:

13   Q    Mr. Sosa, you said you pleaded guilty to both those

14   charges because you are guilty?

15             MR. DURHAM:  Your Honor, could he be more

16   specific as to which charges he is referring?

17   BY MR. LEVINE:

18   Q    You only pleaded guilty to two charges in Federal

19   Court, right?

20   A    Yes.

21   Q    Murder in aid of racketeering and attempted murder in

22   aid of racketeering?

23   A    Yes.

24   Q    Not conspiracy, but the actual murder and attempted

25   murder, correct?

1    A    Yes.

2    Q    And you knew right after David Sandler was killed

3    that you were guilty of the murder of David Sandler,

4    correct?

5            MR. DURHAM:  Objection.

6            THE COURT:  Overruled.

7    A    Yes.

8    BY MR. LEVINE:

9    Q    And you didn't go and turn yourself in because you

10   knew you were guilty, correct?

11           MR. DURHAM:  Objection.

12           THE COURT:  Overruled.

13   A    No.

14   BY MR. LEVINE:

15   Q    And when the FBI came to your house and asked you

16   whether you were MS-13, you didn't say, Yes.  And by the

17   way, I killed David Sandler?

18           MR. DURHAM:  We object, your Honor, scope.

19           THE COURT:  I'll allow it.  Overruled.

20   A    No.

21   BY MR. LEVINE:

22   Q    And when you first got arrested on the federal

23   matter, you didn't ask to plead guilty right away, right?

24   A    No.

25   Q    In fact you told us that you started out fighting the

1  case, right?

2          MR. DURHAM:  Objection.

3          THE COURT:  Overruled.

4  A    Yes.

5  BY MR. LEVINE:

6  Q    And you only pleaded guilty when it turned out that

7  there was going to be a benefit given to you by the

8  government, right?

9  A    I pled guilty because I saw that the case was hard,

10  and I wanted to come clear about the things that I was

11  being accused of.  Because I was not guilty in full of

12  everything that they were accusing me of.

13  Q    You weren't guilty of everything they said you were

14  guilty of?

15  A    When I started fighting the case I wasn't guilty of

16  everything they were saying.

17  Q    But you said in the beginning of the case you weren't

18  guilty of everything they accused you of.  At the end of

19  your case were you guilty of everything they accused you

20  of?

21  A    Yes.  That's why I pled guilty.

22  Q    And you pleaded guilty only with the cooperation

23  agreement, right?

24  A    Yes.

25          MR. LEVINE:  I have nothing further.

1  REDIRECT EXAMINATION

2  BY MR. DURHAM:

3  Q    Mr. Sosa, when you say you weren't guilty of

4  everything, what are you referring to?

5  A    I'm referring to the fact that I didn't shoot the

6  weapon that killed David Sandler.

7  Q    Who shot that weapon?

8  A    Silencio.

9            MR. DURHAM:  No further questions.

10           THE COURT:  Anything further?

11           The witness is excused.

12           The next witness.

13           MR. DURHAM:  Your Honor, the government calls

14  Mark Moorman

15           THE COURT:  Step up to the witness stand, sir,

16  and remain standing once you get there.

17

18  **MARK MOORMAN**

19           called as a witness, having been first duly sworn,

20           was examined and testified as follows:

21           THE COURT:  Please state your name and spell it

22  for the record.

23           THE WITNESS:  Mark Moorman, M-O-O-R-M-A-N.

24           THE COURT:  Okay, I'll just ask you,

25  Mr. Moorman, to pull the microphone closer to you so

501

1  everyone can hear you.  Okay?  Thank you.

2

3  DIRECT EXAMINATION

4  BY MR. DURHAM:

5  Q    Good morning, sir.

6  A    Good morning.

7  Q    Barely.

8  A    Barely.

9  Q    Let me direct your attention to February 17, 2010.

10 Do you remember that day?

11 A    Yes.

12 Q    And where were you that day?

13 A    Most of the day I was at the KK Athletics.

14 Q    And why were you there?

15 A    Along with a soccer tournament I'm a board member of,

16 -- a local soccer club.  There was a local soccer

17 tournament that day.

18 Q    And can you explain to the jury what is KK Athletics.

19 A    It's into door -- I want to say soccer facility.  But

20 they use it for other purposes like lacrosse.  They have

21 two indoor turf fields.

22 Q    And you said you were there for a soccer tournament?

23 A    Yes.

24 Q    And what age groups were playing in the tournament?

25 A    Anywhere from U 8 which is seven year-olds up to high

1  school.

2  Q    And were you there in the evening?

3  A    I was there in and out most of the day.  But I was --

4  I went home for dinner, and I went back about 6:30.

5  Q    And at some point did you leave KK athletics?

6  A    I left there -- when I got back at 6:30 my intentions

7  were to only stay for about an hour just to make sure

8  somebody else was there to cover for the club.  I was

9  intending on heading up to church for Ash Wednesday.

10 Q    Did you make that?

11 A    No.

12 Q    Why not?

13 A    When I left the facility proceeding to my car, on the

14 way over to my car I passed two males in crossing the

15 road.  And I got in my car.  I went to put something in

16 the glove compartment.  And I heard a loud pop which

17 caught my attention.  And I looked up, and I was facing an

18 incident.

19 Q    Let me just break that down a little bit.

20      Approximately what time did you leave KK

21 Athletics to go to your car?

22 A    Well, three years ago, probably between 7:30, 8:00.

23 Q    And when you left KK athletics, can you describe

24 where you walked?

25 A    I left the front of the facility which is facing

1   south.  I turned east on the sidewalk walking over to the

2   side street which is Timberline.  My car was parked on

3   Timberline facing south also, just north of the corner of

4   the KK facility.

5   Q    And once you got to the street, how did you walk to

6   your car?

7   A    When I got to the end of the sidewalk I turned left

8   to go to my car.  So, and obviously since the car was

9   facing south, the driver's side was in the street.

10  Q    And you testified at some point you passed two men?

11  A    When I turned left to go north to my car there were

12  two men walking south in the street towards me.

13  Q    They were right in the street?

14  A    Yes.

15  Q    Of Timberline?

16  A    Correct.

17  Q    And how were those men dressed?

18  A    Well, it was February so it was nighttime, so it was

19  cold.  They were wearing winter coats, hoodies.  Their

20  hoods were up.

21  Q    Were you able to see their faces?

22  A    No.

23  Q    How would you describe the height and build of these

24  two men?

25  A    Well, they were definitely both shorter than me.

1   They were probably in the neighborhood of about

2   five-eight.

3   Q    For the record, how tall are you?

4   A    Six foot three.

5   Q    So they were shorter than you?

6   A    Absolutely.

7   Q    What type of build?

8   A    Medium build, less than 200 pounds.  It was hard to

9   tell with the coats on, but they weren't big.

10  Q    You passed these two men, and then you get into your

11  car.  What happened next?

12  A    Well, like I said, I went to put something in the

13  glove compartment, so I was looking down and I heard a --

14  I would describe it as a pop, and I now know it was a

15  gunshot, which caught my attention.  So I looked up.  And

16  about 50 feet in front of me were now four individuals;

17  the two that had passed me in the street, two more at the

18  time when I looked up.  One was already to the ground.

19  And one of the guys, or one of the males that passed me in

20  the street was standing with his arm out.

21  Q    *His arm out*, what did you mean?

22  A    He had it extended at the two other individuals on

23  the west side of the street.

24        What I saw was the muzzle fire come out of the

25  end of his jacketed arm.  So there was probably about --

1    and obviously it was gunshots at that time.

2    Q    You heard gunshots in addition to seeing the muzzle

3    flash?

4    A    I heard three or four more gunshots, and I saw three

5    or four muzzle flashes.

6    Q    In total how many gunshots did you hear?

7    A    Well, including the first pop which I didn't see but

8    I heard, four or five.

9    Q    And you testified you heard the first shot, you

10   looked up and you saw four people in the street, one was

11   already on the ground?

12   A    One was already on the ground, and the second one

13   was, I would say retreating.  He was moving a away.

14   Q    When you say *retreating*, what direction was he

15   moving?

16   A    He was -- the two people that I saw were facing west.

17   He was going west.  He was moving away from them.

18   Q    And where was he in relation to the individual where

19   you saw the muzzle flash?

20   A    Well, when I originally looked up everybody was

21   probably less than ten feet apart.  When he started moving

22   away he was probably still about 12 feet away.  He didn't

23   get very far.

24   Q    After seeing this happen, what did you do?

25   A    I ducked down in my car.

1  Q    Why?

2  A    Because it was frightening.

3  Q    And how long did you stay down?

4  A    It seemed like forever, but it was probably less than

5  a minute, maybe 30 seconds.

6  Q    And when you looked up, what did you see?

7  A    After composing myself and waiting what seemed like a

8  long time, I felt it was safe enough to look up.  By that

9  time the only people I saw were the two bodies in the

10  street.

11  Q    And where were those two bodies located?

12  A    They were located just probably ten feet south of the

13  end of the sidewalk in the street.

14  Q    And where in the street; were they together, or were

15  they in different parts of the street?

16  A    They were both on the west side of the street.  One

17  was more towards the middle, one was more towards the

18  curb.

19  Q    And what did you do next?

20  A    Well, at that point I felt fairly safe that the

21  incident was over, so I got out of my car and ran back

22  into KK to alert not only people in there, but to call the

23  police.  But I was also concerned that there were young

24  soccer players.

25        It was just a session ending, and there were a

1   number of teams that would be leaving shortly.  So I

2   grabbed a couple of coaches, and I grabbed a couple of

3   adults, and said, *It might not be the best time to walk*

4   *out of the facility right now.*

5   Q    Anything else?

6   A    I mean I met a parent and a young female soccer

7   player.  She was visibly upset.  So I tried to comfort her

8   a little bit.

9          MS. MACEDONIO:  Objection.

10          THE COURT:  Sustained.

11  BY MR. DURHAM:

12  Q    Sir, let me show you what is already in evidence as

13  Government Exhibit 251.  It will be on the screen in front

14  of you, but it's also going to be basically behind you.

15          So what I'm going to ask you to do is turn

16  around and use the laser pointer and put the button on.

17          First all, of looking at this picture, do you

18  recognize this area?

19  A    Yes.

20  Q    And what do you recognize it to be?

21  A    The large white roofed building on the left is KK

22  Athletics.

23  Q    And you're referring to the white and blue building

24  in the top left-hand corner of the photograph?

25  A    Yes.

1    Q    That is KK athletics?

2    A    Yes.

3    Q    And you testified before that you walked out of KK

4    Athletics and walked to your car.  Can you just explain to

5    the jury the route that you took?

6    A    This is where KK was right there, there is a sidewalk

7    that runs adjacent to the front of the building.  That is

8    the sidewalk I walked down.  And I went to approximately

9    there.

10   Q    You identify the building of KK Athletics as a

11   white-blue building.  On the south side of the building in

12   the center there is a door?

13   A    Correct.

14   Q    And you walked from that door headed eastbound on

15   that sidewalk?

16   A    Right.

17   Q    And how far did you go on the sidewalk?

18   A    I went all of the way to the end of the sidewalk and

19   turned left because my car was --

20   Q    You walked north on that street?

21   A    Correct.

22   Q    And can you show the jury approximately where your

23   car was parked that night?

24   A    It was only about two car lengths down, probably

25   right around there.

1    MR. DURHAM:  Your Honor, can the record reflect

2  the witness is indicating a location not to the west side

3  of Timberline.

4    THE COURT:  Yes, the west side he said two car

5  lengths above where the sidewalk from the soccer building

6  meets the sidewalk.

7    MR. DURHAM:  Thank you, your Honor.

8  BY MR. DURHAM:

9  Q    And you said you passed two men in the street.  Can

10  you describe approximately where that was?

11  A    It was approximately right by my car because my car

12  was far away from the sidewalk.  If I was there they were

13  in the center of the street walking south.  I had just

14  turned walking up.

15  Q    And after you got in your car and then you heard the

16  first shot and you looked up, where were the four men?

17  A    The four men were probably right about where this car

18  is so they were just north of the sidewalk or just south

19  of the sidewalk, sorry.

20    MR. DURHAM:  Your Honor, could the record

21  reflect the witness has indicated there is a dark sedan

22  driving southbound on Timberline Drive.

23    THE COURT:  Yes, the one near the soccer

24  building, not the one further down.

25    MR. DURHAM:  Thank you.

1    BY MR. DURHAM:

2    Q    And you indicated somebody was on the ground?

3    A    Yes.

4    Q    That was right there?

5    A    Correct.

6    Q    And you testified that a second person was moving

7    away.  Where was that person?

8    A    They were moving towards the parking lot.

9    Q    So essentially they were headed to the west side of

10   Timberline?

11   A    Correct.

12   Q    Adjacent to where that same sedan is?

13   A    Correct.

14   Q    And where was the shooter?

15   A    The shooter was probably where the sedan is.

16   Q    And then when you got out of the car, where was the

17   first victim?

18   A    The first victim I passed was closer to the sidewalk.

19   Q    And just so we get our first and second.  That

20   person, there was a shot first or a shot second?

21   A    That person was shot first.

22   Q    And he was closer to you?

23   A    Yes.

24   Q    And you went back inside?

25   A    He got farthest away from the shooter.

1    THE COURT:  Just for the record, you indicated

2  that the second person who was shot was lying in the

3  street near where the sidewalk meets.  Is that where you

4  pointed to, sir?

5    THE WITNESS:  Right.

6  BY MR. DURHAM:

7  Q    And then the person who was shot first that was a

8  little further away from you, can you indicate where he

9  was in the street?

10 A    They were pretty close to each other, but he was more

11 toward the center of the street where the second person

12 was more toward the sidewalk.

13    MR. DURHAM:  Thank you.  No further questions,

14 your Honor.

15

16 CROSS-EXAMINATION

17 BY MR. LONDON:

18 Q    Mr. Moorman, I'm curious about something, inasmuch as

19 you say you didn't see their faces, and they wore hoodies,

20 what observation do you base your conclusion that they

21 were males?

22 A    Just general attire.  They appeared to be males.

23 Q    Have you ever seen women wearing hoodies?

24 A    Yes.

25    MR. LONDON:  I have no further questions.

512

1      MS. MACEDONIO:  I have no questions, judge.

2      THE COURT:  Okay.

3      MR. DURHAM:  No questions, your Honor.

4      THE COURT:  You can step down.

5      Next witness?

6      MS. CAPWELL:  Your Honor, the government calls

7  Roy Sineo.

8

9  **ROY SINEO**

10      called as a witness, having been first duly sworn,

11      was examined and testified as follows:

12      THE COURT:  State your name and spell your last

13  name for the record.

14      THE WITNESS:  It's Roy Sineo, S-I-N-E-O.

15      THE COURT:  Mr. Sineo, if you could just move

16  your chair closer to the mic and stay close to it so it

17  picks up your voice.

18      THE WITNESS:  Yes, sir.

19      MS. CAPWELL:  Thank you, your Honor.

20      With the Court's permission, I would like to

21  place some items at the podium.

22      THE COURT:  Sure.

23

24  DIRECT EXAMINATION

25  BY MS. CAPWELL:

1  Q    Good afternoon, sir.

2  A    Good afternoon.

3  Q    What do you do for a living?

4  A    I'm a forensic scientist with the Suffolk County

5  crime laboratory.

6  Q    And how long have you been a forensic scientist with

7  the Suffolk County crime laboratory?

8  A    Just over 14 years.

9  Q    What are your duties and responsibilities as a

10 forensic scientist in the crime laboratory?

11 A    I am assigned to the firearms and ballistics unit of

12 the Suffolk County crime laboratory and my duties and

13 responsibilities include examining any type of weapon that

14 is submitted to the laboratory from any of the police

15 agencies that are located within Suffolk County.

16 Typically I examine guns.  But I'm also responsible for

17 examining any other type of weapon that may be submitted.

18 Conducting microscopic comparisons and examinations on

19 expended evidence components, as well as conducting serial

20 restorations on defaced firearms, gunshot residue exams on

21 clothing, as well as trajectory analysis and crime scene

22 reconstructions.

23 Q    Let me ask you about all of those responsibilities

24 you have.  You mentioned microscopic comparisons and

25 examinations.  Can you briefly tell the members of the

1    jury what that is?

2    A    Yes.

3         What microscopic examination and comparison of

4    expended evidence is, is that I have a specialized piece

5    of equipment at the laboratory called a comparison

6    microscope.  And what that comparison microscope is, is

7    basically two high-powered microscopes joined together

8    optically by one eyepiece.  There are two stages where I

9    can place separate pieces of evidence on and view them as

10   if they were one item.

11        When the police department at times may submit

12   expended evidence.  And what I mean by that is either a

13   bullet or a casing that has been fired in a gun that was

14   recovered at a crime scene.  I can look at those items on

15   the comparison microscope and determine if they had been

16   fired from the same weapon or try to connect them to other

17   weapons or other shootings that may have occurred

18   previously.

19   Q    Do you have any other assignments at the Suffolk

20   County crime laboratory?

21   A    Yes.

22   Q    And what are those?

23   A    I am also a member of the Suffolk County crime lab's

24   crime scene response unit.

25   Q    And what are your duties and responsibilities with

1    that unit?

2    A    When the police department needs laboratory

3    assistance in investigating a crime scene, I am a member

4    of a team that would respond from the laboratory to the

5    crime scene and assist the police department in the

6    evidence collection.

7    Q    How long have you been a member of the crime scene

8    response unit?

9    A    Approximately 12 years.

10   Q    Is the Suffolk County crime laboratory part of the

11   Suffolk County Police Department?

12   A    No, they are not.

13   Q    What agency do you fall under?

14   A    We fall under the office of the Medical Examiner of

15   Suffolk County.

16   Q    Did you receive any training in the area of firearms

17   and ballistics analysis?

18   A    Yes.

19   Q    Can you please describe the training you have

20   received?

21   A    Yes.  About 14 years ago when I first became a member

22   of the lab's firearms unit my title was forensic scientist

23   trainee.  For a two-year period I learned the different

24   functions of the firearms unit and I worked under the

25   direct and then indirect supervision of my two supervisors

1  who taught me the functions and how to conduct the

2  examinations that are required in the firearms unit.

3  During that period of time I had been to several gun

4  manufacturing companies in Connecticut, namely Marlin and

5  Mossberg.  They are manufacturers of firearms.

6        During my period of time up there I was able to

7  go on a tour of those factories and see how they make

8  firearms from the raw materials to the finished product.

9  I got to understand and see what tools they used to create

10  the different parts and how the firearms function.

11        I'm also a -- I took several armorers courses

12  given at the NYPD laboratory in Jamaica, Queens.  These

13  were conducted by representatives of several firearms

14  manufacturers, namely Mossberg, Colt, Glock, Baretta, Sig

15  Sauer and Hi-Point firearms.

16        These classes were like I said, taught by

17  members of those gun manufacturing companies.  And I got

18  to learn how you take apart those specific weapons,

19  understand all the internal parts, how they function and

20  put them back together.

