UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-------------------------------X
UNITED STATES OF AMERICA,          :
                                        CR-10-074
        -against-                  :
                                        United States Courthouse
HERIBERTO MARTINEZ, also known :   Central Islip, New York
as "Boxer," and CARLOS ORTEGA,
also known as "Silencio" and   :
"Silent,"
                                   :   February 25, 2013
                Defendants.            9:30 a.m.
-------------------------------X
```

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT COURT JUDGE, and a Jury


APPEARANCES:

For the Government:        LORETTA E. LYNCH, ESQ.
                          UNITED STATES ATTORNEY
                          610 Federal Plaza
                          Central Islip, New York 11722
                          BY:  JOHN J. DURHAM, ESQ.
                               RAYMOND A. TIERNEY, ESQ.
                               CARRIE N. CAPWELL, ESQ.


For Defendant Martinez:    ELIZABETH MACEDONIO, ESQ.
                          ARNOLD LEVINE, ESQ.


For Defendant Ortega:      MARIANNE RANTALA, ESQ.
                          IRA LONDON, ESQ.


Official Court Reporter:   Ellen S. Combs, CSR
                          Dominick M. Tursi, CM, CSR
                          100 Federal Plaza - Suite 1180
                          Central Islip, New York 11722
                          Phone (631) 712-6107
                          Fax (631) 712-6123

Proceedings recorded by mechanical stenography
Transcript produced by Computer

1    (The following took place at 9:47 a.m.)

2    THE COURT:  United States vs Martinez and Ortega

3  CR-10-074.

4    Counsel, please state your appearances for the

5  record.

6    MR. DURHAM:  John Durham, Raymond Tierney and

7  Carrie Capwell for the United States.

8    Good morning, your Honor.

9    MS. MACEDONIO:  Good morning, your Honor.

10    Elizabeth Macedonio and Arnold Levine for

11  Mr. Martinez.  I'm sure he will be back shortly.

12    MR. LONDON:  Ira London and Marianne Rantala for

13  Carlos Ortega, back with vengeance.

14    THE COURT:  It wasn't the same without you.

15    MR. LONDON:  Thank you.

16    THE COURT:  Good to have you back.

17    We have the interpreters present for both the

18  defendants.  Do we have a new interpreter today, or no?

19    INTERPRETER BARROS:  Yes, your Honor.

20    THE COURT:  I will give the oath to you.  And

21  state your name for the record.

22    (Carmen Barros, was duly sworn to interpret.)

23    THE COURT:  State your name for the record.

24    INTERPRETER BARROS:  My name is Carmen Barros,

25  B-A-R-R-O-S.

1    THE COURT:  Good morning, Ms. Barros.  Thank

2  you.

3         All, right the jurors are all here.  And any

4  issues before the jury comes in.

5         MR. TIERNEY: We need a warning for the witness,

6  your Honor.  Mr. Levine asked me for some information.  I

7  had the information before the witness testified.

8         Also, I provided the defense counsel with a list

9  of the exhibits.  Are you going to be objecting to any of

10  those exhibits?

11         (A conversation between Ms. Macedonio and Mr.

12  Tierney.)

13         MR. TIERNEY: We'll certainly do that.

14         THE COURT:  Good morning.

15         I just wanted to see if there were any issues

16  before we bring the jury in.

17         MR. TIERNEY: Can I have just a moment to speak

18  with Mr. Levine?

19         THE COURT:  Sure.

20         (There was a pause in the proceedings.)

21         MR. TIERNEY:  Thank you, your Honor.

22         THE COURT:  So do you want to bring the witness

23  in so I can give him the warning?

24         MR. TIERNEY:  Sure. Ge is in custody, I'm sorry,

25  your Honor.

1    THE COURT:  Okay.

2    MS. MACEDONIO:  I think we have a wardrobe

3    problem.  I think the defendant wants to change his shirt.

4    MS. RANTALA:  I think he has been in the same

5    shirt for about two weeks.

6    THE COURT:  You can change it now if you want.

7    (There was a pause in the proceedings.)

8    THE COURT:  Mr. Calderon, have a seat.

9    Mr. Calderon, before I bring the jury in I just

10   need to give you a warning.  I'm sure the prosecutor has

11   mentioned this to you, but I want to emphasize it to you.

12   I have made a ruling that the jury is not to

13   know to the age of Diego Torres, or that he was a child at

14   all.  They're not to know that at all.

15   So when you're referring to him during your

16   testimony, you have to use some term that wouldn't reflect

17   that he was a child.  So you can refer to him as the male

18   victim, Diego, or some other term that doesn't reflect

19   that he is a child.

20   THE WITNESS:  That's right.

21   THE COURT:  Okay.  Do you understand?

22   THE WITNESS:  Yes.

23   THE COURT:  All right, let's bring the jury in.

24   THE WITNESS:  Is this water for me?

25   THE COURT:  Yes.  Make sure you don't --

1            MR. TIERNEY:  I'll get it.

2            (There was a pause in the proceedings.)

3            (The jury entered the courtroom at 9:56 a.m.)

4            THE COURT:  Good morning, members of the jury.

5    Nice to see you all this morning.

6            As you know we're beginning week three of the

7    trial.  And I'm going to ask the government to call their

8    next witness.

9            MR. TIERNEY:  Thank you, your Honor.

10           The government calls Santos Joel Calderon.

11

12   **SANTOS JOEL CALDERON**

13           called as a witness, having been first duly sworn,

14           was examined and testified as follows:

15           THE COURT:  Can you state your name and spell it

16   for the record, please.

17           THE WITNESS:  My name is Santos Joel Calderon.

18           THE COURT:  Can you spell it?

19           THE WITNESS:  S-A-N-T-O-S, J-O-E-L,

20   C-A-L-D-E-R-O-N.

21           THE COURT:  Go ahead, Mr. Tierney.

22

23   DIRECT EXAMINATION

24   MR. TIERNEY:

25   Mr. Calderon, how old are you?

1    A    20 years old.

2    Q    Do you speak English?

3    A    A little bit.

4    Q    Are you more comfortable speaking in the Spanish

5    language?

6    A    Yes.

7    Q    Sir, are you currently in jail?

8    A    Yes.

9    Q    How long have you been in jail for?

10   A    35 months.

11   Q    And when were you arrested?

12   A    The 21st of March of 2010.

13   Q    And why were you arrested?

14   A    Because I was involved in a homicide.

15   Q    What homicide?

16   A    A homicide of Mr. Moreno.

17   Q    And that is a security guard of the El Rancho bar?

18   A    Yes, sir.

19   Q    And prior to getting arrested, were you a member of a

20   gang?

21   A    Yes, sir.

22   Q    What gang?

23   A    MS-13.

24   Q    Does that go by any other names?

25   A    Yes.

1    Q    What other name does it go by?

2    A    Mara Salvatruchas.

3    Q    And do you see any fellow MS-13 members in the

4    courtroom today?

5    A    Yes, sir.

6    Q    How many?

7    A    Two.

8    Q    Would you please point them out and identify an

9    article of their clothing?

10   A    Yes, sir.

11   Q    Could you point one of them out and identify an

12   article of their clothing?

13   A    The one with the glasses, his name is Silencio.

14   Q    And do you see another --

15            MR. TIERNEY:  Let the record reflect that the

16   defendant has identified the defendant Ortega.

17            THE COURT:  Yes.

18   BY MR. TIERNEY:

19   Q    And do you see another MS-13 member?

20   A    Yes.

21   Q    And identify an article of his clothing?

22   A    Yes, sir.  His name is Boxer.

23   Q    What is Boxer wearing?

24   A    Black and gray.

25   Q    What type of outfit does he have?

1   A    Like a sweater and a T-shirt or a shirt.

2           MR. TIERNEY:  Your Honor, may the record reflect

3   that the defendant has identified the defendant Martinez.

4           THE COURT:  Yes.

5           THE INTERPRETER:  Your Honor, may the

6   interpreter tell the witness to go a little bit back

7   because the sound is distorted.

8           THE COURT:  Sure.

9   BY MR. TIERNEY:

10  Q    And again, the individual who is wearing the sweater,

11  what name did you know him by?

12  A    Boxer.

13  Q    Now Mr. Calderon, where were you born?

14  A    In El Salvador.

15  Q    And who did you live with growing up?

16  A    With my grandmother.

17  Q    And growing up in El Salvador, were there any gangs

18  in the neighborhood in which you lived?

19  A    Yes, sir.

20  Q    What were the names of these gangs?

21  A    El Mara, MS-13 and 18.

22  Q    And is that the 18th Street Gang and MS-13?

23  A    Yes.

24  Q    And the MS-13, 18th Street Gang in El Salvador, did

25  they control territories in different neighborhoods of --

1      MS. MACEDONIO:  Objection.

2      THE COURT:  Sustained to form.

3  BY MR. TIERNEY:

4  Q    The MS-13 and the 18th Street Gang, how -- did they

5  control various territories in El Salvador?

6      MS. MACEDONIO:  Objection.

7      THE COURT:  Sustained.

8  BY MR. TIERNEY:

9  Q    Growing up in El Salvador, while you were living in

10 your neighborhood, did you have occasion to see MS-13 and

11 18th Street Gang members?

12 A    Yes, sir.

13 Q    And were you able to observe how the MS-13 and the

14 18th Street Gang operated?

15 A    Yes, sir.

16 Q    And were you able to observe whether or not these

17 gangs controlled various territories in El Salvador?

18 A    Yes, sir.

19 Q    How did the MS-13 and the 18th Street Gang control

20 territories in El Salvador?

21 A    It was by sections, by colonies.

22 Q    And so a colony is like a neighborhood in El

23 Salvador?

24 A    Yes, sir.

25 Q    So the MS-13 would control some neighborhoods and the

1    18th Street would control others?

2    A    Yes.

3    Q    Now the neighborhood you lived in, was that

4    controlled by a gang?

5    A    Yes, sir.

6    Q    Which gang controlled the territory in the

7    neighborhood in which you lived?

8    A    18th Street.

9    Q    And how far away was the -- withdrawn.

10          How far away from where you lived was the

11   territory controlled by the 18th Street?

12   A    Could you please repeat the question?

13   Q    You indicated that in the neighborhood that you lived

14   in, it was controlled by the MS-13?

15   A    Yes, sir.

16   Q    I'm sorry.  Who controlled the territory in your

17   neighborhood?

18   A    Both gangs.

19   Q    So you lived in a disputed territory?

20   A    It was in the middle.

21   Q    So you were in the middle of both gangs?

22   A    Yes, sir.

23   Q    Now, did there come a time when you decided to leave

24   El Salvador and come to the United States?

25   A    Yes, sir.

1    Q    When was that?

2    A    When I was about 14 years old.

3    Q    And what year was that?

4    A    2006, 2005.

5    Q    And why did you decide to leave El Salvador?

6    A    Because I witnessed a death.

7    Q    Whose death did you witness?

8    A    One of my cousins.

9    Q    And who killed your cousin?

10   A    The 18th Street gang.

11   Q    And did this create problems for you?

12   A    They wanted to kill me.

13   Q    So is that why you decided to come to the United

14   States?

15   A    Yes, sir.

16   Q    And you were born in December, correct?

17   A    Correct.

18   Q    And you left for the United States in 2006?

19   A    Yes, sir.

20   Q    When you left, were you 13 years old?

21   A    I was 14 or maybe 13 years old.

22   Q    And how did you get to the United States?

23   A    By land through a coyote.

24   Q    And what is a coyote?

25   A    A person who transports people to the US.

1  Q    And does he get paid for this?

2  A    Yes, sir.

3  Q    And how much did the coyote cost?

4  A    $5,000.

5  Q    Who paid for the coyote?

6           MS. MACEDONIO:  Objection.

7           THE COURT:  On what grounds?

8           MS. MACEDONIO:  Relevance.

9           THE COURT:  I'll allow some background as to how

10 he got to the United States.  But we don't need to go any

11 further.

12          MR. TIERNEY:  I don't intend to, your Honor.

13          THE COURT:  Go ahead.

14 A    My mother.

15 BY MR. TIERNEY:

16 Q    And who did you go to the United States with?

17 A    I came alone.

18 Q    Were there other people who hired the same coyote

19 that your mother did?

20 A    Yes, sir.

21 Q    You came with your relatives?

22 A    No.

23 Q    Now, did there come a time when you reached the

24 United States border?

25 A    Yes, sir.

1    Q    Was that in November of 2006?

2    A    Yes, sir.

3    Q    And you were born in December of 1992, correct?

4    A    Yes, sir.

5    Q    And when you got to the border, what part of the

6    boarder of the United States did you get to?

7    A    Texas, San Antonio.

8    Q    And did you attempt to cross the boarder at San

9    Antonio in November of 2006?

10   A    Correct, yes.

11   Q    What happened?

12   A    Immigration got me.

13   Q    And did the immigration authorities, did they take

14   you into custody?

15   A    Yes, sir.

16   Q    What happened?

17   A    They held me about three months until they receive an

18   order from a judge to let me go so that I could go to my

19   mother's.

20   Q    Did your mother -- where was your mother living at

21   the time?

22   A    In New York.

23   Q    And did she come out to Texas?

24   A    No, sir.

25   Q    Did the immigration judge release you?

1    A    Yes, sir.

2    Q    And did you promise the judge that you would return

3    to address your immigration issues?

4    A    Yes, sir.

5    Q    And did you ever return to address those immigration

6    issues?

7    A    No, sir.

8    Q    Now once in the United States, where did you go?

9    A    To New York, to Queens, Far Rockaway.

10   Q    And were you living with your mother?

11   A    Yes, sir.

12   Q    And did you go to school in Far Rockaway?

13   A    Yes, sir.

14   Q    How long did you go to school in Far Rockaway?

15   A    About two and-a-half years.

16   Q    And why did you stop going to school?

17   A    Because I was arrested.

18   Q    And is that the arrest in this case on March 21,

19   2010?

20   A    Yes, sir.

21   Q    What grade were you in when you got arrested?

22   A    Nine.

23   Q    Now while you were living in Far Rockaway, were there

24   any street gangs in the neighborhood where you lived?

25   A    Yes, sir.

1    Q    And which ones?

2    A    Mara, MS-13, 18th Street, Sangres.

3    Q    And is that known, the Sangres, is that known as the

4    Bloods?

5    A    Correct.

6    Q    Any other gang?

7    A    Patrias.

8    Q    Any other gangs?

9    A    The Crips.

10   Q    Now, did there come a time when you met -- withdrawn.

11        Did there come a time when you began hanging out

12   with MS-13 gang members while living in Far Rockaway?

13   A    Yes, sir.

14   Q    And approximately when did you begin hanging out with

15   gang members?

16   A    2009.

17   Q    And how did you meet these gang members?

18   A    When I went to school, one of them went to school.

19   Q    Who is the individual you went to school with?

20   A    He was a member of my MS-13, and his name was Payaso.

21   Q    So you began hanging out with other gang members

22   through Payaso?

23   A    Yes, sir.

24   Q    Why did you decide to hang out with MS-13 members?

25   A    They told me they were going to give me protection.

1    Q    Now, was there a particular clique -- withdrawn.

2         The MS-13, the gang itself, is it divided into

3    smaller groups?

4    A    Yes, sir.

5    Q    And what are these smaller groups called?

6    A    Cliques.

7    Q    And was there a particular clique of the MS-13 that

8    had many members living in Far Rockaway?

9    A    Yes, sir.

10   Q    And what was the name of the clique that had many

11   members living in Far Rockaway?

12   A    SLS, Surenos Locos Salvatruchas.

13   Q    And is that the group of the MS-13 that you were

14   hanging out with?

15   A    Yes, sir.

16   Q    Now the SLS clique, are you aware of whether or not

17   it is located anywhere else in addition to Far Rockaway?

18   A    Yes, sir.

19   Q    Where else is there an SLS clique?

20   A    In El Salvador.

21   Q    And in addition to the SLS clique, are you aware of

22   the existence of any other cliques located in either

23   Queens or Long Island?

24   A    Yes, sir.

25   Q    What are the names of some of these other cliques?

1   A    Hempstead, Coronados, Jamaica, SLS, Freeport,

2   Pelones, Guanacos.

3   Q    And the Coronados, is that also known as CLS?

4   A    Yes, sir.

5   Q    Do you see a member of the CLS in the courtroom

6   today?

7   A    Yes, I do.

8   Q    And who is that?

9   A    Boxer.

10   Q    And that is the defendant you identified before?

11   A    Yes, sir.

12   Q    What is the relationship among the different MS-13

13   cliques on Long Island and Queens?

14   A    They all get along.

15   Q    Now, in addition to the MS-13 cliques in Queens or

16   Long Island, are you aware of the existence of other MS-13

17   cliques anywhere else in the United States?

18   A    Yes.

19   Q    Where is that?

20   A    Texas, Los Angeles.

21   Q    Did you or any other SLS gang members speak to these

22   other MS-13 members in the United States?

23   A    Yes, sir.

24   Q    Now in addition to MS-13 cliques in the United

25   States, are you aware of the existence of MS-13 cliques in

1    other countries?

2    A    Yes, sir.

3    Q    What countries?

4    A    El Salvador, Honduras, Guatemala, Mexico, Nicaragua

5    and the US.

6    Q    And did you ever speak with an MS-13 member from

7    another country?

8    A    Yes, sir.

9    Q    Which country?

10   A    El Salvador.

11   Q    Now, did there come a time when you were asked to

12   join the MS-13?

13   A    Yes, sir.

14   Q    When was that?

15   A    In 2009.

16   Q    Do you remember approximately what time of year it

17   was in 2009 that you were asked to join the MS-13?

18   A    Yes, sir.

19   Q    When, approximately what time of year was it?

20   A    In October.

21   Q    And prior to being asked to join in October of 2009,

22   for how long had you been hanging out with the MS-13

23   members prior to that?

24   A    Six months, five months.

25   Q    And were you asked to join the SLS clique?

1    THE INTERPRETER:  I'm sorry?

2  BY MR. TIERNEY:

3  Q    Were you asked to join the SLS clique?

4  A    Yes, sir.

5  Q    And did you in fact join the SLS clique?

6  A    Yes, sir.

7  Q    And when you joined the SLS clique of the MS-13, who

8  else belonged?

9  A    Payaso, Speedy, Sombra (ph), Rayo, Smokey, Cartoon.

10  Q    And you said Snar?

11  A    Snar.

12  Q    S-N-A-R for the record.

13  A    Baby Blue.

14  Q    Are you aware of MS-13 members known as Carlito and

15  Little Lonely?

16  A    Yes, sir.

17  Q    Are they SLS members at the time you knew them as

18  well?

19  A    Yes.

20  Q    Now, who were the leaders of the SLS clique at the

21  time you joined?

22  A    Smokey was.

23  Q    I show you a photograph, for the record 54.6.  Can

24  you see that on the screen?