21        After completing those courses and taking a

22  written test I was licensed as an armorer for those gun

23  manufacturing companies.

24        I have also been to the FBI academy in Quantico,

25  Virginia for a week of firearms training.  These courses

1   were taught by members of the FBI's firearms and

2   ballistics unit.  And basically I learned advanced

3   techniques in identifying firearms and conducting firearms

4   examinations.

5         I have also been to Largo, Florida for a week of

6   training on a piece of equipment that I have at work

7   called IBIS, and IBIS stands for the Integrated Ballistic

8   Identification System.  It's essentially --

9         MS. RANTALA:  Objection.

10        THE COURT:  I'll allow it.  Go ahead.

11   A   What IBIS is, essentially it's a computer system that

12   we have at work that I place -- I take photographs of

13   expended shell casings that I receive as evidence.  And

14   the computer system compares it to open shootings within

15   our county and some of the other local jurisdictions.

16         I stay current in the field of firearms by

17   reading periodicals issued by certain manufacturers of

18   firearms.  And I read the American Rifleman, which is an

19   official publication of the National Rifle Association, as

20   well as AFTME articles.  AFTME stands for the Association

21   of Firearms and Tool Mark Examiners.  It's a professional

22   organization that firearms examiners can belong to of

23   which I am a regular member.

24   BY MS. CAPWELL:

25   Q   I'm sorry, I was going to -- I'll let you finish.

1  A    I'm sorry.

2         These articles are case studies and casework

3  written by other members of AFTME.  And it just means I

4  stay current in the field.  I have also taken and passed

5  over two dozen proficiency tests in the field of firearms.

6  Q    And just going back to the two-year training program

7  at the crime lab.

8         Once you finished that program, what happened?

9  What was the next step?

10  A    After the two-year training period was over I was

11  promoted to the title of forensic scientist.  At that

12  point I was able to take casework out on my own and sign

13  and authorize my own reports.

14  Q    And were you subsequently promoted to another

15  position?

16  A    Yes.

17  Q    What was that position?

18  A    I remained a Forensic Scietist I for eight years.

19  And in 2008 I was promoted to Forensic Scientist II.

20  Q    And you have been in that position since that time?

21  A    That's my current title, correct.

22  Q    And how does being a Forensic Scientist II differ

23  from being a Forensic Scientist I?

24  A    As a Forensic Scientist II I am responsible for

25  supervising some other members of the firearms unit.

519

1   Q    Approximately how many examinations of ballistics

2   evidence have you conducted in your career?

3   A    I would say thousands.

4   Q    Have you previously testified as an expert in the

5   area of firearms and ballistics examinations?

6   A    Yes, I have.

7   Q    And you testified in both Federal and State Court?

8   A    Yes, I have.

9   Q    Approximately how many times have you previously

10  testified as an expert in the area of firearms and

11  ballistics examination?

12  A    Approximately 50 times.

13  Q    How many of those were in Federal Court?

14  A    Twice.

15  Q    Has any court ever declined to qualify you as an

16  expert in the area of firearms and ballistics examination?

17  A    No.

18       MS. CAPWELL:  Your honor, at this point pursuant

19  to Federal Rules of Evidence 702, the government moves for

20  the qualification of Mr. Sineo as an expert in the field

21  of firearms and ballistics examination.

22       THE COURT:  Any objection?

23       MS. MACEDONIO:  No, judge, thank you.

24       MS. RANTALA:  No objection, your Honor.

25       MS. CAPWELL:  Your Honor, actually this might be

520

1  a good time to take a break because there is one other

2  issue that the government needed to bring to your

3  attention.  And we can clean up --

4         THE COURT:  You want to take a lunch break?

5         MS. CAPWELL:  No, no, just take five minutes to

6  clean this up and to address one matter.

7         THE COURT:  Let me just explain to you before we

8  take a break.

9         There is a request to allow this witness to

10  testify as an expert witness.  Let me just explain to you

11  what that means.  I'll give you more detailed instructions

12  on that at the end of the case.

13         But when someone is allowed to testify as an

14  expert under the Federal Rules of Evidence, it simply

15  means that he or she can offer their opinion in the area

16  of expertise that they have.  Other witnesses, factual

17  witnesses can't offer opinions, they just offer facts.

18  Expert witnesses can offer opinions in the areas of their

19  expertise.  That's the difference.

20         However, under the law you evaluate expert

21  testimony the same way you do every other witness'

22  testimony.  There is no difference how the jury evaluates

23  their creditability and what weight, if any, to give to

24  their testimony.

25         Okay.  So I'm going to take a five-minute break.

1    (A recess was taken.)

2    (After recess.)

3    THE COURT:  Ms. Capwell, you have an issue?

4    MS. CAPWELL:  Yes, your Honor.  At the very end

5  of this witness' testimony --

6    THE COURT:  Hold on, hold on.  Just let me make

7  sure everyone gets set.

8    Okay.  Go ahead.

9    MS. CAPWELL:  Thank you, your Honor.

10    At the very end of this witness' testimony I'm

11  going to ask him a few questions about the Argueta/Torres

12  crime scene.  It will be very limited, perhaps ten

13  questions.  And so I just think your Honor should also

14  give this witness the admonition.

15    THE COURT:  Okay.  Let me explain to you,

16  Mr. Sineo.  I have made a ruling in connection with those

17  two murders that the jury should not know the age of

18  victim Torres in any way.  They're not to know that at

19  all.  They're not to know age, not to know that he was a

20  child.

21    So in referencing anything related to that scene

22  or any -- anything related to those murders, you're not to

23  make reference to those facts.  You can refer to them by

24  the name, or as the individual, the deceased, or whatever,

25  but not anything related to the child.

522

1          THE WITNESS:  Male victim?

2          THE COURT:  Male victim is fine.

3          MS. CAPWELL:  Thank you, your Honor.

4          THE COURT:  Okay.  Bring in the jury.

5          (The jury entered the courtroom at 12:19 p.m.)

6   BY MS. CAPWELL:

7   Q    Mr. Sineo, drawing your attention to the night of

8   February 17th, 2010.  Were you working that night?

9   A    Yes, I was.

10  Q    And did you receive a duty call that night?

11  A    Yes.

12  Q    And pursuant to that call what did you do?

13  A    I was asked to respond to the Suffolk County crime

14  laboratory, collect our equipment and respond with two

15  other members of the crime scene response unit to

16  Timberline Drive in Brentwood.

17  Q    And approximately what time did you arrive at

18  Timberline Drive in Brentwood?

19  A    It was just about 11 o'clock pm.

20  Q    And was law enforcement already present on the scene?

21  A    Yes, they were.

22  Q    What happened when you and your co-workers arrived at

23  the crime scene?

24  A    When we arrived we logged in with the police officer

25  who was keeping the log of who shows up at the crime

1   scenes.  And after that a walkthrough of the crime scene

2   was conducted.

3   Q    And did you go on the walkthrough?

4   A    No, I did not.

5   Q    And did another member of the laboratory go on the

6   walkthrough?

7   A    Yes.

8   Q    And after the walkthrough was finished what happened

9   at that point?

10  A    At that point the identification unit from the

11  Suffolk County Police Department began taking an overall

12  video of the crime scene.

13  Q    And were you there while that was happening?

14  A    For a portion of it.  Then I was asked to respond to

15  Good Samaritan Hospital to collect some evidence.

16  Q    And what evidence were you asked to collect at the

17  Good Samaritan Hospital?

18  A    I learned that there was a victim of a shooting who

19  had survived the shooting and I was asked to swab that

20  person's hands for possible trace evidence or DNA.

21  Q    And while you were at the hospital -- withdrawn.

22       Did you later learn that victim's name was

23  Aaron Galan?

24  A    Yes, that's correct.

25  Q    And while you were at Good Samaritan Hospital that

524

1   night, were photographs taken at the hospital of

2   Mr. Galan?

3   A    Yes, they were.

4   Q    Now, what happened after you were done at the

5   hospital?

6   A    After the photographs were taken and I swabbed

7   Mr. Galan's hands I returned back to Timberline Drive in

8   Brentwood to rejoin the members of my team to process the

9   scene.

10  Q    And what did you do upon returning to the scene of

11  the crime?

12  A    When I returned I notified the other members that I

13  was there.  And at that point the identification unit had

14  just about wrapped up taking the overall photographs and

15  completed their video.

16        At that point I entered the scene with the other

17  members of my team and we began to lay placards down on

18  individual evidence items that we were going to collect.

19  Q    And after you laid down all of the placards for the

20  evidence items, what did you do after that?

21  A    At that point the collection process began.  And each

22  individual item was then photographed again by the

23  identification section and then I collected the evidence

24  items.

25  Q    Let me show you a photograph that is already in

1    evidence, it's Government Exhibit 223.  Do you see that in

2    front of you, sir?

3    A    Yes.

4    Q    And can you please just explain to the members of the

5    jury what is viewed in the photograph?

6    A    This is a photograph of Timberline Drive in

7    Brentwood.  The yellow placards are crime laboratory

8    numbers and letters.  The numbers on this -- number 6 in

9    the front is the pool of blood.  And the letters going

10   away from that are a trail of blood that is indicated by

11   the letters.

12   Q    Okay, and that goes from A and then up through the

13   letters going up, that's north on Timberline?

14   A    That would be north.  That's correct.

15   Q    Now, let me show you what has been marked in evidence

16   as Government Exhibit 231.

17             Do you recognize what you see in this

18   photograph?

19   A    Yes, I do.

20   Q    And can you tell us what this is?

21   A    This is another evidence item that was collected to

22   the east of Timberline Drive in a parking lot south of the

23   beauty supply store.

24   Q    And is there a placard in this picture?

25   A    Yes, there is.

1  Q    And where in the picture is the placard?

2  A    The placard is located to the left in front of that

3  parked vehicle in that parking lot.

4  Q    And indicating pretty much the center of the

5  photograph?

6  A    Yes.

7  Q    And, sir, what does that placard show, what does it

8  designate?

9  A    It designates an expended bullet that I found in that

10  parking lot.

11  Q    And did you find this piece of evidence?

12  A    Yes, I did.

13  Q    And also can you see in the -- can you describe the

14  background of the scene there, what was there?

15  A    There is some crime scene taped placed across which

16  is parallel to Second Avenue in Brentwood.

17  Q    And was that crime scene tape there when you arrived

18  at the scene?

19  A    Yes, it was.

20  Q    And aside from law enforcement personnel and lab

21  personnel, was anybody else permitted at the scene that

22  night?

23  A    No.

24  Q    And how was the scene secured?

25  A    The scene is secured and designated by the crime

527

1  scene tape, as well as constant presence of uniformed

2  Suffolk County police officers.

3  Q    Let me now show you what is in evidence as Government

4  Exhibit 232.  And can you identify that for us?

5  A    Yes.

6  Q    What is it?

7  A    This is lab item number 17.  It's a close-up photo of

8  the previous shot that you saw and it's an expended

9  bullet.

10  Q    Now, after you saw this item in addition to all the

11  other items can you describe when you started speaking

12  about the collection of the evidence, how does that work?

13  A    I'm sorry, can you rephrase that?

14  Q    Sure.  After you found item number 17, the expended

15  bullet, what happened after that?

16  A    After the items had been marked by placards the

17  collection process began.  And that involved the

18  identification unit of the police department photographing

19  each individual item and then I collected the items.

20  Q    Very well.  And did you collect the items for the

21  crime laboratory?

22  A    Yes, they were collected for the crime laboratory.

23  Q    And speaking specifically about item number 17 here,

24  the expended bullet that was found adjacent to the parking

25  lot, what steps did you take to collect that piece of

1    evidence?

2    A    After it was photographed I used a slide box to

3    collect it.  And what a slide box is, it's essentially two

4    white cardboard boxes that fit into one another.  So I

5    opened it up, placed it face down over the expended bullet

6    and closed the box as to collect that evidence item

7    without touching it.

8    Q    And what happened to all of the evidence that was

9    collected by the laboratory that night of the 17th and

10   also into the early morning hours of February 18th?

11   A    Once all the evidence was collected it was secured

12   and locked up in our crime scene response truck and then

13   it was driven back by myself and the other members of the

14   team to the laboratory.  It was logged into our computer

15   system and then the evidence was secured in our crime lab

16   evidence vault.

17   Q    I want you to take a look if you would at what has

18   been marked as Government Exhibit 283.  It should be at

19   the desk there on your left.  If you could just take a

20   look at that, it's the piece of paper.

21              And I ask you if you recognize that?

22   A    Yes, I recognize this.

23   Q    And what is that Exhibit Number 283?

24   A    This is a digital reproduction of a crime scene

25   diagram that reflects the evidence items and the streets

1   in and around Timberline Drive in Brentwood.

2   Q    And did you assist at the scene in taking

3   measurements of where the items were?

4   A    Yes, I did.

5   Q    And can you -- let me ask you this, does that diagram

6   fairly and accurately depict where items of evidence were

7   found on the night of February 17, 2010 into the early

8   mornings hours of February 18th?

9   A    Yes, it does.

10              MS. CAPWELL:  Your Honor, at this time the

11   government would move to admit Government Exhibit 283 and

12   publish it to the jury.

13              MS. MACEDONIO:  No objection, your Honor.

14              MS. RANTALA:  No objection.

15              THE COURT:  Government Exhibit 283 is admitted

16   and you can publish it to the jury.

17              MS. CAPWELL:  Thank you.

18              (Government Exhibit 283 in evidence.)

19   BY MS. CAPWELL:

20   Q    All right.  Sir, if you can just explain some of this

21   diagram to us.  Can you point out where Timberline Drive

22   is?  And there is a laser pointer right in front of you

23   which you're welcome to use, if that assists you.

24   A    Pardon my back.

25              Timberline Drive is the vertical street right

530

1    here running north and south.

2    Q    Let the record reflect right in the center of the

3    photograph running north and south vertical?

4    A    That's correct.

5    Q    All right.  Can you point out where Second Avenue is

6    on the diagram, show us?

7    A    Second Avenue is the horizontal street where the

8    laser pointer is pointing.

9            MS. CAPWELL:  May the record reflect the witness

10   is indicating the horizontal line in the very bottom of

11   the diagram.

12           THE COURT:  Yes.

13   BY MS. CAPWELL:

14   Q    And can you please point out where the salon store is

15   on this diagram?

16   A    Yes.

17           The beauty supply store is this box here.

18   Q    Okay.

19           MS. CAPWELL:  The record will reflect on the

20   right side of the diagram, that is the beauty supply

21   store.

22   BY MS. CAPWELL:

23   Q    Correct?

24   A    That is correct.

25   Q    And can you point out where KK Athletics is on this

531

1   diagram?

2   A    Yes.

3        KK Athletics is located in the top left portion

4   of the diagram up here.

5   Q    Thank you.

6        And if you would look right directly in the

7   middle of the diagram there are the letters RP1.  Is that

8   right.

9   A    Yes, RP1.

10  Q    Can you explain what that is, please?

11  A    RP1 stands for reference point 1.  It's a measurement

12  and a location that we measured off of the telephone pole

13  that is located here.  And it's 12 feet off that pole in

14  the middle of the street.

15       The reason that it is in the diagram is that is

16  our point of reference where we made all of our

17  measurements from to the individual evidence items.

18  Q    And can you also -- is there another telephone pole

19  that is depicted in this diagram?

20  A    Yes, there is.

21  Q    And can you point out to the members of the jury what

22  that is, please?

23  A    Yes.  The second telephone pole is located up here.

24            MS. CAPWELL:  All right.  May the record reflect

25  towards the top of the diagram just north of a vehicle

1    that is on the west side of Timberline Drive in the

2    diagram.

3              THE COURT:  Yes.

4    BY MS. CAPWELL:

5    Q    And can you point out where item, lab item number 17

6    is on the diagram?

7    A    Yes.  It's located right here, which would be the

8    bottom right side.

9    Q    That is designated number 17?

10   A    Yes, it is.

11   Q    And what is that?

12   A    That is the expended bullet.

13   Q    And also if you could just briefly explain without

14   going into much detail, the box on the left side of the

15   diagram that contains a lot of information.  What is that?

16   Explain it.

17   A    Is it this box you're talking about?

18   Q    Yes, indicating the box towards the left bottom

19   corner of the diagram.

20   A    That box has some writing in it that indicates each

21   individual laboratory item that was collected and what it

22   was.

23   Q    And does it also include ID items?

24   A    Yes.  There were some items that the laboratory did

25   not collect but the identification unit collected.  And

1  they are also included in that.

2  Q    Just so that is clear, each item number has a number,

3  and that number is designated where it was found on that

4  diagram, correct?

5  A    That's correct.

6  Q    And can you explain whether this diagram is to scale

7  or how it was prepared in that regard?

8  A    The diagram measurements were taken to the individual

9  evidence items.  There is a scale for distance.  And some

10  of the items had been placed by photograph, such as the

11  beauty supply store and KK Athletics.  But essentially

12  it's a fair and accurate depiction of the evidence items

13  that were collected and the way the scene appeared on that

14  night.

15  Q    Thank you, sir.

16        If you would now turn your attention to one of

17  the plastic packages that are on the witness stand and

18  specifically the item 265.

19        Do you see the items that are labeled with

20  stickers and the number 265?

21  A    Yes, I do.

22  Q    And turning your attention specifically to 265B.

23  What is contained -- do you recognize the items contained

24  in 265B?

25  A    Yes, I do.

534

1  Q    And what are they?

2  A    The item contained within 265B is an expended bullet

3  that was collected at the crime scene which was item

4  number 17.  And it also contains the original slide box

5  that I used to collect that evidence item.

6  Q    And how do you recognize those items as such?

7  A    I recognize the items as such by my handwriting.

8  It's on the slide box.  The specific and unique central

9  complaint number that is assigned in this case is on that

10  box.  As well as on the expended bullet I see my initials

11  and the laboratory number that was assigned to this case.

12        MR. DURHAM:  The government moves to admit into

13  evidence Government Exhibit 265B.

14        MS. MACEDONIO:  No objection, judge.

15        MR. RANTALA:  No objection, your Honor.

16        THE COURT:  Government Exhibit 265B is admitted.

17        (Government Exhibit 265B in evidence.)

18  BY MS. CAPWELL:

19  Q    Did you perform a ballistic examination of the

20  expended bullet labeled item number 17 by the laboratory

21  and contained within Government Exhibit 265B?

22  A    Yes, I did.

23  Q    On what date?

24  A    That was on February 19, 2010.

25  Q    And can you just describe your examination to the

1    jury, when you examined the expended bullet?

2    A    Once I took the expended bullet into my custody and

3    logged it in on the computer, I brought it back to my

4    workstation and began taking notes as to the packaging.

5    And I started working on trying to classify what kind of

6    expended bullet this was.

7              What I mean by that is, I took measurements of

8    the bullet to try to determine its caliber or what type of

9    weapon may have fired this bullet.  And I also weighed it

10   to see how much it weighed.  And I also looked at the

11   physical characteristics and class characteristics of this

12   bullet to try to determine -- assist in my determination

13   as to what kind of weapon may have fired this bullet.