25  A    Yes, sir.

1    Q    Do you recognize that?

2    A    Yes, sir.

3    Q    Who do you recognize that to be?

4    A    Carlito.

5    Q    And he is a fellow SLS member?

6    A    Yes, sir.

7    Q    And for the record, I'm going to show you what has

8    been marked for identification as 405.58 and 405.59.

9         Do you see those pictures on your screen, sir?

10   A    Yes, sir.

11   Q    Is a particular individual depicted in those

12   pictures?

13   A    Yes, sir.

14   Q    Who is depicted in the those photos?

15   A    Little Lonely.

16        MR. TIERNEY: Your Honor, I would move in

17   evidence at this time, Government Exhibits 405.58 and

18   405.59

19        MS. RANTALA:  No objection, your Honor.

20        MR. LEVINE:  No objection.

21        THE COURT:  405.58 and 405.59 in evidence.

22        (Government's Exhibits 405.58 and 405.59 in

23   evidence.)

24

25   BY MR. TIERNEY:

1 Q    You have just been shown 405.58.  Who is that?

2 A    Little Lonely.

3 Q    And 405.59, is that a photograph of Little Lonely?

4 A    Yes, sir.

5 Q    Finally, I'm going to show you what has been marked

6 previously for identification as Government Exhibit 54.1.

7        Do you recognize that photograph?

8 A    Yes, sir.

9 Q    Who is that a photograph of?

10 A    Payaso.

11 Q    And that is that the same Payaso that you, that

12 initially introduced you to the gang?

13 A    Yes, sir.

14        MR. TIERNEY:  I would move 54.1 into evidence at

15 this time, your Honor.

16        MS. RANTALA:  No objection, your Honor.

17        MR. LEVINE:  Objection.

18        THE COURT:  54.1 admitted.

19        (Government's Exhibit 54.1 in evidence.)

20 BY MR. TIERNEY:

21 Q    And for the record, sir, is that 54.1, is that a

22 picture of Payaso?

23 A    Yes, sir.

24 Q    Now, in order to become a member of the MS-13, what

25 do you have to do?

1    A    To attack people and to go against rivals.

2    Q    And by *rivals*, what do you mean?

3    A    Gangs that are rivals.

4    Q    And what are some of the rivals of the MS-13?

5    A    18th Street, Patrias, Sangres, Latin Kings.

6    Q    Again, Sangres is the Spanish name for Bloods?

7    A    Yes, sir.

8    Q    And what did you do to get into the MS-13?

9    A    Showed that I was with them and going and attacking

10   the rival gangs.

11   Q    Approximately how many times did you attack members

12   of to rival gangs?

13   A    More than ten times.

14   Q    And did you ever kill anyone during any of these

15   attacks or fights?

16   A    No, sir.

17   Q    Did you ever shoot and stab anyone in any of these

18   fights?

19   A    No, sir.

20   Q    During, while you were engaging in these fights, were

21   you armed with any weapons?

22   A    Yes, sir.

23   Q    What were you armed with?

24   A    With a knife.

25   Q    Did you ever use that knife during any of the fights?

1    A    No, sir.

2    Q    And these fights that you had, what did you use to

3    fight with the other rival gang members?

4    A    My fists and my feet.

5    Q    Now, do you recall a time when you were at the

6    laundromat in Far Rockaway when you saw members of the

7    Bloods and the 18th Street?

8    A    Yes, sir.

9    Q    What happened?

10   A    It was a morning, a Saturday morning.  I was with my

11   mother doing the laundry.  And members of the 18th gang

12   approached me and they were doing signals to me indicating

13   that they wanted to attack me.

14   Q    They were making gang signs?

15   A    Yes, sir.

16   Q    After seeing this, what did you do?

17   A    I felt cornered and I had to call members of the Mara

18   MS-13.

19   Q    Who did you call?

20   A    Payaso, Carlito and Speedy.

21   Q    And what happened?

22   A    They arrived.  And when they saw that they were

23   there, well, we started running after them.

24   Q    So you started chasing the other gang members?

25   A    Yes, sir.

1    Q    What happened?

2    A    Well, it came to a point where they hid inside a car.

3    And we realized they were in there.  And they got out and

4    we started fighting.

5    Q    And did you have any weapons on you?

6    A    I did not.

7    Q    And what happened -- was any of the other rival gang

8    members injured as a result of this fight?

9    A    Yes, sir.

10   Q    What happened?

11   A    One of them was hit behind his head with a stone.

12   Q    Who did that?

13   A    Payaso did.

14   Q    And was anyone else hurt?

15   A    One of them was injured by stabs, stabbing.  It was

16   with an ice pick.

17   Q    Who stabbed a rival gang member with the ice pick?

18   A    Carlito.

19   Q    Was it Speedy or Carlito?

20        MR. LEVINE:  Objection.

21   A    I don't know.

22   BY MR. TIERNEY:

23   Q    Who stabbed the rival gang member with the ice pick?

24        MR. LEVINE:  Objection.

25        THE COURT:  I'll allow it.

1   A    Who was the one who attacked with the ice pick?

2   BY MR. TIERNEY:

3   Q    Yes.

4   A    Speedy.

5   Q    And after that did the other gang members run away?

6   A    Yes, sir.

7   Q    Did you stab anyone with a rock?

8   A    No, sir.

9   Q    You realize you're still criminally responsible for

10  the actions of the other gang members, correct?

11  A    Yes, sir.

12  Q    Now, are you familiar with the term *gang jumped in*?

13  A    Yes, sir.

14  Q    What is the term *gang jumped in*?  What does that

15  mean?

16  A    To become a member of the MS-13 gang.

17  Q    And how does one become a member of the MS-13 gang?

18  A    They beat you up for 30 seconds.  They kick you when

19  you're laying down.

20  Q    And by *they* you mean fellow gang members?

21  A    Yes, sir.

22  Q    And to your knowledge, is this how everyone becomes a

23  member of the MS-13?

24  A    Yes, sir.

25  Q    And in Halloween of 2009 did you get jumped in?

1    A    Yes, sir.

2    Q    And who jumped you in?

3    A    Carlito, Little Lonely and Speedy.

4    Q    And while you were getting jumped in, was someone

5    counting?

6    A    Yes, sir.

7    Q    Who was counting?

8    A    Our leader, Smokey.

9    Q    Now, once you became -- withdrawn.

10         Were you given a gang name?

11   A    Yes, sir.

12   Q    And what was your gang name?

13   A    Gasparin.

14   Q    And what does Gasparin mean?

15   A    It's a ghost.

16   Q    Like in English it would be like Casper the Ghost?

17   A    Yes, sir.

18   Q    Now, are there certain rules that all MS-13 members

19   must follow?

20   A    Yes, sir.

21   Q    Generally speaking, what are some of these rules?

22   A    Never let down any member of the MS-13 gang.  If you

23   see a member of a rival gang you always have to attack

24   them, assault them.

25   Q    And the SLS, would they have gang meetings?

1    A    Yes, sir.

2    Q    Generally speaking, approximately how often would

3    they have these meetings?

4    A    Every week, every eight days.

5    Q    And what goes on in these meetings?

6    A    You talk about the problems that you have with other

7    gangs.  You talk about the problems between the cliques.

8    Q    And would money be collected during these meetings?

9    A    Yes, sir.

10   Q    And what was the -- what would this money be used

11   for?

12   A    To buy weapons and to help anybody who needs help.

13   Q    By anyone, who do you mean anyone?

14   A    Other members of the MS-13 gang.

15   Q    Did the SLS clique to your knowledge ever send money

16   to El Salvador?

17   A    Yes, sir.

18   Q    Now, are you familiar with the term *going on a*

19   *mission*?

20   A    Yes, sir.

21   Q    What does that mean?

22   A    To go look for rival gang members or to go kill

23   somebody.

24   Q    And are you familiar with the term *chavala*,

25   C-H-A-V-A-L-A?

1    A    Yes, sir.

2    Q    What does the term *chavala* mean?

3    A    Rival gang member.

4    Q    Now, are there penalties in MS-13 for failing to

5    follow the rules?

6    A    Yes, sir.

7    Q    What is the penalty called?

8    A    Calenton.

9    Q    And what is a calenton?

10   A    They beat you up and they kick you for 13 or up to 26

11   seconds.

12   Q    Now, are there any rules about members of the MS-13

13   cooperating with law enforcement?

14   A    Yes, sir.

15   Q    What are the rules for MS-13 members cooperating with

16   law enforcement?

17   A    If it's just to get out of a problem on the spot,

18   that's not a problem.  But if it's something that is going

19   to put somebody in jail for life, then it's death.

20   Q    So in other words, if you -- if a police officer

21   encounters you on the street you're allowed to speak with

22   that officer to get out of trouble?

23   A    Yes, sir.

24   Q    What about cooperating with the FBI or a prosecutor's

25   office?

1    A    Death.

2    Q    Now, did the SLS, did they possess any weapons during

3    the time that you were associated with them or a member?

4    A    Yes, sir.

5    Q    What types of weapons did the SLS possess?

6    A    Firearms, machetes, knives, bats.

7    Q    Now, what type of firearms did the SLS possess?

8    A    A .38 caliber.

9    Q    Any other guns?

10   A    We receive a .22 caliber long.

11   Q    You also indicated that there was a .38 in your

12   testimony, correct?

13   A    Yes, a .38 caliber, yes.

14   Q    What type of weapon was a .38 caliber?

15   A    A firearm, not very big, like this, black color.

16   Q    And you're indicating with your fingers, indicating

17   the size of a handgun?

18   A    Yes, sir.

19   Q    And did you ever see that .38 caliber handgun?

20   A    Yes, sir.

21   Q    I'm going to show you what has previously been marked

22   as Government Exhibit 95 for identification.  Just ask you

23   if you recognize?

24   A    It is a weapon.

25   Q    This is -- do you recognize Government Exhibit 9589

1   as being the .38 caliber handgun that was the clique

2   weapon of the SLS?

3   A    Yes, sir.

4   Q    How do you recognize it as such?

5   A    Because of the silver, the silver dots that it has on

6   both sides and also because of the handle.

7   Q    You're mentioning this, like ring lower on the gun?

8   A    Yes, sir.

9         MR. TIERNEY:  Your Honor, I would move

10  Government Exhibit 95 in evidence at this time.

11        MR. LEVINE:  Can I see that?

12        (There was a pause in the proceedings.)

13

14  VOIR DIRE EXAMINATION

15  BY MR. LEVINE:

16  Q    Mr. Calderon, did you see many guns?

17  A    Yes, sir.

18  Q    And the guns you have seen haven't been necessarily

19  unique from one other, correct?

20  A    I don't understand your question.

21  Q    Well, SLS didn't do anything to the gun, to the .38

22  caliber.  Is that correct?

23  A    No.

24  Q    They didn't make any markings on it?

25  A    Yes.

1  Q    Yes what, they did or they didn't?

2  A    They didn't do one to it, but it already had one, the

3  little rings that it had.

4  Q    The little ring is part of the gun, right, they

5  didn't add that to it, right?

6  A    That's right.

7  Q    And it is not damage to the gun, correct?

8  A    I don't think so.

9  Q    That appears to be the way the gun was manufactured,

10  right?

11  A    I wouldn't know, sir.

12  Q    The best you can do is say this looks like the gun

13  that SLS had, but you couldn't say it was the exact gun,

14  right?

15  A    That's the weapon that the SLS clique had.

16  Q    How do you know it is the actual weapon as opposed to

17  another weapon that just is made the same way?

18  A    Because of the little ring that it had, sir.  Also on

19  both sides it has the silver dots, so -- I have seen many

20  weapons that have been black.

21  Q    So you're pointing to that because it's silver as

22  opposed to black, it must be the same gun?

23  A    Yes, sir.

24  Q    That silver thing was put there by the manufacturer,

25  right?

1   A      I would imagine, sir.

2            MR. LEVINE:  I would object, your Honor.

3            THE COURT:  Do you want to approach?

4            (The following occurred at sidebar.)

5            THE COURT:  Are you joining in the objection?

6            MS. RANTALA:  We would.

7            THE COURT:  There is another witness who is

8   going to testify about the gun as well.

9            MR. TIERNEY:  Yes, your Honor.

10           THE COURT:  Who is that going to be?

11           MR. DURHAM:  The person who recovered the gun.

12           THE COURT:  Is there any reason to get it

13  through this witness or can we just wait for that witness?

14           MR. TIERNEY:  I can put it in subject to

15  connection.

16           THE COURT:  Is there anything else you need to

17  do with the gun?

18           MR. TIERNEY:  No, I would just ask him if this

19  appears to be the gun.

20           THE COURT:  I think this goes to the weight of

21  the evidence, not to its admissibility.

22           MR. TIERNEY:  That would be my position, your

23  Honor.

24           THE COURT:  But if it is a question though I

25  would just want to just wait for the police officer to

1   come in to admit it.  All right?

2           MR. TIERNEY:  That's fine, your Honor.

3           (The following occurred in open court.)

4           MR. TIERNEY:  Your Honor, with regard to

5   Government Exhibit 95, the government would move that in

6   subject to connection through an additional witness.

7   BY MR. TIERNEY:

8   Q    Mr. Calderon, with regard to Government Exhibit 95 --

9           MR. LONDON:  Do I understand you're withdrawing

10  it.

11          MR. TIERNEY:  I'm sorry.

12          We would withdraw our offer at this time.  We

13  will be renewing that offer or application through an

14  additional witness.

15          THE COURT:  Okay.

16          MS. RANTALA:  Your Honor, could we repeat that,

17  because it wasn't interpreted.

18          THE COURT:  The government is withdrawing its

19  offer of that piece of evidence from this witness, and is

20  going to wait until later or through an additional witness

21  and then offer it.

22

23  DIRECT EXAMINATION  (Continued)

24  MR. TIERNEY:

25  Q    Mr. Calderon, with regard to Government Exhibit 95,

1  based upon those three marks on the gun, that appears to

2  be the same gun that you saw previously?

3  A    Yes, sir.

4  Q    Now, would the SLS clique ever ask other cliques of

5  the MS-13 to borrow their weapons?

6  A    Yes, sir.

7  Q    And what weapons was that?

8  A    Firearms, machetes, bats.

9  Q    Now, the .38 caliber which you testified to --

10  withdrawn.

11        Now, would the SLS clique ever borrow weapons

12  from -- withdrawn.

13        The .38 caliber weapon, are you aware whether or

14  not the SLS clique ever loaned that out to other MS-13

15  cliques?

16  A    No, sir.

17  Q    Now, the SLS clique, would it ever borrow weapons

18  from other cliques?

19  A    Yes, sir.

20  Q    What type of weapons would the SLS clique borrow from

21  other MS-13 cliques?

22  A    Firearms, machetes, knives, bats.

23  Q    Now, with regard to the SLS clique weapons, who owns

24  those weapons?

25  A    Smokey.

1   Q    And Smokey is the leader of the clique?

2   A    Yes, sir.

3   Q    Now, do MS-13 members, do they use particular colors

4   to identify themselves?

5   A    Yes, sir.

6   Q    And what color is that?

7   A    Blue.

8   Q    And do MS-13 members use any hand signs to identify

9   themselves?

10  A    Yes, sir.

11  Q    What type of hand signs?

12  A    The M.

13  Q    And just -- the M is the -- for the record, he's got

14  his pointer finger pointing up, he has got his pinkie

15  finger pointed out and he has his other three fingers

16  curled.

17       What else?

18  A    The S.

19  Q    The S.  And you have your two -- your pointer finger

20  in an S and your other fingers are curled.  Is that the S?

21  A    Yes, sir.

22  Q    What other hand signs?

23  A    The 13.

24  Q    And that you have your pointer finger curled and the

25  next two fingers extended and the thumb and the pinkie

1    curled.  And does it show a three?  Where is the three?

2    A    It's one, two, three.

3    Q    The three extended fingers form the three?

4             THE COURT:  You said the pinkie is curled.  The

5    pinkie was extended.

6             MR. TIERNEY:  The pinkie is extended.  I'm

7    sorry, your Honor.

8    BY MR. TIERNEY:

9    Q    What other hand signs does the MS-13 use?

10   A    They also present this as the devil's face.

11   Q    And for the record, you're -- you have your pinkie

12   and your pointer finger extended and your other three

13   fingers curled?

14   A    Yes.

15   Q    And what does that hand signal signify to the MS-13?

16   A    The devil's face.

17   Q    Could you just point out the features of the devil's

18   face?

19   A    Those are the horns and the face.

20   Q    So the pointed fingers are the devil's horns and the

21   three curled fingers signify his face?

22   A    Yes, sir.

23            MR. TIERNEY:  Your Honor, when do you plan on

24   breaking, because I'm going into a new area?  We can break

25   now.

1    THE COURT:  You can start now.

2    MR. TIERNEY:  Thank you, your Honor.

3  BY MR. TIERNEY:

4  Q    Sir, while living in Far Rockaway did there come a

5  time when you met an MS-13 member by the name of Boxer?

6  A    Yes, sir.

7  Q    And is that the same person you identified earlier?

8  A    Yes, sir.

9  Q    When did you first meet Boxer?

10 A    Approximately three months before I got jumped in and

11 became a member of the MS-13.

12 Q    So you got jumped in this October of 2009?

13 A    Yes, sir.

14 Q    So you met him around July of '09?

15 A    Yes, sir.

16 Q    And where did Boxer live back in 2009?

17 A    In Far Rockaway.

18 Q    And where -- or where did he live in relation to

19 where you lived?

20 A    Two blocks away.

21 Q    And did Boxer -- I believe you said Boxer belonged to

22 the CLS clique?

23 A    Yes, sir.

24 Q    And the CLS clique, did they control a certain area

25 on Long Island?

1  A   Yes, sir.

2  Q   And what area was that?

3  A   Brentwood.

4  Q   Now, what was Boxer's position within the CLS?

5  A   He was the leader.

6  Q   And how did you know that?

7  A   He told me.

8  Q   And was it important for you to know whether or not

9  Boxer was the leader?

10 A   Yes, sir.

11 Q   Why is that?

12 A   Because I need to follow what the leader say.

13 Q   Now, how did you meet Boxer?

14 A   At Payaso's house.

15 Q   And would Boxer sometimes hang out and socialize with

16 you and the other SLS members?

17 A   Yes, sir.

18 Q   I'm going to call your attention to Saturday,

19 February 20, 2010.  Were you playing Xbox in Boxer's house

20 in Far Rockaway at that time?

21        Mr. LEVINE:  Objection, leading.

22        THE COURT:  Sustained as to leading.

23 BY MR. TIERNEY:

24 Q   I'm calling your attention to February 20, 2010.  Do

25 you remember where you were that day?

1    A    Yes, sir.

2    Q    Where were you?

3    A    At Boxer's place.

4    Q    What were you doing?

5    A    Playing Xbox.

6    Q    What game were you playing?

7    A    Call of Duty.

8    Q    And what occurred while you were at Boxer's house

9    playing Call of Duty on the Xbox?

10   A    Another member of the MS-13 gang showed up at Boxer's

11   house.