14   Q    What conclusions did you reach regarding that

15   expended bullet?

16   A    My examination revealed that it was a .38/.357 class

17   caliber.  And it was -- had been fired from a weapon that

18   its barrel had been rifled with five lands and grooves

19   with a right hand twist of a conventional style rifle.

20   Q    Okay.  Let's break that down a bit, it's a mouthful.

21             You first mentioned that you determined it was a

22   .38 or .357 class caliber.  Is that correct?

23   A    That's correct.

24   Q    And can you explain what that is, what is a *class*?

25   A    A class caliber, .38/.357 class caliber, refers to

1  the type of weapon that may have fired this bullet.  And

2  the diameter of the bore of that weapon would be

3  approximately .357 inches.  And this expended bullet fit

4  that category.

5  Q    All right.  And do bullets in the .38 caliber and

6  .357, do they share the same diameter?

7  A    The base of the bullet would be the same.

8  Q    Now, you also mentioned lands and grooves.  Can you

9  explain what those are?

10  A    Yes.

11          Lands and grooves are firearms terms that

12  describe the rifling characteristics of a barrel of a

13  weapon.  And what I mean by *rifling* is that when a weapon

14  is made in the factory the manufacturer may cut a series

15  of spiral cuts into that barrel in order to -- when a

16  bullet is fired to give the bullet stability, velocity and

17  accuracy.

18          These class characteristics are determined by

19  the manufacturer of the firearm.  And it just -- they're a

20  tool they use to cut this rifling in.  This can help us to

21  determine and also to eliminate certain kinds of weapons

22  once we see that on a bullet.  The bullet will have those

23  class characteristics impressed upon it when it's fired

24  down -- and it travels down the barrel of the weapon.

25  Q    And the lands and grooves, what do those specifically

1  refer to?

2  A    The lands and grooves correspond to the cut rifling.

3  And they are a series of high areas and low areas that are

4  created inside of the barrel when the rifling process is

5  conducted by the manufacturer.

6  Q    And you mentioned that it was conventional rifling.

7  Is that right?

8  A    That's correct.

9  Q    And what do you mean by that?  Is there something

10 that's a different type of rifling?

11 A    There are essentially two types of rifling processes

12 that a manufacturer can use.  One is conventional, it's

13 probably the most common type where they use a tool to cut

14 the riflings into the barrel.

15       The second type is called polygonal.  And

16 essentially the way that process is done real simply is

17 they place the rifling tool into the barrel and then they

18 compress the barrel around the tool to create the riflings

19 inside.

20 Q    And are those two different ways to create or build

21 the barrel?

22 A    Yes, they are.

23 Q    And you also mentioned that it had a right-hand

24 twist.  Is that right?

25 A    That's correct.

1  Q    And what does that refer to?

2  A    When they cut rifling into a barrel the

3  manufacturer -- the rifling is helical.  It's going to be

4  as a twist.  So it's either right or left which are the

5  only two options, and that is a choice determined by the

6  manufacturer.

7  Q    All right.  On February 19th, 2010 in connection with

8  this case did you also examine small lead fragments that

9  were recovered during the autopsy of David Sandler?

10 A    Yes, I did.

11 Q    And I would ask you now to look at what's been marked

12 as Government Exhibit 265D.

13        Do you recognize the items listed in Government

14 Exhibit 265D?

15 A    Yes, I do.

16 Q    And what are they?

17 A    Within 265D is a paper bag.  There is also a slide

18 box.  And then there's a zip-lock bag that contained some

19 small fragments.  The paper bag was the original bag that

20 was submitted to the laboratory from the Medical

21 Examiner's Office.

22        When I opened up that bag it contained the slide

23 box that has the medical examiner's markings on it.  And

24 when I opened up that slide box it contained the small

25 metal fragments.

539

1 Q    And how do you recognize those items?

2 A    I recognize these items as I see my initials are on

3 the -- both packaging, as well as the zip-lock bag that I

4 created has the unique central complaint number on the

5 labels.  And it has my initials on it.

6         MS. CAPWELL:  The government moves to admit

7 Government Exhibit 265D.

8         MS. MACEDONIO:  No objection, judge.

9         MR. RANTALA:  No objection, your Honor.

10         THE COURT:  All right.  265D is admitted.

11         MS. CAPWELL:  Thank you.

12         (Government Exhibit 265D in evidence.)

13 BY MS. CAPWELL:

14 Q    What if any conclusion did you reach based on your

15 examination of those lead fragments?

16 A    The only conclusion I was able to draw from them was

17 that they were metal fragments and they had no ballistic

18 value to them.

19 Q    And what do you mean by *no value*.  What is the *value*?

20 A    What I mean by *no ballistic value* is that they're so

21 small that I could not detect any riflings or any

22 individual markings that may have been transferred from

23 the barrel of the weapon.

24 Q    Let me now turn your attention to what is marked as

25 265C.

1    Did you examine a third piece of ballistic

2    evidence that same day on February 19th, 2010 in

3    connection with the David Sandler murder?

4    A    Yes, I did.

5    Q    And what else did you examine?

6    A    This was an expended bullet core.

7    Q    And can you please describe to the jury what a bullet

8    core is?

9    A    Yes.

10    A bullet core is a lead portion of a bullet.

11    It's usually the interior portion of a jacketed cartridge.

12    And what I mean by *jacketed*, is that it would have copper

13    coating or possibly brass or nickel coating over it.  It's

14    the main weight or the main body of the cartridge.

15    Q    And do you recognize the items within Government

16    Exhibit 265C?

17    A    Yes, I do.

18    Q    What are they?

19    A    Within 265C is a slide box.  It has my markings on it

20    and the central complaint number assigned to this case.

21    And there is also a zip-lock bag that contains the

22    expended bullet core that has my markings on it.

23    MS. CAPWELL:  The government moves to admit

24    Government Exhibit 265C.

25    MS. MACEDONIO:  No objection, your Honor.

1    MS. RANTALA:  No objection.

2    THE COURT:  265C is admitted.

3    (Government Exhibit 265C in evidence.)

4  BY MS. CAPWELL:

5  Q    And where does the expended bullet core come from?

6  A    The expended bullet core was recovered from articles

7  of clothing that were given to us at the crime scene from

8  police officer Ziegler (ph) that night.

9  Q    And specifically as to the bullet core that is within

10  Government Exhibit 265C, whose clothing did they come

11  from?

12  A    Mr. Galan.

13  Q    What was your conclusion regarding that piece of

14  ballistic evidence?

15  A    With the bullet core I'm not able to determine the

16  caliber, and it has no value to it.  And the reason it has

17  no value is that there is a portion of it missing that

18  would be the jacket.  That is what would be coming into

19  contact with the interior portion of the barrel when that

20  bullet is fired.  And that is missing.

21  Q    Now, subsequent to your ballistic examination on

22  February 19th, 2010, were you asked to examine additional

23  ballistic in connection with the David Sandler homicide

24  investigation?

25  A    Yes, I was.

1  Q    And what items were you requested to analyze?

2  A    There was an expended bullet that was submitted to

3  the laboratory, as well as some fragments of bullet

4  submitted to the laboratory after surgery.

5  Q    And when you mention surgery, whose surgery?

6  A    Mr. Galan.

7  Q    I'll ask you now to take a look at Government

8  Exhibit 266A and B in that separate plastic package.  And

9  looking specifically at Government Exhibit 266A.

10         Do you recognize what is inside there?

11  A    Yes, I do.

12  Q    And what is that?

13  A    Within 266A is a plastic bag.  There is a plastic

14  container.  It has a hospital label on it, and then that

15  is a zip-lock bag that has some other fragments in it.

16  These all have my initials and a date on it.  And they

17  also have the lab number associated with it.

18         MS. MACEDONIO:  I didn't hear that last part,

19  what number is associated with it?

20         THE WITNESS:  The lab number.

21  BY MS. CAPWELL:

22  Q    Referring to the Suffolk County crime laboratory?

23  A    Yes.

24         MS. CAPWELL:  The government moves to admit

25  Government Exhibit 266A into evidence.

543

1    MS. RANTALA:  May we approach, your Honor?

2    THE COURT:  Yes.

3    (The following occurred at sidebar.)

4    MS. RANTALA:  I don't think we have a connection

5    of chain of custody all the way from when it was found and

6    to this officer.  So I would object on the chain of

7    custody basis.

8    THE COURT:  It isn't necessarily all the way,

9    but I think he certainly -- he can't establish that it was

10   taken from the body.  I don't know if you have another

11   witness that is going to do that.  Unless you're going to

12   call whoever did that at the hospital.

13   MS. CAPWELL:  And that would be just to get the

14   piece of evidence into evidence here.  But he could still

15   testify about it?

16   THE COURT:  Yes, he can.  He obviously examined

17   it, but I can't admit it until I have the .

18   MS. CAPWELL:  Subject to connection --

19   THE COURT:  Right.

20   You have no objection to him testifying what

21   analysis he did on it.

22   MR. RANTALA:  Well, again, subject to the

23   connection, if there is a proper chain of custody that it

24   came from the body.

25   THE COURT:  If they don't get that I'll strike

544

1  the testimony.

2         MS. RANTALA:  Very well.

3         MS. CAPWELL:  It is not for the value, it is

4  just to make it complete.

5         MS. RANTALA:  All right.  I'm protecting the

6  record.

7         (The following occurred in open court.)

8         MS. CAPWELL:  Your Honor, the government moves

9  to admit 266A into evidence subject to connection.

10        THE COURT:  Well, I'm not going to admit it into

11 evidence at this point.  I'm going to allow the witness to

12 testify regarding whatever examination he did on it,

13 because what *subject to connection* means, another witness,

14 that the chain of custody has to be testified to first.

15        So I'm not going to admit it, but I'll allow him

16 to testify regarding it.

17        MS. CAPWELL:  Thank you.

18 BY MS. CAPWELL:

19 Q    And, sir, what, if any, conclusions did you reach

20 regarding the exhibit within 266A or the evidence within

21 266A?

22 A    I concluded that the metal fragments had no value.

23 Q    Thank you.

24        Now, if you would take a look at Government

25 Exhibit 266B which is already in evidence.

545

1    Do you recognize it?

2  A    Yes, I do.

3  Q    And what items are within 266B?

4  A    Within 266B is a paper bag.  It has my markings on

5  it, the central complaint number assigned to this case, a

6  slide box that has my markings on it, and the central

7  complaint number on this case.  It also contains an

8  expended bullet that has my markings on it.

9        MS. RANTALA:  Objection.  May we approach?

10        THE COURT:  Yes.

11        (The following occurred at sidebar.)

12        MS. RANTALA:  I don't know that we have a chain

13  of custody between, I think this was the one that was --

14        MS. CAPWELL:  It is already in evidence.

15        MS. RANTALA:  There's a chain of custody between

16  the person who -- this is one on the roadside, correct?

17        MS. CAPWELL:  Yes.

18        MS. RANTALA:  Collected by officer or the CSI

19  Jodi Rios.  I don't know how it got from Jodi Rios to the

20  examiner.

21        THE COURT:  Okay, you can question him regarding

22  that.  But because it is in evidence already he can

23  testify regarding whatever examination that he did.  And

24  break in the chain can go to the weight.  But it is in

25  already.

1       MS. RANTALA:  Just complete the record.

2       MS. CAPWELL:  That officer will testify as to

3    the individual from the unit who transported this bullet

4    to the crime lab.  And she put his name on the record.

5    And I believe that he is retired.

6       THE COURT:  Okay.

7       (The following occurred in open court.)

8    BY MS. CAPWELL:

9    Q    Sir, as to 266B which we were just discussing, I

10   believe you mentioned it was a slide box included in the

11   Government Exhibit 266B?

12   A    That's correct.

13   Q    In what condition was it when you received the slide

14   box?

15   A    It was originally inside of the paper bag that I

16   previously mentioned.

17   Q    And was the paper bag sealed?

18   A    Yes, it was sealed with yellow evidence tape.

19   Q    And then you opened that brown evidence bag?

20   A    That's correct.

21   Q    And the slide box was within it?

22   A    That's correct.

23   Q    And was the slide box sealed in any way?

24   A    May I refer to my notes?

25       MS. CAPWELL:  Your Honor, is that all right?

1    THE COURT:  Yes.  You need to refresh your

2  recollection?

3    THE WITNESS:  Yes, sir.

4    THE COURT:  Go ahead.

5    MS. CAPWELL:  For the record, the witness has

6  two 3500 exhibits in front of him.  And I believe he's

7  going to look at 3500 RS19.

8  BY MS. CAPWELL:

9  Q    Is that correct, are you looking at 3500 RS19?

10  A    Yes, that's correct.  The slide box was sealed with

11  Scotch tape.

12  Q    Now, did you conduct a ballistic -- I'm sorry, once

13  the slide box was out of the paper bag, did you mention

14  the other evidence inside the 266B?

15  A    Yes.  There was also an expended bullet.

16  Q    And did you conduct a ballistics examination of that

17  expended bullet?

18  A    Yes, I did.

19  Q    And what were your conclusions based on your

20  examination?

21  A    I determined that it was .38/.357 class caliber.  It

22  was rifled, had been fired from a weapon whose barrel had

23  been rifled with five lands and grooves with a right-hand

24  twist of a conventional style rifling.

25  Q    Now, did you have an opportunity to compare the

1    expended bullet within Government Exhibit 266B to lab item

2    number 17, the expended bullet that you recovered from the

3    scene?

4    A    Yes, I did.

5    Q    And were you able to make any conclusions?

6    A    I used my comparison microscope to compare what is

7    lab item number 6 to lab item number 17.  And my results

8    were inconclusive at this time.  I was unable to ascertain

9    if they had both or had not been fired from the same

10   weapon.

11   Q    And why were your conclusions inconclusive?

12   A    Each of those bullets had areas that had damage to

13   them from hitting objects.

14             MS. MACEDONIO:  Objection.

15             THE COURT:  Can you tell how the damage, what

16   type of damage it is, what it's from?

17             THE WITNESS:  It had to have hit an object prior

18   to us collecting it.

19             THE COURT:  The objection is overruled.

20   A    So with the damage to those bullets the areas where I

21   would look for individual markings that would identify

22   that back to a weapon, they -- the two of them were

23   damaged in opposite areas, so I wasn't able to compare the

24   two of them.

25   BY MS. CAPWELL:

1  Q    Now, regardless of having been unable to ascertain

2  whether the two bullets were fired from the same weapon,

3  what similarities did the two bullets have based on your

4  examination?

5  A    Both bullets were of the same class caliber.  They

6  both had impressions of the same rifling characteristics.

7  And the lands and grooves on each of those bullets when I

8  measured them were approximately the same width.

9  Q    And how about the material that the both expended

10  bullets were made out of, was that similar?

11  A    Both were lead bullets.

12  Q    And did they both have the right-hand twist?

13  A    Yes, they both were.

14  Q    And what, if any, significance did it have to you as

15  an expert in the area of ballistics and firearms that when

16  you measured the lands and grooves that they had the same

17  width on both expended bullets?

18  A    That significance would indicate that they -- it's

19  possible that they were fired from a similar model and

20  make of weapon.

21  Q    Now I ask you to turn to --

22        THE COURT:  Before you go to another exhibit, I

23  want to break for lunch now.  Okay?

24        We'll take a lunch break.  We'll meet again at

25  two o'clock.  Okay?  Two o'clock.

550

1          Don't discuss the case.

2          (The jury left the courtroom at 12:56 p.m.)

3          THE COURT:  Okay.  Everyone be seated.  How much

4    more do you have of this witness?

5          MS. CAPWELL:  Your Honor, I think 15, 20 minutes

6    at the most.

7          THE COURT:  Okay.  Then the next witness?

8          MR. DURHAM:  Janet Talavera, your Honor.  The

9    FBI witness, two in this case .

10         THE COURT:  Okay.  Have a good lunch.

11         MS. CAPWELL:  Thank you.

12         (A luncheon recess was taken at 12:58 p.m.)

13         (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

551

1        A F T E R N O O N   S E S S I O N

2                          2 pm

3

4              (The following ensued in the presence of the

5    jury.)

6              THE COURT:  Please be seated.

7

8    **ROY SINEO**

9          called by the Government, having been previously

10         duly sworn/affirmed, continued testifying as

11         follows:

12

13   DIRECT EXAMINATION (Continued)

14   BY MS. CAPWELL:

15   Q.   Mr. Sineo, if you could, please look at what has been

16   marked as Government Exhibit 265A.

17              Do you recognize the items within that pouch?

18   A.   Yes, I do.

19   Q.   What are they?  Or what is it?

20   A.   265A is an envelope that I created at the laboratory.

21   It has my markings, the unique central complaint number

22   assigned to this case, and it obviously contained the

23   expended bullets that I had previously spoken about.

24              This envelope contains that evidence and it is

25   used to be secured in a secure area in our laboratory in

552

1    the firearms what we call open case file.  And this is an

2    area where I keep evidence that is not linked to a

3    specific weapon so that they can be actively searched

4    against new evidence that comes into the laboratory.

5    Q.    Is there any ballistics evidence within that envelope

6    at this time?

7    A.    No, there is not.

8    Q.    Can you explain to us where it is now; what you did.

9    A.    I had removed the expended bullets and placed them

10   into the other exhibits here that are marked 265B, 265C,

11   and 265D.

12          They were taken out of that envelope so that

13   they could be seen for the purposes of this trial.

14   Q.    Did you also place a couple of the items in

15   Exhibit 266, 266B?

16   A.    Yes.  266B and also 266A were also originally

17   contained within that envelope.

18   Q.    Thank you.

19          MS. CAPWELL:  Your Honor, at this time we move

20   to admit Government Exhibit 265A.

21          MS. MACEDONIO:  No objection, your Honor.

22          MS. RANTALA:  No objection.

23          THE COURT:  265A is admitted.

24          (Government Exhibit 265A in evidence.)

25          MS. CAPWELL:  Thank you, your Honor.  And may I

553

1  also briefly publish to the jury, using the envelope, two

2  expended bullets?

3          THE COURT:  Yes.

4  BY MS. CAPWELL:

5  Q.   I will just publish 265B on the overhead projector.

6          Mr. Sineo, again, if you would, briefly describe

7  the items just because now the jury can see what you are

8  speaking about; that is 265B, starting with this box here.

9  A.   Okay.  That box is Exhibit 265B.  And it is an

10  expended bullet with the original slide box that I

11  collected at the crime scene on Timberline.  It reflects

12  Lab Item No. 17.

13  Q.   Thank you.  What is this dark item here that I'm

14  pointing to?

15  A.   That is the expended bullet, Item 17.

16  Q.   I'm now going to place Exhibit 266B on the overhead

17  projector.

18          And again, can you just describe briefly the

19  items that are within the pouch labeled 266B.

20  A.   Exhibit 266B is the original paper bag that this

21  evidence item was submitted in.  Within that paper bag,

22  once I opened it, contained the slide box that was sealed.

23  That's next to the paper bag.

24          And once I opened that slide box, it contained

25  the evidence which is the expended bullet, Item No. 6.