12   Q    And do you remember the name of this other member of

13   the MS-13?

14   A    Yes, sir.

15   Q    What was his name?

16   A    Pollo.

17   Q    And that's P-O-L-L-O?

18   A    Yes, sir.

19   Q    And did Pollo, did he belong to a particular clique

20   of the MS-13?

21   A    Yes, sir.

22   Q    What clique was that?

23   A    PLS, Pelones Locos Salvatrucha.

24   Q    And PLS, did they control a particular area on Long

25   Island?

1  A   Yes, sir.

2  Q   What general area did they control?

3  A   Hempstead.

4  Q   Now, what occurred after Pollo arrived at Boxer's

5  house?

6  A   We were there for a while and then we received that

7  call from Guanaco, who is another member of the MS-13

8  gang.

9  Q   What clique is Guanaco a member of?

10  A   Pelones also.

11  Q   PLS, the same as Pollo?

12  A   Yes, sir.

13  Q   And as a result of the phone call received from

14  Guanaco, what did you, Boxer and Pollo decide to do?

15  A   To go to Hempstead to pick him up.

16  Q   And did you in fact -- did you, Guanaco -- withdrawn.

17       Did you, Boxer and Pollo in fact go to

18  Hempstead?

19  A   Yes, sir.

20  Q   What happened once you got to Hempstead?

21  A   We pick him up.  We left the place where he was and

22  we went up to where the streetlight was.  Which was close

23  to El Rancho Bar.

24  Q   What happened when you got to that street corner?

25  Did you meet anyone?

1   A    Yes, sir.

2   Q    Who did you meet?

3   A    A person whose name used to be Princessa.

4   Q    And who is Princessa?

5   A    A gay person who knew Boxer and Pollo.

6   Q    And did you ever -- did you have a conversation with

7   Princessa?

8   A    Yes, sir.

9   Q    What did Princessa say?

10  A    That he wanted to invite us to a few beers and that

11  we would go to El Rancho Bar, and that he was going to

12  pay.

13  Q    And did you, Princessa, Boxer, Pollo and Guanaco, did

14  you end up going to El Rancho Bar?

15  A    Yes, sir.

16  Q    I'm going to show you what has already been in

17  evidence as 306.

18       Do you recognize that?

19  A    Yes, sir.

20  Q    What is depicted in 306?

21  A    El Rancho Bar, the place where we went.

22  Q    And what happened when you and the other members of

23  the group got into El Rancho?

24  A    We stayed there for about a half an hour drinking

25  some beers.  And then we realized Princessa was not around

1   and we decided to leave.

2   Q    And how many beers had you had?

3   A    Two.

4   Q    And what happened?

5   A    When we realized that Princessa wasn't there, we

6   decided to leave, but we didn't have money to pay.

7   Q    And what happened?

8   A    Boxer, Guanaco and Pollo left the bar and the

9   policeman, the security guard kept me, restrained me and

10  said that he was sorry that we couldn't pay for the beers,

11  but that he couldn't let me go like that.

12  Q    I'm showing you a photo of what is in evidence as

13  Government Exhibit 337.

14        Do you recognize that?

15  A    Yes, sir.

16  Q    Who is that a photograph of?

17  A    The same security guard who was there the night of

18  the incident.

19  Q    And when that security guard -- when he told you you

20  couldn't leave, what happened then?

21  A    As I was trying to leave and Boxer was telling him to

22  let me go, but I couldn't, I couldn't leave.

23  Q    And this -- where were you located within the bar

24  when the security guard stopped you?

25  A    Inside close to the door.

1  Q    Close to the front door?

2  A    Yes, sir.

3  Q    And when you got stopped where were Guanaco, Pollo

4  and Boxer?

5  A    They were outside telling him to let me go.

6  Q    Then what happened?

7  A    The policeman grabbed me by my shirt collar and threw

8  me to the ground.

9  Q    And by *policeman*, you mean the security guard?

10 A    Yes, sir.

11 Q    And after that happened, what happened next?

12 A    The security guard was holding me to the ground and

13 Boxer was telling him to let me go.  And then he started

14 approaching him with a bottle, kind of menacing,

15 threatening him like he was going to break it on his head.

16 Q    You said he approached him.  Who approached who with

17 the bottle?

18 A    Boxer approached the security guard.

19 Q    And did Boxer have anything in his hand?

20 A    Yes.  He had a bottle, a beer container.

21 Q    Was it a metal container or a glass bottle?

22 A    It was a glass bottle.

23 Q    What happened?

24 A    When the security realized that Boxer was approaching

25 him, he took out his spray and he sprayed him in the face.

1  Q    Do you know what type of spray this was?

2  A    Pepper spray.

3  Q    And where did this occur within the bar?

4  A    That happened outside of the bar close to the main

5  entrance to the front door.

6  Q    And when this happened, where were Pollo and Guanaco?

7  A    They were threatening him like they also wanted to

8  approach and hit him with a glass bottle in the head.

9  Q    Pollo and Guanaco, did they have anything in their

10  hand?

11  A    Yes, sir.

12  Q    What did they have?

13  A    Glass bottles.

14  Q    Did anyone -- did you see anyone with a knife that

15  night?

16  A    No, sir.

17  Q    Now, after the security guard sprays Boxer in the

18  face with the pepper spray; what happened next?

19  A    He let me go, the security guard let me go and Boxer

20  stood up and I started helping him walk.

21  Q    What was Boxer's physical condition like at this

22  time?

23  A    His face was red and he was very angry.

24  Q    Were you and the other members of your group, were

25  you allowed to leave the bar at that point?

1    A    Yes, sir.

2    Q    Did you -- were any of the other members -- did you

3    pay for your beers?

4    A    No, sir.

5    Q    Did anyone in your group including yourselves say

6    anything to the bouncer before you left?

7    A    We were all saying that we belonged to the Mara, and

8    Boxer was saying that this wouldn't end here.

9    Q    And by -- when you say *belonged to the Mara*, what

10   does that mean?

11   A    That we're letting him know that we belong to the

12   Mara, to the gang, and that they should not mess with us.

13   Q    Now, after you left the bar --

14        THE COURT:  Counsel, would this be a good time

15   to break now?

16        MR. TIERNEY:  Certainly, your Honor.

17        THE COURT:  We'll take the morning break.  Don't

18   discuss the case.

19        (A recess was taken at 11:10 a.m.)

20        (Continued on the following page.)

21

22

23

24

25

1     (The following ensued in the absence of

2  the jury at 11:35 am.)

3     THE COURT:  Please bring the witness in.

4     (The following ensued in the presence of the

5  jury.)

6     THE COURT:  Go ahead, Mr. Tierney.

7     MR. TIERNEY:  Thank you, your Honor.

8  DIRECT EXAMINATION (CONTINUED)

9  BY MR. TIERNEY:

10  Q.   Mr. Calderon, I believe when we left off prior to the

11  morning break, you and the other members Boxer, Pollo, and

12  Guanaca had just left the El Rancho Bar.

13     Do you remember those questions?

14  A.   Yes.

15  Q.   I'm just going to show you what has been placed in

16  evidence as Government Exhibit 316.

17     Do you recognize that, sir?

18  A.   It is the inside part of the bar.

19  Q.   And do you see depicted in that picture the

20  approximate area where the security guard stopped you?

21  A.   Yes, sir.

22  Q.   And where is that?

23  A.   It is near the chair.  Near the stool that is near

24  the door.

25  Q.   If you could just -- I know it is terrible up here,

1  but if you could just turn around use that, point it like

2  this, just point to the general area.

3         For the record, you are pointing just in the

4  general location of the exit, the front exit or entrance

5  to the bar?

6  A.   Yes, sir.

7  Q.   You can put that down.  Thank you.

8         And the ensuing altercation, where Boxer got

9  pepper sprayed in the face, where did that occur?

10 A.   Outside the bar.

11 Q.   Okay.  So it is outside that photograph.  On the

12 outside.

13 A.   Yes, sir.

14 Q.   Now, where did you and Boxer go after the incident at

15 El Rancho?

16 A.   We went to the back part or the back side of the

17 Rancho bar.  We stayed there for a while, applying snow on

18 his face.  And then we decided to go back to Far Rockaway.

19 Q.   When you got back to Far Rockaway, did you have a

20 conversation with Boxer?

21 A.   Yes, sir.

22 Q.   What did Boxer tell you about the incident that

23 happened in the bar?

24 A.   That it wouldn't end there and that nobody should

25 mess with the Mara.

1  Q.  I'm going to next call your attention to March 6,

2  2010.

3          Were you in Far Rockaway on that date?

4  A.  Yes, sir.

5  Q.  And on the evening of March 6, did there come a time

6  when anyone came to pick you up?

7  A.  Yes, sir.

8  Q.  Who came to your house?

9  A.  Carlito.  Boxer.  And Demente.  And Michichi.

10 Q.  By Boxer, you mean the defendant?

11 A.  Yes, sir.

12 Q.  And Carlito you identified earlier?

13 A.  Yes, sir.

14 Q.  I show you what has been marked as Government Exhibit

15 81.

16          Do you recognize that?

17 A.  Yes, sir.

18 Q.  And who is that?

19 A.  Demente.

20 Q.  Is he a member of any gang?

21 A.  He belongs to the Mara, MS-13.

22 Q.  And does he belong to a clique?

23 A.  Yes, sir.

24 Q.  Which clique?

25 A.  SNS Coronados.  El Locos Salvatrucha.

1  Q.  Is that the same clique as Boxer?

2  A.  Yes, sir.

3  Q.  What is Demente's position within SLS?

4  A.  He is just a regular member of the Mara, MS-13.

5  Q.  He is not a leader?

6  A.  No, sir.

7  Q.  And who is Michichi?

8  A.  A person who does favors for the Mara.

9  Q.  And is he in the MS-13?

10  A.  No, sir.

11  Q.  I show you what is already in evidence as Government

12  Exhibit 54.39.

13        Do you recognize who is depicted in that

14  photograph?

15  A.  Yes, sir.

16  Q.  Who is that?

17  A.  Michichi.

18  Q.  After those individuals came over to your house, what

19  did you do?

20  A.  They told me that my part was that I had to indicate

21  to them where rival gangs would be in Far Rockaway.

22  Q.  So did you and the other members of the group go out

23  into Far Rockaway?

24  A.  Yes, sir.

25  Q.  How did you go out into Far Rockaway?

1    A.    We went driving.

2    Q.    Whose car?

3    A.    Michichi's car.

4    Q.    Let me show you what has been previously marked as

5    Government Exhibit 307.2 in evidence.

6          Do you recognize that vehicle?

7    A.    Yes, sir.

8    Q.    Whose car is that?

9    A.    It is Michichi's car.

10   Q.    On March 6, 2010, when you and the other individuals

11   were driving around Far Rockaway in Michichi's car, what

12   were you doing?

13   A.    We went looking for rival gangs.

14   Q.    For what reason?

15   A.    To kill them.

16   Q.    And did you have any weapons to accomplish this?

17   A.    Yes, sir.

18   Q.    What did you have?

19   A.    A .22 caliber.

20   Q.    And is a .22 caliber, is that a handgun?

21   A.    Yes.  A small one.

22   Q.    And do you know the color of the gun?

23   A.    Silver.

24   Q.    And do you know whose gun that was?

25   A.    It belonged to Boxer's clique.

1  Q.   Is that CLS?

2  A.   Correct, sir.

3  Q.   And while you and the other members of the group were

4  driving around in the -- through Far Rockaway, were you

5  able to find any gang members, rival gang members?

6  A.   No, sir.

7  Q.   Then what happened?

8  A.   Well, it came to a point, after driving around Far

9  Rockaway it came to a point when Boxer said he wanted to

10 go and kill the security guard.

11 Q.   And after Boxer said this, what happened?

12 A.   We agreed.  And we went to Hempstead.

13 Q.   And you drove in Michichi's car?

14 A.   Yes, sir.

15 Q.   And once you got to Hempstead, where did you go?

16 A.   To the Rancho Bar.

17 Q.   Where did Michichi park his car?

18 A.   At the back, in a parking area where the Rancho

19 Bar is.

20 Q.   Now, either on the ride over or in the parking lot,

21 did you and the other people in the car, did you discuss

22 what you were going to do once you got to Hempstead?

23 A.   Yes, sir.

24 Q.   What did you and the other individuals discuss?

25 A.   To go and kill the security guard.

1  Q.   And did you discuss how this was going to be

2  accomplished?

3  A.   Yes, sir.

4  Q.   What did you discuss with regard to that?

5  A.   Well, that we were going to get there, get out of the

6  car, then go over there, and then Demente was going to

7  kill him and I was going to ID him.

8  Q.   Who -- was it decided who was going to get out of

9  the car?

10  A.   Yes, sir.

11  Q.   Who was going to get out of the car?

12  A.   Carlito.  Demente.  And myself.

13  Q.   And Demente was going to shoot the security guard?

14  A.   Yes, sir.

15  Q.   Did Demente have anything for that purpose?

16  A.   He wanted to know how it felt to kill.  To feel what

17  you felt when there was a death.

18  Q.   Did he have a weapon with him?

19  A.   Yes, sir.

20  Q.   Is that the .22?

21  A.   The same one.

22  Q.   And I believe you indicated you were chosen to pick

23  out the security guard.

24       Why were you chosen to do this?

25  A.   Because I had been already at that bar before and I

1   knew who Boxer was and I could recognize Boxer.

2   Q.   Boxer or the bouncer?

3   A.   I meant that the security guard could recognize

4   Boxer.

5   Q.   Okay.  So you were there that night.  So you were

6   chosen to point out the security guard?

7   A.   Yes, sir.

8   Q.   And Michichi and Boxer, what were they going to do?

9   A.   Wait.

10  Q.   And why was Boxer going to wait?

11  A.   Because he was going to be recognized and he's the

12  one who sent others to do the job.

13  Q.   Now, so after you, Carlito, and Demente get out of

14  the car, Michichi's car, what happens next?

15  A.   We started walking.  We got to the bar, El Rancho,

16  and we couldn't do anything because there was a lot of

17  people around the place, so we decided to keep on going

18  until the next light.

19          And at the next light, we crossed over to the

20  other street.  And when we came back, I stopped at a

21  certain point and I identified the security guard.

22  Q.   You saw the same security guard that you earlier had

23  the problem with?

24  A.   Yes, sir.

25  Q.   And did you point him out to Demente and Carlito?

1    A.    Yes, sir.

2    Q.    And what happened next?

3    A.    I identified the security guard and we decided to go

4    back to the car.

5    Q.    For what reason?

6    A.    Well, to talk about the fact that we couldn't do

7    anything else because there was a lot of people.

8    Q.    So do you, Demente, and Carlito, you go back to where

9    the -- Michichi's car is?

10   A.    Yes, sir.

11   Q.    And do you have a discussion at that time, once you

12   get back to where the car is?

13   A.    Yes, sir.

14   Q.    What's discussed?

15   A.    That it couldn't be done because there was a lot of

16   people.

17   Q.    And what was decided with regard to those other

18   people?

19   A.    That we had to go back to finish the job.

20   Q.    And what happened?

21         Was there any discussion as to what should be

22   done if anyone witnessed it or tried to interfere?

23   A.    Yes, sir.

24   Q.    What was that discussion?

25   A.    That if there was any other person around, the person

1    should also be eliminated.

2    Q.    And by eliminated, what do you mean?

3    A.    Kill the person.

4    Q.    Now, during these discussions amongst the group, who

5    was in charge?

6    A.    Boxer was.

7    Q.    Why is Boxer in charge?

8    A.    Because he is the leader.

9    Q.    Were there any other leaders of the MS-13 present in

10   that car that night other than the defendant?

11   A.    No.

12   Q.    And after this discussion, does there come a time

13   when any of the group returns to El Rancho?

14   A.    Yes, sir.

15   Q.    Who returns to El Rancho?

16   A.    Carlito, Demente, and myself.

17   Q.    And what happens after you, Demente, and Carlito

18   approach El Rancho Bar for a second time?

19   A.    We started walking.  We went all the way to the bar,

20   El Rancho, and there was nobody outside.

21   Q.    It wasn't as crowded?

22   A.    There was nobody outside.

23   Q.    So as you approached El Rancho and saw no one was

24   outside, what happened next?

25   A.    We decided to do the job.

1   Q.   What happened?

2   A.   We approached.  Carlito opened the door.

3   Q.   Now, when you say you approached.  You approached the

4   front entrance of El Rancho?

5   A.   Yes, sir.

6   Q.   What happened as you approached the front entrance of

7   El Rancho?

8   A.   We approached.  Carlito opened the door.  When

9   Carlito opens the door, the security guard turns his head

10  to one side.

11  Q.   Okay.  Now, where was the security guard located

12  within the bar in relation to the front door?

13  A.   Very close.  Like a meter away.

14  Q.   After Carlito opened the door, what happened?

15  A.   The security guard put his head outside the door and

16  turned sideways.

17  Q.   Did he put his head outside the door or did he just

18  turn his head sideways?

19  A.   Well, he put his head outside but he was sitting down

20  and then he just turned his head sideways.

21  Q.   So you are saying he turned his head to the direction

22  of the door?

23  A.   Yes, sir.

24  Q.   Then what happened?

25  A.   When the security guard turned sideways, Demente was

1    pointing the gun at him and shot him.

2    Q.    Did Demente say anything just prior to firing the

3    gun?

4    A.    Yes.

5    Q.    What did he say?

6    A.    *Good-bye.*

7    Q.    After -- how many times did Demente shoot?

8    A.    One time.

9    Q.    Did you see where -- withdrawn.

10          Did you see whether or not the bullet struck the

11   security guard?

12   A.    Yes, sir.

13   Q.    Where did the bullet strike the security guard?

14   A.    Around his forehead.  Maybe here.

15   Q.    So you are gesturing, for the record, you are

16   pointing to an area located in the approximate middle of

17   the security guard's forehead, above his eyebrows.

18   A.    Yes, sir.

19   Q.    And after Demente shot the security guard, what

20   happened next?

21   A.    The security guard dropped to the floor and Carlito

22   closed the door and we started running.

23   Q.    And where are you running to?

24   A.    To the back part, where Boxer and Michichi were

25   waiting for us.

1  Q.   That night -- and as you were running, what if

2  anything happened?

3  A.   Demente started running, Carlito followed him, and I

4  was the last one.

5       And Carlito that night had my cellular phone and

6  he dropped it.  He threw it down and then the telephone

7  broke down in little pieces.

8  Q.   Did Carlito throw the phone down or did the phone

9  just drop out of his sweatshirt?

10      MR. LEVINE:  Objection.  Assumes facts not in

11 evidence.

12      THE COURT:  Overruled.

13 A.   Yes.

14      MR. LEVINE:  I believe there was

15 testimony that --

16      MR. TIERNEY:  I will ask it another way.

17 BY MR. TIERNEY:

18 Q.   How did that phone end up on the sidewalk?

19 A.   Well, when Carlito started running, he had a sweater

20 that had openings on both sides and so it fell to the

21 ground.