554

1  Q.   Thank you.  I just want to ask you a few questions

2  about Item 6.

3        This is your signature, down here at the bottom

4  of 266A and 266B?

5  A.   Yes.

6  Q.   Thank you.  And on the paper bag within 266B, are

7  those your initials:  RS?

8  A.   That's right.

9  Q.   What does 2/24/10 refer to there?

10 A.   That refers to February 24, 2010, the date that I

11 took custody of this evidence item.

12 Q.   And on the slide box within 266B, there is a notation

13 Item No. 06.  What does that refer to?

14 A.   That is my handwriting.  And I placed it on that

15 slide box, once I had removed it from the paper bag, to

16 reflect that that packaging belonged to the expended

17 bullet, Item No. 6.

18 Q.   So Item No. 6, is that what the expended bullet was

19 labeled within the crime lab?

20 A.   That's correct.

21 Q.   And again, on the slide box, your initials:  RS?

22 A.   Correct.

23 Q.   And the date of your examination:  2/24/10?

24 A.   That's the date I took possession of that.  Yes.

25 Q.   Sir, what is a casing?

1  A.    A casing is a component of a cartridge.

2         A cartridge is the ammunition that would be

3  placed into a weapon to be fired.

4  Q.    And the casing is?

5  A.    It is one of four components of a cartridge.  The

6  casing is the main body of the cartridge.

7         Typically, a cartridge consists of four

8  components.  The first one would be the projectile, or

9  bullet, that is seated at the front end of a cartridge,

10 and that is what would come down the barrel once the

11 weapon is fired.

12        The main body is the casing that holds the

13 bullet at one end.

14        And the third component is located inside that

15 casing, which is gun powder, or the propellant.

16        And the fourth component of the cartridge would

17 be a primer.  And a primer is simply a small metal disk,

18 that is on the opposite end from the bullet of the casing,

19 that contains a little bit of explosive material.

20 Q.    Were any casings found at the crime scene on February

21 17, 2010, into February 18, 2010?

22 A.    None were recovered.

23 Q.    And were any casings provided to the laboratory for

24 analysis in connection with the David Sandler murder

25 investigation?

556

1  A.    No, there were not.

2  Q.    What type of handguns eject casings when a bullet is

3  fired from them?

4  A.    Typically, that would be a pistol.

5  Q.    What types of handguns do not eject casings when a

6  bullet is fired from them?

7  A.    Typically, it would be a revolver.

8  Q.    With a revolver, what happens to a casing?

9  A.    With a revolver, the way it is designed, once the

10 weapon is loaded and then subsequently fired, the casings

11 are retained within a portion of that weapon called the

12 cylinder.  The cylinder is a round metal portion of that

13 weapon that has holes cut into them that would accept an

14 individual cartridge.

15        So those casings, once the weapon is fired, can

16 only be removed if you physically remove them with your

17 hands.

18 Q.    Based upon your examination of the expended bullet

19 that you found at the scene on February 17 and into

20 February 18, 2010, which was labeled Item No 17 by the

21 laboratory and is within Government Exhibit 265B, what is

22 your expert opinion as to the likelihood that a revolver

23 was used to fire that bullet?

24 A.    That type of bullet is typically a revolver-type

25 round.

557

1    Q.    And the same question for Lab Item No. 6, which is

2    within Government Exhibit 266B, which was recovered and

3    sent into the lab subsequently.

4              What is your expert opinion as to the likelihood

5    that a revolver was used to fire that bullet?

6    A.    It was highly likely that it was a revolver used.

7    Q.    Sir, now I want to draw your attention to a different

8    date:  to February 5 of 2010.

9              Did you respond to a crime scene on that date?

10   A.    Yes, I did.

11   Q.    Where was that crime scene?

12   A.    That crime scene was in a wooded area near Windsor

13   Place in Central Islip.

14   Q.    At approximately what time did you arrive there?

15   A.    Approximately 9 am.

16   Q.    Did you assist in the recovery of any ballistic

17   evidence at that scene?

18   A.    Yes, I did.

19   Q.    What ballistic evidence was recovered at that scene?

20   A.    At that location the laboratory recovered three

21   expended shell casings, one expended bullet, and one

22   expended shot shell.

23   Q.    And as to that, you called it a shot shell?

24   A.    Yes.

25   Q.    What does that mean?

558

1  A.    A shot shell, expended shot shell, is a, was

2  originally a component of a shotgun shell cartridge that

3  would be placed into a shotgun to be fired.

4  Q.    And what, if any, determination did you make at the

5  scene about that expended shotgun shell?

6  A.    That expended shell was collected and retained by the

7  laboratory, but it was probably not involved with the

8  incident that we were investigating due to the physical

9  condition of it.  It has a lot of rust on the gun shell.

10  Q.    Thank you.  Now, did you transport the items of

11  ballistics evidence back to the crime laboratory?

12  A.    Yes.

13  Q.    Did you do that on February 5, 2010?

14  A.    That's correct.

15  Q.    And what did you do with the bullet, the evidence

16  upon arriving back at the crime laboratory?

17  A.    Once I returned to the lab, with the assistance of my

18  other two team members the evidence was logged into our

19  computer and then the ballistic evidence was placed in the

20  firearms main vault, which is a secure area of the crime

21  laboratory.

22  Q.    Sir, I'm now going to show you what's been marked as

23  Government Exhibits 111A, 111B, and 111C.

24         Do you recognize the items within those plastic

25  pouches?

1    A.    Yes.

2    Q.    How do you recognize them?

3    A.    I recognize that there are four slide boxes and the

4    paper bag.  They have my initials on them as well as the

5    other members of the crime lab response unit that

6    responded to the scene in Central Islip.

7              It has the date, February 5, and the central

8    complaint number that is unique to this investigation, on

9    them.

10   Q.    Let me break it down only because within that one

11   plastic pouch we have three separate exhibits labeled, so

12   let's just take them in order.

13             Government Exhibit 111A, what do you see in

14   there?

15   A.    Exhibit 111A contains two laboratory envelopes that

16   were prepared by a firearms examiner who I work with,

17   Charles Hopkins.

18             There are also two Ziploc bags.  One of them

19   contains three expended shell casings, and the other

20   contains an expended bullet.

21   Q.    All right.  Then moving down to 111B, what is within

22   that exhibit?

23   A.    111B is a paper bag that has the laboratory label

24   with the case identification number on it and one of my

25   team member's initials.

560

1    This bag contained the three expended shell

2  casings and one expended bullet that were recovered at the

3  scene.  They were placed into this paper bag once we

4  returned to the laboratory.  And this bag was then placed

5  in the firearms vault.

6  Q.   Is there a date on that paper bag within Government

7  Exhibit 111B?

8  A.   Yes.

9  Q.   What is the date on the paper bag, evidence bag?

10  A.   The date on the seal, on the evidence tape where it

11  was signed and sealed, is February 6, 2010.

12  Q.   Then turning to Government Exhibit 111C.  What do you

13  recognize in there?

14  A.   In 111C there are four slide boxes that my initials

15  are contained on them.  These were the original packaging,

16  the slide boxes that we used to collect the physical

17  evidence at the crime scene.

18      MS. CAPWELL:  Your Honor, the government moves

19  to admit Government Exhibits 111B and 111C.

20      MS. MACEDONIO:  May I see them for a moment?

21      THE COURT:  Sure.

22      MS. MACEDONIO:  May I have a brief voir dire?

23      THE COURT:  Sure.

24  VOIR DIRE EXAMINATION

25  BY MS. MACEDONIO:

1    Q.   The packaging that this is in, the overall packaging,

2    this is prepared for trial litigation?

3    A.   Yes, it is.

4    Q.   Your office breaks this down so that it is one

5    package; anything that came inside this envelope is now

6    inside this clear plastic package?

7    A.   That's correct.

8              MS. MACEDONIO:  I have no objection, judge.

9              THE COURT:  Just B and C?

10             MR. DURHAM:  Yes, your Honor.

11             THE COURT:  Government Exhibits 111B and 111C

12   are admitted.

13             MS. RANTALA:  No objection, your Honor.

14             THE COURT:  I'm sorry, Miss Rantala.

15             (Government Exhibits 111B and 111C in evidence.)

16   DIRECT EXAMINATION (Continued)

17   BY MS. CAPWELL:

18   Q.   And, sir, as to the ballistic evidence that was

19   recovered on February 5, 2010, at that crime scene, did

20   you conduct any of the ballistics examinations of that

21   evidence?

22   A.   No, I did not.

23             MS. CAPWELL:  Your Honor, the government has no

24   further questions.

25             THE COURT:  Cross-examination?

562

1    MS. MACEDONIO:  I have no questions of the

2  witness.

3    MS. RANTALA:  Yes, your Honor, please.

4

5  CROSS-EXAMINATION

6  BY MS. RANTALA:

7  Q.    Good afternoon.

8  A.    Good afternoon.

9  Q.    For my own clarification, you are talking about doing

10  a comparison of two spent projectiles.  Correct?

11  A.    Yes, I did.

12  Q.    From my understanding, they are Exhibits 266B --

13  right?

14  A.    Yes, I believe it was.

15  Q.    -- and whatever exhibit number ended up being the

16  item No. 17 from the parking lot.  Correct?

17  A.    That's correct.

18  Q.    What is your understanding of where 266B came from,

19  exactly?

20        That was the other one you compared it to?

21  A.    That was submitted to the laboratory from the Suffolk

22  County Police Department.

23  Q.    So that was not an item you personally, your team,

24  collected from the Brentwood scene?

25  A.    No, we did not collect that one.

563

1   Q.   Okay.  So that is just clarification for that.

2        Now, you testified on direct that the markings

3   on these two expended projectiles were approximately the

4   same.  Correct?

5   A.   The measurements of the land and groove widths were

6   approximately the same.

7   Q.   Approximately the same, that was the term you used,

8   the lands and grooves?

9   A.   That's correct.

10  Q.   Correct?  Okay.

11       And you testified also on direct that the

12  material that both expended projectiles were made of was

13  similar.  Correct?

14  A.   That's correct.

15  Q.   The word *similar*.

16       And you also testified that the make and model

17  that equipment come from is similar.  Both those expended

18  projectile1s came from a similar make and model gun.

19            MS. CAPWELL:  Objection, your Honor.

20            THE COURT:  Overruled.

21  A.   I said it was possible that they were both fired from

22  the same weapon because of their measurements.  They were

23  in the same category.

24  BY MS. RANTALA:

25  Q.   Okay.  You did not say that it was absolutely coming

1    from the same gun.  Correct?

2    A.    Definitely not.

3    Q.    Definitely not coming from the same gun?

4    A.    No.  No, I definitely did not say that they were from

5    different guns.

6    Q.    Okay.  So they could just as easily have come from

7    two separate, totally separate guns.  Correct?

8    A.    That would be correct.

9    Q.    And you don't really know when those projectiles were

10   placed in those particular locations.  Correct?

11   A.    An absolute time?  No, I do not.

12   Q.    Okay.  So they could have come from totally separate

13   guns, you just testified.  Correct?

14   A.    It would be -- I couldn't rule that out.

15   Q.    And they could have come from totally different time

16   periods.  Correct?

17   A.    Yes.  I have no reference of time.

18   Q.    And as far as these guns being of similar make and

19   model --

20              MS. CAPWELL:  Objection, your Honor.  That is

21   mischaracterizing his testimony.

22              THE COURT:  The witness can say.  When asked a

23   question, he can say whether it is a correct

24   characterization or not.  Okay?

25              THE WITNESS:  Okay.

565

1  BY MS. RANTALA:

2  Q.   You testified on direct we have just reviewed that

3  the projectile, expended projectile, could have come from

4  a similar make and model of a gun.

5        MS. CAPWELL:  Objection.

6        THE COURT:  Let him answer it.

7        Go ahead.

8  A.   Yes, that's possible.

9  BY MS. RANTALA:

10  Q.   That's possible.  Now, you had done a -- or prepared

11  a report, correct, for the crime laboratory?

12  A.   That's correct.

13  Q.   Regarding your analysis of those two expended

14  projectiles.  Correct?

15  A.   Correct.

16  Q.   And you had work papers attached to that report?

17  A.   That's correct.

18  Q.   You also include a listing of various weapons to that

19  work paper bunch, like a two-page list of weapons?

20  A.   That is correct.

21  Q.   Are those -- and how many weapons -- do you need to

22  refresh your recollection on this or do you know, about

23  those two pages of weapons?

24  A.   I'm aware that I do have two pages of notes.  As to

25  how many weapons are listed on that, I do not know.

1    Q.    Okay.  Would it refresh your recollection if I

2    brought it to you?

3    A.    Sure.

4    Q.    Okay.  That is your report.  Correct?

5    A.    That is correct.

6    Q.    And are these in fact work papers associated with

7    that report?

8    A.    Yes.

9    Q.    Continuing on, another work paper associated with

10   that report.  If I can flip the page.  And another work

11   paper?

12   A.    Yes.

13   Q.    All right.  Are the -- are the next two pages also

14   part of the work papers of that report?

15   A.    Yes, they are.

16   Q.    And does that consist of a number of different

17   weapons?

18   A.    Yes, it does.

19   Q.    Are all of those, weapons that that projectile, those

20   two expended projectiles, could have come from?

21   A.    That would be accurate.

22   Q.    And approximately how many weapons -- if you want to

23   count, that's okay -- would be on just page 1 of that

24   particular list?

25   A.    There's about 17 different models.

1 Q.   That's just page 1 of the two-page list.  Correct?

2 A.   Yes.

3 Q.   Would there be approximately the same number of

4 weapons on the second page of that list?

5 A.   Can I look at it?

6 Q.   Please.

7        MR. TIERNEY:  Judge, the government will

8 stipulate that there are approximately 34 weapons.

9        THE COURT:  Okay.

10 A.   There is about ten different on this.

11 BY MS. RANTALA:

12 Q.   So we are talking approximately 27 different weapons

13 altogether on those two lists?

14 A.   Yes.  That's possible.

15 Q.   Would that be a fair statement?

16 A.   Yes.

17 Q.   So approximately 27 different weapons those expended

18 projectiles could have come from?

19 A.   I would not be able to rule those out without having

20 a weapon to compare against those expended bullets.

21 Q.   And each expended projectile could have come from a

22 different one of those weapons on those lists.  Correct?

23        That would also be a fair statement.  Correct?

24 A.   I would have to say yes.

25 Q.   All right.  And you mentioned you don't have a weapon

568

1    to actually compare the expended projectiles with.

2    Correct?

3    A.    None was submitted.

4    Q.    And you had testified that the examination failed to

5    reveal enough individual markings to ascertain if they had

6    or had not been fired in the same weapon.  Correct?

7    A.    That's correct.

8    Q.    And that's directly in a line from your report?

9    A.    Yes, it is.

10   Q.    So basically, there is no match, really, with any

11   certainty.

12   A.    No, I could not match those.

13   Q.    Okay.  Now, you had testified also on direct about

14   the same crime scene regarding casings or no casings.

15   Correct?

16   A.    Yes.

17   Q.    And that in your experience if there are no casings,

18   that could mean a revolver was used.  Right?

19   A.    That's one possibility.

20   Q.    So it doesn't necessarily mean that a revolver was

21   used, either.  Does it?

22   A.    The lack of finding casings:  Is that the question?

23   Q.    Yes.

24   A.    No, that doesn't necessarily mean that a revolver was

25   used.

569

1  Q.    So it could have been picked up; disappeared; any

2  number of possibilities.  Correct?

3  A.    Yes.  That's possible.

4  Q.    But when there are casings, I believe your testimony

5  was that it is a pistol?

6  A.    Typically, a pistol.

7  Q.    Typically, a pistol.  But that is not even a

8  certainty.  Correct?

9  A.    I would never say that *this is an absolute* to

10  anything.

11  Q.    All right.  So essentially it is a fair statement to

12  say there is no certainty with regard to the analysis of

13  these project -- or expended projectiles at that crime

14  scene.  Correct?

15  A.    I'm not sure I understand your question.

16  Q.    Would it be a fair statement to say that there are no

17  certainties regarding the analysis or comparison of those

18  two expended projectiles at the Brentwood crime scene?

19           MS. CAPWELL:  Objection.

20           THE COURT:  Do you understand the question?

21           THE WITNESS:  I'm not sure I do, sir.

22           THE COURT:  Can you rephrase the question.

23  BY MS. RANTALA:

24  Q.    I will break it down a little bit.

25           You compared two expended projectiles.  Right?

570

1   A.   Correct.

2   Q.   You are not certain that they came from the same

3   weapon.

4   A.   That's correct.

5   Q.   And no certainty whether they came from a revolver or

6   pistol?

7   A.   I'm pretty certain, based on my experience and the

8   type of expended components those are, that they were from

9   a revolver.

10   Q.   But they could have been from a pistol.

11   A.   I can't think of a pistol that shoots that

12   ammunition, but I just simply don't know.

13   Q.   So there is no certainty regarding that, either.

14   A.   It is highly unlikely it was a pistol.  I mean, it

15   was highly unlikely it was a pistol.

16   Q.   But would you agree that if the casings were picked

17   up by tires or something else, that that would change your

18   analysis?  Correct?

19   A.   I just can't think of a weapon, a semiautomatic

20   pistol weapon, that would take that kind of ammunition and

21   eject those kind of casings.  They are almost certainly

22   from a revolver.

23   Q.   But not 100 percent certain?

24   A.   Not 100 percent certain.

25   Q.   Okay.  Thank you.

571

1    MS. RANTALA:  May discuss with cocounsel for

2    just one moment?

3            THE COURT:  Sure.

4            (There was a pause in the proceedings.)

5            MS. RANTALA:  No further questions.  Thank you.

6            MS. CAPWELL:  I have a brief redirect, please.

7            THE COURT:  Okay.

8            MS. CAPWELL:  May the record reflect I'm just

9    waiting for defense counsel.

10            THE COURT:  Go ahead.

11            MS. CAPWELL:  Thank you, sir.

12

13   REDIRECT EXAMINATION

14   BY MS. CAPWELL:

15   Q.    Mr. Sineo, do you recall Miss Rantala asked you

16   questions about the possibility of the two expended

17   bullets coming from different weapons?

18   A.    Yes, I recall that.

19   Q.    Is it fair to say that you cannot rule out the

20   possibility that both those expended bullets were fired

21   from the same weapon?

22   A.    I cannot rule that out.

23   Q.    Turning briefly back to Lab Item No. 17 within

24   Government Exhibit 265B.

25            That is a bullet you located at the scene.

572

1   Correct?

2   A.   That's correct.

3   Q.   And that was within the crime scene.

4   A.   Yes, it was.

5   Q.   And you found that it was originally a component of a

6   .38 or .357 class caliber cartridge.  Correct?

7   A.   That's correct.

8   Q.   Are you sure of that finding?

9   A.   Yes, I am.

10  Q.   Did you also find, as to that expended bullet, that

11  it exhibited five lands and grooves?