22 Q.   The three of you, what were you wearing on the top of

23 your bodies that night?

24 A.   What do you mean, the upper part of the body?

25 Q.   What were you wearing?

1   Were you wearing a jacket?  Were you wearing a

2   sweatshirt?  What were you wearing?

3   A.   We were wearing a sweater.  And they all had like a

4   pocket.

5   Q.   So is it like a sweatshirt with a hood, and one giant

6   pocket in the middle of the sweatshirt?

7            MR. LEVINE:  Objection.

8            THE COURT:  Overruled.

9   A.   Yes, sir.

10  BY MR. TIERNEY:

11  Q.   You all had those types of sweatshirts?

12  A.   Yes, sir.

13  Q.   What color was yours?

14  A.   It was dark purple.

15  Q.   What color was Demente's?

16  A.   Black.

17  Q.   What color was Carlito's?

18  A.   I don't remember, sir.

19  Q.   And as you were running, I believe you testified

20  Demente was ahead of you, Carlito was next, and you were

21  following?

22  A.   Yes, sir.

23  Q.   After the phone fell out of Carlito's pocket, what if

24  anything did you do?

25  A.   Well, we started running, and I picked up the phone

1  but I left behind the back part of the phone and also the

2  battery, and we started running.

3  Q.   So you just picked up the main part of the phone?

4  A.   Yes, sir.

5  Q.   And where -- the three of you, where did you run to?

6  A.   Towards the back area, where Michichi and Boxer were

7  waiting for us.

8  Q.   And did you get into the car?

9  A.   Yes, sir.

10  Q.   And once you got into the car, where did you guys go?

11  A.   To Brentwood.

12  Q.   And while you got into the car -- withdrawn.

13         After you, Carlito, and Demente got in the car,

14  was anything said?

15  A.   Yes, sir.

16  Q.   What was said in the car?

17  A.   They were saying La Mara.  La Mara.  And also the

18  Coronados and the Surenos will be together forever.  And

19  nobody will beat us.  And nobody messes with the Mara.

20  Q.   Who said this?

21  A.   All of us.

22  Q.   How were you saying it?

23  A.   *La Mara!  La Mara!  La Mara!*

24         We were all screaming *La Mara* inside of the car.

25  Q.   And was there are mention of the beast?

1    A.    Yes, sir.

2    Q.    What was discussed with regard to the beast?

3    A.    That that night we have fed the beast.

4    Q.    Now, I believe you indicated that there came a time

5    when you were arrested.

6                Do you remember that, sir?

7    A.    Yes, sir.

8    Q.    And when you were arrested, did you have a cell phone

9    on you?

10   A.    Yes, sir.

11   Q.    And did you allow the agents who arrested you to take

12   a look at that phone?

13   A.    Yes, sir.

14   Q.    I'm going to show you what has previously been marked

15   as Government Exhibit 333 in evidence.  I just ask that

16   you take a look at that.

17                Do you recognize that?

18   A.    That's my cell phone.

19   Q.    And that cell phone, did you also have Government

20   Exhibit 333, was this the same cell phone that you had on

21   you the night that the security guard was murdered?

22   A.    Yes, sir.

23                MR. LEVINE:  Could we have a sidebar, judge?

24                THE COURT:  Yes.

25                (Discussion at sidebar ensued as follows.)

1208

1   MR. DURHAM:  If I said -- judge, maybe I can

2   short-circuit this.

3          If I said it was already in evidence, I

4   misspoke.  I'm going to attempt to place it in evidence

5   through this defendant.

6          THE COURT:  Okay.

7          MR. TIERNEY:  Sorry.

8          While we are here, do you have any objection?

9          MR. LEVINE:  I didn't hear it identified as his

10  phone.

11         MR. TIERNEY:  Yes.  He had it the night of the

12  murder and also the night he was arrested.

13         MR. LEVINE:  Okay.

14         THE COURT:  Any objection?

15         I will clarify that, obviously.

16         MS. RANTALA:  No objection.

17         MR. LEVINE:  No.

18         (Discussion at sidebar was concluded.)

19         THE COURT:  Members of the jury, that exhibit is

20  not in evidence yet.  Mr. Tierney misspoke.  It's not in

21  evidence yet.

22         But I don't know, the question of the witness,

23  I'm not sure that he answered it before the objection.

24  BY MR. TIERNEY:

25  Q.   This phone, did you have this phone both on the night

1    that the security guard was murdered as well as on the

2    night you were arrested?

3    A.    Yes, sir.

4    Q.    And is this phone in the same or substantially the

5    same condition as it was on the day that you were

6    arrested?

7    A.    No.

8    Q.    What is different?

9    A.    The back lid and the battery were replaced.

10   Q.    Did you replace that before or after you were

11   arrested?

12   A.    Before I got arrested.

13   Q.    So is this phone in the same condition as it was

14   after you replaced the back of it as well as the battery?

15   A.    Can you repeat that?

16   Q.    Is this phone in the same condition as it was on the

17   day that you were arrested?

18   A.    Yes, sir.

19            MR. TIERNEY:  I move it into in evidence now,

20   your Honor, as Government Exhibit 333.

21            MR. LEVINE:  I have no objection.

22            MS. RANTALA:  No objection, your Honor.

23            THE COURT:  Government Exhibit 333 is admitted.

24            (Government Exhibit 333 in evidence.)

25

1  BY MR. TIERNEY:

2  Q.   Now, you indicated earlier that you left the phone

3  back and the battery to the phone, on the sidewalk at El

4  Rancho.  Correct?

5  A.   Yes, sir.

6  Q.   How did you get the phone working again?

7  A.   Because I replaced the battery.

8  Q.   Did you replace the battery and the back of the

9  phone?

10  A.   Yes, sir.

11  Q.   With what?  What did you replace it with?

12  A.   With another lid and battery.

13  Q.   So Government Exhibit 333, this part of the phone you

14  replaced?

15  A.   Yes, sir.

16        MR. TIERNEY:  For the record, I'm showing the

17  witness the back portion of the phone.

18        THE COURT:  Yes.

19  BY MR. TIERNEY:

20  Q.   And the battery, the battery inside the phone, that

21  is -- you replaced it?

22  A.   Yes, sir.

23  Q.   Where did you get the back of the phone as well as

24  the battery?

25  A.   My ex-girlfriend gave them to me.

1    Q.   From a different phone?

2    A.   Yes.

3    Q.   I'm going to show you what has been previously marked

4    in evidence as Government Exhibit 331B.

5         Do you recognize that?

6    A.   That's the back lid.

7    Q.   That is the back lid of your phone?

8    A.   Yes, sir.

9         MR. TIERNEY:  Your Honor, could I just show the

10   jury the different phones?

11        THE COURT:  Sure.

12   BY MR. TIERNEY:

13   Q.   Just with regard to this back.  Does there appear to

14   be dirt in the replacement back?  In the holes?

15   A.   Yes.

16   Q.   Does that dirt, does that exist on this phone?

17   A.   No, sir.

18   Q.   I'm just going to show the back to the jury.

19        THE COURT:  Just give it to them, Mr. Tierney.

20        So the record is clear, are you giving them

21   both?

22        MR. TIERNEY:  I'm giving the replacement parts

23   now, and then I'm going to put the part of the phone that

24   was recovered at the scene next.

25        THE COURT:  So right now they have?

1    MR. TIERNEY:  The phone as it exists at the time

2  of his arrest with the replacement part.

3    THE COURT:  Okay.  Why don't you get the other

4  one started while --

5    MR. TIERNEY:  I kind of wanted to show it

6  separately.

7    THE COURT:  Okay.

8    MR. TIERNEY:  I'm putting the part of the phone

9  that was found at the scene now, your Honor.

10    THE COURT:  Which is Government Exhibit what?

11    MR. TIERNEY:  Government Exhibit 331B.

12    THE COURT:  All right.

13    MR. TIERNEY:  Thank you, your Honor.

14  BY MR. TIERNEY:

15  Q.    Now I'm just going to show you what is in evidence as

16  Government Exhibit 314.

17        Do you recognize that?

18  A.    That's the bar.

19  Q.    Which part of the bar?

20  A.    The front.

21  Q.    And I'm next going to show you what is in evidence as

22  Government Exhibit 317.

23        Do you recognize that?

24  A.    That's the inside.

25  Q.    And do you see the approximate location of where the

1   bouncer was located on the night he was murdered?

2   A.   Yes, sir.

3   Q.   And just, if you could, use that laser pointer.  If

4   you could just point out on the overhead, where was the

5   bouncer located?

6   A.   There.

7   Q.   Again, you are pointing to a location to the left of

8   the stain on the floor.

9   A.   Yes, sir.

10  Q.   And was he standing in that location or was he

11  sitting?

12  A.   He was sitting.

13  Q.   And the chair he was sitting in, obviously that is

14  not depicted in that photo.  Correct?

15  A.   No, sir.

16  Q.   You can stop.  Thank you, sir.

17          Now, on the date that you were arrested, did you

18  speak with members of the Nassau County Homicide Division?

19  A.   Yes, sir.

20  Q.   And did you prepare a diagram, with one of the

21  homicide detectives, of what happened that night at

22  El Rancho?

23  A.   Yes, sir.

24  Q.   I'm going to show you what has been marked as

25  Government Exhibit 340 for identification.

1          Do you recognize that?

2    A.    Yes, sir.

3    Q.    What is Government Exhibit 340?

4    A.    That is the diagram that the officer drew up.  That I

5    asked him to draw.

6    Q.    Did you draw that up on the night of your arrest

7    later in March with the assistance of that homicide

8    detective?

9    A.    Yes, sir.

10   Q.    And does that diagram fairly and accurately depict

11   the general location of the participants in the murder of

12   the bouncer at or around the time that the bouncer was

13   murdered?

14   A.    Right, sir.

15   Q.    And would it assist you today in your testimony

16   before this jury?

17   A.    Yes, sir.

18          MR. TIERNEY:  Your Honor, I would move that in

19   as Government Exhibit 340.

20          MR. LEVINE:  Could I see that?

21          MR. TIERNEY:  Sure.

22          MR. LEVINE:  No objection.

23          MS. RANTALA:  No objection, your Honor.

24          THE COURT:  Government Exhibit 340 is admitted.

25          (Government Exhibit 340 in evidence.)

1    BY MR. TIERNEY:

2    Q.    I'm just going to, I have placed, for the record,

3    Government Exhibit 340 on the overhead.

4            And the top portion of the document, is that an

5    aerial photo of something?

6    A.    Yes, sir.

7    Q.    What is that an aerial photo of?

8    A.    The Rancho Bar.

9    Q.    Now, and then below that, is that the document that

10   you prepared with the assistance of the homicide

11   detective?

12   A.    Yes, sir.

13   Q.    Now, the top portion -- and I apologize; it might be

14   a little difficult to see in the overhead; but in your

15   monitor do you see a triangle with a No. 1 in it, located

16   at the top of the diagram?

17   A.    Yes, sir.

18   Q.    What does that represent?

19   A.    The point where we arrived initially in the parking

20   lot and where Michichi parked.

21   Q.    So that is where Michichi initially parked.

22   A.    The first time.  Yes.

23   Q.    And then extending from that triangle is the No. 1,

24   and it proceeds down one street, across to the other.  And

25   this box that says El Rancho, what does that depict?

1    A.    The bar.

2    Q.    So the No. 1 passes past El Rancho and then you cross

3    the street and the 1 ends at an X.

4              What is the approximate location that that X

5    signifies?

6    A.    Where I stopped and pointed out the security guard.

7    Q.    And who were you with?

8    A.    With Carlito and Demente.

9    Q.    And then the No. 2 that extends from that X and it

10   goes back across the street and it ends at a triangle with

11   a 2 inside of it, what does all that signify?

12   A.    That's the way we returned towards the car and then

13   the place where we had the second conversation.

14   Q.    So the No. 2, Michichi had moved the location of

15   the car?

16   A.    Yes, sir.

17   Q.    And then you had that conversation in that area.  And

18   then who goes back to the bar?

19   A.    Demente, Carlito, and myself.

20   Q.    And then there is, from a triangle with a 2, there is

21   a 3 that ends at El Rancho.

22              What does that signify?

23   A.    The third time we returned to the bar.

24   Q.    And then after you go back to the bar, there is a 3,

25   there is a triangle with a 3 in it, and then there is an

1    arrow pointing up the page.

2           What does that triangle with a 3 and what does

3    that arrow pointing up, what does that signify?

4    A.    The No. 3 is the third time that Michichi had moved

5    the car, changed the position of the car.  And the arrow

6    is pointing in the direction that we took off.

7    Q.    So after you went back and murdered the bouncer, then

8    you ran from the front of El Ranch Bar to where the 3 is,

9    and then Michichi pulled out in that direction?

10   A.    Yes, sir.

11   Q.    Now, once you and the other people you were with got

12   in Michichi's car, where did you go?

13   A.    We went to a park in Brentwood.

14   Q.    And what did you do?

15   A.    We were smoking weed.

16   Q.    And did there come a time when somebody left the

17   group?

18   A.    Yes, sir.

19   Q.    Who left?

20   A.    Demente did.

21   Q.    Did he take anything with him?

22   A.    The weapon.

23   Q.    Did you see, after the murder did you see where the

24   weapon went?

25   A.    Inside a box, a cell phone box, inside a blue

1  backpack.

2  Q.   And so there was the gun, the .22 was put inside a

3  box?

4  A.   Yes.

5  Q.   Was that a cell phone box?

6  A.   Yes, sir.

7  Q.   And once the gun was placed in the cell phone box,

8  where did the cell phone box go?

9  A.   Excuse me?

10 Q.   Was the cell phone box, was that placed inside of

11 anything?

12 A.   Inside a blue backpack.

13 Q.   And when Demente committed the murder, was he wearing

14 anything on his hand?

15 A.   He was wearing gloves, black gloves with a figure of

16 a skeleton.

17 Q.   A skeleton, like a hand on the black gloves?

18 A.   Yes, sir.

19 Q.   Where did those gloves go?

20 A.   They were put inside the blue backpack together with

21 the gun.

22 Q.   And then when Demente left, did he take the gloves,

23 the two -- the gun and the blue bag and the cell phone bag

24 (sic) with him?

25 A.   Yes, sir.

1    Q.    Now, during that period of time did you have a

2    conversation with Boxer with regard to what had happened

3    at the bar?

4    A.    Yes, sir.

5    Q.    What if anything did Boxer tell you about what had

6    happened at the bar?

7    A.    That Demente had managed to have his first killing

8    and that he has his balls in the right place and that he

9    was a good soldier.

10   Q.    By good soldier, what did you take that to mean?

11   A.    That he was a good gang member for the MS-13.

12   Q.    I'm next going to call your attention to the early --

13   withdrawn.

14          And after you guys were done hanging out in

15   Brentwood, where did you go?

16   A.    Michichi got a call.  Our intention was to go back to

17   Far Rockaway, but Michichi got a call from a woman for him

18   to go pick her up.  She was at a party.

19   Q.    Did you pick this woman up?

20   A.    Yes, sir.

21   Q.    Was there any discussion of the murder once you got

22   in the car?

23   A.    No, sir.

24   Q.    And after that did Michichi eventually take you and

25   Boxer back to Far Rockaway?

1   A.   Yes, sir.

2   Q.   I'm next going to call your attention to the early

3   evening of March 16, 2010.

4        Where were you on that date?

5   A.   At Payaso's house.

6   Q.   Who else was at Payaso's house?

7   A.   Boxer.  Little Lonely.  Carlito.  Payaso.  Gabriel.

8   And myself.

9   Q.   And Boxer is the defendant.  Correct?

10  A.   That's right.

11  Q.   And Carlito, Little Lonely, and Payaso, they are

12  fellow SLS members.  Correct?

13  A.   Yes, sir.

14  Q.   Who is Gabriel?

15  A.   That's a friend of Payaso's.

16  Q.   Is he a MS-13 gang member?

17  A.   No, sir.

18  Q.   And did you have a conversation with Boxer at that

19  time with regard to who was going to be coming over that

20  evening?

21  A.   Yes, sir.

22  Q.   What did he say?

23  A.   That a big home boy from El Salvador was coming to do

24  an inspection of the cliques and of our clique to see how

25  the SLS clique was being run.

1    Q.    And when he said *big home boy*, what did you take that

2    to mean?

3    A.    A person from El Salvador, which means, you know, was

4    a fellow member of MS-13.

5    Q.    And did he tell you what clique this individual

6    belonged to?

7    A.    Sitios Locos Salvatruchas.

8    Q.    And did he tell you what this individual's name was?

9    A.    Silencio.

10   Q.    And did there come a time when Silencio got to

11   Payaso's house?

12   A.    Yes, sir.

13   Q.    And that Silencio, is that the same individual that

14   you identified earlier this morning?

15   A.    Yes, sir.

16   Q.    And when Silencio got to Payaso's house, did he come

17   with anyone?

18         THE INTERPRETER:  Could you please repeat the

19   question?

20   Q.    Sure.  When Silencio got there, did he come to

21   Payaso's house with anyone?

22   A.    Yes, sir.

23   Q.    Who did he come with?

24   A.    With Michichi and Demente.

25   Q.    And Demente was the person earlier you testified with

1222

1    regard to El Rancho?

2    A.    Yes, sir.

3    Q.    Michichi is the associate with the car?

4    A.    Yes, sir.

5    Q.    What happened once Silencio and the others arrived at

6    Payaso's house?

7    A.    We had like a mass.  And we started discussing what

8    was happening in our clique and that it wasn't really

9    going well.

10   Q.    Now you used the term *misa*.

11         Does the term misa have any significance in the

12   MS-13?

13   A.    Yes, sir.

14   Q.    What does misa mean?

15   A.    When the members of the Mara MS-13 get together to

16   discuss.

17   Q.    So a misa is like an MS-13 meeting.

18   A.    Correct, sir.

19         MS. MACEDONIO:  Judge, there is no translation

20   going on.  A lot of this being done in Spanish.  It's

21   understood that the interpreter can hear the witness but

22   the defendant can't.

23         THE COURT:  I'm going to ask the witness to move

24   closer to the mic.  And if the defendant can't hear at any

25   point, let me know, as you did.

1    THE INTERPRETER:  The interpreter would like to

2  state that she did translate *misa* for mass, which would be

3  the literal translation of the word.

4    MS. MACEDONIO:  I couldn't hear what the

5  interpreter just said.

6    THE COURT:  Could you repeat that.

7    THE INTERPRETER:  The interpreter would like to

8  state that she did interpret the worth misa, M-I-S-A, as

9  mass, M-A-S-S, because that is the literal meaning of the

10  word in English.

11    MR. TIERNEY:  May I proceed, your Honor?

12    THE COURT:  Yes.

13  BY MR. TIERNEY:

14  Q.   Now, during this meeting where were Gabriel and

15  Michichi, the non-MS13 members?

16  A.   They were in the living room.

17  Q.   What was discussed at this meeting?

18  A.   It was discussed that Baby Blue wasn't running

19  properly.  That he only caused problems and never solved a

20  thing.