12  A.   That's correct.

13  Q.   And are you certain as to that finding?

14  A.   I'm certain.

15  Q.   And you also found that it exhibited conventional

16  rifling with a right-hand twist.  Correct?

17  A.   That's correct.

18  Q.   Are you certain as to those findings?

19  A.   I am certain.

20  Q.   And as to Government Exhibit 66B, the expended bullet

21  within that exhibit, which is Lab Item No. 6.

22       Did you make the same finding during your

23  examination as to that expended bullet?

24  A.   Yes, I did.

25  Q.   And are you certain about those findings?

1    A.    Yes, I am certain.

2              MS. CAPWELL:  No further questions.

3              THE COURT:  Anything further?

4              MS. RANTALA:  Nothing further.

5              THE COURT:  You can step down.

6              (The witness was excused.)

7              THE COURT:  Next witness.

8              MR. DURHAM:  The government calls

9    Jannette Talavera.

10             May we approach briefly?

11             THE COURT:  Yes.

12             (Discussion at sidebar ensued as follows.)

13             MR. DURHAM:  This is the linguistics witness.

14   She prepared translations of statements made by these

15   defendants.

16             We are not going to offer the Spanish

17   statements.  We are going to show them to witness for

18   identification.  She will review those and then say she

19   used that to prepare an English translation.  I will then

20   offer that subject to connection but will not move to

21   publish at this time.

22             We're going to do that and then bring these

23   items into evidence.  We'll have her testify first so that

24   when the detectives and agents who conducted the

25   interviews testify, we will then be able to publish it

1    won't the once the foundation is laid for the underlying

2    Spanish statements.

3          I just want to raise it to avoid objections and

4    sidebars during the testimony.

5          MR. LONDON:  We are not waiving objections in

6    advance.

7          THE COURT:  No.  It is just if you have an

8    objections to the procedure, in other words.

9          MR. LONDON:  No, we don't.

10         MR. LEVINE:  Subject to connection.

11         MR. LONDON:  We don't object to the procedure,

12    your Honor.

13         MS. RANTALA:  I also understand, because you had

14    given us a couple of 3500 items discussing items found in

15    my client's residence, you are not going to touch any of

16    that.  That is my understanding.

17         MR. DURHAM:  You said 3500 material?

18         MS. RANTALA:  Yes.

19         THE COURT:  Items seized?

20         MS. RANTALA:  Yes.

21         MR. DURHAM:  There were exhibits seized but not

22    3500 material seized.

23         THE COURT:  Did she translate anything from that

24    seizure?

25         MR. DURHAM:  There was a letter and a number of

1  articles recovered during the arrest, which she is

2  translating.

3      MS. RANTALA:  Are you seeking to admit that,

4  too?

5      MR. DURHAM:  Not through her, but that is along

6  the lines of something I will show her for identification.

7  She prepared the translation.

8      THE COURT:  It sounds like a procedure to me.

9      You are not going to offer anything.  You are

10  just laying a foundation so that when the law enforcement

11  officers testify, that they will be able to utilize them

12  without having to then call the linguistics expert.

13      MR. DURHAM:  That's right.  As opposed to

14  calling each of the law enforcement officers and then

15  calling the linguistics witness again --

16      MR. LONDON:  There is one item that I think we

17  would like a ruling on now; that is, a copy of a letter

18  received are by Carlos Ortega, not written by him.  We

19  fail to see how that is relevant.

20      MS. RANTALA:  It is one of the items from his

21  residence.

22      MR. LONDON:  That was sought to be translated.

23      MR. DURHAM:  It is a letter written by another

24  MS-13 gang member in 2008.

25      THE COURT:  Why don't we do this, Mr. London.

1  If she is not going to say what the letter is, I think it

2  is okay.

3          MR. LONDON:  We will rule at a later time then?

4          THE COURT:  Yes.

5          MR. DURHAM:  Thank you.

6          (Discussion at sidebar was concluded.)

7          THE COURT:  Can we have the witness?

8

9  **JANNETTE   TALAVERA**

10          called by the government, having been first duly

11          sworn/affirmed, was examined and testified as

12          follows:

13          THE COURT:  Ms. Talavera, if you could, just

14  move a little closer to the mic.  And keep your voice up

15  so that everybody can hear you.

16          MR. DURHAM:  Your Honor, may I approach the

17  witness briefly?

18          THE COURT:  Yes.

19

20  DIRECT EXAMINATION

21  BY MR. DURHAM:

22  Q.   Good afternoon.

23  A.   Hi.

24  Q.   What do you do for a living?

25  A.   I'm a translator for the FBI.

1   Q.   How long have you been doing that?

2   A.   13-and-a-half years.

3   Q.   13-and-a-half?

4   A.   Yes.

5   Q.   And prior to joining the FBI, what did you do for a

6   living?

7   A.   I was a New York City police officer.

8   Q.   How long were you a police officer?

9   A.   For five-and-a-half years.

10  Q.   And while you were working for the New York City

11  Police Department, where were you assigned?

12  A.   New York City Transit District 30.

13  Q.   And ma'am, what languages do you speak?

14  A.   Spanish and English.

15  Q.   Can you explain to the jury how you learned to speak

16  Spanish.

17  A.   My parents spoke Spanish at home.

18  Q.   And were you born in the United States?

19  A.   Yes, I was.

20  Q.   What about your parents?  Where are they from?

21  A.   My parents are from Puerto Rico.

22  Q.   And obviously, you also learned to speak English?

23  A.   Yes, sir.

24  Q.   Is that in school?

25  A.   That was in school.  Yes.

578

1  Q.   And when you applied to the FBI, did you have to take

2  any tests to judge your Spanish ability?

3  A.   Yes, I did.

4  Q.   What types of tests?

5  A.   We took a battery of tests:  reading, writing,

6  listening, comprehension.

7  Q.   And did you pass those tests?

8  A.   Yes, I did.

9  Q.   And since, you have been working for the FBI for 13

10 years as a linguist or a translator?

11 A.   Yes.

12 Q.   Now, at some point were you asked to prepare any

13 translations in connection with this case?

14 A.   Yes, I was.

15 Q.   And specifically with respect to these two

16 defendants, what were you asked to translate?

17 A.   I translated documents, confessions --

18         MS. MACEDONIO:  Objection.

19         MR. LONDON:  Objection.

20         THE COURT:  Sustained.  The jury will disregard

21 the use of the terms.

22         Just describe what types of documents.  Don't

23 classify them.  Okay?

24 A.   Documents.  Letters.  Documents from El Salvador.

25 Newspaper articles.

1  BY MR. DURHAM:

2  Q.   And can you explain to the jury generally, when

3  you're given a document to translate, what your process

4  is.

5  A.   When I'm given a document, I submit it to my

6  supervisor and he assigns a job number.  I produce a cover

7  letter, cover sheet, and I proceed to read it.  And then

8  start translating it.

9  Q.   And in this case, the documents you were asked to

10  translate, what language were you asked to translate them

11  from?

12  A.   From Spanish into English.

13  Q.   And once you prepared a translation, what if any

14  quality control is done on that document?

15  A.   If the document is going to be required to be

16  presented in court, then we have a peer of mine review it.

17  Q.   And just generally, what is a peer review?

18  A.   It is just to make sure that there are, you know, no

19  misspellings or anything is missing.  It is accurate for

20  court.

21  Q.   Now I ask you to look in front of you, I left a

22  number of documents there, and turn first to a document

23  that has been labeled Government Exhibit 401.

24         Do you recognize that?

25  A.   Yes, I do.

580

1    Q.   What is it?

2    A.   It is a handwritten letter, document.

3    Q.   Is it a written statement?

4    A.   Yes.

5    Q.   What language is that statement?

6    A.   In Spanish.

7    Q.   And prior to coming to court today, have you seen

8    that written statement?

9    A.   Yes.

10   Q.   And what if anything did you do with that written

11   statement?

12   A.   I read it thoroughly and I translated it into

13   English.

14   Q.   And I would ask you to look at the next document,

15   which has been marked as Government Exhibit 402.

16        Do you recognize that?

17   A.   Yes, I do.

18   Q.   What is Government Exhibit 402?

19   A.   It is another handwritten letter in Spanish.

20   Q.   And who prepared that?

21   A.   Who wrote it?

22   Q.   Looking at -- are you look at 402?

23   A.   Oh.  Sorry.  Okay, yes, 402.  That is my --

24   Q.   Let's rewind.

25        Government Exhibit 402:  What is that?

581

1   A.   That is my work.

2   Q.   That is your work?

3   A.   Translation.

4   Q.   And is that a translation of Exhibit 401?

5   A.   Yes, it is.

6   Q.   And you prepared that?

7   A.   Yes.

8   Q.   And is it a fair and accurate translation of

9   Exhibit 401?

10  A.   Yes, it is.

11  Q.   And was that reviewed by a peer?

12  A.   Yes, it was.

13        MR. DURHAM:  Your Honor, at this time the

14  government would offer Exhibit 402 subject to connection.

15        MR. LONDON:  Objection.  There is no way we can

16  rule on that.

17        THE COURT:  Yes.  Rather than admit it subject

18  to connection, we will do what we did with the other

19  exhibit, hold off admitting it and do it through the next

20  witness.

21        MR. DURHAM:  May we approach, your Honor?

22        (Discussion at sidebar ensued as follows.)

23        THE COURT:  I don't know what the purpose is of

24  admitting it subject to connection.  What is the problem

25  with just waiting to admit it when the appropriate witness

1  is testifying?

2          MR. DURHAM:  There isn't any, your Honor.  I

3  just want to be clear.  There are two sets of objections

4  here.  One is that we haven't laid a proper foundation

5  through this witness.  I just want to make sure that --

6          THE COURT:  You don't have to recall her.

7          MR. DURHAM:  Exactly.

8          I understand they are objecting to the document

9  coming in right now because foundation hasn't been laid

10  for the underlying Spanish statement.  I just want to make

11  sure that is the objection.  So when I offer it subject to

12  connection, when I say subject to connection, that

13  essentially says we have laid a proper foundation.

14          THE COURT:  I have it.

15          Is there any objection to the foundation she

16  laid for her work?

17          MR. LONDON:  None.  But I don't understand why

18  it is being offered.  You can't really offer it.

19          THE COURT:  I just want to make sure.  When you

20  say objection --

21          MR. LONDON:  No, we are not objecting to her

22  procedure.  We're just saying there is no way we can --

23          THE COURT:  I got it.  But at the same time --

24          MS. RANTALA:  Yes.

25          MR. DURHAM:  We just don't want to recall her

1  because they say well, you didn't ask her this question.

2         THE COURT:  That is not what they are saying.

3         MR. DURHAM:  Okay.

4         (Discussion at sidebar was concluded.)

5  BY MR. DURHAM:

6  Q.    Please go to the next document that is in front of

7  you.  It has been marked as Government Exhibit 403.

8  A.    Yes.

9  Q.    Showing you that for identification only, do you

10 recognize it?

11 A.    Yes, I do.

12 Q.    What is that document?

13 A.    It is a handwritten letter document.

14 Q.    What language is it written in?

15 A.    In Spanish.

16 Q.    And what if anything did you do to that document?

17 A.    I read it thoroughly and then I translated it into

18 English.

19 Q.    I ask you to look at the next document, Exhibit 404.

20 A.    Yes.

21 Q.    Do you recognize that document?

22 A.    Yes, I do.

23 Q.    What is it?

24 A.    It is my translation into English.

25 Q.    It is a translation of Exhibit 403?

584

1   A.   Yes, it is.

2   Q.   And did you prepare that translation?

3   A.   Yes, I did.

4   Q.   And again, was that reviewed by --

5            MS. MACEDONIO:  Objection.

6            THE COURT:  Yes.  Sustained as to what another

7   colleague did.

8   BY MR. DURHAM:

9   Q.   Was that document subjected to peer review?

10  A.   Yes, it was.

11           MR. DURHAM:  Your Honor, similarly we would

12  offer this subject to connection.

13           MS. MACEDONIO:  Same objection, judge.

14  Objection.

15           THE COURT:  Yes.  The jury will disregard that:

16  peer review.

17           Unless another person testifies that they

18  reviewed it, then you should not consider that, okay?

19           Again, he is offering it subject to connection.

20  Sustained.

21           The objection is to the lack of connection.

22  Correct?

23           MS. MACEDONIO:  Yes, your Honor.

24           MR. LONDON:  Yes.

25           THE COURT:  Okay.

585

1          MR. DURHAM:  Thank you, your Honor.

2     BY MR. DURHAM:

3     Q.   I would ask you to look at the next document before

4     you, Government Exhibit 301 for identification only.

5          Do you recognize that document?

6     A.   Yes, I do.

7     Q.   What is it?

8     A.   It is another handwritten letter in Spanish.

9     Q.   And what if anything did you do with that document?

10    A.   I read it thoroughly and I translated it into

11    English.

12    Q.   Look at Government Exhibit 302.

13         Do you recognize that?

14    A.   Yes, I do.

15    Q.   What is that document?

16    A.   It is my translation into English of this

17    document, of 301.

18    Q.   So 302 is a translation of 301?

19    A.   Yes.

20    Q.   Is it a fair and accurate translation?

21    A.   Yes, it is.

22         MR. DURHAM:  Your Honor, we would offer

23    Exhibit 302.

24         THE COURT:  Same objection?

25         MS. MACEDONIO:  Yes, your Honor.

1    MR. LONDON:  Same objection.

2    THE COURT:  Okay.

3  BY MR. DURHAM:

4  Q.   I ask you to next look at a document which has been

5  marked as Government Exhibit 411A for identification only.

6       Do you recognize that document?

7  A.   Yes, I do.

8  Q.   What is it?

9  A.   A Spanish letter, handwritten.

10 Q.   What did you do with that document?

11 A.   I also read it thoroughly and I translated it into

12 English.

13 Q.   I would ask you to look at Exhibit 411B.

14      Do you recognize that document?

15 A.   Yes, I do.

16 Q.   What is 411B?

17 A.   It is a translation of 411A into English.

18 Q.   Who prepared that translation?

19 A.   I did.

20 Q.   Is that a fair and accurate translation?

21 A.   Yes, it is.

22      MR. DURHAM:  Your Honor, the government offers

23 Exhibit 411B at this time.

24      THE COURT:  Same objection?

25      MS. MACEDONIO:  Yes.

587

1          THE COURT:  Mr. London, same objection?

2          MR. LONDON:  Yes, judge.  Thank you.

3          THE COURT:  Okay.

4    BY MR. DURHAM:

5    Q.   Next, I would ask you to look at what has been marked

6    as Government Exhibits 250A for identification only.

7          Do you recognize that?

8    A.   Yes, I do.

9    Q.   What is that item?

10   A.   It is a handwritten document in Spanish.

11   Q.   What did you do with that document?

12   A.   I read it thoroughly and translated it into English.

13         MR. LONDON:  Excuse me.  What is that number?

14         MR. DURHAM:  250A.

15   BY MR. DURHAM:

16   Q.   Ma'am, looking in front of you, do you have other

17   document, marked 250B?

18   A.   Yes.

19   Q.   What is that?

20   A.   It is my English translation from 250A.

21   Q.   You prepared that document?

22   A.   Yes, I did.

23   Q.   Is it a fair and accurate translation?

24   A.   Yes, it is.

25         MR. DURHAM:  Your Honor, the government offers

588

1    Exhibit 250B.

2              MS. MACEDONIO:  Same objection.

3              MS. RANTALA:  Same objection.

4              THE COURT:  Okay.

5    BY MR. DURHAM:

6    Q.   And next, I'd ask you to look at what has been marked

7    as Government Exhibit 284.

8              Do you recognize that?

9    A.   Yes.

10   Q.   What is it?

11   A.   It is a handwritten document in Spanish.

12   Q.   Again, what if anything did you do with that

13   document?

14   A.   I read it thoroughly and I translated it into

15   English.

16   Q.   I would ask you to look at Government Exhibit 284A.

17             THE COURT:  What was the number of the one she

18   just referred to?

19             MR. DURHAM:  284.  It has no letter.

20             THE COURT:  Yes.

21   BY MR. DURHAM:

22   Q.   Do you recognize Government Exhibit 284A?

23   A.   Yes, I do.

24   Q.   What is it?

25   A.   My translation into English.

1    Q.    You prepared that?

2    A.    Yes, I did.

3    Q.    And is that a translation of Exhibit 284?

4    A.    Yes, it is.

5    Q.    Is it fair and accurate?

6    A.    Yes, it is.

7                MR. DURHAM:  Again, the government offers

8    Exhibit 284A.

9                THE COURT:  Same objection?

10               MS. MACEDONIO:  Yes, your Honor.

11               MS. RANTALA:  Same objection, your Honor.

12               THE COURT:  Just so the jury understands.

13               I have sustained the objection to each of these.

14               The objection is to the lack of connection of

15   the document that she translated.  The government has to

16   authenticate the document translated, and if they do that,

17   then the Spanish document will come in.  At that point

18   they can seek to introduce the English translation.

19               But the underlying Spanish documents are not in

20   evidence yet, so that is why I'm sustaining the objection.

21               MR. DURHAM:  Thank you, your Honor.

22   BY MR. DURHAM:

23   Q.    And finally, would you take a look at what has been

24   marked as Government Exhibit 240 for identification only.

25   A.    Yes.

590

1    Q.    What is that item?

2    A.    A newspaper article written in Spanish.

3    Q.    And what if anything did you do with that exhibit?

4    A.    I read it thoroughly and translated it into English.

5    Q.    And the last document before you, that has been

6    marked as Government Exhibit 240A, do you recognize that?

7    A.    Yes.

8    Q.    What is that?

9    A.    It is my translation into English.

10    Q.    Is it a fair and accurate translation?

11    A.    Yes, it is.

12            MR. DURHAM:  Your Honor, at this time the

13    government offers Government Exhibit 240A.

14            THE COURT:  Same objection?

15            MS. MACEDONIO:  Yes.

16            MS. RANTALA:  Same objection.

17            THE COURT:  Same ruling.

18            MR. DURHAM:  No further questions.

19            THE COURT:  Cross-examination?

20            MS. MACEDONIO:  Thank you, your Honor.

21            MR. LONDON:  May we just have a moment?

22            THE COURT:  Yes.

23            (There was a pause in the proceedings.)

24            MR. LONDON:  Thank you, judge.

25

591

1    CROSS-EXAMINATION

2    BY MS. MACEDONIO:

3    Q.    Good afternoon.

4    A.    Good afternoon.

5    Q.    I believe you testified on direct that you were born

6    in the United States.  Is that correct?

7    A.    Yes.

8    Q.    And that both of your parents were from Puerto Rico?

9    A.    Yes.

10   Q.    So is it fair to say that Spanish was the primary

11   language spoken in your home when you were growing up?

12   A.    In my home, yes.

13   Q.    And did you go to school in the United States?

14   A.    Yes, I did.

15   Q.    And the primary language in your schools -- correct

16   me if I'm wrong -- would have been English.