21  Q.   And Baby Blue, is that -- that's an SLS member?

22  A.   Yes, sir.

23  Q.   And was a plan discussed amongst the members to --

24    MS. RANTALA:  Objection.  Leading.

25    THE COURT:  Sustained.

1224

1   BY MR. TIERNEY:

2   Q.   What was discussed with regard to Baby Blue?

3   A.   That he was no good for the Mara because he only

4   caused problems and that therefore a *mision*, m-i-s-o-n,

5   was going to be started.

6   Q.   A mission is when MS-13 members go out and look for

7   rivals?

8   A.   Yes, sir.

9   Q.   For what reason were -- was the MS-13 going to go out

10  on this mission?

11  A.   Because of the fact that Baby Blue was not doing

12  anything for the Mara and that he only brought problems

13  and that he was going to be on probation.

14  Q.   What was Baby Blue going to be required to do during

15  this mission?

16  A.   Kill a person.  Kill somebody from a rival gang.

17  Q.   And who goes out -- and do you in fact go out on a

18  mission?

19  A.   Yes, sir.

20  Q.   Who goes out on the mission?

21  A.   Silencio.  Me.  Boxer.  Demente.  Baby Blue.  And

22  Michichi.

23  Q.   And Baby Blue is not there, so you go and you pick up

24  Baby Blue?

25  A.   Correct.

1   Q.   And you are driving in Michichi's car?

2           MS. RANTALA:  Objection.  Leading.

3           THE COURT:  Sustained.  Sustained.

4   BY MR. TIERNEY:

5   Q.   Who's driving?

6   A.   Michichi was.

7   Q.   In what car?

8   A.   In his car.

9   Q.   The same car that you identified before?

10  A.   Yes, sir.

11  Q.   And once all of you get in Michichi's car, where do

12  you go?

13  A.   To pick up Baby Blue.

14  Q.   And after you pick up Baby Blue, where do you go?

15  A.   Go around looking for rivals.

16  Q.   And what happens?  Are you able to find any?

17  A.   No, sir.

18  Q.   So after that what happens?

19  A.   Well, it got to a point where we decided to go back

20  home and then we were going to drop Baby Blue -- and

21  actually he did say or ask to be forgiven, but the fact is

22  that he said he never pulled a trigger and he was no good

23  to do anything like that.

24  Q.   And Baby Blue told you that while you were looking

25  for rivals.

1    A.    Yes, sir.

2    Q.    Then, after Baby Blue said that, you dropped Baby

3    Blue off at his house?

4    A.    Yes, sir.

5    Q.    And the rest of the people in the car, where did

6    they go?

7    A.    Back again to Payaso's house.

8    Q.    And once you get back to Payaso's house, what

9    happens?

10   A.    We started discussing things again.  And then we were

11   saying that he was no good and that he had to be

12   eliminated.

13   Q.    And you indicated we were discussing that he was no

14   good.

15         Who is *he*?

16   A.    Payaso, Little Lonely, Carlito, myself, Boxer,

17   Demente, and Silencio.

18   Q.    So did you guys have another meeting?

19   A.    Another misa.

20   Q.    During the second meeting, where was Michichi and

21   Gabriel?

22   A.    In the same living room.

23   Q.    Were they a part of the meeting?

24   A.    No, sir.

25   Q.    During this meeting what was discussed with regard to

1    Baby Blue?

2    A.   That he had to be eliminated because he only brought

3    or caused problems and that he was not there to help the

4    Mara.

5    Q.   By eliminated, what does *eliminated* mean?

6    A.   Kill him.

7    Q.   Did Silencio say anything about what Baby Blue said

8    in the car while you were hunting chavalas?

9    A.   That people like that should not be in the Mara.

10   Q.   Now, who was doing most of the talking during this

11   meeting?

12   A.   Payaso.

13   Q.   And did there come a time when a vote was taken as to

14   what to do with Baby Blue?

15   A.   Yes, sir.

16   Q.   What was the result of that vote?

17   A.   To go pick him up and go kill him.

18   Q.   And did anyone, any of the MS-13 members, did anyone

19   speak out in opposition to this plan?

20   A.   No.   Nobody.

21   Q.   Then after that meeting, did there come a time when

22   members of the MS-13 left Payaso's apartment?

23   A.   Yes, sir.

24   Q.   Who left the apartment?

25   A.   Little Lonely.   Boxer.   Silencio.   Michichi.   And

1  Payaso.

2  Q.   And did they have a certain plan?

3  A.   To go pick him up and kill him.

4  Q.   And who is *he*?

5  A.   Baby Blue.

6        MR. TIERNEY:  Your Honor, do you want me to

7  continue?

8        THE COURT:  No.  Let's break here for lunch.  We

9  will break for lunch and reconvene at 2 o'clock.

10        Don't discuss the case.

11        (The following ensued in the absence of the jury

12  at 12:40 pm.)

13        THE COURT:  Everyone, please be seated.  I did

14  want to address the defense subpoenas.  I'm assuming you

15  want this done ex parte?  Should the government clear out?

16        I want to ask them some questions regarding this

17  subpoena.

18        MS. MACEDONIO:  I'm happy to step up to sidebar.

19        THE COURT:  All right.

20        (Discussion at sidebar ensued.  Defense counsel

21  present.  Government counsel not present.  Record of

22  sidebar was ordered sealed and so is not included in the

23  trial record.)

24

25

1

2

3

4

5          This page is reserved for text which the Court

6    has ordered to be sealed.

7

8

9                                    Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1230

1

2

3

4

5          This page is reserved for text which the Court

6     has ordered to be sealed.

7

8

9                              Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1231

1    THE COURT:  So the record is clear, the sidebar

2  was conducted under seal, with copies to be made available

3  to defense counsel and their clients, if they wish.

4    Anything else?

5    How much more do you have, Mr. Tierney?

6    MR. TIERNEY:  I would say about 45 minutes, your

7  Honor.

8    THE COURT:  Have a good lunch.

9    (Lunch recess taken at 12:45 pm.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **AFTERNOON SESSION**

2

3          (The following took place at 2:04 p.m.)

4          THE COURT:  Continue, Mr. Tierney.

5          MR. TIERNEY: Thank you, your Honor.

6

7    DIRECT EXAMINATION  (Continued)

8    BY MR. TIERNEY:

9    Q    Mr. Calderon, I believe when we left after at lunch

10   you indicated that the defendants Boxer, Silencio, Little

11   Lonely and Payaso, as well as Michichi left Payaso's

12   apartment to go pick up Baby Blue.

13   A    Yes.

14   Q    How was it decided who out of the MS-13 was going to

15   go and who was going to stay back at the apartment?

16   A    Well, the people that were, the people who were going

17   to go on that mission were chosen.  We voted and we

18   decided who was going to go.

19          THE COURT:  Would you stay closer to the mic and

20   keep your voice up.

21   BY MR. TIERNEY:

22   Q    Initially were you selected to go?

23   A    Yes, sir.

24   Q    What happened?

25   A    Well, I was told that I couldn't go because I

1  participated in the crime that had to do with the security

2  guard.

3  Q    So who replaced you?

4  A    Little Lonely.

5  Q    Now after those individuals left the apartment, who

6  stayed back at the apartment?

7  A    Carlito, Demente and Gabriel.

8  Q    And what did you guys do?

9  A    We stayed and waited at Payaso's apartment.

10 Q    And while you were at the apartment, did there come a

11 time when you received a call from any of the individuals

12 who left?

13 A    Yes, sir.

14 Q    Approximately what time did you receive this call?

15 A    Around midnight, around twelve am.

16 Q    What happened?

17 A    We got a call from Silencio asking us to go pick them

18 up because they needed us to go over there, the police was

19 after them.

20 Q    Who received the call?

21 A    Carlito.

22 Q    And were you able to hear Silencio on the other line.

23         MR. LONDON:  Objection leading.

24         THE COURT:  Sustained.

25

1    BY MR. TIERNEY:

2    Q    So on whose phone was Carlito's call?

3    A    That was Payaso's telephone.  He lent it to Carlito.

4    Q    So Carlito received a call back on Payaso's phone?

5    A    Yes, sir.

6    Q    And were you able to hear Carlito on the phone?

7    A    Yes, sir.

8    Q    Were you able to hear the other person on the phone?

9    A    No, sir.

10   Q    After Carlito hung up the phone did he tell you about

11   the conversation?

12           MR. LONDON:  Objection, leading.

13           THE COURT:  That's okay.

14   A    Excuse me?

15   BY MR. TIERNEY:

16   Q    After Carlito hung up the phone did he tell you about

17   the conversation?

18   A    Yes, sir.

19   Q    What did Carlito tell you?

20   A    That things went wrong and Silencio said they needed

21   help.

22   Q    Did he tell you anything else?

23   A    That he needed a car to go pick him up, or some help.

24   Q    So Carlito told you that Silencio told him that he

25   needed a car to pick them up.  Is that correct?

1    A    Yes, sir.

2    Q    Who is *they*?

3    A    Payaso and Silencio.

4    Q    And did Carlito tell you whether or not Silencio told

5    him what happened to the other members who left the

6    apartment?

7             MR. LONDON:  Objection; leading.

8             THE COURT:  Sustained.

9    BY MR. TIERNEY:

10   Q    What if anything else did Payaso tell you about that

11   conversation that he had with Silencio on the phone?

12   A    You mean Carlito?

13   Q    I meant Carlito, yes.

14   A    That the police were after them.  That they were able

15   to flee, but Little Lonely, Michichi and Boxer were caught

16   by the police.

17   Q    And by, you said they were able to flee.  By *they*, do

18   you mean Payaso and Silencio?

19             MR. LONDON:  Objection.

20             THE COURT:  Sustained.

21   BY MR. TIERNEY:

22   Q    What do you mean by *they* --

23             MR. LONDON:  Your Honor, may we have a sidebar?

24             THE COURT:  Yes.

25             (The following occurred at sidebar.)

1    MR. LONDON:  It may be inadvertent, but counsel

2  is leading the witness, suggesting the answer.  When an

3  objection is made he rephrases the question properly.  But

4  the witness already has the answer by the leading question

5  that was put to him in the question before.

6    THE COURT:  This guy has been on the stand for

7  two hours.  And he has been very good up to this point.

8  So I sustain the objection.  It was leading.  But I know

9  you may be trying to expedite things.

10    MR. TIERNEY:  I am, your Honor, and I apologize.

11    THE COURT:  But just let him -- if you need him

12  to, it's okay to clarify anything he says after he says

13  it.  But when he is describing the events of what

14  happened, just as you were doing this morning, just say,

15  *what happened next*, *what if anything else was said*?  You

16  know how to do it.

17    MR. TIERNEY:  I do.  My intention with regard to

18  this is to have the answer read back and I'm going to ask

19  him, What do you mean?  Who do you mean by that?

20    THE COURT:  That's the way to do it.

21    MR. LONDON:  Thank you judge.

22    (The following occurred in open court.)

23    MR. TIERNEY:  Your Honor, may I have the

24  witness's last question read back.

25    THE COURT:  If you can?

1    MR. TIERNEY:  I mean the question and answer

2    read back.

3    THE COURT:  The question and answer.

4    (The last question and answer was read back.)

5    THE INTERPRETER:  Could you plead tell me a

6    little slower.

7    THE COURT:  Could you read it a little slower.

8    (The last question and answer was read back.)

9    BY MR. TIERNEY:

10   Q    You say *they*.  Who did you mean by *they*?

11   A    Little Lonely, Boxer and Michichi.

12   Q    What happened to those individuals?

13   A    Silencio said they had been arrested.

14   Q    And what happened to Silencio and Payaso?

15   A    They were able to flee.

16   MR. LONDON:  What was that?

17   THE INTERPRETER:  They were able to flee.

18   BY MR. TIERNEY:

19   Q    Now, did there come a time earlier that morning when

20   someone came back to Payaso's apartment?

21   A    Yes, sir.

22   Q    Do you remember approximately when?

23   A    Friday and the following day.

24   Q    Who came back to the apartment on that Friday?

25   A    Payaso and Silencio.

1  Q    And physically how did they look when they got back

2  to the apartment at that time?

3  A    They were scared, dirty, full of sand and wet.

4  Q    Now, did you see what if anything Silencio and Payaso

5  did with their clothes once they got back to the

6  apartment?

7            MS. RANTALA:  Objection, leading.

8            THE COURT:  No, I'll allow that.

9  A    They took the clothes off.  They put them in a bag

10  and they threw the clothes away in the garbage of the

11  building.

12  BY MR. TIERNEY:

13  Q    Now, after Payaso and Silencio got back to the

14  apartment and changed, what happened next?

15            MS. RANTALA:  Objection as to facts not in

16  evidence.

17            THE COURT:  Overruled.

18  A    We picked up money to be able to help Demente, to

19  help him go to a taxi station so he could go back home.

20  BY MR. TIERNEY:

21  Q    And did you walk anywhere after Payaso and Silencio

22  got back to the apartment?

23            THE INTERPRETER:  Do you man, would you like to

24  know --

25            MR. TIERNEY:  Did the witness walk anywhere?

1    A    Yes, sir.  I went to drop him at the taxi station to

2    together with Paliatso.

3    BY MR. TIERNEY:

4    Q    And who went to the, who else went to the taxi stand

5    with you?

6    A    Silencio and Demente.

7    Q    And what happened when the group got to the taxi

8    station?

9    A    They go into the taxi and they went to Brentwood.

10   Q    Who is *they*?

11   A    Demente and Silencio.

12   Q    And after Demente and Silencio got into the taxi,

13   what did you and Payaso do?

14   A    Payaso and I went back to Payaso's house.

15   Q    And did you have a conversation with Payaso at that

16   time?

17   A    Yes, sir.

18   Q    What did Payaso tell you?

19   A    He started telling me the whole story how it

20   happened.

21   Q    What did Payaso tell you?

22   A    That Michichi and Boxer, and Silencio and Little

23   Lonely went to pick up Baby Blue with excuse that they

24   were going to go to a mission?  And they took him to a

25   beach.

1  Q    And did Payaso tell you what happened when they got

2  to the beach?

3  A    Yes, sir.

4  Q    What happened?

5  A    They were all standing, they were all together.  And

6  Payaso told Baby Blue to turn to a certain side.  And when

7  Baby Blue turned his head, then Payaso pointed the gun to

8  his head.

9  Q    Now you indicated *they*.  Who is out on the beach?

10 A    Boxer, Little Lonely, Payaso and Silencio.

11 Q    Where is Michichi?

12 A    He was waiting in the car.

13 Q    And you indicated that while they were on the beach

14 Payaso does something with the gun?

15 A    He had it pointed towards Baby Blue.

16 Q    Then what happened?

17 A    He tried to pull the trigger, but the gun got stuck.

18 Q    Then what happened?

19 A    He gave the gun to Boxer.

20 Q    By *he*, who is *he*?

21 A    Payaso gave the gun to Boxer.  And Boxer gave a

22 machete to Payaso.

23 Q    Then what happened?

24 A    Payaso started stabbing Baby Blue.

25 Q    Then what happened?

1    A    Baby Blue fell to the ground and asked not to be

2    killed.  But Payaso kept stabbing him.  And he kept

3    saying, *die chavala*, *die leva*.

4    Q    L-E-V-A?

5    A    Well, sort of treating the person like if this person

6    was from a rival gang.

7    Q    Now, did Payaso tell you what the other people on the

8    beach were doing at this time?

9    A    Stabbing him -- correction, supporting him.

10   Q    Did there come a time when Payaso indicated that Baby

11   Blue didn't get up?

12              MS. RANTALA:  Objection, leading.

13              THE COURT:  Sustained.

14   BY MR. TIERNEY:

15   Q    What happened next?

16   A    Well, Payaso kept stabbing Baby Blue to the point

17   that Baby Blue turned around and then he actually stabbed

18   him in his eye, around the bone around the eye.

19   Q    After Payaso stabbed Baby Blue in the eye, what

20   happened?

21   A    They started walking and talking about Boxer,

22   Silencio, Payaso and Little Lonely.  They started walking

23   towards the car.

24   Q    And what happened as the group -- withdrawn.

25              As those individuals were walking towards the

1  car, where was Baby Blue?

2  A    Laying on the sand.

3  Q    Now, while Boxer, Silencio, Payaso and Little Lonely

4  are walking towards the car, what happens?

5  A    Boxer and Little Lonely are going ahead.  And Payaso

6  and Silencio go behind them.  When they are near the car

7  there was a patrol car parked right alongside Michichi's

8  car.

9  Q    And by *patrol car*, what do you mean?

10  A    A police car in the State of New York.

11  Q    And after the group that was walking back, observed

12  the police car, what happened?

13  A    They stood still and the police put on the lights.

14  And they had blood on their pants.  And that's why the

15  police came to them.

16  Q    And did he tell you who was arrested by the police

17  there?

18  A    Little Lonely, Boxer and Michichi.

19  Q    I'm just going do show you some photographs.

20        MR. LONDON:  Can I see them?  (Handing)

21  BY MR. TIERNEY:

22  Q    I'm just going to show you what has previously been

23  marked as 418A, 418B, 418C, 418N and 418G.

24        .  Just look through those.  And I ask you if

25  you recognize the individuals depicted in those pictures?

1    A    Yes, sir.

2    Q    And also, with regard to where those photographs were

3    taken, do you recognize that location?

4    A    At Payaso's building.

5    Q    And who is depicted in Government Exhibit 418A?

6    A    Boxer, Payaso and Carlito.

7    Q    And 418B?

8    A    Payaso, Boxer, Carlito and Little Lonely.

9    Q    And 418C, who is depicted in that photograph?

10   A    Payaso, Boxer, and Little Lonely and Gabriel.

11   Q    And 418G.

12   A    Little Lonely, Payaso, Carlito, Boxer and Gabriel.

13   Q    And 418N?

14   A    Little Lonely, and Payaso.

15   Q    And do you recognize the clothes that those

16   individuals were wearing?

17   A    Yes, sir.

18   Q    When do you remember them wearing those clothes?

19   A    The night of the mission -- correction -- of the

20   homicide of Baby Blue.

21   Q    And do these photographs fairly and accurately depict

22   the way those individuals looked on that night?

23   A    Yes, sir.

24             MR. TIERNEY: Your Honor, I would move Government

25   Exhibits 418A, 418N, 418G, 418B, and 418C in evidence at

1   this time.

2           MS. MACEDONIO:  May we have a moment?

3           THE COURT:  Sure.

4           (There was a pause in the proceedings.)

5           MR. LEVINE:  May I have a brief voir dire?

6           THE COURT:  Sure.

7

8   VOIR DIRE EXAMINATION

9   BY MR. LEVINE:

10  Q    Mr. Calderon, have you seen those pictures before

11  today?