17         Is that fair to say?

18   A.    That's correct.

19   Q.    And how far did you go in school?

20   A.    I had two years of college.

21   Q.    When you were going to school through those two years

22   of college, did you ever study Spanish?

23   A.    Just basic, mandatory Spanish.

24   Q.    So you didn't study Spanish as an advanced degree or

25   anything like that?

1  A.   No.

2  Q.   And now you work as a translator for the FBI.  Fair

3  to say?

4  A.   Yes.

5  Q.   Did you have to go through any training or testing

6  for that?

7  A.   I had to go through a battery of tests to be hired by

8  the FBI.  Yes.

9  Q.   Okay.  So before the FBI hired you -- withdrawn.

10      Did the FBI hire you as a translator?

11  A.   Yes.

12  Q.   So that has been your primary position within the

13  FBI.  You were never a Special Agent or anything like

14  that.

15  A.   No.

16  Q.   Right?  You have always been a translator for the

17  FBI?

18  A.   Correct.

19  Q.   How long did you say you worked for the FBI?

20  A.   13-and-a-half years.

21  Q.   Okay.  Now, when you received these documents that

22  you just testified to, you received copies of the

23  documents.  Is that correct?

24  A.   Some were copies and some were originals.

25  Q.   Okay.  So sometimes you were getting a copy of

593

1  something.  Correct?

2  A.    Yes.

3  Q.    And on other occasions, were you actually getting an

4  ink-written document?

5  A.    Yes.

6  Q.    So with regard to the copies, you wouldn't have been

7  able to tell if something had been altered before you got

8  it.

9        Is that fair to say?

10 A.    That's fair to say.

11 Q.    And with regard to the ink copies, if something had

12 been changed, you may or may not have been able to tell if

13 something had been altered.  Right?

14 A.    Right.

15 Q.    Now, you get these documents to translate after they

16 have been generated.  Right?

17 A.    Correct.

18 Q.    In other words, you are not present when the ink

19 copies are being provided.  Right?

20 A.    No.

21 Q.    So you have absolutely no idea what the conditions

22 were when those statements were being provided.  Right?

23 A.    Correct.

24 Q.    You don't have any idea if the statements were being

25 produced, let's say, under duress?

1    A.    No.

2    Q.    Right?  You don't have any idea whether the words

3    that were put on that paper are true.  Right?

4    A.    Correct.

5    Q.    And you have absolutely no idea what the writer's

6    intent would have been in putting those words on the

7    paper.  Right?

8    A.    That's right.

9    Q.    Is that fair to say?

10   A.    Yes.

11   Q.    So you are just translating literally word for word.

12   Right?

13   A.    Oh.  I translate what is written in the document.

14   Q.    And you do that accurately, corresponding to what has

15   been written?

16   A.    What has been written.  Yes.

17   Q.    You are not trying to read in any particular meaning

18   or get an essence from it.  You are just translating what

19   is on there.  Right?

20   A.    Right.

21   Q.    And certainly, you couldn't tell us who wrote those

22   documents.  Right?

23   A.    I just identified them by -- they can identify

24   themselves in the document, but if that person was sitting

25   down writing it, I wouldn't know.

1   Q.   So sometimes it might say:  *My name is*

2   *Elizabeth Macedonio and I'm saying such and such.*  But you

3   don't really know that I wrote that, right?

4   A.   Right.

5   Q.   And even if it said:  *My name is Elizabeth Macedonio*

6   *and I state X, Y, and Z,* you don't know that that's true.

7   Right?

8   A.   Correct.

9   Q.   And you have no idea what would have prompted me to

10  put that on paper, if indeed I did so.  Right?

11  A.   Right.

12  Q.   And certainly, you couldn't authenticate anybody's

13  handwriting.  Fair to say?

14  A.   No.

15          MS. MACEDONIO:  I have no further questions,

16  Judge.

17          MR. LONDON:  No questions.

18          MR. DURHAM:  Nothing further, your Honor.

19          THE COURT:  You can step down.

20          (The witness was excused.)

21          THE COURT:  Next witness.

22          MR. TIERNEY:  The government calls Jose Pastor

23  Avila.

24          Your Honor, may we approach?

25          THE COURT:  Yes.

1            Why don't we take a break now.  If you need to

2    break, let's just take the afternoon break now.  Okay?

3            Don't discuss the case.

4            (The following ensued in the absence of the jury

5    at 3 pm.)

6            THE COURT:  What did you want to discuss,

7    Mr. Durham?

8            MR. DURHAM:  Your Honor, this witness found the

9    bodies of Vanessa Argueta and Diego Torres, so we need a

10   strong admonition from the court to delve into areas that

11   would be inconsistent with the court's rulings.

12           THE COURT:  Is he in the courtroom?

13           MR. TIERNEY:  No.  He is in the waiting area.

14           THE COURT:  Why don't you bring him in now and I

15   will give him the warning before the break.

16           MR. LONDON:  Judge, while we have this break,

17   could I bring up an issue for next week?

18           THE COURT:  Sure.

19           MR. LONDON:  Next week, on Thursday, the

20   government has told me that they don't anticipate any

21   witnesses, it is not written in stone but they don't

22   anticipate any witnesses that will be against Carlos

23   Ortega.

24           I would ask if I could be excused on Thursday to

25   take care of another matter from this courthouse.  My

1    client has said he understands and he agrees to it.  Your

2    Honor may want to make an inquiry about it.

3           THE COURT:  Yes.  That is fine with me.  Let me

4    do that.

5           Mr. Ortega, you heard Mr. London.  Next Thursday

6    he is going to be handling another matter and won't be

7    present.  Obviously, Miss Rantala will be present.

8           I just want to make sure that it is agreeable to

9    you, that he won't be here on Thursday.

10          Is that okay?

11          DEFENDANT ORTEGA:  Yes.

12          MR. LONDON:  Thank you, your Honor.

13          THE COURT:  Is this the witness?

14          Good afternoon.  I just want to -- you don't

15    have to sit down.

16          CASE AGENT:  He doesn't speak English.

17          THE COURT:  Please state your name for the

18    record.

19          THE WITNESS:  Jose Avila.

20          THE COURT:  I just wanted to make sure you

21    understand.  I think the prosecution has explained this to

22    you, but I want to make sure you understand a ruling that

23    I have made.

24          I have determined, I have decided that the jury

25    should not know anything related to Diego Torres' age.

1   They are not to know that the victim was a child at all.

2          So when you are referring to -- what did you say

3   his role was?

4          MR. TIERNEY:  Your Honor, he was the one who

5   found the bodies as he was walking to work.

6          THE COURT:  So when you are referring to him,

7   you can't refer to him as *the child, the boy*, or anything

8   like that.  You have to use another term.

9          I'm trying to think of what term to use.

10          MS. CAPWELL:  Person?

11          THE COURT:  *Person.  The male*.

12          MR. TIERNEY:  The male victim.

13          THE COURT:  *The male victim*.

14          Is everybody okay with that?

15          MS. MACEDONIO:  Fine.

16          MR. LONDON:  Yes.

17          THE COURT:  So whenever you are referring to his

18   body, you should just refer to it as *the male victim*.

19          Do you understand?

20          THE WITNESS:  Yes.

21          THE COURT:  Okay.

22          MR. TIERNEY:  And, your Honor, with regard to

23   that, my intention is to lead him around that area and

24   just touch upon it.  Lead him to that point and then get

25   out, and that will be it.

1          THE COURT:  Let's take a break.

2          (Recess taken at 3:10 pm.)

1      (After recess the following occurred.)

2      THE COURT:  Next witness?

3      MR. TIERNEY: Jose Avila, Jose Pastor Avila.

4

5  **JOSE PASTOR AVILA**

6      called as a witness, having been first duly sworn,

7      was examined and testified as follows:

8      THE CLERK:  Please state your name and spell it

9  for the record.

10      THE WITNESS:  May name is Jose Avila, J-O-S-E,

11  A-V-I-L-A.

12      THE COURT:  Be seated, Mr. Avila.  You may

13  continue.

14      MR. TIERNEY:  Thank you, your Honor.

15

16  DIRECT EXAMINATION

17  BY MR. TIERNEY:

18  Q    Sir, how old are you?

19  A    31 years old.

20  Q    Where were you born?

21  A    Honduras.

22  Q    Do you speak English, sir?

23  A    No.

24  Q    Do you have a job?

25  A    Yes.

1   Q   Where do you work?

2   A   I work at 120 Windsor Place, Central Islip.

3   Q   And what is the name of that company?

4   A   It is Freeport Paper.

5   Q   And what kind of company is Freeport Paper?

6   A   It's a pizza box company.  It's a company that makes

7   boxes for pizzas.

8   Q   And what is it that you do for that company, sir?

9   A   My work is a forklift driver.

10  Q   And how long have you been working at Freeport Paper?

11  A   Ten years.

12  Q   And back in February of 2010 were you working for

13  Freeport Paper?

14  A   Yes.

15  Q   And what were your hours of work back in February of

16  2010 at Freeport Paper?

17  A   From 6:30 to 4:30.

18  Q   That is a 6:30 in the morning to 4:30 in the

19  afternoon?

20  A   Yes.

21  Q   And how many days a week did you work?

22  A   Monday through Saturday.

23  Q   Now back in February of 2010, oftentimes how would

24  you get to work in the morning?

25  A   At that time always walking.

602

1   Q    And on your way to work is there a wooded area that

2   you would cut through to get to Freeport Paper?

3   A    Yes.

4   Q    And was there a path through this wooded area?

5   A    Yes, there is.

6   Q    And do you know where you would first enter this

7   wooded area?

8   A    There is an entrance that connects to my place of

9   work.

10   Q    And so you would go through that entrance, walk

11   through the woods, and then exit by your place of work?

12   A    Yes, that's right.

13   Q    Now I'm going to call your attention to February 5,

14   2010.

15           Did you walk to work that day?

16   A    Yes.

17   Q    Did you enter that wooded area on that day?

18   A    Yes.  I went in through there.

19   Q    Would this be sometime shortly before 6:30 in the

20   morning?

21   A    I think so.

22   Q    And on February 5, 2010, as you were walking through

23   this wooded area, did you observe anything?

24   A    Yes.

25   Q    What did you observe?

1  A    As I walked on my way to work through the path that I

2  had to go through there was a body.

3  Q    And were you able to see whether the body was a woman

4  or a man?

5  A    I was able to see that it was a woman.

6  Q    And were you able to observe the clothes that the

7  woman was wearing?

8  A    Yes.

9  Q    What do you remember the woman wearing?

10  A    She was wearing a red jacket and blue jeans.

11  Q    And when you saw her in the woods, did you see her

12  move at all?

13  A    No, no, she was not.

14  Q    After you observed this, sir, what did you do?

15  A    After I observed her, I got afraid and I ran to my

16  place of work.

17  Q    And once you got to your place of work, did you speak

18  with anyone?

19  A    Yes, I spoke with my boss.

20  Q    And after you spoke with your boss, what did you do

21  next?

22  A    We went back to that location to take another look at

23  the body again.

24  Q    And so you went back with your supervisor?

25  A    Yes.  To see what was happening.

1  Q    And when you went back into the woods, was the woman

2  still in the same location?

3  A    Yes.  She was there, yes.

4  Q    And was she still not moving?

5  A    Yes.  She was still, sir.

6  Q    And while you went back to check on the woman, did

7  there come a time when you and your supervisor observed

8  the body of a male victim?

9  A    Yes, sir.  When we got back there was not only one

10 body but two bodies.

11 Q    And after you and your supervisor observed this, did

12 you call 911?

13 A    Yes, we called.  Yes, we did.

14 Q    Who called 911?

15 A    My boss.

16 Q    And why was that?

17 A    Because he knew how to speak more English.

18 Q    And did you stay in that location and wait for the

19 police to arrive?

20 A    Until the police arrived.

21 Q    I'm going to ask that you take a look at a photograph

22 which has been marked as Government Exhibit 103.29 for

23 identification.

24       Do you recognize that, sir?

25 A    Yes.  It is the wooded area through which I get to my

1    place of work.

2    Q    And is that the entrance to that wooded area?

3    A    Yes.  It is the exit to get to my work.

4    Q    So that is the area where you walked through the

5    woods and you exit into your place of employment?

6    A    Yes, that's right.

7    Q    And does that photograph there accurately show what

8    that exit to the wooded area looked back on February of

9    2010?

10   A    Yes, that's right.

11            MR. TIERNEY:  Your Honor, I move that into

12   evidence at this time.

13            MS. MACEDONIO:  No objection, your Honor.

14            MR. LONDON:  No objection.

15            MR. TIERNEY: Actually, your Honor it's 103.29.

16            THE COURT: 103.29 in evidence.

17            (Government Exhibit 103.29 in evidence.)

18   BY MR. TIERNEY:

19   Q    Mr. Avila, is that the exit from the woods?

20   A    Yes, that's it, to get to my work.

21   Q    I'm going to now ask that you take a look at

22   Government Exhibit 104.38.

23            Do you recognize what is depicted in that

24   photograph, sir?

25   A    Yes.

606

1    Q    What is depicted in that photograph?

2    A    This is the entrance to get to the wooded area to get

3    to my work.

4    Q    And does that photograph fairly and accurately depict

5    the way the entrance to the woods looked back in February

6    of 2010?

7    A    Yes.

8              MR. TIERNEY: I would move that into evidence at

9    this time, your Honor.

10             MS. MACEDONIO:  I have no objection, your Honor.

11             MR. LONDON:  No objection.

12             THE COURT:  This is 103 A as in apple?

13             MR. TIERNEY:  I'm sorry, your Honor.  I didn't

14   enunciate.  It is 104.38.

15             THE COURT:  All right, admitted.

16             (Government Exhibit 104.38 in evidence.)

17   BY MR. TIERNEY:

18   Q    And sir, is that the entrance into the woods?

19   A    Yes, that's it.

20   Q    Next I'm going to show you what has previously been

21   marked as Government Exhibit 105.15.

22             And I'm going to ask you if you recognize what

23   is depicted in that photo?

24   A    Yes.

25   Q    What is depicted in that photograph, sir?

1  A    That is the body I found when I was on my way to

2  work.

3  Q    Does that fairly and accurately depict the way that

4  female body looked when you first saw it on February 5,

5  2010?

6  A    Yes.  That's right.

7         MR. TIERNEY: I would move Government Exhibit

8  105.15 into evidence at this time, your Honor.

9         MS. MACEDONIO:  No objection, judge.

10        MR. LONDON:  No objection.

11        THE COURT:  105.15 in evidence.

12        (Government Exhibit 105.15 in evidence.)

13 BY MR. TIERNEY:

14 Q    Now you and your boss, you stayed in that area until

15 the police arrived?

16 A    Yes.

17 Q    Prior to finding the two dead people in the woods on

18 February 5, 2010, for how long had you been walking

19 through those woods?

20 A    Always like two years back.

21 Q    So you had been, prior to February 5, 2010, you used

22 to walk that route for two years?

23 A    Yes.

24 Q    And during the course of those two years of walking

25 back and forth to work, would you ever see people in the

608

1   woods hanging out, socializing?

2   A    Yes, yes, in the summertime.

3        MR. TIERNEY: Thank you.  I have no further

4   questions, your Honor.

5        THE COURT:  Cross-examination?

6

7   CROSS-EXAMINATION

8   BY MS. MACEDONIO:

9   Q    Good afternoon, Mr. Avila.

10  A    Good afternoon.

11  Q    Can you tell us how long you have been in this

12  country?

13  A    Ten years.

14  Q    And where did you -- where were you born?

15       THE INTERPRETER:  I beg your pardon?

16       MR. LONDON:  Where was he born.

17       THE INTERPRETER:  Thank you.

18  A    Honduras.

19  BY MS. MACEDONIO:

20  Q    And during the ten years that you have been here, you

21  worked during that period of time.  Is that correct?

22       THE INTERPRETER:  Report?

23       MR. LONDON:  Work.

24       THE INTERPRETER:  Thank you.

25  A    Yes.

1    BY MS. MACEDONIO:

2    Q    And you use a Spanish interpreter.  Is that correct?

3    A    Yes.

4    Q    Since you have been in this country for ten years,

5    ave you been able to pick up on any of the English

6    language?

7    A    I understand a little bit.

8    Q    A little, okay.

9         I'm going to show you what has been marked 3500

10   JPA-1.

11        Do you recognize the signature at the end of

12   this document?

13   A    Yes.

14   Q    Is that your signature, sir?

15   A    It is my name and my boss.

16   Q    This 3500 JPA-1, this is a document that has been

17   written in English.  Is that correct?

18   A    Yes.

19   Q    But you don't read English, correct?

20   A    No, I don't.

21   Q    And was this the statement that you made to the

22   Suffolk County Police Department with regard to the

23   incidents that you just talked about?

24   A    Yes, that's right.

25   Q    And even though you don't speak or read in English,

610

1    they ask asked you to sign the document in English, right?

2    A    That's right.

3    Q    Now with regard to the Spanish language, you said you

4    came from Honduras.  Is that correct?

5    A    Yes, that's right.

6    Q    And are you aware, sir, that people who speak Spanish

7    that are from different regions, let's say from El

8    Salvador or Honduras or Puerto Rico, they have different

9    dialects?

10              MR. TIERNEY: Objection, your Honor.

11              THE COURT:  Sustained.

12   BY MS. MACEDONIO:

13   Q    Let me ask you this, sir.

14              In conversing with other people in this country

15   who speak Spanish, do you sometimes have difficulty

16   understanding some of the terms that they use even though

17   they're speaking Spanish?

18              MR. TIERNEY: Objection, your Honor.

19              THE COURT:  Sustained.

20              MS. MACEDONIO:  I have no further questions,

21   judge.

22              MR. LONDON:  No questions.

23              THE COURT:  Redirect?

24              MR. TIERNEY:  Yes, your Honor.

25

1    REDIRECT EXAMINATION

2    BY MR. TIERNEY:

3    Q    Sir, during cross-examination you were asked about

4    the statement you gave to the police.  Do you remember

5    those questions?

6    A    Yes.

7    Q    Do you remember giving that statement to the

8    detective with the Suffolk County Police Department?

9    A    Yes, I remember.

10    Q    Who was with you when you gave that statement to the

11    police?

12    A    My boss.

13    Q    And that is Marvin Yanez, correct?

14    A    That's right, right.

15    Q    And was that the same individual who called 911?

16    A    That's right.

17    Q    And he speaks English?

18    A    Perfectly, yes.

19    Q    What did Marvin Yanez do for you with regard to the

20    statement that you gave to the Suffolk County Police

21    Department?

22    A    We gave the statement to the effect that I have found

23    a body.

24    Q    But let me withdraw the question.

25         Did Marvin Yanez translate that statement for

612

1    you into Spanish?

2    A    Oh, yes.

3    Q    And I'm just going to show you what has been marked

4    as Government Exhibit 3500 PA-1.  I'm sorry, 3500 JPA-1.

5         Do you recognize that, sir?

6    A    Yes.

7    Q    What is that?

8    A    It is the information, what was read.

9    Q    Is that the statement that you gave to the police on

10   February 5th?

11   A    That's right.

12        MR. TIERNEY: I would move that into evidence,

13   your Honor, at this time.