12  A    First time I see them, sir.

13  Q    This is the very first time you've seen any of those

14  pictures?

15  A    Yes, sir.

16          MR. LEVINE:  No objection, your Honor.

17          THE COURT:  Okay 418A, B, C, G and N in

18  evidence.

19          (Government Exhibits 418A, 418B, 418C, 418G and

20  418N in evidence.)

21

22  DIRECT EXAMINATION  (Continued)

23  BY MR. TIERNEY:

24  Q    I'm putting up on the presenter 418A.

25          Who is this individual, who is, for the record

1  in the forefront of the picture to the right?

2  A    That's Boxer.

3  Q    And the person in the dark jacket next to Boxer.  Who

4  is that?

5  A    That's Payaso.

6  Q    And the person in the back, who's that?

7  A    That's Carlito.

8  Q    And 418B.  This individual in the lighter colored

9  jacket in the forefront, who's that?

10  A    That's Boxer.

11         THE COURT:  For the record, is that the person

12  going out the door?

13         MR. TIERNEY:  Going through the door, your

14  Honor?

15         THE COURT:  Right.

16  BY MR. TIERNEY:

17  Q    And the person behind that, the person in the gray

18  sweatshirt, who's that?

19  A    Carlito.

20  Q    And the person in the back, dressed all in blue.  Who

21  is behind the other three individuals?  Who's that?

22  A    Little Lonely.

23  Q    And for the record, 418C.  The individual in the gray

24  sweatshirt walking through the door.  Who's that?

25  A    Carlito.

1  Q    And the individual behind him all in blue.  Who's

2  that?

3  A    Little Lonely.

4  Q    And the individual all in -- in the back.  Who's

5  that?

6  A    Gabriel.

7            MR. TIERNEY: For the record 418G.

8  BY MR. TIERNEY:

9  Q    The person in the middle of the picture, facing the

10  camera.  Who's that?

11  A    Payaso.

12  Q    And the person to Payaso's left, who I'm pointing to.

13  Who's that?

14  A    Carlito.

15  Q    And the person to Carlito's left.  You can just see

16  the baseball hat.  Based on all of the pictures, who's

17  that?

18  A    Boxer.

19  Q    And the person to Boxer's left in the brown hat.

20  Who's that?

21  A    Gabriel.

22  Q    And the person to Gabriel's left, in the white

23  T-shirt.  Who's that?

24  A    Little Lonely.

25            MR. TIERNEY:  For the record, I'm showing the

1  witness 418N.

2  BY MR. TIERNEY:

3  Q    And the individual coming out through the doors to

4  the right side of the picture.  Who's that?

5  A    Payaso.

6  Q    And the person next to Payaso, who's that?

7  A    Little Lonely.

8  Q    Thank you.

9          Now, I believe you indicated that there came a

10  time when you were arrested.

11  A    Yes, sir.

12  Q    When was that?

13  A    March 21, 2010.

14  Q    And prior to your arrest on March 21st, did anything

15  happen?

16  A    I went to a meeting.

17  Q    Explain what happened.

18  A    The leader of my clique wanted to speak to me because

19  he wanted to know how all these things had happened.

20  Q    Who's to the leader of your clique?

21  A    Smokey.

22  Q    Smokey?

23  A    Yes.

24  Q    And what happened when Smokey wanted to talk to you?

25  A    He wanted to know everything that had happened

1  related to Baby Blue's death.  And he didn't agree to Baby

2  Blue's killing.

3  Q    So what if anything happened?

4  A    We had a meeting, and he had me speak to a member of

5  my clique of the MS-13 in El Salvador.

6  Q    And what person was that?

7  A    SLS.

8  Q    The SLS, you had a conversation with someone who

9  identified himself as a member of the SLS clique in El

10  Salvador?

11  A    Yes, sir.

12  Q    And what was said during this conversation?

13  A    That he was saying that there was a clique of the SLS

14  in El Salvador, and he was speaking to me so that he

15  could --

16        THE INTERPRETER:  Interpreter needs a

17  clarification.

18  A    And he was talking to me so that we all could be

19  saved from the results of the death of Baby Blue.

20  Q    Fair to say the SLS clique in El Salvador wasn't

21  happy about what happened to Baby Blue?

22  A    They were not happy.

23  Q    Now, later that day did you get arrested?

24  A    Yes, sir.

25  Q    And who were you arrested by?

1    A    FBI agents.

2    Q    And subsequent to your arrest that day, were you

3    informed of your rights from a card by the FBI?

4    A    Yes, sir.

5    Q    And did the FBI ask you questions about the murder of

6    the bouncer and your involvement in that murder?

7    A    Yes, sir.

8    Q    And did you waive your right to remain silent and

9    tell the FBI about your involvement in the murder of the

10   bouncer?

11   A    Yes, sir.

12   Q    In what language did you speak to the FBI agent?

13   A    In Spanish.

14   Q    Who did you speak to?

15   A    With the agent who is sitting behind you.

16   Q    Would you point him out?   What is he wearing?

17   A    I would have to stand up to look.

18   Q    What is he wearing?

19   A    A dark suit with a light blue shirt and a red tie.

20            MR. DURHAM:  The record will reflect that the

21   witness has picked out Special Agent Tariche.

22            THE COURT:  Yes.

23   BY MR. TIERNEY:

24   Q    Did you have any problems understanding Agent

25   Tariche?

1    A    No, sir.

2    Q    And in addition, did you tell Agent Tariche not only

3    about your involvement, but also about the involvement of

4    your co-conspirators?

5                MS. MACEDONIO:  Objection.

6                MR. LEVINE: Objection.

7                THE COURT:  Sustained.

8    BY MR. TIERNEY:

9    Q    What did you tell Agent Tariche?

10               MR. LEVINE: Objection.

11               THE COURT:  Yes.  Why don't you approach,

12   counsel.

13               (The following occurred at sidebar.)

14               THE COURT:  You can't elicit prior consistent

15   statements.  You haven't met the requirements for doing

16   that.  So you can't do that.  You can bring out that he

17   started cooperating.  But not knowing about who he

18   implicated or what he said.

19               MR. TIERNEY:  Very well, your Honor.

20               (The following occurred in open court.)

21   BY MR. TIERNEY:

22   Q    Did you begin cooperating with the agents and the

23   police that day?

24   A    Yes, sir.

25   Q    And when you were arrested, were you carrying your

1    phone?

2    A    I had already given it to them.

3    Q    Did you provide the agents with your phone number?

4    A    Yes, sir.

5    Q    And at the time that you provided the agents with

6    your phone number, did you know what your phone number was

7    back in March of 2010?

8    A    2413 I think is the last for digits.  And I think it

9    was a 347.

10   Q    At the time that you gave the agent your phone

11   number, did you execute a document that had your phone

12   number at the time on it?

13            MS. MACEDONIO:  Objection, your Honor.

14            THE COURT:  Are you trying to refresh his

15   memory?  Is that what you're trying to do?

16            MR. TIERNEY:  That's correct, your Honor.

17            THE COURT:  Okay, overruled.

18   A    Yes, sir.

19   BY MR. TIERNEY:

20   Q    And you gave the agent consent to search your phone?

21   A    Yes, sir.

22   Q    I'm showing you what has previously been marked as

23   Government Exhibit 3500-JC4.

24            Do you recognize that document?

25   A    Yes, sir.

1  Q    And is that the document you executed at the time of

2  your arrest granting the FBI permission to search your

3  phone?

4  A    Yes, sir.

5  Q    And at the time you executed that document, did you

6  know what your phone number was?

7  A    Not exactly.

8  Q    Did you verify what your phone number was when you

9  executed that document?

10  A    Yes, sir.

11  Q    And does that document refresh your recollection as

12  to what your phone number was back in March of 2010?

13  A    Yes, sir.

14  Q    What was your phone number back in March of 2010?

15  A    13479355423.

16  Q    Now since your arrest have you been in jail

17  continuously?

18  A    Yes, sir.

19  Q    And during that approximate three year period while

20  in jail have you been involved in any fights in jail?

21  A    Yes, sir.

22  Q    Do you know approximately how many?

23  A    More than five.

24  Q    And all of fights that you were involved with, who

25  did you fight with?

1   A    With other inmates.

2   Q    Did you use any weapons during any of these fights?

3   A    No, sir.

4   Q    Did you fight with any of the correction officers?

5   A    No, sir.

6   Q    And did you seriously injure anyone during these

7   fights?

8   A    No, sir.

9   Q    And did you receive any administrative punishment as

10  a result of being involved in these fights?

11  A    Yes, sir.

12  Q    Were you charged with any crimes in connection with

13  any of these fights?

14  A    No, sir.

15  Q    Also, in December of 2012 did you smoke marijuana

16  while you were in jail?

17  A    Yes, sir.

18  Q    Who did you get the marijuana from?

19  A    Through another member of the MS-13.

20  Q    And did you get in any trouble for smoking marijuana

21  in December of 2012?

22  A    No, sir.

23  Q    Why not?

24  A    Because I was aware of what I was doing.

25  Q    And did you get caught?

1   A    No.

2   Q    How did the US Attorney's office find out about that?

3   A    I told them myself.

4   Q    Now, after your arrest in March of 2010, were you

5   charged in federal court with the murder of the bouncer?

6   A    Yes, sir.

7   Q    And did you continue to cooperate with the government

8   after that arrest?

9   A    Yes, sir.

10  Q    And did you speak with the government with regard to

11  your involvement in the MS-13?

12  A    Yes, sir.

13  Q    And did you tell the government about your

14  involvement in the murders of Baby Blue and the bouncer?

15  A    Yes, sir.

16  Q    Did you also discuss the involvement of

17  co-conspirators?

18  A    Yes, sir.

19  Q    And initially were you charged as a juvenile with the

20  commission of the murder of the bouncer?

21  A    Could you repeat it with different words?

22  Q    When the bouncer died how old were you?

23  A    17 years old.

24  Q    And prior to pleading guilty to the commission of

25  that crime, did you waive prosecution as a juvenile?

1    A    Yes, sir.

2    Q    And thereafter as an adult did you plead guilty to

3    having conspired to murder the security guard, as well as

4    having murdered the security guard?

5    A    Yes, sir.

6    Q    Why did you do that?

7    A    Because that's what I did.  And I came to an

8    agreement with the government.

9    Q    Now, when you pled guilty, you pled guilty pursuant

10   to an agreement with the government?

11   A    Yes, sir.

12   Q    Showing you what has been marked as Government

13   Exhibit 62 for identification.

14        Take your time and take a look at that, and I

15   ask if you recognize that?

16   A    Yes.

17   Q    What do you recognize that to be?

18   A    Cooperation agreement.

19   Q    And is that the cooperation agreement that you

20   entered into with the United States?

21   A    Yes, sir.

22   Q    And on the last page did you sign that document?

23   A    Yes, sir.

24   Q    And what language is that document in?

25   A    In English.

1  Q    And prior to signing the document, was it translated

2  into Spanish for you?

3  A    Yes, sir.

4  Q    And the last page, does it have a date?

5  A    Yes, sir.

6  Q    What is the date of that agreement?

7  A    That's the same day when you pled guilty of all my

8  charges.

9  Q    What day is that?

10  A    June 14, 2010.

11        MR. TIERNEY:  Your Honor, I would move

12  Government Exhibit 62 in evidence at this time.

13        MR. LEVINE:  I have no objection.

14        MS. RANTALA:  No objection, your Honor.

15        THE COURT:  Government Exhibit 62 is in

16  evidence.

17        (Government Exhibit 62 in evidence.)

18  BY MR. TIERNEY:

19  Q    What are you required to do on your agreement?

20  A    To tell the truth and only the truth.

21  Q    And what do you hope to receive as a result of coming

22  to that agreement with the government?

23  A    Whatever Judge Bianco decides.

24  Q    Have you been sentenced yet?

25  A    No, sir.

1  Q    And do you know what judge is going to be sentencing

2  you?

3  A    Yes, sir.

4  Q    Who is going to be sentencing you?

5  A    Mr. Bianco.

6  Q    And when you say, *whatever Judge Bianco decides*, what

7  do you mean by that?

8  A    That he has the last word in terms of my sentence.

9  Q    And in that agreement, there is mentioned something

10  called a 5K letter.  Are you aware of that?

11  A    Yes, sir.

12  Q    And what is your understanding of what a 5K letter

13  is?

14  A    I'm sorry, could you repeat the question?

15  Q    What is a 5K letter?

16  A    It's an agreement that I made with the government.

17  Q    And the charges that you pled guilty to under that

18  agreement, do you recall what your mandatory minimum

19  sentence is?

20  A    Yes, sir.

21  Q    What is the minimum you could receive with regard to

22  the charges that you pled guilty?

23  A    Life.

24  Q    And is that what you receive if you do not get a 5K

25  letter?

1  A    Yes, sir.

2  Q    What is your understanding what will happen if you

3  get a 5K letter?  What could you be sentenced?

4  A    Whatever Mr. Bianco says.

5  Q    So conceivably you can get less than a life sentence?

6  A    That's something that only Mr. Bianco will decide.

7  Q    Is it required that you get a reduced sentence as a

8  result of that 5K letter?

9  A    No, sir.

10  Q    And when you're sentenced, what can the judge take

11  into consideration with regard to your sentence?

12  A    That I recognize my responsibility for my actions and

13  I always told the truth.

14  Q    And can the judge consider everything that you have

15  testified about with regard to your involvement, not only

16  with the bouncer but as well as Baby Blue's murder?

17  A    That's something that he will decide.

18  Q    Now what happens if you lie in this courtroom today?

19  A    They will rip up the agreement that I have with the

20  government.

21  Q    And what will your sentence be?

22  A    Life.

23  Q    Now, I just want to show you what has been marked in

24  evidence as Government Exhibit 41.

25        Do you recognize that person?

1  A    Yes, sir.

2  Q    Who's that?

3  A    That's Gringo.

4  Q    And 54.12 -- I'm sorry, 54.29.

5        Do you recognize that?

6  A    Yes, sir.

7  Q    And finally, who is 54.29, who is that?

8  A    Cruzito.

9  Q    And finally, Government Exhibit 120 in evidence.

10       Do you recognize who that is?

11  A    Yes, sir.

12  Q    Who's that?

13  A    Zorro.

14  Q    And did there come a time when you met that

15  individual?

16  A    Yes, sir.

17  Q    When did you meet Cruzito, Zorro and Gringo?

18  A    I don't remember the exact date, but happen in the

19  night when they were asking for help.

20  Q    And do you remember approximately when you met them

21  in relation to the murder of the bouncer?

22  A    It was a long while before that happened.

23  Q    And where did you meet these individuals?

24  A    Far Rockaway.

25  Q    And these individuals, were they a member of any

1  gang?

2  A    Yes, sir.

3  Q    What gang?

4  A    MS-13.

5  Q    How did you know that they were a member of the

6  MS-13?

7  A    They let me know that they were members Mara MS-13.

8  Q    And Gringo and Zorro, did they tell you what clique

9  they belonged to?

10 A    Yes, sir.

11 Q    What clique was that?

12 A    Gringo and Zorro belonged to the Karlington clique.

13 Q    Is that also known as KLS?

14 A    Yes, sir.

15 Q    And what about Cruzito, did he tell you what clique

16 he belonged to?

17 A    To the Coronados clique, CLS.

18 Q    And is that Boxer's clique?

19 A    Yes, sir.

20 Q    And you indicated that -- withdrawn.

21        And I believe you indicated that you met them in

22 Far Rockaway?

23 A    Yes, sir.

24 Q    Did you know why they were in Far Rockaway?

25 A    Yes, sir.

1  Q    Why were they in Far Rockaway?

2  A    They were fleeing from the place where they lived.

3  Q    And did you have a conversation with them with regard

4  to why they were fleeing?

5  A    Yes, sir.

6  Q    Who did you speak with?

7  A    With Gringo.

8  Q    And what did Gringo tell you with regard to why they

9  were fleeing?

10  A    Because they had committed a homicide, two people.

11  Q    They had killed two people?

12  A    Yes, sir.

13  Q    And did they, did Gringo tell you why they killed

14  those two people?

15  A    Yes, sir.

16  Q    What did he say?

17  A    Cruzito was a person who liked to frequent many

18  people, many women.  So he had a girlfriend, and this

19  girlfriend found that he was going out with another

20  person.  And she didn't like it.  And he decided to

21  eliminate him and he was killed.

22  Q    Did Gringo tell you what if anything the girl did to

23  Cruzito?

24  A    Yes, sir.

25  Q    What did Gringo tell you that the girl did to

1   Cruzito?

2   A    That she had brought over many rival members of the

3   18th Street gang to kill him.

4   Q    And did Gringo tell you why he, Zorro and Cruzito

5   killed the woman and the other person?  What did he say?

6   A    Yes.

7   Q    What did Zorro tell you?  What did Gringo tell you?

8   A    That the girl deserved it, to die.

9   Q    Now, did there come a time when you discussed those

10  murders with the defendant Boxer?

11  A    Yes, sir.

12  Q    And what if anything did Boxer tell you about that

13  murder?

14  A    That she deserved it.  And he was always in agreement

15  with the death of that girl, but not of the death of the

16  other person.

17  Q    Now did Boxer tell you why he believed the girl

18  deserved to die?

19  A    Because she had brought over members of a rival gang

20  to Cruzito's place to kill him.

21  Q    Now, did anyone ever tell you what weapons were used

22  to kill the girl and the other person?

23  A    Yes, sir.

24  Q    And who told you what weapons were used?

25  A    Gringo.

1  Q    And what did he tell you was used to kill the woman

2  and the other person?

3  A    The same weapon that was used to commit a homicide

4  for the security guard.

5  Q    Is that that silver 22?

6  A    Correct, sir.

7  Q    I'm just going to show you -- do you recognize that

8  photograph, sir?

9  A    It's myself.

10  Q    That's a picture of you?

11  A    Yes, sir.

12        MR. TIERNEY:  Your Honor, I move Government

13  Exhibit 54.1 1 in evidence at this time?

14

15  BY MR. TIERNEY:

16  Q    That is a picture of you?

17  A    Yes, sir.

18        MS. RANTALA:  I'm sorry, what was the exhibit

19  number of that?

20        MR. TIERNEY:  That 54.11.

21  BY MR. TIERNEY:

22  Q    I'm going to also show you 406.10, and 406.13.

23        Do you recognize what is depicted in those

24  photographs?

25  A    Yes, sir.

1264

1  Q    What is depicted in those photographs?

2  A    That was the machete that was used for the death of

3  Baby Blue.

4  Q    How do you know that?

5  A    Because they carried it that night.

6  Q    And have you, prior to that night had you ever seen

7  that weapon before?

8  A    Yes, sir.

9  Q    Where had you seen that weapon before?

10 A    At Little Lonely's house.

11 Q    And whose machete was that?

12 A    It was, it belonged to our clique, to the SLS.

13 Q    And did you, yourself, carry that weapon at one time?

14 A    Yes, sir.

15 Q    And when was, prior to your arrest, when was the last

16 time you saw that?