14        MS. MACEDONIO:  Your Honor, I would object.

15        THE COURT:  Sustained.

16        MR. TIERNEY:  Nothing further, your Honor.

17

18   RECROSS-EXAMINATION

19   BY MS. MACEDONIO:

20   Q    You testified on direct that your boss translated for

21   you.  Is that fair to say?

22   A    Yes.

23   Q    Did you also testify this afternoon that your boss

24   spoke more English.  Do you remember that?

25   A    Yes.

1  Q    Your boss is primarily a Spanish speaker, correct?

2  A    That's right.

3  Q    And when your boss was translating for you, you had

4  to rely on him, not knowing if the translation was

5  correct.  Is that fair to say?

6  A    Yes.

7           MS. MACEDONIO:  Thank you.  No further

8  questions.

9           THE COURT:  Anything further?

10          MR. TIERNEY:  No your Honor, thank you.

11          THE COURT:  You can step down.

12          Next witness?

13          MR. TIERNEY: Your Honor, may we approach just

14  briefly?

15          THE COURT:  Yes.

16          (The following occurred at sidebar.).

17          MR. TIERNEY: The next witness is going to be the

18  crime scene who does the --

19          THE COURT:  Why don't we ask the jury to take a

20  break.

21          MR. TIERNEY: Okay.

22          (The following occurred in open court.)

23          THE COURT:  I apologize.  We're going to have a

24  five minute break.  So you can go back into the jury room.

25          (The jury left the courtroom.)

1            (The following occurred in open court.)

2            THE COURT:  So there is an issue and you want me

3    to give the warning?

4            MR. TIERNEY: There is actually two issues, your

5    Honor.  That, and also we are requesting the Court to

6    provide the jury with an instruction with regard to the

7    crime scene insofar as we're not showing any photos of the

8    Diego Torres pursuant to the Court's instruction.  And we

9    don't want the jury to speculate as to some impropriety on

10   the part of the government.

11           So we would just ask, we are just requesting

12   that the Court give a brief explanatory instruction;

13   something to the effect that, you know, the defendant

14   Martinez is only charged with the murder of Vanessa

15   Argueta, and not the murder of Diego Torres.  And

16   therefore I have instructed the government not to show any

17   photos, or something along that line.

18           THE COURT:  I think that makes sense.

19           MS. MACEDONIO:  I have had discussions with

20   Mr. Tierney about this.  I do not intend to ask the crime

21   scene person any questions as to why he took pictures of

22   this and why he didn't take pictures of that.

23           To the extent that the Court wants to tell the

24   jurors that the government isn't required to put into

25   evidence every photograph that was taken at the crime

1  scene, I have no objection to that.

2  THE COURT: Would you rather me phrase it that

3  way? I could be more strong about it and say something to

4  the effect that neither of the defendants are charged with

5  respect to the murder of the Diego Torres. And I have

6  instructed the government not to put any evidence on with

7  respect to Mr. Torres.

8  MS. MACEDONIO: I agree. And I think it should

9  be both defendants, not just Martinez.

10  THE COURT: Okay. Do you want to bring the

11  witness in?

12  MR. TIERNEY: Yes, your Honor.

13  THE COURT: Sir, would you state your name for

14  the record.

15  THE WITNESS: Timothy Kelly.

16  THE COURT: Mr. Kelly, I just want to note, the

17  prosecutors have discussed it with you, but I just want to

18  emphasize to you that I have ruled that the jury should

19  not know the age of Diego Torres or the fact that he was a

20  child or a boy. They are not to know that at all.

21  So during course of your testimony, if it is

22  necessary to refer to him, you should refer to him either

23  by his name, Diego Torres, or the male victim, not

24  indicating his age or that he is a child. Do you

25  understand?

1    THE WITNESS:  Yes, your Honor.

2    THE COURT:  Okay.  Bring the jury in.

3    (The jury entered the courtroom.)

4    THE COURT:  Members of the jury, just let me

5    explain something to you.  This witness and some other

6    witnesses during the course of the trial are going to be

7    testifying regarding the murder of Vanessa Argueta.

8    Neither of these defendants are charged with the murder of

9    Diego Torres.  Neither of the defendants are charged with

10   that murder.  Therefore, I have instructed the government

11   not to put on any evidence with respect to that murder

12   because it is not one of the charges in this case.  Okay?

13   .  Please state who you are calling next.

14   MR. TIERNEY: Yes, your Honor.

15   The government calls Suffolk County Police

16   Detective Timothy Kelly.

17

18   **TIMOTHY KELLY**

19   called as a witness, having been first duly sworn,

20   was examined and testified as follows:

21   THE COURT:  Please state your name and spell

22   your last name for the record.

23   THE WITNESS:  Timothy Kelly, K-E-L-L-Y.

24   THE COURT:  Okay, just move closer to the mic so

25   it picks up your voice better.

1          Okay, thank you.

2          Go ahead, Mr. Tierney.

3          MR. TIERNEY: Thank you, your Honor.

4

5   DIRECT EXAMINATION

6   BY MR. TIERNEY:

7   Q    Sir, by whom are you employed?

8   A    Suffolk County Police Department.

9   Q    And how long have you been employed by the Suffolk

10  County Police Department?

11  A    22 years.

12  Q    And where are you currently assigned?

13  A    Suffolk County Police Identification Section.

14  Q    How long have you been assigned to the identification

15  section?

16  A    Four years.

17  Q    And what are your duties and responsibilities with

18  the identification section?

19  A    Photographs, video documentation, and collection of

20  evidence at scenes.

21  Q    And prior to that, detective, where were you

22  assigned?

23  A    I was assigned briefly to the Fourth Squad as a

24  detective.  And before that, six years at the Suffolk

25  County Police crime scene section.

1  Q    So you were assigned to the Crime Scene Unit for six

2  years?

3  A    Yes.

4  Q    And what were your duties and responsibilities with

5  the Suffolk County Crime Scene?

6  A    Working at the direction of the Suffolk County Police

7  detectives; photo and collection of evidence at their

8  direction.

9  Q    What is the difference between, in the Suffolk County

10 Police Department between the crime scene section and the

11 identification section?

12 A    As a detective in the identification section I'm also

13 a latent print examiner and I handle homicide and major

14 case felonies.

15 Q    So in total how long have you been responding to

16 crime scenes for the Suffolk County Police Department?

17 A    Ten years.

18 Q    And during that ten year period, approximately how

19 many crime scenes have you responded to?

20 A    I have responded to hundreds of crime scenes for the

21 Suffolk County Police Department.

22 Q    Detective, I'm going to direct your attention to

23 February 5, 2010.  On that date did you respond to a

24 homicide?

25 A    Yes, I did.

1  Q    Where was that scene located?

2  A    At the rear of 111 Windsor Place, Central Islip.

3  Q    Is that in Central Islip?

4  A    Yes, it is.

5  Q    And what caused you to respond to that location?

6  A    We were notified of a homicide investigation, and at

7  the request of homicide to respond to that location to

8  process the scene.

9  Q    And did you respond to that location with anyone else

10 from the identification section?

11 A    Yes, I did, Detective-Sergeant Jambor and Evidence

12 Specialist Karen Oswald.

13 Q    And again, what was your role or purpose in

14 responding to the scene that day?

15 A    The role and purpose was to photograph, to video, and

16 to document any collection of evidence in coordination

17 with the Suffolk County crime lab.

18 Q    And what was going to be your function?

19 A    My function was to photo and to video, and to

20 document if there was any evidence for us as far as for

21 identification purposes.

22 Q    And would you be working in conjunction with someone

23 else from the identification section?

24 A    With Karen Oswald.  I was actually the backup for

25 Karen Oswald.  Karen Oswald was the lead identification

1    person assigned to this case.

2    Q    And did you assist her with regard to the taking of

3    the photos?

4    A    Yes I did.

5    Q    And did you observe all the taking of the photos?

6    A    Yes, sir.

7    Q    And did you take notes in connection with all of the

8    photos that were taken?

9    A    Yes, sir.

10   Q    Currently where is Karen Oswald?

11   A    Karen Oswald is assigned, she is in Afghanistan right

12   now as a latent print examiner.

13   Q    And do you recall what time you and the other

14   identification section personnel got to the crime scene?

15   A    9:25.

16   Q    Was the scene secure when you and the other personnel

17   got there?

18   A    Yes, it was.

19   Q    How was it secured?

20   A    Third Precinct patrol had patrol vehicles there and

21   there was yellow tape up in the parking lot to the

22   entrance of the scene.

23   Q    In addition to the Third Precinct officers

24   maintaining the scene, were there other detectives, and

25   police personnel on the scene?

1   A    Yes.  Homicide detectives had been at the scene.

2   Q    And upon your arrival to the scene, could you just

3   briefly describe what the scene looked like to the members

4   of the jury?

5   A    We pulled into the parking lot and they had the

6   yellow tape and the patrol vehicles securing the entrance

7   to a wooded area which was south of a building which was

8   Raymour & Flanigan.

9   Q    Just let me show you what has already been placed in

10  evidence as 101.33.

11       And I just ask you if you recognize what is

12  depicted in that photograph?

13  A    Depicted in this photo is the parking lot, the wooded

14  area and Pinewood Avenue.

15  Q    Do you have the laser pointer?

16  A    Yes, I do.

17  Q    Could you just show us -- on the lower right-hand

18  portion of the picture there is a road.  What is that

19  road?

20  A    That's Pinewood Avenue.

21  Q    And then on the left middle there is a parking lot

22  depicted.

23  A    That is the parking lot to the rear of 111 Windsor

24  Place.

25  Q    And where is the victim depicted in that photograph?

1  A    This area here.

2  Q    You're pointing to the approximately middle of the

3  wooded area between Pinewood and the parking lot at

4  Windsor Avenue?

5  A    Yes, south.

6  Q    Thank you, detective.  You can turn around.

7       Now what is the first thing that you did upon

8  your arrival to that scene?

9  A    Upon arrival I met with Detective Chase from the

10 homicide section, he is the scene detective for homicide.

11      And then we, we meet with him and in

12 coordination with him and the lab we discuss, we go

13 through the walk-through of the scene.

14 Q    And so in addition to the homicide, as well as the

15 identification section, did personnel from the Suffolk

16 County crime lab respond as well?

17 A    Yes, they did.

18 Q    And do you remember who responded from the Suffolk

19 County crime lab?

20 A    Forensic scientist Don Doller, forensic scientist Roy

21 Sineo, and foreign scientist Jim Caulkens.

22 Q    And did, yourself, and members of both the homicide

23 and Suffolk County crime lab have a discussion?

24 A    Yes, we did.

25 Q    After that conversation, what did you do?

1  A    At that time as a backup for Karen Oswald at the

2  scene, I have to go through the walk-through with the

3  homicide section and with the crime lab.

4  Q    Could you describe to the members of the jury what a

5  walk-through is?

6  A    The walk-through is; we now, we're the first ones to

7  walk through that scene.  And we're going to walk through

8  there to document, you know, look for possible evidence,

9  initial evidence that we're going to process using a video

10  survey.  And we're going to use photographs before any

11  placards, before anything is touched.

12  Q    Just using Government Exhibit 101.33, could you with

13  the laser pointer, could you show the approximate route of

14  the walk-through that you did?

15  A    We first walked through an entrance here.  There was

16  another path.  We walked down here to make sure that there

17  was, you know, we weren't sure of anything down this path.

18      We came around here.  Pinewood Avenue went

19  through south.  We came around, and then we were right

20  here in the middle of the scene and we walked out.  And it

21  took, the walk-through ten took minutes.

22      THE COURT:  So the record is clear, the witness

23  made a circle around, circular motion around the area of

24  the photograph.

25

624

1   BY MR. TIERNEY:

2   Q    So is it fair to say there were two trails in that

3   wooded area?

4   A    Yes.

5        The main path was from north to south.  This is

6   the south entrance here.  And there was a west path.

7   Q    So and for the record, indicating a path north from

8   Windsor Place to Pinewood Avenue, and a path west from

9   Deer Park Road to Windsor Avenue?

10  A    Yes.

11  Q    And you indicated that it took you approximately ten

12  minutes to do that?

13  A    Ten minutes.

14  Q    Now did you encounter two bodies in the scene?

15  A    Yes, we did.

16  Q    Approximately where were they?

17  A    They were right here south of the entrance that we

18  walked through in the gate right here.  It was

19  approximately right in this area right here.

20       MR. TIERNEY:  So for the record he is pointing

21  to approximately the center of the wooded area located in

22  the middle of Government Exhibit 101.33, your Honor.

23       THE COURT:  Yes.

24  BY MR. TIERNEY:

25  Q    Now who went on the walk through with you?  Would did

1  you do that with?

2  A    It was myself representing THE identification

3  section, from the homicide section was

4  Detective-Lieutenant Cosky (ph), Detective-Sergeant Doyle,

5  Detective Chase.  And from the crime lab it was Forensic

6  Scientist Don Doller.

7            MS. MACEDONIO:  Your Honor, the witness appears

8  to have a binder with documents that he is referring to.

9  Can we know what that is?

10           MR. TIERNEY:  I didn't notice he was looking at

11 it.

12           THE COURT:  If you have to refer to it to

13 refresh your recollection, just let the Court know, and

14 then you will say what document you're referring to, to

15 refresh your recollection with.  Okay.

16           THE WITNESS:  Okay.

17           MR. TIERNEY:  Just for the record, your Honor,

18 it's his 3500 material, the identification paperwork.

19 BY MR. TIERNEY:

20 Q    And detective, if you need to refresh your

21 recollection, if you could just ask the Court's

22 permission?

23 A    Okay.

24 Q    Now, after you did the walk-through of the scene,

25 what did you do next?

1    A    After the walk-through at the scene we came back.

2    Now it's my turn to do the video survey of the scene.  And

3    Karen Oswald and I go back and I discuss the scene with

4    her.  We discuss the video, the video survey before

5    anything.  We're the next two people coming in to do, to

6    video survey the scene.

7    Q    And what areas of the scene did you survey with the

8    video?

9    A    The same as the walk-through.  That's the idea of the

10   walk-through.  We walk through the same way on the video

11   when we are doing a video at the scene.

12   Q    You don't have to do it.

13          And how long does that take?

14   A    20 minutes.

15   Q    And after you did the video, what did you do next?

16   A    After the video we came back and, you know we, Karen

17   Oswald now has to photograph and do all of the photography

18   at the scene.

19   Q    And did you prepare the scene for photography?

20   A    Yes, we did.

21          Prior to the actual video and photography,

22   because there were patrol cars there securing the scene

23   and with the tape, we have to put everybody back in the

24   parking lot.  So this way we can't have any patrol

25   vehicles or anybody in the, you know, inside the video or

1  in the photographs.

2  Q    So once the police personnel are moved back from the

3  scene, is the scene then photographed?

4  A    Yes, it is.  We actually make the scene larger than

5  we're able to walk through.

6  Q    Do you remember what time you began photographing the

7  scene, detective?

8  A    If I can just refer to my notes one second?

9         MR. TIERNEY:  May he?

10        THE COURT:  Yes.  Just tell us what document by

11  number you're referring to, okay?

12        What document are you referring to, detective?

13        THE WITNESS:  Referring  to 3500-TK 1.

14  BY MR. TIERNEY:

15  Q    What time did you start the photography of the scene?

16  A    11:49.

17  Q    And what time did you finish?

18  A    5:30.

19  Q    That is when you left the scene?

20  A    That is when we left the scene.

21  Q    Between 11:49 and 5:30 in the evening, what did you

22  do at that scene?

23  A    During that scene we, when we did all of the

24  photography, we now walked back and let the lab know

25  because we're working in coordination with the lab.  That

1  they can come in and start placing placards on evidence

2  that they're going to process.

3  Q    And where are these placards placed?

4  A    They're placed through the scene from the back, from

5  north to south.

6  Q    And then when the placards are placed is the scenery

7  photographed?

8  A    The scene is then re-photographed.  And each evidence

9  item is also re-photographed with and without scale.

10  Q    And then after the scene is photographed both without

11  and with placards, what happens next?

12  A    The Medical Examiner, she responds, Doctor Hall.  And

13  she examines the victims.  And at that time she also

14  requested us to take additional photos as she is examining

15  the victims.

16  Q    And were any items, were any items -- I'm sorry

17  withdrawn.

18       Was the identification section, was there any

19  request for you to dust any items of evidence for prints?

20  A    Yes, there was.  There was a cell phone that we were

21  asked to dust.

22  Q    And what was the result of that, the dusting of that

23  cell phone?

24  A    The result was we had negative results, not

25  sufficient for identification purposes.

1   Q    I'm just going to ask that you take a look at some of

2   the photographs to your left, detective.

3         Would you look at what has been marked for

4   identification as Government Exhibit 103.34, 103.29,

5   104.2, and 104.4?

6   A    Okay.

7   Q    Do you recognize those four photographs?

8   A    Yes, I do.

9   Q    What do those four photographs depict.

10   A    103.34 was Raymour & Flanigan, which is north of the

11   path to the wooded area.  So the wooded area would be

12   south of this building.

13   Q    Okay, we will do those.

14         Are those photographs that you took of this

15   crime scene?

16   A    Yes, they are.

17   Q    Do they, do those four photographs fairly and

18   accurately depict those portions of the crime scene as

19   they existed on February 5, 2010?

20   A    Yes, they do.

21         MR. TIERNEY:  I would move them into evidence at

22   this time, your Honor.

23         MS. MACEDONIO:  No objection, judge.

24         MR. LONDON:  No objection, your Honor.

25         THE COURT:  Make sure the numbers are right.  I

1   have 103.3 4, 103.29, 104.2 and 104.4.

2           MR. TIERNEY:  Correct, your Honor.

3           THE COURT:  They're admitted into evidence.

4           (Government Exhibits 103.34, 103.29, 104.2, and

5   104.4?  In evidence.)

6   BY MR. TIERNEY:

7   Q    What is that a photograph of, detective.

8   A    That's the Raymour & Flanigan building, 111 Windsor

9   Place.  That's north of the wooded area.

10  Q    The wooded area is, would be in the foreground of the

11  picture?

12  A    Yes, it was.

13  Q    I'm next going to show you what has been marked in

14  evidence as 103.29.

15          Do you recognize that photograph, detective?

16  A    Yes, that's an overall of the entrance to the wooded

17  area.

18  Q    Is that essentially a photograph taken in the

19  opposite direction as the other photograph was taken?

20  A    Yes.

21  Q    So that is taken from Raymour & Flanigan pointing

22  south into the entrance of the wooded area?

23  A    Yes, sir.

24  Q    Next I'm going to show you what has been marked as

25  104.2.

1   A    That's a mid-range of the same photo.

2        What happens is, she walks a little closer, she

3   takes a mid-range.  It's an overall mid-range.

4   Q    By *she* you mean?

5   A    Karen Oswald.

6   Q    And 104.4.

7   A    And we go to a close-up after that.  That is the

8   entrance, so it's overall mid-range, and then close-up to

9   the entrance.