17 A    The night of the homicide of Baby Blue.

18        MR. TIERNEY: I would move 406.10 and 406 --

19 withdrawn.

20 BY MR. TIERNEY:

21 Q    And do those pictures fairly and accurately depict

22 the way that weapon appeared prior to your arrest?

23 A    Yes, sir.

24        MR. TIERNEY:  I would move them into evidence,

25 your Honor now, Government Exhibit 406.10 and 406.13.

1    MS. RANTALA:  No objection, your Honor.

2    THE COURT:  406.10 and 406.13 are in evidence.

3    (Government Exhibit 406.10 and 406.13 in

4  evidence.)

5  BY MR. TIERNEY:

6  Q    That's the machete?

7  A    Yes, sir.

8    THE COURT:  Which one is that?

9    MR. TIERNEY:  I showed 406.10 and I showed

10  406.13.  And for the record, those are the machete.

11  BY MR. TIERNEY:

12  Q    And those, the photograph is both sides of the

13  machete?

14  A    Yes, sir.

15  Q    Next I'm going to show you what has been marked as

16  407.20 for identification.

17    Do you recognize that?

18  A    Yes, sir.

19  Q    What do you recognize that to be?

20  A    That was the backpack that the weapon was in the

21  whole time.

22  Q    Now that appears to be the blue backpack that the

23  weapon was stored in?

24  A    Yes, sir.

25  Q    And that's the .22 caliber silver handgun?

1  A    Yes, sir.

2  Q    And when did you see that silver handgun being stored

3  in that blue bag?

4  A    Could you please repeat the question?

5  Q    When did you see that blue bag?  When did you see the

6  .22 caliber handgun inside of that bag?

7  A    The night of the security guard's death.

8  Q    And the evening before Baby Blue's death when you

9  went out on that mission to shoot a chavala, do you

10  remember when you went out with Baby Blue to shoot a

11  chavala?  Do you remember that?

12  A    Yes, sir.

13  Q    What weapon was Baby Blue supposed to use?

14  A    The same .22 caliber.

15  Q    Did you see where that gun was being stored that

16  night?

17  A    Yes, sir.

18  Q    Where?

19  A    In that same blue backpack.

20  Q    The photo of that blue backpack, did that fairly and

21  accurately show the way that backpack looked when you saw

22  it on those dates?

23  A    Yes, sir.

24       MR. TIERNEY:  I move into evidence now as

25  Government Exhibit 407.20.

1      MR. LEVINE:  No objection.

2      MS. RANTALA:  No objection, your Honor.

3      THE COURT:  407.20 is in.

4      (Government Exhibit 407.20 in evidence.)

5  BY MR. TIERNEY:

6  Q    For the record, that's the blue bag?

7      THE INTERPRETER:  Could you repeat the question

8  again, please?

9  Q    Is that the blue bag that you saw the weapon in those

10 two times?

11 A    Yes, sir.

12 Q    I'm going to show you what has previously been marked

13 as 407.21 for identification.

14      Do you recognize that?

15 A    Yes, sir.

16 Q    What do you recognize that to be?

17 A    That's where that weapon, the .22 was at all times.

18 Q    That 407.21, was that a cell phone box?

19 A    Yes, sir.

20 Q    And does that appear to be the same cell phone box

21 where the .22 weapon was stored prior to it being placed

22 inside of the blue bag?

23 A    Yes, sir.

24 Q    On what occasion did you see that cell phone box?

25 A    At the time of the death of the security guard and

1  Baby Blue's death.

2  Q    The night before Baby Blue's death and you were

3  riding in the car, you saw that cell phone box?

4  A    Yes, sir.

5            MR. LEVINE:  Objection, leading.

6            THE COURT:  I think he is just clarifying.

7            Overruled.

8  BY MR. TIERNEY:

9  Q    And does that picture fairly and accurately depict

10 the way that cell phone box looked to you when you saw it

11 on those two occasions?

12 A    Yes, sir.

13           MR. TIERNEY:  Your Honor, I would move

14 Government Exhibit 407.21 in evidence at this time.

15           MR. LONDON:  Can I just have a brief voir dire,

16 your Honor?

17           THE COURT:  Sure.

18

19 **VOIR DIRE EXAMINATION**

20 **BY MR. LONDON**:

21 Q    Looking at that photograph of that cell phone box, is

22 there anything about that cell phone box that makes it

23 different from every other cell phone box with the same

24 emblem on it?

25 A    Yes, sir.  There is a difference.

1  Q   What is that?

2  A   The brand name that appears on the box.

3  Q   But how is that brand name different from every other

4  brand name that appears with the same writing?

5  A   I said telephone.

6  Q   It's a cell phone box, isn't it?

7  A   Yes, sir.

8  Q   How is it different from every other -- cell phone

9  box manufactured by the same company?

10 A   The cell phone could have been another color.

11 Q   Are you identifying this as the box that you remember

12 seeing because the government is showing it to you?

13 A   No, sir.  That's a box that I saw that night at the

14 time of Baby Blue's death and the security guard's death.

15 Q   What makes this box distinctive in your mind from any

16 other box manufactured by the same company?

17 A   The telephone that is painted on the box could have

18 been a different color.

19 Q   A different color from what, sir?

20 A   The telephone that is depicted on the box could have

21 been black or red or any other color.

22 Q   How do you know that?

23 A   Because there are many companies that produce many

24 different phones?

25 Q   How many of these boxes do you believe have been

1   produced?

2           MR. TIERNEY:  Objection, your Honor.

3           THE COURT:  As you did with respect to other

4   exhibits, just wait until the other witness has testified

5   to offer it.

6           MR. TIERNEY:  That is fine, your Honor.

7           MR. LONDON:  They're withdrawing their offer?

8           THE COURT:  Yes.

9

10  DIRECT EXAMINATION  (Continued)

11  BY MR. TIERNEY:

12  Q    Government Exhibit 407.21, does that appear to be the

13  same cell phone box that you saw the .22 caliber handgun

14  being stored in?

15          MR. LONDON:  Objection.

16          THE COURT:  Overruled.

17  A    That is the box that I saw that night.  I'm sure that

18  that is the box.

19  BY MR. TIERNEY:

20  Q    Now, I'm going to show you what has been marked as

21  Government Exhibit 406.9.

22          Do you recognize that?

23  A    Yes, sir.

24  Q    What do you recognize that to be?

25  A    The .22 that was used for the death of Baby Blue and

1    for the security guard's death.

2              (Continued on the following page.)

1  BY MR. TIERNEY:

2  Q.   And does that photograph, 406.9, does that fairly and

3  accurately depict the way that that weapon appeared?

4  A.   Yes, sir.

5          MR. TIERNEY:  Your Honor, I would move 406.9 in

6  evidence at this time.

7          MS. MACEDONIO:  Can we be heard at sidebar?

8          THE COURT:  Yes.  It is time for a break anyway.

9          Let's take a break.  Don't discuss the case.

10          (The following ensued in the absence of the

11  jury.)

12          THE COURT:  Everyone can be seated.

13          So the objection is the same one as it was for

14  95?

15          MS. MACEDONIO:  Yes.

16          THE COURT:  I think, again to avoid voir dire

17  for this whole issue, the gun, what appears to be the gun,

18  I don't understand why you are eliciting that he

19  recognizes it.  But in terms of getting it in, why don't

20  we just wait until --

21          MR. TIERNEY:  That's fine, your Honor.

22          I would say that that goes to the weight and not

23  the admissibility, but I can do it either way.  That's

24  fine.

25          THE COURT:  How much more do you have, then?

1      MR. TIERNEY:  That's it.

2      THE COURT:  Okay.  So --

3      MR. TIERNEY:  I'm going to just ask him a couple

4  of questions with regard to this exhibit, and that will

5  be it.

6      THE COURT:  Okay.  And we'll go right into

7  cross.

8      (Recess taken from 3:20 pm until 3:40 pm.)

9      (The following ensued in the absence of the

10  jury.)

11      THE COURT:  Be seated, please.

12      MR. LONDON:  Your Honor, on a personal matter.

13      I just received a phone call from my wife that

14  my son-in-law's mother passed away this morning in

15  Florida.

16      The funeral is Thursday.  I don't know what

17  time.  If it is in the morning, I will have to miss the

18  morning session and I can be here in the afternoon.  If it

19  is in the afternoon, I can reverse.

20      THE COURT:  That is fine.

21      MR. LONDON:  But I will have to be at the

22  funeral.

23      THE COURT:  Fine.  I'm sorry to hear that.

24      MR. LONDON:  Thank you.

25      THE COURT:  Did you discuss that with your

1274

1  client?

2        MR. LONDON:  I was just about to when you came

3  in.

4        THE COURT:  Why don't you do that at the end of

5  the day and we will bring in the jury now.

6        (The following ensued in the presence of the

7  jury.)

8        THE COURT:  Go ahead, Mr. Tierney.

9        MR. TIERNEY:  With regard to the government's

10  application to move in Exhibit 406.9, the government would

11  withdraw that application.

12

13  DIRECT EXAMINATION (CONTINUED)

14  BY MR. TIERNEY:

15  Q.    But prior to the break, you indicated that you

16  recognized the gun depicted in 406.9, sir?

17  A.    Yes, sir.

18  Q.    Whose gun is that?

19  A.    It was the gun that belonged to the Coronado clique.

20  Q.    That is CLS?

21  A.    That's right, sir.

22  Q.    And just with regard to these pictures, 418A, 418B,

23  418C, 418G, and 418N.

24        You were never shown these photos but were you

25  shown the video?

1    A.    Yes, sir.

2    Q.    The FBI agent showed you the video.

3    A.    Yes, sir.

4              MR. TIERNEY:  Thank you.  I have nothing

5    further, your Honor.

6              THE COURT:  Cross-examination.

7

8    CROSS-EXAMINATION

9    BY MR. LEVINE:

10   Q.    Mr. Calderon, before today you and I have never met.

11   Right?

12   A.    No, sir.

13   Q.    We have never had any discussion about this case at

14   all before today.  Right?

15   A.    No, sir.

16   Q.    How many times did you meet with the prosecutors for

17   the government?

18   A.    More than five times, sir.

19   Q.    How many times did you meet with federal agents

20   without the prosecutors in the case?

21   A.    On the occasion when I was arrested, sir.

22   Q.    That was it?

23   A.    Yes, sir.

24   Q.    Okay.  Now, you signed a cooperation agreement on

25   June 14, 2010.  Right?

1    A.    Yes, sir.

2    Q.    And up to that point, you had been cooperating with

3    the government since your arrest on March 19 -- March 21,

4    2010.

5    A.    Yes, sir.

6    Q.    And on June 14, 2010, you also pleaded guilty.

7    Correct?

8    A.    Yes, sir.

9    Q.    Before Judge Bianco?

10   A.    Yes, sir.

11   Q.    You had your lawyer there?

12   A.    Yes, sir.

13   Q.    And your mother was there?

14   A.    Yes, sir.

15   Q.    And you even let your mother sit up at the table with

16   you and your lawyer.  Right?

17   A.    Yes, sir.

18   Q.    And you discussed the case with your mother a lot.

19   Right?

20   A.    Not a lot, sir.

21   Q.    Now, as part of the cooperation agreement you said

22   that you are required to tell the truth.  Right?  You are

23   required to tell the truth.

24   A.    Yes, sir.

25   Q.    And if you don't tell the truth, as far as you know

1   the agreement can be torn up.

2   A.   That's right.

3   Q.   And you would go to prison for life.

4   A.   Yes, sir.

5   Q.   And in that circumstance the judge would have

6   absolutely no discretion.  Right?

7   A.   I would imagine, sir.

8   Q.   Well, aren't you aware that the absolute minimum

9   sentence on the charge on which you pleaded guilty, the

10  murder in aid of racketeering, would be life?

11  A.   I'm sorry.  Could you repeat the question a different

12  way?

13  Q.   I believe you answered the government that the

14  minimum sentence you face for the charge of murder in aid

15  of racketeering was life.

16  A.   Yes, sir.

17  Q.   And life would mean life.  Right?

18  A.   Yes, sir.

19  Q.   Now, also in that agreement, your cooperation

20  agreement you signed with the government, it said that

21  you're not allowed to commit new crimes.  Right?

22  A.   Yes, sir.

23  Q.   And your understanding of it was that if you commit

24  new crimes, they can tear up the agreement.  Right?

25  A.   We have never mentioned that, sir.

1  Q.   What did you think the consequences would be if you

2  committed new crimes after signing the cooperation

3  agreement?

4  A.   That would be a decision up to the prosecutors.

5  Q.   Well, doesn't the cooperation agreement state that if

6  you do commit any new crimes after signing the cooperation

7  agreement, that they would not be bound to submit a 5K1

8  letter for you?

9  A.   Could you please repeat that question a different

10  way?

11  Q.   Well, is it your -- withdrawn.

12       The cooperation agreement that you signed with

13  the government says that you are not allowed to commit any

14  new crimes.  Right?

15  A.   That's right, sir.

16  Q.   And it says that if you do commit any new crimes,

17  that the government would no longer be bound by their

18  promise to submit a 5K1 letter for you.

19  A.   That's something that the prosecutor needs to

20  decide, sir.

21  Q.   So it is not your understanding?

22  A.   Yes, they let me know that, but that's a decision of

23  the prosecutors.

24  Q.   So as far as you are concerned, it doesn't really

25  mean what it says?

1279

1    MR. TIERNEY:  Objection.

2    THE COURT:  Sustained.

3  BY MR. LEVINE:

4  Q.   Now, you discussed the cooperation agreement with

5  your lawyer before signing it.  Correct?

6  A.   Yes, sir.

7  Q.   How many times?

8  A.   Many times.

9  Q.   And you went over it with him before you signed it in

10  court.  Right?

11  A.   Yes, sir.

12  Q.   And you signed it in court before Judge Bianco.

13  Right?

14  A.   Yes, sir.

15  Q.   Now, on June 21, 2010, you had a fight in Nassau

16  County jail.  Right?

17  A.   Yes, sir.

18  Q.   And that was a full seven days after you signed the

19  cooperation agreement.  Right?

20  A.   Yes, sir.

21  Q.   And as a result of that fight, you got disciplined by

22  the officials at Nassau County jail.  Right?

23  A.   Yes, sir.

24  Q.   And before they actually meted out the punishment,

25  they held a hearing at the Nassau County jail.  Right?

1    A.    Yes, sir.

2    Q.    And you got to present your side of things?

3    A.    Yes, sir.

4    Q.    And the officers at the Nassau County jail found you

5    guilty.

6    A.    Yes, sir.

7    Q.    And they gave you, on the June 21, 2010, fight,

8    14 days in lock-in.  Right?

9    A.    Yes, sir.

10    Q.    And they gave you another seven days because you

11    refused to obey a direct order by refusing to stop

12    fighting.  Right?

13    A.    I'm sorry.  Could you repeat the question a different

14    way?  I couldn't understand it.

15    Q.    Okay.  Resulting from the June 21 fight, you had

16    two charges.  Right?

17    A.    That's right.

18    Q.    One for fighting.  Right?

19    A.    Yes, sir.

20    Q.    And one for refusing to obey a direct order.

21    A.    Yes, sir.

22    Q.    And after a hearing, you were found guilty of both

23    charges.

24    A.    That's right, sir.

25    Q.    And then you got a sentence or a punishment for both

1    charges.

2    A.    Yes, sir.

3    Q.    For the fighting you got 14 days lock-in.  Right?

4    A.    Yes, sir.

5    Q.    And for the refusing to obey a direct order, you got

6    seven days lock-in.  Right?

7    A.    Yes, sir.

8    Q.    Those were a total of 21 days locked in.

9    A.    Yes, sir.

10   Q.    And locked in means you are locked into your cell?

11   A.    Yes, sir.

12   Q.    Then two days later, on June 23, you had another

13   fight.  Right?

14   A.    I imagine so, sir.

15   Q.    Well --

16   A.    I don't remember the exact date, but I think so.  I

17   was involved in a fight.

18   Q.    Well, wasn't it just two days after your previous

19   fight?

20   A.    No, sir.

21   Q.    Would seeing your disciplinary reports refresh your

22   recollection?

23   A.    I would imagine so, sir.

24              MR. LEVINE:  May I approach, your Honor?

25   A.    When did this happen?

1  BY MR. LEVINE:

2  Q.   Do you see where it says *Incident Date*?

3  A.   Yes, sir.

4  Q.   Does that refresh your recollection that it occurred

5  on June 23, 2010?

6  A.   Yes, sir.

7  Q.   So this was your second fight at the jail within

8  nine days of signing your cooperation agreement.  Right?

9  A.   That's right, sir.

10  Q.   And again, you had two charges.  Right?

11  A.   Yes, sir.

12  Q.   Fighting.  Right?

13  A.   Yes, sir.

14  Q.   And refusing to obey a direct order.  Right?

15  A.   Yes, sir.

16  Q.   The direct order was stop fighting.

17  A.   Yes, sir.

18  Q.   And you had another hearing.  Right?

19  A.   Yes, sir.

20  Q.   And you were allowed to give your side of things at

21  that hearing.  Right?

22  A.   Yes, sir.

23  Q.   And you were found guilty of those two charges.

24  A.   Yes, sir.

25  Q.   And you received 18 days lock-in for the fighting.

1    Right?

2    A.    Yes, sir.

3    Q.    And seven more days for the refusal to obey the

4    direct order.

5    A.    Yes, sir.

6    Q.    That's for a total of 25 days lock-in for the June 23

7    incident.

8    A.    Yes, sir.

9    Q.    And that was to run after you finished your 21 days

10   that had previously been imposed.

11   A.    Yes, sir.

12   Q.    By the way, when you entered the jail originally,

13   were you given a handbook with rules?

14   A.    Yes, sir.

15   Q.    And you knew that the rules included no fighting.

16   Right?

17   A.    Yes, sir.

18   Q.    And that you have to obey orders given to you by the

19   corrections officers.  Right?

20   A.    That's right, sir.

21   Q.    On June 21, after you got into the fight, did you

22   call anybody at the US Attorney's office and tell them

23   that you had just been in a fight?

24   A.    I don't remember that.

25   Q.    And on June 23, after you had that fight nine days

1284

1    after you signed the cooperation agreement, did you call

2    anybody at the US Attorney's office and say I just had my

3    second fight since signing the agreement?

4              MR. TIERNEY:  Objection.

5              THE COURT:  Overruled.

6    A.   I don't remember doing that, sir.

7    BY MR. LEVINE:

8    Q.   Then on July 4, 2010, you were still in lock-in.

9    Right?

10   A.   Yes, sir.

11   Q.   And you started banging on the wall of your cell.

12   Right?

13   A.   Yes, sir.

14   Q.   And the corrections officer told you to stop.  Right?

15   A.   Yes, sir.

16   Q.   And you kept banging.

17   A.   Yes, sir.

18   Q.   And they told you to stop and you kept banging?

19   A.   Yes, sir.

20   Q.   And then you had a chance for a hearing in that

21   matter, also.  Right?