10  Q    And now that is a close-up of, that is the entrance

11  to get into the woods for the Raymour & Flanigan parking

12  lot?

13  A    Yes.

14  Q    I'm going to show you what has been previously marked

15  as Government Exhibit -- just take a look at Government

16  Exhibit 104.5, 104.7, 104.8, 104.10, 104.29, and 104.32.

17       Do you have those photographs?

18  A    Yes, I do.

19  Q    And are those photographs taken once inside the

20  wooded area?

21  A    Yes.

22  Q    And do those photographs fairly and accurately depict

23  the way that wooded area appeared on February 5, 2010?

24  A    Yes, they do.

25       MR. TIERNEY:  Your Honor, I move those

1    photographs into evidence at this time.

2              MS. MACEDONIO:  No objection, your Honor.

3              MR. LONDON:  No objection.

4              THE COURT:  104.5, 104.7, 104.8, 104.10, 104.29,

5    and 104.32 admitted.

6              (Government Exhibits 104.5, 104.7, 104.8,

7    104.10, 104.29, and 104.32 in evidence.)

8    BY MR. TIERNEY:

9    Q    Now, what is that a photograph of, detective, 104.5?

10   A    Like the last one this is actually depicting the path

11   as you walk into the entrance gate or entry area going

12   into the wooded path.

13   Q    And 104.7?

14   A    This is the path once you go in past that gate.  This

15   is the path looking south.  This is a north to south path.

16   Q    And so we're starting to work our way southbound to

17   Raymour & Flanigan?

18   A    Yes.

19   Q    And now I'll show you 104.8?

20   A    104.8 is, what happens is we walk in.  We get closer.

21   And you can see the victim Vanessa Argueta in the middle

22   of the path just south of where we're standing.

23   Q    It's a little hard to show in the overhead.  Could

24   you just laser the location of --

25   A    (Indicating).

1      Should I do it again?

2   Q    No, that is good.  Thank you.

3        Next I'll show you 104.10.

4   A    Like I said earlier, we then moved forward, moving

5   south.  And now you can see the victim, you know, from an

6   overall to a mid-range.  And the victim was lying in the

7   path.

8   Q    Now I'm going to show you what has been marked as

9   104.29.

10       What is that a photograph of?

11  A    This is from Pinewood Avenue.  And we're looking at

12  the entrance from Pinewood Avenue to the path.

13  Q    So you walk past the victim out of the woods, and

14  you're out on Pinewood Avenue?

15  A    Yes.  Shooting back now to the entrance from Pinewood

16  Avenue.

17  Q    104.32.

18  A    And again, this is the mid-range.  So you can see

19  that the gate is open.  And this is the actual entrance to

20  the path from Pinewood Avenue to go north towards Raymour

21  & Flanigan.

22  Q    And now I'm just going to show you what has been

23  marked as 104.38?

24       Is that the -- is that a close-up of the gate

25  of, of the Pinewood gate entrance?

634

1    A    Yes, it is.

2    Q    Does that fairly and accurately depict the way that

3    looked?

4    A    Yes.

5    Q    And that fairly and accurately depicts the way it

6    looked on February 5, 2010?

7    A    Yes.

8              MR. TIERNEY:  I move that into evidence, your

9    Honor.

10             MS. MACEDONIO:  I have no objection, your Honor.

11             MR. LONDON:  No objection.  That is 104.32, not

12   38?

13             MR. TIERNEY:  No, I'm just doing 104.38.

14             THE COURT:  104.38 is admitted.

15             MR. TIERNEY: Thank you.

16             (Government Exhibit 104.38 in evidence.)

17   BY MR. TIERNEY:

18   Q    And that is the entrance to the Pinewood gate?

19   A    Yes, it is.

20   Q    Now just now I ask you to take a look at exhibits

21   105.1?

22   A    Yes.

23   Q    105.7?

24   A    Yes.

25   Q    And 105.15?

1  A    Yes.

2  Q    And 105.21?

3  A    Yes.

4  Q    105.22?

5  A    Yes.

6  Q    And 105.24?

7  A    Yes.

8  Q    Are those pictures of -- now have you and Karen

9  Oswald gone back into the scene and have taken photographs

10 of the woods as well as the victim?

11 A    Yes.

12       Now we're walking back towards Raymour &

13 Flanigan.  And as you can see the victim was in the first

14 photograph 105.1.

15 Q    Well, just before you get into a discussion -- do

16 those photographs fairly and accurately depict that area

17 of the way that that area of, the wooded area looked on

18 February 5, 2010?

19 A    Yes.

20       MR. TIERNEY: I move those into evidence, your

21 Honor.

22       MS. MACEDONIO:  No objection, judge.

23       MR. LONDON:  No objection.

24       THE COURT:  Those exhibits are admitted.

25       (Government Exhibit 105.1, 105.7, 105.15,

636

1    107.21, 105.22 and 105.24 in evidence.)

2    BY MR. TIERNEY:

3    Q    I'm going to show you 105.1.

4            What is that a photograph of?

5    A    This is the path.  We're walking now north from that

6    south entrance.  And there is the victim, Vanessa Argueta

7    is in the middle of the path.

8    Q    Just point it out because it's a little --

9    A    (Indicating)

10            MR. TIERNEY: For the record, it is to the center

11   left of the photograph.

12   BY MR. TIERNEY:

13   Q    And now we're walking our way back to Raymour &

14   Flanigan?

15   A    Yes.

16   Q    Now I'm going to show you what has been previously

17   marked at 105.7?

18   A    105.7, we're walking and we're getting closer, which

19   is the mid-range shot, photo.

20   Q    And 105.15?

21   A    And 105.15, like I said is really your -- it is an

22   overall mid-range and a close-up.  And this is the victim

23   Vanessa Argueta.

24   Q    And 105.21?

25   A    And that is a close-up of the victim Vanessa Argueta.

1  Q    And 105.22?  Is that a close-up?

2  A    Another close-up.  We take photos of the upper half

3  and then lower half of the victims.  So this would be an

4  upper half photo of the victim Vanessa Argueta.

5  Q    105.24?

6  A    This is the back, and now we're looking south.  So we

7  took a photo of the back of Vanessa Argueta, just photos

8  from different angles.

9  Q    I ask you to take a look at Government Exhibits

10  106.12, 106.15, 106.16, and 106.20 and 21.

11         Do you recognize those photographs?

12  A    Yes, I do.

13  Q    Are those photographs that you and Karen Oswald took

14  on February 5, 2010?

15  A    Yes, they are.

16  Q    And those are a close-up of the victim?

17  A    Yes.

18  Q    And do they fairly and accurately depict the way the

19  victim appeared on February 5, 2010?

20  A    Yes, they do.

21         MR. TIERNEY:  I move them into evidence at this

22  time, your Honor.

23         MS. MACEDONIO:  No objection, judge.

24         MS. RANTALA:  NO objection, judge.

25         THE COURT:  Those photographs are admitted.

1    (Government Exhibits 106.12, 106.15, 106.16,

2    106.20 and 106.21 in evidence.)

3    BY MR. TIERNEY:

4    Q    I'm going to show you what is marked as 106.12.

5         Do you recognize that, detective?

6    A    Yes, I do.

7    Q    What is depicted in that photo?

8    A    There is a red stain and an injury to the left side

9    of Vanessa Argueta's forehead there.

10   Q    And could you just, using the laser pointer, just

11   point that out for us?

12   A    (Indicating.)

13   Q    And in addition, while you were photographing the

14   scene, did you notice any damage to the sweatshirt at all?

15   A    Yes, I did.

16        It's right here above the area, there is a hole

17   in the sweatshirt.

18   Q    Now, I'm going to show you 106.15.

19        Do you recognize that?

20   A    Yes, I do.

21        That was the sweatshirt that Vanessa Argueta was

22   wearing.

23   Q    And with regard to that sweatshirt, do you see -- is

24   there any damage to that sweatshirt depicted in that

25   photo?

1    A    Yes.  There is a hole, a hole in the sweatshirt.

2    Q    Just using the laser pointer, could you just point it

3    out?

4    A    (Indicating.)

5    Q    How big was that hole?

6    A    It was a small circle.  I don't know.

7    Q    I'm next going to show you 106.20  -- I'm sorry

8    106.16.

9    A    Doctor Hall was at the scene at this time examining

10   the victims.  So during her examination she recognizes the

11   hole.  She pulls back the sweatshirt.  Upon pulling back

12   the sweatshirt we see a hole in the shirt of Vanessa

13   Argueta.  And Doctor Hall had us photograph that.

14   Q    Can you just show where the hole is?

15   A    (Indicating.)

16   Q    And that hole in the white sweatshirt, is it

17   surrounded by a red stain?

18   A    Yes, it is.

19   Q    And could you just, for the members of the jury, can

20   you explain who Doctor Hall is?

21   A    Doctor Hall responds.  She is the Medical Examiner.

22   So before any victim is transported she has to do a

23   thorough examination at the scene.  And we actually

24   fingerprinted Vanessa Argueta at the scene, and asked

25   permission from Doctor Hall.  So anything with the body,

1  Doctor Hall is the medical examiner.

2  Q    She examined both of the victims?

3  A    Yes , she did.

4  Q    Now, were there any items of evidence that were

5  recovered as well?

6  A    From the identification section or just from the

7  crime lab?

8  Q    Yes.

9  A    From the evidence?

10  Q    Yes.

11  A    There was a projectile.  A projectile is after a

12  weapon is shot a projectile was collected by the crime

13  lab.

14  Q    Do you have what has been marked as photograph --

15          THE COURT:  Mr. Tierney, it is 4:30.  Why don't

16  we finish for the day.

17          MR. TIERNEY:  Okay.

18          THE COURT:  We are not going to have Court

19  tomorrow, members of the jury, as you know.

20          We'll reconvene Monday morning at 9:30 -- Monday

21  is a holiday -- Tuesday morning at 9:30.

22          Don't discuss the case.

23          Don't read anything or listen to anything

24  regarding the case.

25          I'll see you all Tuesday at 9:30.

1        (The jury left the courtroom at 4:39 p.m.)

2        THE COURT:  You can step down, detective.

3        Can you just go through the witnesses on

4   Tuesday?

5        MR. DURHAM:  Your Honor, we'll continue with

6   Detective Kelly, with his testimony.

7        MR. LONDON:  Could you speak into the

8   microphone?  I can't hear you.

9        MR. DURHAM:  We begin with Detective Kelly,

10  finish his testimony.

11       We anticipate getting to Carla Santos on

12  Tuesday.  She is going to be an extremely lengthy witness.

13  We expect that will take us most of that day, if not into

14  Wednesday.  And after that we'll call Detective Ralph

15  Rivera, Special Agent Edward Heslin.

16       THE COURT:  Okay.  I just want to get this --

17  are you suggesting for the week -- what do you expect in

18  terms of your projections?

19       MR. DURHAM:  We made enough ground today, your

20  Honor, yes.

21       THE COURT:  So are there any issues you want to

22  raise with respect to any of the witnesses?

23       MS. MACEDONIO:  Nothing, your Honor.

24       MR. LONDON:  Nothing from Mr. Ortega, your

25  Honor.

1    THE COURT:  Okay, is there anything else?

2    There are a couple of issues with the letter.

3    Just so I know you mentioned it earlier.  Do you know what

4    that issue is?

5    MS. RANTALA:  That would be the letter

6    apparently found during a search of the Mr. Ortegas'

7    residence, not written by him but written to him.

8    Complete hearsay.  We have no idea who this person is that

9    wrote it to him.  So that is the relevance issue.

10   THE COURT:  What is the government's theory of

11   admissibility on that?

12   MR. DURHAM:  Your Honor, that letter refers to

13   the defendant by his name of Silent.  Additionally the

14   second page, it is actually a front and back of either

15   side of the -- maybe you should have a copy, your Honor.

16   This is Government Exhibit 284. (Handing)

17   Essentially what it is, your Honor, there are

18   two legal pages.  One side has writing front and back.

19   The second page is MS-13 graffiti, including the letters

20   STLS, which the government's theory is signifies the

21   defendant's clique.  And it is also consistent with a

22   tattoo that he has on his hand.

23   THE COURT:  What is the rest?  Is this document

24   going to be connected?

25   MR. DURHAM:  Yes, your Honor.  They were

1    recovered together.

2           THE COURT:  Do you know who the author of the

3    letter is, or what your theory is of who wrote the letter?

4           MR. DURHAM:  Your Honor, the letter itself

5    contains a lot of reference to gang membership.  We have

6    identified the sender of the letter who at the time was a

7    federal inmate.  I can't remember what facility he was at

8    at the time.  But essentially he is another MS-13 member

9    writing.

10          So our theory of admissibility is it goes to

11   show that the defendant was a member of the MS-13, as far

12   back as 2008.  And as the Court recalls, Mr. London --

13          THE COURT:  Do you know when this letter was

14   written?

15          MR. DURHAM:  Either the letter itself, your

16   Honor, or the envelope it was sent in contains a date.

17          THE COURT:  You said the author is an inmate who

18   is an MS-13, based on the content of the letter or

19   somebody is identifying him as an MS-13?

20          MR. DURHAM:  My recollection, your Honor, is the

21   return address included the nickname, his marshal number,

22   and the facility where he is incarcerated.

23          THE COURT:  Who can identify him as a member of

24   the gang, is the question.  Based on the content of the

25   letter, or some other cooperating witness who can identify

1  he is a member of the gang?

2         MR. DURHAM:  Your Honor, in our theory the

3  sender of the letter is somewhat irrelevant.  I'm

4  responding to the Court's question about the contents of

5  the letter.  It is identifying the defendant by his gang

6  name, his clique, and then the content of the letter

7  refers to gang business.

8         THE COURT:  In order for it to be admissible, it

9  would have to be a coconspirator.  Correct?

10        MR. DURHAM:  Well, it is a physical item within

11  the possession of the defendant, your Honor.

12        THE COURT:  I know.  But it is a statement. .

13  Just because someone is in physical possession doesn't

14  mean with your theory that whatever is in there is

15  evidence.

16        Let me think about it, okay?  If I can have the

17  original or a copy of the translation.

18        MR. DURHAM:  That has been marked as Government

19  Exhibit 284A.  It is one of the additional exhibits we

20  provided to the Court this week.

21        THE COURT:  Okay, I'll think about it.

22        MR. LONDON:  I think your Honor has picked up

23  the highlight of our objection, which is unless there is

24  some proof that he is a coconspirator, it is still

25  irrelevant and immaterial.

1    MS. RANTALA:  And complete hearsay to boot.

2    MR. LONDON:  Also, judge, we have not been

3  furnished with a copy of the envelope.  We had no idea

4  that they had identified the sender.

5    THE COURT:  Okay, if you can just highlight the

6  --

7    MR. DURHAM:  Your Honor, this letter will be

8  coming in through a witness who will testify in the trial.

9  So we don't need this issue to come up this week.

10    THE COURT:  Okay, that is why I asked about it.

11  And I can look at it in advance.

12    MR. TIERNEY:  Your Honor, we have one request.

13    We would ask that if the defense is going to use

14  exhibits with witnesses, they provide the government with

15  a copy of that.  I understand they have, they don't want

16  us prepping our witness to respond to documents.  But once

17  the defendant is on cross-examination, we would ask -- I'm

18  sorry -- once the witness is on cross-examination, to the

19  extent that they're showing the witness a document to

20  impeach them or to refresh to their recollection, we would

21  ask that a copy be provided.

22    Mr. London yesterday was showing Mr. Sosa a

23  number of documents.  We didn't have copies.  We let it

24  go.  But going forward we request copies of any documents

25  they use.

1          THE COURT:  I am going to direct that if you

2     know in advance you're going use a document, show it to

3     them in advance.

4          MR. LONDON:  It is a reasonable request, your

5     Honor.

6          THE COURT:  Okay, I have some cases for the

7     record regarding some rulings that I made this week.  But

8     being that it is 4:45 on Thursday, I won't do that to you

9     now.  We'll do that on Tuesday.

10         Okay, I'll see you all Tuesday at 9:30.

11         (Whereupon the trial was adjourned at 4:47 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3    **JIMMY SOSA**                              452
     CROSS-EXAMINATION (CONTINUED)             453
4    BY MR. LONDON
     CROSS-EXAMINATION                         454
5    BY MR. LEVINE
     REDIRECT EXAMINATION                      489
6    BY MR. DURHAM
     RECROSS-EXAMINATION                       494
7    BY MR. LONDON
     RECROSS-EXAMINATION                       497
8    BY MR. LEVINE
     REDIRECT EXAMINATION                      500
9    BY MR. DURHAM
                                               500
10   **MARK MOORMAN**
     DIRECT EXAMINATION                        501
11   BY MR. DURHAM
     CROSS-EXAMINATION                         511
12   BY MR. LONDON

13   **ROY SINEO**                              512
     DIRECT EXAMINATION                        512
14   BY MS. CAPWELL

15   DIRECT EXAMINATION (Continued)            551
     BY MS. CAPWELL
16   VOIR DIRE EXAMINATION                     560
     BY MS. MACEDONIO
17   DIRECT EXAMINATION (Continued)            561
     BY MS. CAPWELL
18   CROSS-EXAMINATION                         562
     BY MS. RANTALA
19   REDIRECT EXAMINATION                      571
     BY MS. CAPWELL
20
     **JANNETTE  TALAVERA**                     576
21   DIRECT EXAMINATION                        576
     BY MR. DURHAM
22   CROSS-EXAMINATION                         591
     BY MS. MACEDONIO

23

24

25

648

INDEX (Continued)

**JOSE PASTOR AVILA**                                    600
DIRECT EXAMINATION                                       600
BY MR. TIERNEY
CROSS-EXAMINATION                                        608
BY MS. MACEDONIO
REDIRECT EXAMINATION                                     611
BY MR. TIERNEY
RECROSS-EXAMINATION                                      612
BY MS. MACEDONIO
                                                         616
**TIMOTHY KELLY**
DIRECT EXAMINATION                                       617
BY MR. TIERNEY

## <u>EXHIBITS</u>

Defense Exhibits Ortega A and B in evidence              454
Government Exhibit 283 in evidence                       529
Government Exhibit 265B in evidence                      534
Government Exhibit 265D in evidence                      539
Government Exhibit 265C in evidence                      541
Government Exhibit 265A in evidence                      552
Government Exhibits 111B and 111C in evidence            561
Government Exhibit 103.29 in evidence                    605
Government Exhibit 104.38 in evidence                    606
Government Exhibits 105.15 in evidence                   607
Government Exhibits 103.34, 103.29, 104.2,               630
and 104.4?  In evidence
Government Exhibits 104.5, 104.7, 104.8,                 632
104.10, 104.29, and 104.32 in evidence
Government Exhibit 104.38 in evidence                    634
Government Exhibits 105.1, 105.7, 105.15,                635
107.21, 105.22 and 105.24 in evidence
Government Exhibits 106.12, 106.15, 106.16,              638
106.20 and 106.21 in evidence