22   A.   Yes, sir.

23   Q.   But that one you waived your right to a hearing.

24   Right?

25   A.   I don't remember doing that, sir.

1  Q.   Okay.  You were given another 16 days in lock-in for

2  that.  Right?

3  A.   I would imagine so, sir.

4  Q.   You were finally let out of lock-in on August 6 --

5  I'm sorry, August 22 of 2010.  Right?

6  A.   I would imagine so, sir.

7  Q.   And then, less than two months later, you had another

8  fight with another inmate.  Right?

9  A.   Yes, sir.

10  Q.   On October 18, 2010?

11  A.   I don't remember the exact date, sir.

12  Q.   Do you remember getting 31 days more of lock-in?

13  A.   Yes, sir.

14  Q.   And you also lost commissary for a week.  Right?

15  A.   That's right, sir.

16  Q.   And that took you to -- from October 18, you were

17  supposed to get out of lock-in on November 18.  Right?

18  A.   I would imagine so, sir.

19  Q.   While you were still in lock-in, on November 9 you

20  had another fight with another inmate.

21  A.   Yes.

22  Q.   And you got another ten days of lock-in.

23  A.   Yes, sir.

24  Q.   Now, those were all at the Nassau County jail.

25  Right?

1  A.    All the fights?

2  Q.    Those fights that we just discussed from June 21

3  through November 9, 2010.

4  A.    Yes, sir.

5  Q.    And at some point you were moved to the Queens

6  private detention facility.  Correct?

7  A.    That's right, sir.

8  Q.    And on May 20, 2012, at the Queens private detention

9  facility, you got into another fight.  Right?

10  A.    Yes, sir.

11  Q.    And in that one you attacked an inmate after you

12  thought he said something about your girlfriend.

13  A.    Yes, sir.

14  Q.    And even after that person complied with the order of

15  the corrections officers, you continued to try to go after

16  him.  Right?

17  A.    Could you repeat that question, please?

18  Q.    Even after the person you attacked complied with the

19  orders not to fight, you continued to try to go after him.

20  A.    Yes, sir.

21  Q.    Have you -- since May 20, 2012, how many other fights

22  have you had?

23  A.    None that I can think of, sir.

24  Q.    You said you received marijuana in jail from another

25  MS-13 member.

1  A.    Yes, sir.

2  Q.    Was that Carlito?

3  A.    No, sir.

4  Q.    Now, you know that smoking marijuana, by itself, is a

5  crime in New York.  Right?

6  A.    Yes, sir, I know that.

7  Q.    And you know that possessing marijuana in a jail is a

8  crime.  Right?

9  A.    Yes, sir.

10 Q.    Now, in December 2012 you smoked marijuana at the

11 jail.  Right?

12 A.    Yes, sir.

13 Q.    And you have been locked up for 35 months.  Right?

14 A.    That's right, sir.  That's so.

15 Q.    And you used to smoke marijuana fairly regularly when

16 you were not in jail.  Right?

17 A.    That's right, sir.

18 Q.    Okay.  And you are saying that you only smoked

19 marijuana that one time, in December of 2012; never smoked

20 it again in those 35 months.

21 A.    That's right, sir.

22 Q.    And you told that to the government last Friday.

23 Right?

24 A.    That's right.

25 Q.    Because they asked you?

1  A.   No, sir.

2  Q.   They didn't ask you?

3  A.   No, sir.

4  Q.   So in December of 2012 you knew what you were doing

5  was in violation of your cooperation agreement.  Right?

6  A.   I didn't know that, sir.

7  Q.   You didn't realize that smoking marijuana in jail was

8  a violation of your cooperation agreement?

9  A.   I didn't know that, sir.

10  Q.   Okay.  Your cooperation agreement says you can't

11  commit any new crimes.  Correct?

12  A.   That's what it says, sir.

13  Q.   And you know that smoking marijuana, even on the

14  street, would be a crime.  Correct?

15  A.   Yes, sir.

16  Q.   And you knew that smoking marijuana in jail was a

17  crime.

18  A.   Yes, sir.

19  Q.   So didn't you know that smoking marijuana in the jail

20  in December 2012 was a violation of your cooperation

21  agreement?

22  A.   No, sir.

23  Q.   Okay.  So when you told it to the government on

24  Friday, you didn't realize that you were telling them that

25  you had violated your cooperation agreement.

1    A.    Could you repeat that in a different way, please?

2    Q.    Sure.

3          When you told the government on Friday that you

4    had smoked marijuana at the jail in December of 2012, you

5    didn't realize that you were actually telling them that

6    you had violated your cooperation agreement.

7    A.    I am sorry, but I just don't understand you.  I don't

8    understand you.

9    Q.    You didn't know it was a crime, you said.  Right?

10   A.    No, I didn't know that it was a crime to smoke

11   marijuana, sir.

12   Q.    But you didn't know that it was a violation of your

13   cooperation agreement.  (Sic)

14   A.    No, sir.

15   Q.    So when you didn't know, when you admitted to the

16   government that you smoked marijuana at the jail, as far

17   as you were concerned you were not telling them that you

18   had violated your cooperation agreement.

19   A.    I still don't understand you, sir.

20   Q.    All right.  Now, aside from the assault that you had

21   or the fight that you had in jail, you got into a lot of

22   fights before you went to jail.  Right?

23   A.    That's right, sir.

24   Q.    Would you say you told the government somewhere

25   between 10 and 15 fights?

1   A.   Yes.  More than ten, sir.

2   Q.   Do you know when those fights occurred?

3   A.   No, sir.

4   Q.   Were they before you got jumped into MS-13 or after?

5   A.   Before and some after.

6   Q.   You often carried a machete or a knife with you when

7   you knew there was going to be a fight.

8   A.   Yes, sir.

9   Q.   Because your purpose in fighting the chavalas was not

10  just to have a fight with them but to hurt them.

11  A.   Yes, sir.

12  Q.   And to hurt them as badly as you could.

13  A.   Yes, sir.

14  Q.   But your testimony on direct examination was that,

15  even though you took knives and machetes to these fights,

16  you never used them.

17  A.   That's right, sir.

18  Q.   Okay.  You just left them in the car?  Or what?

19  A.   I had them on me, sir.

20  Q.   Okay.  And when you were at the laundromat, you

21  saw -- you said you were at the laundromat with your

22  mother at one point.  Right?

23  A.   Yes, sir.

24  Q.   And you saw the Bloods and 18th Street?

25  A.   Yes, sir.

1    Q.    When did that occur?

2    A.    I don't remember the exact date, but I remember it

3    was a Saturday morning, sir.

4    Q.    Well, was it before you got jumped in or after you

5    got jumped in?

6    A.    Before, sir.

7    Q.    And so you called a couple of your buddies to come

8    and help you out.  Right?

9    A.    Yes, sir.

10   Q.    And Carlito came?

11   A.    Yes, sir.

12   Q.    And Speedy came?

13   A.    That's right, sir.

14   Q.    Anybody else?

15   A.    Payaso also did.

16   Q.    And they came with weapons.  Right?

17   A.    Yes, sir.

18   Q.    And Speedy came with an ice pick?

19   A.    Carlito was the one carrying the ice pick.

20   Q.    You said that Speedy stabbed one of the men from the

21   Bloods?

22   A.    Yes, sir.  Because Speedy grabbed it from him.

23   Q.    Speedy grabbed the ice pick from Carlito?

24   A.    Yes, sir.

25   Q.    And one of them used a rock to hit one of the other

1    guys over the head?

2    A.   That's right, sir.

3    Q.   You didn't pick up any rocks?

4    A.   Yes, I did, sir.

5    Q.   Okay.  You didn't hit anybody with it?

6    A.   I tried but I could not do it.

7    Q.   What does that mean?

8    A.   I threw the rock but I didn't hit anybody.

9    Q.   Did you pick up another rock?

10   A.   No, sir.

11   Q.   And the three of you, or the four of you chased these

12   rival gang members.  Right?

13   A.   That's right, sir.

14   Q.   Even when they ran away -- withdrawn.

15        When they ran away, you didn't feel cornered any

16   more.  Right?

17   A.   No, sir.

18   Q.   And you didn't turn around and go home.  Right?

19   A.   No.

20   Q.   The four of you chased them with rocks and an ice

21   pick.

22   A.   That's right, sir.

23   Q.   You have no idea how serious the injury was with the

24   ice pick, do you?

25   A.   No, sir.

1    Q.    You didn't stick around for the police.  Right?

2    A.    No, sir.

3    Q.    You didn't see whether an ambulance came.  Right?

4    A.    No, sir.

5    Q.    You didn't call up the hospitals to see whether he

6    was in a hospital someplace.  Right?

7    A.    No, sir.

8    Q.    You didn't send him a get-well card.  Right?

9              MR. TIERNEY:  Objection.

10              THE COURT:  Sustained.

11   BY MR. LEVINE:

12   Q.    So you have no idea whether that person was actually

13   seriously injured or not.

14   A.    No, sir.

15   Q.    And the person who got hit in the head with a rock by

16   Carlito, you have no idea how seriously that person got

17   hurt, either.  Right.

18   A.    No, sir.

19   Q.    And you took part in other assaults also.  Right?

20   With baseball bats?

21   A.    That's right, sir.

22   Q.    When was that?

23   A.    When I was about 15.

24   Q.    So that was also before you were a member of MS-13.

25   A.    Yes, sir.

1  Q.    Who were you with -- withdrawn.

2            When you used the baseball bat, did you actually

3  personally have a baseball bat in your hands?

4  A.    Yes, sir.

5  Q.    And did you hit somebody with the baseball bat?

6  A.    No, sir.

7  Q.    Did you miss them again?

8  A.    I didn't use it, sir.

9  Q.    Did your friends go also with baseball bats?

10  A.    That one was the only bat that was around that

11  day, sir.

12  Q.    Now, you testified earlier that you are actually a

13  member of MS-13.  Right?

14  A.    Yes, sir.

15  Q.    And there is a difference between members and

16  associates.  Right?

17  A.    What do you mean?  I don't understand your question.

18  Q.    Well, there are members of MS-13 and there are

19  associates of MS-13.

20  A.    Yes, sir.

21  Q.    And those are not the same thing.  Right?

22  A.    No, sir.

23  Q.    So there are people like Michichi, for example, who

24  is an associate but not a member.  Right?

25  A.    That's right, sir.

1295

1    Q.    Now, you told us that you were jumped in, and thus

2    becoming a member, on Halloween 2009.  Is that right?

3    A.    Yes, sir.

4    Q.    So as of the time of your arrest, on March 21, 2010,

5    you had already been a member for four months?  Five

6    months?

7    A.    Yes, sir.

8    Q.    You didn't forget you were a member.  Right?

9    A.    I knew that I was a member of the gang, sir.

10   Q.    And on March 21 you had a conversation, after you got

11   arrested, with some agents.  Right?

12   A.    Yes, sir.

13   Q.    And on March 21 you started cooperating with them.

14   Right?

15   A.    Yes.

16   Q.    You made up your mind on that date that you were

17   going to be truthful and honest with the agents.  Right?

18   A.    Yes, sir.

19   Q.    And didn't you tell those agents on March 21, 2010,

20   that you, in fact, were not a member of MS-13?

21   A.    That's right, sir.

22   Q.    And you continued that lie -- withdrawn.

23         That was a lie, right?

24   A.    Yes, sir.

25   Q.    And you continued that lie consistently when you met

1  with the government.  Right?

2  A.  Yes, sir.

3        MR. TIERNEY:  Objection.

4        THE COURT:  Overruled.

5  BY MR. LEVINE:

6  Q.  You told that lie to the government several times

7  during the course of your cooperation.  Right?

8  A.  Could you repeat that question in a different way,

9  please?

10  Q.  You met with the government several more times after

11  March 21, 2010.

12  A.  Yes, sir.

13  Q.  And during those meetings, you told that same lie,

14  that you were not a member of MS-13.

15  A.  That's right, sir.

16  Q.  In fact you continued that lie even after you signed

17  the cooperation agreement.  Right?

18  A.  That's right, sir.

19  Q.  This cooperation agreement said that you have to be

20  truthful and honest and tell them everything.  Right?

21  A.  Yes, sir.

22  Q.  And that if you are not truthful with them, they can

23  tear up the agreement.  Right?

24  A.  Yes, sir.

25  Q.  And yet, when you signed the cooperation agreement

1  you were still telling them that you were not a member.

2          MR. TIERNEY:  Objection, your Honor.

3          THE COURT:  Overruled.

4  A.   Yes, sir.

5  BY MR. LEVINE:

6  Q.   In fact you had them alter the cooperation agreement

7  to refer to *members or associates*?

8          MR. TIERNEY:  Objection, your Honor.

9          May we approach.

10         THE COURT:  Why don't we end for the day.  It is

11 4:28.  We will reconvene tomorrow morning at 9:30.

12         We are going to follow the Tuesday schedule,

13 which that we would end at 3:30 and take a late lurch.

14         Don't discuss the case.  Don't read or listen to

15 anything regarding the case.

16         Have a good night.

17         (The following ensued in the absence of the jury

18 at 4:28 pm.)

19         THE COURT:  Everyone, please be seated.

20         Go ahead, Mr. Tierney.  What is the objection?

21         MR. TIERNEY:  Just with regard to, with regard

22 to the verbiage that was added in the plea agreement.

23 That was done at the request of this defendant's counsel.

24         THE COURT:  Well, I don't remember if that

25 occurred at the time of the plea or that was before it was

1  on the record when that happened or before.

2      MR. TIERNEY:  There is a -- there is a

3  handwritten addendum in the plea agreement, which was

4  added at the request of the defense counsel, which says he

5  was a member, and then in pen it says *or associate*.  That

6  was done at the behest of the defense.

7      THE COURT:  I'm not sure.  I think you are

8  missing the point here.

9      The point is not whose behest it was done at.

10  He acknowledged that he continued to lie about his

11  membership through the time of the plea, and I think

12  Mr. Levine is trying to bring out the fact of whether it

13  was the lawyers or him altered the government plea

14  documents to reflect the lie.

15      Is that the point?

16      MR. LEVINE:  You said it better than I could,

17  judge.

18      THE COURT:  Okay.  So if you want, you can bring

19  out on redirect that his lawyer asked.  But I'm not sure

20  how much good that would be, given the point that is

21  trying to be made.  Okay.

22      I think we went through a number of witnesses.

23  Tomorrow will be the same order, when Mr. Calderon is done

24  the same witnesses at least?

25      MR. DURHAM:  We may ask the court's permission

1 and defense counsel's permission tomorrow morning to call

2 a couple of witnesses out of order. Two medical examiners

3 who are on a tight timeline tomorrow. I already spoke

4 with Ms. Macedonio about it. I've not had an opportunity

5 to speak to other counsel. That would be Dr. Hall and Dr.

6 Catanese.

7 THE COURT: You want to call them first thing in

8 the morning?

9 MR. DURHAM: They're Ms. Capwell's witnesses.

10 She has had the direct contact with them. I was going to

11 speak with her and with defense counsel.

12 THE COURT: Relatively brief, I assume.

13 MR. DURHAM: Relatively.

14 Dr. Hall will testify to the fact that she

15 performed the autopsy on David Sandler as well as Vanessa

16 Argueta and Diego Torres. Three different autopsies she

17 has to testify to. Dr. Catanese did the autopsies with

18 respect to Nestor Moreno.

19 Obviously, given the court's ruling we're going

20 to be very cautious as we proceed with respect to David

21 Torres, and we will streamline that as much as possible.

22 But they're relatively, I think, brief witnesses.

23 However, I can sense that Mr. Calderon may be on

24 the stand for quite some time, so our proposal would be --

25 one moment, your Honor.

1    (Government counsel confer.)

2    MR. DURHAM:  Our proposal would be that, because

3  we have already had the medical examiners adjust their

4  schedules several times due to the delays last week, we

5  would ask to start the day tomorrow with the testimony of

6  the medical examiners and then resume cross of

7  Mr. Calderon.

8    THE COURT:  Any objection to that?

9    MR. LEVINE:  I have no objection.

10   MS. RANTALA:  No objection, your Honor.

11   THE COURT:  So that is what we will do.

12   Then other witnesses you say after Mr. Calderon,

13 who I hope we will finish.  And then after him will be the

14 government witnesses you named on Thursday.

15   MR. DURHAM:  Yes, your Honor.  Detective

16 DePietro and Detective Aponte.  In fact, given the fact

17 we're breaking at 3:30, we probably won't even get through

18 all that tomorrow.

19   THE COURT:  Any other issue for tonight?

20   Mr. London, can you take a minute to speak to

21 your client to make sure it's okay about Thursday?

22   MR. LONDON:  Thank you, judge.

23   (There was a pause in the proceedings.)

24   MR. LONDON:  My client is okay with that.

25   THE COURT:  Mr. Ortega, you know Mr. London has

1  a scheduling issue, a death in the family on Thursday.

2  I want to confirm that you are okay, as we did

3  last week, with proceeding on that day.  He may be here

4  for a part of the day.  He is going to do his best to be

5  here for part of the day if he can.

6  But are you willing to go forward on Thursday

7  with Miss Rantala if he is not available?

8  DEFENDANT ORTEGA:  Yes.

9  THE COURT:  Have a good night.

10  (Proceedings adjourned at 4:35 pm.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

**SANTOS JOEL CALDERON**                                    1151
DIRECT EXAMINATION                                         1151
MR. TIERNEY
VOIR DIRE EXAMINATION                                      1176
BY MR. LEVINE:
DIRECT EXAMINATION   (Continued)                           1179
MR. TIERNEY
DIRECT EXAMINATION   (Continued)                           1232
BY MR. TIERNEY
DIRECT EXAMINATION   (Continued)                           1232
BY MR. TIERNEY
VOIR DIRE EXAMINATION                                      1244
BY MR. LEVINE:
DIRECT EXAMINATION   (Continued)                           1244
BY MR. TIERNEY
**VOIR DIRE EXAMINATION**                                  **1268**
**BY MR. LONDON**
**DIRECT EXAMINATION   (Continued)**                       **1270**
**BY MR. TIERNEY**
**DIRECT EXAMINATION   (Continued)**                       **1270**
**BY MR. TIERNEY**
**DIRECT EXAMINATION (CONTINUED)**                         **1274**
**BY MR. TIERNEY**
**CROSS-EXAMINATION**                                      **1275**
**BY MR. LEVINE**

<u>EXHIBITS</u>

Government's Exhibits 405.58 and 405.59 in               1166
evidence
Government's Exhibit 54.1 in evidence                    1167
Government Exhibit 333 in evidence                       1209
Government Exhibit 340 in evidence                       1214
Government Exhibits 418A, 418B, 418C, 418G               1244
and 418N in evidence
Government Exhibit 62 in evidence                        1256
Government Exhibit 406.10 and 406.13 in                  1265
evidence
Government Exhibit 407.20 in evidence                    1267